## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| The United States of America,<br>ex rel., Andrew M. Garner, III,<br>and Andrew M. Garner, III, individually, | ) ) ) | |
| | ) | Case No. 1:00CV463 |
| Plaintiffs, | ) ) | SENIOR JUDGE S. ARTHUR SPIEGEL |
| v. | ) ) | |
| Anthem Insurance Companies, et al. | ) ) | |
| | ) ) | |
| Defendants. | ) | |

### RELATOR'S MEMORANDUM IN OPPOSITION TO
### UNITED STATES' NOTICE OF DISMISSAL AND SETTLEMENT

### HEARING REQUESTED IN ACCORD WITH 31 U.S.C. § 3730(c)(2)(A) and (B)

Timothy Keller
Illinois Bar #6225309
Aschemann Keller LLC
108 West Jackson Street
Marion, Illinois 62959
Telephone: (618) 998-9988
Facsimile: (618) 998-0796
E-Mail: tkeller@quitamlaw.org
*Counsel for Relator*

Paul Martins (0007623)
Helmer, Martins, Rice & Popham Co., L.P.A.
Fourth & Walnut Centre, Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202
Telephone: 513) 421-2400
Facsimile: (513) 421-7902
E-Mail: pmartins@fcalawfirm.com
*Trial Counsel for Relator*

## <u>TABLE OF CONTENTS AND SUMMARY</u>

**RELATOR'S MEMORANDUM IN OPPOSITION TO
UNITED STATES' NOTICE OF DISMISSAL**

Page

**I.   INTRODUCTION** ..................................................................................................2

Congress expressly afforded the False Claims Act relator authority to object to any settlement reached by the Government and a defendant.  Upon such an objection, Congress required a judicial hearing whereby the Government would be required to establish that its proffered settlement is "fair, adequate, and reasonable."

Unlike other civil cases, the Government cannot settle and dismiss this case without this Court's specific approval.  The Government, however, has made no effort to demonstrate to the Court that the proposed settlement is fair, adequate and reasonable, but rather simply chose to "notify" the court it was dismissing the action.

**II.   DISCUSSION** ...................................................................................................3

   **A.   Defendants' Contracts with OPM** ..................................................................3

Mr. Garner's allegations relate to the Defendants' management and administration of two OPM contracts with the Office of Personnel Management ("OPM") for health insurance provided to former and current federal employees and their dependents.

   **B.   Relator's Allegation** ...............................................................................5

Relator alleges that Defendants submitted numerous false claims for payment to the United States related to the FEP and HMP contracts with OPM.

**III.   RELATOR'S OBJECTIONS**.................................................................7

Relator objects to Government counsel's proffered settlement for the following reasons.

   **A.   Dismisses Counts and Allegations for no Consideration**.......................8

The government's counsel's attempted dismissal applies to all counts and allegations of the complaint even though Mr. Alderson's correspondence admits that defendant is only providing consideration as to allegations contained in one Count of the Relator's complaint that relate to PrintMail's and APM's improper inclusion of profits in the charges submitted to OPM.

   **B.   Does not even Equal Single Damages for the APM Fraud**................8

The amounts paid to resolve the allegations against APM are wholly inadequate and unreasonable since the $578,000 does not even amount to single damages.

   **C.   Fails to Recite Total Consideration**...........................................17

The Settlement Agreement does not state the total amount of consideration received by the Government in that it fails to account for previous payments already made by the

Page

Defendants and does not quantify Defendants' waiver of claims to reimbursement they allege are due.  The Government has a duty to advise the Relator of the value of these additional items of consideration.  *U.S. v. U.S. ex rel Thornton*, 207 F.3d 769, 773 (5th Cir., 2000).

**D.      Doesn't Provide for Investment Income or Return of Bonus
          Service Charges**...........................................................................20
The proposed Settlement fails to provide for prejudgment interest or for disgorgement of bonuses.

**E.      Fails to Impose Civil Penalties though such Imposition is Clearly
          Warranted**……………………………………………………..……...22
Section 3729(a) of the False Claims Acts provides that Defendants that submit false claims to the Government are liable for civil penalties.

**IV.     THE FALSE CLAIMS ACT**…………………………………….…..22

**A.      The Role of the *Qui Tam* Relator in False Claims Act
          Litigation**………………………………………………………....22
Congress enacted the False Claims Act in 1863 to deal with fraud against the United States committed by defense contractors during the Civil War.  See S. Rep. No. 345, 99th Cong., 2d Sess. 8-10 (1986), *reprinted in* U.S.C.C.A.N. 5266, 5273-75.  *See also United States ex rel. Roby v. The Boeing Co.,* 995 F. Supp. 790, 795 (S.D. Ohio, 1998), *aff'd on other grounds*, 302 F.3d 637 (6th Cir.), *cert denied*, 539 U.S. 969, 123 S. Ct. 2641, 156 L. Ed.2d 675 (2003).  In 1986 Congress amended the False Claims Act in recognition of the valuable role citizens could play in stopping contractor abuse. *Id.* Relators are neither mere place-holders for the Government nor mere conduits for the assertion of a Government claim.  They "continue" as "parties" entitled to "unrestricted participation" when the Government intervenes unless the Court decides otherwise.  31 U.S.C. § 3730(c)(2). The Sixth Circuit has likewise stated that the 1986 Amendments allow the qui tam relator to remain a party to the action even if the Government intervenes. *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 938 (6th Cir.), *cert. denied*, 522 U.S. 1077 (1997); *see also, United States ex rel. Klump v. Dynamics Corporation of America*, 1998 U.S. Dist. LEXIS 21930 (S.D. Ohio 1998).

This Court was the first to recognize a Relator's right to question the reasonableness of a proffered settlement, so ruling even before Congress amended the Act to specifically provide this right in 1986.  This Court's opinion in *U.S. ex rel. Gravitt v. General Electric Co.* gave rise in large part to the very statutory provision

<u>Page</u>

requiring that the Government establish that its proffered settlement is "fair, adequate, add reasonable."  680 F. Supp. 1162 (S.D. Ohio 1988), *appeal dismissed*, 848 F.2d 190 (6th Cir.), *cert. denied sub nom.*, *General Electric Co. v. United States*, 488 U.S. 901 (1988).  *See also,* James B. Helmer, Jr., *False Claims Act: Whistleblower Litigation*, § 1-1 (LexisNexis 3d ed. 2002).

**B.     Liability**…………………………………………………………..………..27
The False Claims Act imposes liability on persons or entities that "knowingly" present or cause to be presented to the Government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1).  The Act also imposes liability for "knowingly" making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government. 31 U.S.C § 3729(a)(2).  The "knowing" element is defined by the False Claims Act as "actual knowledge," acting in "deliberate ignorance," or acting in "reckless disregard" of the truth or falsity of the information in question.  31 U.S.C. § 3729(b).  No proof of specific intent to defraud is required.  *Id.*

The Sixth Circuit has consistently summarized the duty imposed by the False Claims Act as requiring government contractors to "turn square corners when they deal with the Government." U.S.C. § 3729(a)(2).

The evidence that Defendant continued to submit false annual certifications and failed to report and return all rebates due OPM for at least two years after receiving a copy of the Complaint clearly demonstrates their conduct during 2002 and 2003 was intentional. This conduct at the very least constitutes reckless disregard, which is all that is necessary to establish liability.

**C.     Damages**………………………………………………………....28
The False Claims Act requires the imposition of civil penalties as well as the trebling of damages suffered by the Government as a result of the actions of the defendant. 31 U.S.C. § 3729(a).  A Federal administrative increase effectuated in 1999 increases the civil penalty range for false claims made on or after September 29, 1999 to $5,500 to $11,000.
The limited information obtained by Relator without the benefit of conducting any formal discovery already indicates that Defendants have made at least 24 false statements, all of which are subject to the imposition of mandatory civil penalties.

**D.     Award to the Relator**………………………………………..………30
The False Claims Act rewards relators who bring *qui tam* actions by providing them a share in a percentage of "the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action."  31 U.S.C § 53730(d).

iii

Page

**E.     The Settlement Standard and Burden of Proof……………....…30**

The False Claims Act provides that the Government may settle an action over the Relator's objections only if there is: (1) a hearing; and, (2) a judicial determination that the proffered settlement between the Government and the defendant is fair, adequate and reasonable under all the circumstances. 31 U.S.C. § 3730(c)(2)(B).

As recognized by this court in *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 151 (S.D. Ohio, 1992), "The burden of proving the fairness of the settlement rests with the proponents." This Court should consider the judgment of experienced counsel for the parties in determining whether a proffered settlement is fair, adequate and reasonable. *Stotts v. Memphis Fire Dept.*, 679 F.2d 541, 554 (6th Cir. 1982); *Alvarado v. Memphis-Shelby County Airport Authority*, 2000 U.S. App. LEXIS 21259 (6th Cir. 2000). Government counsel's attempt to simply "Notify" this Court of his decision to settle and dismiss this action is specifically prohibited by §§ 3730(c)(2)(B) and 3730(c)(2)(A) of the False Claims Act. Government counsel should not benefit by his attempt to improperly utilize F.R.C.P. 41 to circumvent the applicable statute. Relator requests that this Court specifically find that the Government has the burden of proof in showing that the proposed settlement is fair, reasonable, and adequate under the circumstances.

**F.     The Relator's Right to Discovery……………………………….…32**

The False Claims Act unequivocally confers upon the Relator the right to object to the Government's proposed settlement as well as the right to a hearing to determine the fairness, adequacy, and reasonableness of the proffered settlement. 31 U.S.C. § 3730(c)(2)(B). The right to conduct limited discovery is a necessary corollary to Relator's right to object to the settlement. *United States ex rel. McCoy v. California Medical Review, Inc.*, 133 F.R.D. 143, 149 (N.D. Cal. 1990); *United States ex rel. Thornton v. Science Applications Int'l Corp.*, 207 F.3d 769, 771-73 (5th Cir. 2000).

In *United States ex rel. Gravitt v. General Electric Co.*, this Court sustained the Relator's objection to a proffered settlement and ordered that the Relator conduct limited discovery.

**VI.     CONCLUSION………………………………………………………34**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

The United States of America,     )
ex rel., Andrew M. Garner, III,     )
and Andrew M. Garner, III, individually,     )
         )   Case No. 1:00CV463
    Plaintiffs,    )
         )   SENIOR JUDGE S. ARTHUR SPIEGEL
    v.    )
         )
Anthem Insurance Companies, et al.    )
         )
         )
    Defendants.    )

## RELATOR'S MEMORANDUM IN OPPOSITION TO
## UNITED STATES' NOTICE OF DISMISSAL AND SETTLEMENT

### HEARING REQUESTED IN ACCORD WITH 31 U.S.C. § 3730(c)(2)(A) and (B)

Presently before the Court is the United States' Notice of Dismissal, pursuant to Fed. R. Civ. P. 41(a) and the terms of the attached Settlement Agreement, wherein the United States is attempting to summarily dismiss Counts I through IV of the action. The United States' attempt to simply provide the court with "Notice" of its intended dismissal violates specific provisions of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.* (hereafter "FCA") enacted by Congress to ensure that the Court supervise and review the United States' actions under the FCA.

A litigant's right to effectuate a voluntary dismissal under Rule 41(a) is subject to the provisions of "any statute of the United States." The FCA specifically provides the procedure to be followed by the United States when attempting to settle and/or dismiss *qui tam* actions. The Government may only:

    1)    dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion (31 U.S.C. § 3730(c)(2)(A)); and/or

    2)    settle the action with the defendant notwithstanding the objections of the person

initiating the action if the court determines, after a hearing, that the proposed settlement
is fair, adequate, and reasonable under all the circumstances (31 U.S.C. § 3730(c)(2)(B)).

Both of these cited provisions apply in this case since the Government is attempting to 1) dismiss

Counts II, III and IV of the complaint without prejudice even though Defendant is not paying

any consideration for the dismissal; and, 2) settle only a portion of the allegations contained in

Counts I and II with prejudice.

## I.    INTRODUCTION

Congress expressly afforded the False Claims Act relator authority to object to any

settlement reached by the Government and a defendant.  Upon such an objection, Congress

required a judicial hearing whereby the Government would be required to establish that its

proffered settlement is "fair, adequate, and reasonable."

Unlike other civil cases, the Government can not settle and dismiss this case without this

Court's specific approval.  The Government, however, has made no effort to demonstrate to the

Court that the proposed settlement is fair, adequate and reasonable, but rather simply chose to

"notify" the court it was dismissing the action.  In fact, the Government neither bothers to

explain to this Court what the settlement is nor even what the defendants' conduct was that

requires any settlement.

As will be discussed in detail below, the Relator objects to the proposed settlement for

the following reasons:

A.    Dismisses Counts and Allegations for no Consideration;.

B.    Does not even Equal Single Damages for the APM Fraud;

C.    Fails to Recite Total Consideration;

    D.      Does not Provide for Investment Income or Return of Bonus Service Charges; and

    E.      Fails to Impose Civil Penalties though such Imposition is Clearly Warranted.

## II.   DISCUSSION

### A.   Defendants' Contracts with Office of Personnel Management

Mr. Garner's allegations relate to the Defendant's management and administration of two contracts with the Office of Personnel Management ("OPM") for health insurance provided to former and current federal employees and their dependents (hereafter "Federal Employees"). The contracts at issue include a direct contract Defendants held with OPM to provide HMO style benefits to Federal Employees residing in Ohio referred to as the Health Maintenance Plan # CS 1659 ("HMP") and a second contract between the Blue Cross Blue Shield Association ("BCBSA") and OPM known as the Blue Cross and Blue Shield Service Benefit Plan and commonly referred to as the Federal Employee Program ("FEP"). As a licensee of BCBSA, Defendants contracted to provide benefits to FEP Federal Employees residing in Ohio, Kentucky, and Indiana as a participating plan under the FEP contract. Copies of these contracts are attached hereto as Exhibits A and B.

Both of these contracts are cost reimbursement contracts with a limited profit component known as the service charge, which was based in large part on Defendants meeting certain performance goals outlined generally in §§ 1.9 of the contracts. Both contracts clearly required that Defendants select subcontractors on a competitive basis to the maximum practical extent. §§ 5.39. Both the HMP and FEP contracts were Experience Rated, meaning that if actual costs and health benefit payments incurred by Defendants in administering the contracts exceeded their annually estimated costs, the Government paid

3

the allowable additional costs.  Likewise, if Defendants' total incurred costs and health benefit payments were less than their annual estimated costs, Defendants agreed to return the surplus to the Government.

The contracts require that the Defendants' Chief Financial Officer and Chief Executive Officer certify in writing that all submitted costs are actual, necessary and reasonable.  §§ 3.2.  Furthermore, this certification required that the Defendants annually certify that "Income, rebates, allowances, refunds and other credits made or owed in accordance with the terms of the contract and applicable cost principles have been included in the statement."

Defendants were authorized to charge Federal Employees premiums in addition to the administrative payments Defendants received directly from OPM.  5 U.S.C. § 8902(i).  These premium charges, however, were to reflect the actual costs incurred in administering and providing health care benefits.

The contract specifically required that Defendants invest any funds on hand in excess of the funds needed to promptly discharge the OPM Contract obligations to maximize this investment income ("Investment Income").  §§ 3.4(a).  Any resulting Investment Income was to be credited to a special reserve account maintained by the Defendants.  §§3.4(b).  If the Defendants charged unallowable, unallocable, or unreasonable costs under the contracts, failed to invest income received by Defendants including *refunds* or other *credits*, or failed to properly invest excess funds, the Defendants must credit the special reserve fund with Investment Income lost as a result of the improper costs allocations.  The Investment Income is to be computed utilizing the interest rates established by the Secretary of the Treasury as provided by § 611 of the Federal Contract Disputes Act (41 U.S.C. § 611 (as amended)) every six months, which, by

4

way of example ranged from a high of 8 3/8 to a low of 3 1/8 between January 1991 and the present.

Defendants directly or though its predecessors, have administered the FEP contract for Federal Employees residing in Kentucky, Indiana, and Ohio since at least 1990 and HMP plan for Federal Employees residing in the Cincinnati, Ohio area since at least 1991.

### B. Relator's Allegations

Relator alleges that Defendants submitted numerous false claims for payment to the United States related to the FEP and HMP contracts with OPM.  In Count I, Relator alleges that Defendants fraudulently included profits in its contractual costs submissions to OPM.  This was achieved by Defendants purposely and knowingly subcontracting some of the services required of the OPM contracts to its subsidiaries since at least 1991.  The subsidiaries including, Personix a/k/a Print Mail, Wright Health, Paragon, American Health and, Anthem Prescription Management ("APM") improperly included profits within their charges to Anthem, which Anthem then submitted or caused to be submitted to OPM.  In addition, APM failed to report or return the full amount of the rebates received as required by the Contracts and falsely certified on an annual basis that it did.

Count II alleges that Defendants, knowingly and fraudulently allocated unrelated costs to the FEP and HMP cost reimbursement contracts that were unallowable.  Examples of improper costs included:  expenses and salary costs associated with "Special Projects" that Kathy Hinkle (former Director of FEP) and her staff conducted; costs and expenses associated with a political rally for then governor Ohio Governor O'Bannon which FEP management were required to

5

attend; charges and costs related to the 1995/1996 merger of Community Mutual and Associated; costs associated with Defendants' sale and administration of private side add on health benefits provided Federal Employees in addition to those required by OPM; costs associated with the development of a POS Pilot System; and, costs that Defendants' subsidiaries improperly shifted from its commercial accounts to the OPM contracts.

Count III alleges that Defendants knowingly and fraudulently misrepresented to OPM that it was in compliance with certain contractual requirements and prohibitions. Specifically, Defendants split major subcontracts to avoid competitive bid and OPM reporting requirements, falsified and manipulated the periodic performance evaluations performed by OPM, shredded claims that were not processed timely, and failed to perform third party subrogation activities required of the contract.

Counts IV and V of the current complaint contain allegations, which although meritorious, appear to have already been settled or already in litigation prior to the filing of the instant suit and most likely will not be pursued by Relator.

Count VI of the complaint involves Defendants' intentional retaliatory actions taken against the Relator, Mr. Garner, for his engaging in activities specifically protected under 31 U.S.C. §3730(h). In a nutshell, Defendants terminated Mr. Garner after he finally threatened to bring a *qui tam* action against the company if it did not correct its fraudulent practices. Relator's individual claim is not germane or pertinent to this settlement objection.

## III.    RELATOR'S OBJECTIONS

Pursuant to the Government's Settlement Agreement attached to its proposed "Notice of

Dismissal," Government proposes to dismiss all allegations against the Defendant, except for Relator's retaliatory discharge action. The dismissal would be with prejudice as to Counts I and II and without prejudice as to Counts III through V. Correspondence of Government counsel clarifies that out of the recited $1.5 million dollar settlement payment, $922,000.00 represents double the maximum potential single damages on the Print Mail (a/k/a Personix) fraud (Count I) while the remaining $578,000.00 are associated with the allegations relating to Anthem Prescription Management (Count I). (*See* Stan Alderson's August 9, 2005 correspondence, attached hereto and made a part hereof by reference as Exhibit C). Relator objects to Government counsel's proffered settlement for the following four reasons.

### A.    Dismisses Counts and Allegations for no Consideration

The Government counsel's attempted dismissal applies to all counts and allegations of the complaint even though Mr. Alderson's correspondence admits that defendant is only providing consideration as to allegations contained in one Count of the Relator's complaint that relate to PrintMail's and APM's improper inclusion of profits in the charges submitted to OPM. While Relator is in agreement that Counts IV and V would be difficult to prosecute at this point due to OPM's previous settlement of these issues[1], the settlement agreement proposes to dismiss important allegations of fraud for which the Government is not receiving any consideration. This includes all allegations of Counts II and III and allegations relating to other subsidiaries

---

[1] The Government provided Relator with information indicating that Defendants paid $195,760.00 to resolve the $600,000.00 overpayment made to affiliated pharmacies as alleged in Count IV on July 20, 1998. In regards to Defendant's fraud relating to the $4,000,000.00 overpayment owed by community health plan alleged in Count V, Defendants' paid $283,503.00 on May 7, 1997 to resolve the overpayment claim and $385,174.00 on May 15, 2002 for lost

similar to those against Print Mail contained in Count I.  The proposed settlement agreement is

also limited to 1992 through 2002 even through the evidence indicates Defendant continued to

engage in fraudulent practices through 2003.  If the Government and Defendant are agreeable to

settling only two of the numerous allegations for an *adequate* amount, then Relator should be

allowed to proceed with the remainder.

 **B.**  **The Proposed Settlement Does not even Equal Single Damages for the APM Fraud**

 The $578,000.00 allocated by Government counsel and the Defendant to resolve the

allegations against APM are wholly inadequate and unreasonable since it does not even amount

to single damages.  On an annual basis contemporaneous with each fiscal year, Defendants

provided to OPM documents it referred to as "FEP True Up Summaries" that allegedly

reconciled the amount of rebates due the Government.  Earlier this year, this Court ordered the

Government to provide Relator's counsel copies of documents received from the Defendants.

These documents revealed that after receiving a copy of the Relator's complaint sometime in late

2001, Defendant's counsel admitted that several of the original FEP True Ups contained errors

and provided "revised" FEP True Up summaries.  Specifically, those documents included

Barbara Duncombe's (Defendants' outside Counsel) and Jeffrey Hannah's (Defendants' in-house

counsel) March 18, 2003 memorandum to DCIS Agent John Edminston to which were attached

documents purporting to revise Defendants' original contemporaneous FEP True Ups for 1998,

1999, 2000, and 2001 (attached hereto as Exhibit D and referred to hereafter as

"Hannah/Duncombe Memorandum).  Not surprisingly, this second round of FEP True Ups

---

investment income.      8

indicate Defendants underreported the actual rebates owed OPM.

As evidenced by the documents provided Relator by Government's counsel earlier, Defendants, through counsel, were misrepresenting to the Government as late as March of 2003 that APM had returned all rebates due OPM.  In the Hannah/Duncombe Memorandum, the defense attorneys unequivocally stated that the first revised FEP True Up summaries:  1) were calculated using the "total amount of rebates received for the entire year" (p.2, ¶ 3); 2) were "based on the *actual* rebate amounts received" (p. 3, ¶7); 3) recite "*actual* 100% share of the realized amount of rebates" (p. 4, ¶ 1); and, 4) ensured that FEP/HMP received "its full, 100% share of the allocable rebates received" (p. 4, ¶ 3).  In addition, Attorney Duncombe's correspondence of February 13, 2003 references Agent Edminston's February 12, 2003 interview of Tom Rasp, the Business Unit Account Executive and Assistant Treasurer for APM. (attached hereto as Exhibit E),  and states that "we made great progress towards establishing that Anthem passed through to the FEP/HMP program all (i.e., 100%) of its share of the total rebate amounts received by Anthem Prescription Management ("APM")."  As discussed in detail later, however, Defendants acknowledged that these statements were false as evidenced by defense counsel's subsequent correspondence.

Mr. Alderson allowed Relator's counsel to speak with Mr. Bill Scott, an OPM auditor, on March 17, 2005.  Mr. Scott relayed that he had conducted an audit regarding the OPM-related allegations, which included an on-site visit during the summer of 2001.  Specifically, he indicated he reviewed information provided by Defendants for 1998, 1999, and 2000 and determined the allegations were unfounded.  When asked about  the Hannah/Duncombe

Memorandum indicating the information he had previously reviewed was, in fact, incorrect, Mr.

Scott was unable to provide any information regarding the alleged errors, when he was made

aware of these alleged errors, or what circumstances had transpired to necessitate the

Defendants' revisions (after his on-site audit) to the FEP True Ups.  When asked if he had

followed up with further questions or audits after receiving the revelations in the March 18, 2003

memorandum, he indicated he had not.  When asked what he should have reviewed while on-site

to have discovered the errors reported in the Hannah/Duncombe Memorandum and reflected in

the revised FEP True Ups, Mr. Scott became indignant, stated "he was not the one on trial" and

hung up shortly thereafter.

Relator's counsel also asked Mr. Alderson why the Government had not informed

Relator that Defendants had basically admitted that the original FEP True Ups for 1998 through

2001 were false and had been revised.  Mr. Alderson, on behalf of the Government, responded

that the cited errors were only mathematical, did not rise to the level of fraud, and continued to

insist that there was absolutely no merit to the rebate allegations.  After Relator's counsel finally

obtained Hannah/Duncombe Memorandum from Government counsel in March 2005, he began

questioning the accuracy of even the first revised FEP True Ups, specifically, whether or not the

Defendants had reported and returned rebates attributable to mail in prescriptions ("Mail-In

Rebates").  In his April 1, 2005 correspondence to Defendants (attached as Exhibit F), Relator's

Counsel specifically requested additional information to attempt to verify the information

contained in the Revised FEP True Ups.

To their credit, Defendants did provide some responses to the information requested by

Relator's counsel.  For instance, Defendants did provide copies of the annual accounting

certifications for the years 1993, 1994, 1995, 1997, 1998, 1999, 2000, and 2001, copies of which

are attached as Group Exhibit G.  In these Certification of Annual Accounting Statements,

various officers of the Defendants, *falsely* certified that "Income, rebates, allowances, refunds

and other credits made or owed with the terms of the contract and applicable cost principles have

been included in the statement."  Additionally, Defendants provided a listing of the service

charge incentive payments received from OPM, attached hereto as Exhibit H, indicating

Defendants were paid total profit/bonuses of $3,166,571.00 between 1991 and 2001 inclusive by

OPM for its alleged outstanding contract performance.

Most disturbing however, was the information contained in Ms. Duncombe's responsive

letter of May 2, 2005, a copy of which is attached hereto as Exhibit I with the limited

attachments initially provided Relator's counsel.  Even though Defendants certified annually

they had returned all applicable rebates (*see* certifications above), and had provided OPM a first

revised True Up categorically stating that 100% of the rebates had been accounted for, it *finally*

admitted on May 2, 2005 (based on Relator's prodding) that for 1996 and 1997, APM was

"unable to confirm that FEP performed a similar true-up for the rebates portion" owed OPM.

(Exhibit I, p. 1).  "Without being able to identify the dollar amount of the rebate generated by

retail scripts, there is no precise way to determine the amount of over/under payment of rebates

shared with OPM."  (*Id.*, p.2).  Ms. Duncombe goes on to state that Defendants have somehow

estimated the amount due OPM during these years and further asserts the results "overstate any

rebate that may have been due to OPM …."  (*Id.*, p.3).  Relator, however, takes little comfort in

11

this unsworn and untested representation in light of Ms. Duncombe's previous inaccurate statements that OPM received "its full, 100% share of the allocable rebates received" (p. 4, ¶ 3 of the Hannah/Duncombe Memorandum, Exhibit D).

Likewise, Defendants finally admit in this May 2, 2005 correspondence that, just as originally alleged by Relator, *"APM had not included in its FEP/HPM Rebate True-Ups the full amount of Rebates earned by APM during each of the years 1999-2004; instead, APM had included an amount intended to represent the Retail Rebate Amount."* (*Id.*, p. 3, ¶ 2). Defendant goes on to state, however, that inclusion of the Mail-In Rebates also requires inclusion of the associated expenses and the "net effect of the corrective steps undertaken in this exercise is that FEP has *undercharged* the Government, relative to the administrative expenses offset by rebates." (*Id.*, p. 3, ¶ 3).

Ms. Duncombe further indicated that in "2001, 2002 and 2003, it appears that APM's True-Up analysis was not included in FEP's year-end adjustments, as reflected in the Annual Accounting Statement." (*Id.*, p. 4, ¶ 3). Ms. Duncombe again assures the Government, however, that the "net effect of this omission was in favor of the Government." *Id*.

Defendants initially refused to provide Relator's counsel with full copies of the attachments and supporting documentation, but instead only provided "executive summaries for years 1999-2004" (*Id.*, p. 4, ¶ 7), and informed the Government the remaining information was confidential and proprietary and not to be shared with Relator. Nevertheless, Relator's counsel did eventually convince Defendants of the necessity of reviewing all of the supporting documentation to the "executive summaries" previously provided. A review of these alleged

supporting documents FULLY explains why Defendants did not want to share this information. Notably, the documentation provided in support of this *third attempt* at of FEP True Up summaries does not reconcile.

Defendants' submissions for 2000 attached to Ms. Duncombe's May 2, 2005 letter clearly illustrate this. Attached as Exhibit J is all documentation provided by Defendants in support of their second revised True Ups – essentially their third bite at the apple – for the 2000 rebate reconciliation. Exhibit K consists of five pages excerpted from Exhibit J, which are all that are relevant for purposes of this objection. The first page of Exhibit K clearly shows the results of the three FEP True Up summaries, *two* of which were prepared after Defendants were provided a copy of Relator's complaint.

The first, prepared by Defendants contemporaneously with fiscal year 2000, indicated total allocable rebates accruing to OPM were $442,305.00, of which $70,224.00 was still owed at the end of the year.

The second, prepared in February 2003 and referenced as the "02/03 Submission," indicated total allocable rebates accruing to OPM increased to $463,621.00, of which $85,675.00 was still owed at the end of the year.

The third summary, prepared in April 2005 and referenced as the "04/05 Submission," increases total allowable rebates accrued to OPM to $495,597.00. However, along with this increase, Defendants now claim they are entitled to increases expenses allocable to OPM from $127,566.00 to $244,442.00, an increase of $116,876.00. According to Defendants' third try, the end of the year adjustment payable to OPM decreases from $85,675.00 (second try) to

13

$775.00 (third try).  Unbelievably, Defendants now claim it overpaid OPM approximately

$70,000.00, the difference between $70,224.00 (original submission) and the last.[2]

Defendants arrive at this astounding increase in expenses by more then doubling the total

amount of expenses it claims is allowable to FEP in its third revised 2000 FEP True-Ups.  Note

that Defendants originally indicated the total Base expenses allowable to FEP were

$14,662,773.00 (first try).  On the "04/05" submission, Defendants more then DOUBLE these

expenses to $29,450,824.00.  Defendants' claim this tremendous increase in expenses made at

the 11th hour applies to 1999 through 2003 inclusive.

What is most problematic, however, is the documentation provided by Defendants *do not

support the rebate amounts recited in the third FEP True-Ups* (Exhibit K, p. 1).  The increase in

allocable rebates from $442,305.00 (first try) to $495,597 (third try) results from increasing total

Rebates Earned from $53,289,765.00 (first try) to $59,710,432.00.   The remainder of Exhibit K,

entitled "APM FEP Rebates Shared & Admin Expenses 2000", however, tells a different story.

The second and third pages of Exhibit K contain a series of credits and debits relating to

rebates.  At the top of the fourth page is the entry "Total Shared Rebates" below a total line

indicating total rebates of $150,547,703.00.  There is no reconciliation or references within the

171 pages of Exhibit K that explains the $90,000,000.00 plus difference between the

$59,000,000.00 reported by Defendants in the 2000 FEP True-Up Summary and the

$150,000,000.00 total appearing in the supporting documentation.

---

2 This overwhelming increase in expenses that Defendant claims occurred in years 1999 through
2003 is what forms the basis for Defendants' claim that it overpaid the OPM referenced
repeatedly in Ms. Duncombe's May 2, 2005 correspondence.

The same type of discrepancy occurs with the Defendants' last 1999 FEP True-Up summary and supporting documentation, relevant excerpts of which are attached hereto as Exhibit L. The "04/05" submission (third try), indicates Defendants received total rebates of $50,342,073.00. However, page 3 of the supporting documentation indicates again, under the heading "Total Shared Rebates," that the amount is $129,263,423.00, an increase of $79,000,000.00.

These increases in "Total Shared Rebates" contained in the supporting documentation (Exhibits K and L) result in a substantial increase in the amounts Defendants owe OPM. Even assuming the increased expenses claimed in the third try are legitimate (which Relator disputes), the $79,000,000.00 increase in "Total Shared Rebates" for 1999 increases OPM's allocation of the "FEP portion of rebates earned" by $734,000.00. For 2000, the $90,000,000.00 increase in "Total Shared Rebates" increases OPM's allocation of the "FEP portion of rebates earned" by $747,000.00.

This type of comparison cannot be made for 1996, 1997, 1998, 2001, 2002, and 2003 because the supporting documentation provided by Defendants do not contain the same type of detail as provided for 1999 and 2000. In fact, the documents provided for all other years do not appear to contain ANY supporting documentation for the purported respective rebates of $79,550,708.21, $84,606,828.00 and $104,132,367.00 (*See* Exhibit I, attachments 5, 6, and 7). Documentation for 2004, however, does appear to be complete and reconciles with the $195,085,539.00 in total rebates reported by Defendants.[3] Based upon the 1999 and 2000 data,

---

[3] Difficult to understand the tremendous increase of approximately $90 million between the total

an extrapolation of the approximate $740,000.00 allocation due OPM for the eight year period 1996 through 2003 is $5,920,000.00.

When this discrepancy was brought to Defendants' attention, Relator's counsel was assured there was a "simple explanation" that would be forthcoming and that the amounts recited on the FEP True-Up for Total Rebates Earned were accurate. Relying on this statement, Relator's counsel drafted a Demand Letter, at the behest of Defendants, assuming the third FEP True Ups were accurate.

Defendants failed to provide a satisfactory response and instead went back to negotiating with Government's counsel. Instead of explaining the inconsistencies, Defendants ran back to Mr. Alderson and increased their settlement offer from $400,000.00 to the current $1,500,000.00, which he accepted.

Relator's Counsel attempted to discuss this inconsistency with Mr. Alderson. He summarily responded, that Mr. Scott, the OPM auditor, had reviewed all of the information provided with Ms. Duncombe's letter of May 2, 2005, and agreed with the Defendants that they had overpaid OPM approximately $700,000.00.

### C.    Fails to Recite Total Consideration

The Settlement Agreement does not state the total amount of consideration received by the Government in that it fails to account for previous payments already made by the Defendants and does not quantify Defendants waiver of claims to reimbursement it alleges are due.

As explained within the attorneys' Memorandum of March 18, 2003 (Exhibit D),

---

rebates reported on the 2003 and 2004 FEP True-Up summaries.

Defendants appear to have already returned $122,027.92 to OPM, which represent an underpayment relating to the 2001 fiscal year. Ms. Duncombe states on page 2 of the memorandum that when Jeff Hannah (internal counsel), Tom Rasp (Business Unit Account Executive and Assistant Treasurer for APM), and her discovered a routine mathematical error while reviewing the 2001 APM 2001 FEP True-Up Summary. She further indicates that this underpayment "is being returned to OPM through an adjustment to FEP's 2002 year-end cost report." (Exhibit D, p.2). The facts, however, clearly indicate this goes beyond a simple mathematical error.

As explained previously, OPM required that Defendants' annually certify the accuracy of their annual accounting statement. Included within Exhibit G, is Defendants' 2001 certification executed by Michel Jensen, Defendants' Executive Director of FEP, and Darin Rothert, Defendants' Director of FEP Finance and Compliance. In this compliance, Defendants specifically certified that they had "reviewed this accounting statement" and "Income, rebates, allowances, refunds and other credits made or owed with the terms of the contract and applicable cost principles have been included in the statement." Even if an error was made as alleged, it was done with reckless disregard in light of this specific certification, which is actionable under the False Claims Act, which defines "knowingly" as "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(3). Furthermore, Defendants did not make this "discovery" and "disclosure" until more then one year had elapsed from their receipt of Relator's complaint, which alleges that APM "only refunded a small portion [of the rebates] to OPM." (¶77 of the Complaint).

17

Furthermore, APM has argued that it is has substantially overpaid OPM rebates based on its third set of FEP True-Up Summaries, as argued extensively in Ms. Duncombe's May 2, 2005 correspondence (Exhibit I).  In addition to the $578,000.00 payment the Government attributes to the APM allegations (Exhibit C), Defendants itself stated in response to the Relator's Motion for Partial Lifting of the Stay, that the settlement involves "waiver of certain claims for reimbursement due Defendants from the Government."  (p. 2 of Defendants' Memorandum in Opposition to Relator's Motion for Partial Unsealing.)  In an e-mail to Attorney Alderson date April 26, 2005 and attached hereto as Exhibit M, Ms. Duncombe stated that "it appears that FEP has undercharged the Government by approximately $600,000.00 for the years 1996, 1997, 1999-2004 …."  When Relator's counsel requested Mr. Alderson explain and quantify the amounts being waived by Defendants referenced in their pleading, Mr. Alderson refused to answer and suggested inquiring of Defendants.

The proposed Settlement Agreement seems to support Defendants' position in providing that Defendants fully release the Government from any claims it has or could have asserted relating to the complaint allegations (§III, ¶ D of the Settlement Agreement attached to the Government's Notice of Dismissal).  Furthermore, the Settlement Agreement provides additional consideration in that the Government agrees to not debar or suspend Defendants from government contracting (§III, ¶ A(3)), the Defendants agree not to seek reimbursement from the Government for any "unallowable costs", and Defendants agree to repay the Government for any "unallowable costs" for which they previously were reimbursed (§III, ¶ E(3).

The Government has a duty to advise the Relator of the value of these additional items of

18

consideration.  *U.S. v. U.S. ex rel Thornton*, 207 F.3d 769, 773 (5th Cir., 2000) (government has

a duty to advise the relator of the value of the settlement at the time it notifies him that it intends

to settle the case, and this representation should include the Government's estimate of the value

of non-cash proceeds.)  Although requested orally and in writing, however, the Government has

continued with its refusal to supply this information.  Relator requests that the Court order the

Government to provide this vital information.

  **D.**  **Doesn't Provide for Investment Income or Return of Bonus Service Charges**

  Fourth, the proposed Settlement fails to account for prejudgment interest, which OPM is

entitled to pursuant to the Contracts.  As discussed previously, Section §§ 3.4(a) of the Contracts

provides that if the contractor charged unallowable, unallocable, or unreasonable costs under the

contracts, or fails to invest income such as refunds or other credits, the contractor is liable for

"Investment Income".  The interest to be assessed against Defendants is computed utilizing the

rate established by the Secretary of the Treasury as provided by § 611 of the Federal Contract

Disputes Act (41 U.S.C. § 611 (as amended)).

  This aspect of damages was originally pled in the complaint by Relator when filed in

2001.  Furthermore, Relator is admittedly somewhat surprised that OPM would not require

Defendants pay this facet of damages since it is normally assessed to ensure that the Government

is made whole.  In OPM's Office of Inspector General's Semiannual Report to Congress for the

period ending September 30, 2002 and available on the Internet at

http://www.opm.gov/oig/pdf/SAR27final.pdf, then Inspector General McFarland discussed at

length the results of the audits that led to an $87.3 million dollar False Claims Act settlement

with PacifiCare Health Systems, Inc., announced on April 12, 2002. (*Id,*. p. 9).  In connection

with this case, OIG conducted 10 audits of PacifiCare health plans and its predecessor, FHP

International Corporation.  (*Id.*, p. 10).  Director McFarland discussed the finding of FHP of

Utah audit in her report, noting:  "we identified net overcharges to the FEHBP amounting to

$20,392,390.00, including $14,311,097.00 for inappropriate health benefit charges in 1992

through 1996; $1,222,564.00 due the plan for Medicare undercharges; and $7,303,857.00 for

investment income lost by the FEHBP as a result of the overcharges."  (*Id.*, p. 11).

Likewise, a contractor's liability for investment income is well known to Defendants.

After Defendants ceased operation of the Community Health Plan, known as Key Health Plan,

OPM performed an audit and found that Defendants owed OPM a large amount due to

overcharges submitted to OPM during its operation of the CMP.  (Complaint allegations ¶¶ 327-

338).  This dispute between Defendants and OPM was finally settled in mid 2002 when Anthem

agreed to pay lost investment income to OPM.  Attached hereto as Exhibit N, is Mr. T. Jeffrey

Hannah's letter dated May 15, 2002, in which he states:  "I write in response to your April 28,

2002 letter, forwarding the fully executed settlement agreement regarding the lost investment

income charges issue for the Final Audit Report Number GH-00-95-004 on Key Health Plan,

Inc.  Per our settlement agreement, enclosed is a check payable to the Office of Personnel

Management in the amount of $385,174.00."

Lastly, OPM paid Defendants $3,166,571 between 1991 and 2001 inclusive in service

charge incentive payments as indicated by Exhibit H.  In light of Defendants' admitted false

certifications and continued and *intentional* failure to report the total amount of rebates received

20

through 2003 (two years AFTER it received a copy of the Complaint), it seems reasonable that the settlement should provide for disgorgement of these bonuses.

### E.    Fails to Impose Civil Penalties though such Imposition is Clearly Warranted

The proposed settlement does not include the imposition of any civil penalties mandated by section 3729(a) of the False Claims Act.  However, the Defendants' initial submission of false certifications and FEP True-Ups, submission of revised false FEP True-Ups, and submission of a second set of false revised FEP True-Ups that appear to underreport total rebates and over reports legitimate expenses, cries out for criminal prosecution or, at the very least, the imposition of the maximum amount of civil penalties provided by the statute.  Anything less by itself, renders the proposed settlement inadequate, unfair and unreasonable.

Relator has previously voiced all of these five objections to the Government's counsel (to the extent he would listen) well in advance of the submission of the proffered settlement. Despite knowing these arguments in advance and the Relator's position that this settlement does not satisfy the standards set out in the False Claims Act, the Government makes no effort to deal with any of these points in its filing with this Court and has the audacity to simply "Notify" the court of its purported dismissal well knowing such action is prohibited by the FCA.

## IV.    THE FALSE CLAIMS ACT

### A.    The Role of the *Qui Tam* Relator in False Claims Act Litigation

Congress enacted the False Claims Act in 1863 to deal with fraud against the United

States committed by defense contractors during the Civil War.[4]  Initially, the Government had no

right to intervene in the *qui tam* relator's False Claims Act action.[5]  If successful, the relator was

entitled to 50% of the amount returned to the Treasury.[6]

In 1943, Congress significantly curtailed the *qui tam* provisions of the False Claims Act.[7]

As a result, *qui tam* actions virtually disappeared.  In 1985, Congressional and popular media

reports focused on outrageous examples of government contractor abuse, such as $400.00

hammers and $7,000.00 coffeepots.[8]

Against this backdrop, in 1986 Congress amended the False Claims Act in recognition of

the valuable role citizens could play in stopping contractor abuse.[9]  The Senate Report to the

1986 Amendments expressly states "[t]he Committee's overall intent in amending the *qui tam*

---

[4] *See* S. Rep. No. 345, 99th Cong., 2d Sess. 8-10 (1986), *reprinted in* U.S.C.C.A.N. 5266, 5273-75.  *See also United States ex rel. Roby v. The Boeing Co.*, 995 F. Supp. 790, 795 (S.D. Ohio, 1998), *aff'd on other grounds*, 302 F.3d 637 (6th Cir.), *cert denied*, 539 U.S. 969 (2003).

[5] S. Rep. No. 345, 99th Cong., 2d Sess. 8-10 (1986), *reprinted in* U.S.C.C.A.N. 5266, 5275.

[6] *See* James B. Helmer, Jr., False Claims Act: Whistleblower Litigation § 2-4 (LexisNexis 3d ed. 2002); *See also*, Act of March 2, 1863, Ch.67, 12 Stat. 696; Roby, 995 F. Supp. at 795.

[7] *See* James B. Helmer, Jr., False Claims Act: Whistleblower Litigation § 2-5, *supra*; *see also*, *United States ex rel. Roby v. Boeing Co.*, 995 F. Supp. at 795-96, *citing* Kenneth D. Broody, Recent Developments in the Area of "*Qui Tam*" Lawsuits:  A New Weapon For Challenging Those Who May Be Submitting False Claims To The Government, 37 Fed. B. News & J. 592, 593 (1990).

[8] *See* James B. Helmer, Jr., False Claims Act: Whistleblower Litigation § 2-6 (LexisNexis 3d ed. 2002).

[9] *Id.*

section of the False Claims Act is to encourage more private enforcement suits."[10]  Similarly, the

House Report emphasized that "[t]he purpose of the *qui tam* provisions of the False Claims Act

is to encourage private individuals who are aware of fraud being perpetuated against the

Government to bring such information forward."

> Another reason for providing for this full party status is to keep pressure on
> the Government to pursue the case in a diligent fashion. Even the United
> States Government is not without financial limitations.  It is not uncommon
> for Government attorneys to be overworked and underpaid given the
> demanding tasks and frequently overwhelming case loads they maintain.  I
> do not say this to impugn the ability or character of Government attorneys,
> but only to reflect the harsh reality of today's funding limitations of
> Government activities in all areas which include the budgets of the
> Government's prosecuting agencies.  If the Government can pass a law that
> will increase the resources available to confront fraud against the
> Government without paying for it with taxpayer money, we are all better off.
> This is precisely what this law is intended to do: deputize ready and able
> people who have knowledge of fraud against the Government to play an
> active and constructive role through their counsel to bring to justice those
> contractors who overcharge the Government.[11]

These views of Representative Berman, the House Sponsor of the 1986 Amendments, are

entitled to substantial weight.[12]

---

[10] S. Rep. No. 345, 99th Cong., 2d Sess. 23-24 (1986), *reprinted in* U.S.C.C.A.N. 5266,
5288-89; *Roby*, 995 F. Supp. at 796.

[11] 132 Cong. Rec. 29315, 29321-22 (October 7, 1986) (Remarks of Cong. Berman)
(*emphasis added*).

[12] *E.g.*, *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (affording deference to
Rep. Berman's views regarding the standard for analyzing a defendant's intent under the
False Claims Act); *Federal Recovery Services, Inc. v. United States*, 72 F.3d 447, 452 (5th
Cir. 1996) (quoting Congressman Berman regarding original-source issues); *United States
ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 17 (2d Cir. 1990) (same); *United
States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 410 (9th Cir. 1993) (observing that
Rep. Berman was the House Sponsor and quoting his views as authoritative); *United States*

The Senate Report on the 1986 Amendments mirrors Representative Berman's sentiment:

Subsection [31 U.S.C. § 3730] (c)(1) provides *qui tam* plaintiffs with a more direct role not only in keeping abreast of the Government's efforts and protecting his financial stake, but also in acting as a check that the Government does not neglect evidence, cause unduly delay, or drop the false claims case without legitimate reason.[13]

As long recognized by the Supreme Court, the difference between a *qui tam* relator and the Government is that between "the enterprising privateer [and] the slow-going public vessel."[14]  Thus, relators are neither mere place-holders for the Government nor mere conduits for the assertion of a Government claim.  They "continue" as "parties" entitled to "unrestricted participation" when the Government intervenes unless the Court decides otherwise.[15]  The Sixth Circuit has likewise stated that the 1986 Amendments allow the *qui tam* relator to remain a party to the action even if the

---

*v. Krizek*, 859 F. Supp. 5, 13 (D.D.C. 1994); *United States ex rel. McCoy v. California Medical Review, Inc.*, 133 F.R.D. 143, 146 (N.D. Cal. 1990) (*quoting* Rep. Berman's statement that "[o]ne of the principal features of the Act was a strengthening of the role of *qui tam* plaintiffs in actions brought under the False Claims Act"); *United States ex rel. Truong v. Northrop Corp.*, 728 F. Supp. 615, 618 (C.D. Cal. 1989) (quoting Rep. Berman's statement that the best way to deploy government resources against contract fraud and false statements is to "deputize ready and able people who have knowledge of fraud against the government to play an active and constructive role through their counsel to bring to justice those contractors who overcharge the government");  *United States ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.*, 722 F. Supp. 607, 613 (N.D. Cal. 1989) (same).

[13] Senate Report No. 345, 99th Cong.2d Sess. 2526 (1986) reprinted in 1986 U.S.C.C.A.N. at 5290-91.  *See also*, *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 964 n.8 (9th Cir. 1995).

[14] *Schumer*, 520 U.S. at 949 *quoting United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943), *quoting in turn United States v. Griswold*, 24 F. 361, 366 (D. Ore. 1885).

[15] 31 U.S.C. § 3730(c)(2).

Government intervenes.[16]

These rulings, and the statute that gives rise to them, reflect no more than a common-sense view of the realities of *qui tam* litigation.  Whistleblowers who take the enormous risks and undergo the overwhelming emotional strain of taking on a Government contractor in federal court are doing far more than merely starting a process and turning it over to the Government.  Undertaking these cases involves an enormous commitment of time, effort, and resources on the part of a relator and his attorneys.

Objecting to a settlement proposed by the Government is not done lightly and in reality, is a right afforded Relator's that is seldom utilized.  Of course, this Court was the first to recognize a Relator's right to question the reasonableness of a proffered settlement, so ruling even before Congress amended the Act to specifically provide this right in 1986.

In *U.S. ex rel. Gravitt v. General Electric Co.*,[17] this Court's opinion gave rise in large part to the very statutory provision requiring that the Government establish that its proffered settlement is "fair, adequate, and reasonable."  As a result of this Court's refusal to approve the $234,000.00 settlement proposed by the Government in *Gravitt* and allowing Relator's counsel to proceed with discovery and litigation, relator was able to eventually obtain a settlement in

---

[16] *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 938 (6th Cir.), cert. denied, 522 U.S. 1077 (1997); *see also*, *United States ex rel. Klump v. Dynamics Corporation of America*, 1998 U.S. Dist. LEXIS 21930 (S.D. Ohio 1998).

[17] 680 F. Supp. 1162 (S.D. Ohio 1988), *appeal dismissed*, 848 F.2d 190 (6th Cir.), *cert. denied sub nom.*, *General Electric Co. v. United States*, 488 U.S. 901 (1988).  *See also*, James B. Helmer, Jr., False Claims Act: Whistleblower Litigation, § 1-1 (LexisNexis 3d ed. 2002).

excess of $3.5 million—more than 15 times larger than the original settlement proffered by the Government.[18]

### B.    Liability

The False Claims Act imposes liability on persons or entities that "knowingly" present or cause to be presented to the Government a false or fraudulent claim for payment or approval.[19] The Act also imposes liability for "knowingly" making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.[20]  The "knowing" element is defined by the False Claims Act as "actual knowledge," acting in "deliberate ignorance," or acting in "reckless disregard" of the truth or falsity of the information in question.[21]  No proof of specific intent to defraud is required.[22]

The Sixth Circuit has consistently summarized the duty imposed by the False Claims Act as requiring Government contractors to "turn square corners when they deal with the Government."[23]

---

[18] Helmer, *False Claims Act: Whistleblower Litigation*, § 1-1 at p. 5.

[19] 31 U.S.C. § 3729(a)(1); *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 300-01 (6th Cir. 1998); *United States ex rel. Augustine v. Century Health Services, Inc.*, 289 F.3d 409, 413 (6th Cir. 2002).

[20] 31 U.S.C. § 3729(a)(2).

[21] 31 U.S.C. § 3729(b).

[22] *Id.*

[23] *Compton*, 142 F.3d at 302; *Augustine*, 289 F.3d at 413.

26

While Government counsel continues to labor under the misconception that Defendants' actions were not intentional and do not rise to the level of a false claims action, however, the limited evidence currently available to Relator that was discussed previously clearly indicates otherwise. The evidence that Defendants continued to submit false annual certifications and failed to report and return all rebates due OPM for at least *two years* after receiving a copy of the Complaint clearly demonstrates their conduct during 2002 and 2003 was intentional. Even prior to the Defendants' receipt of the complaint in late 2001, however, this conduct at the very least constitutes reckless disregard, which is all that is necessary to establish liability.

### C.    Damages

The False Claims Act requires the imposition of civil penalties as well as the trebling of damages suffered by the Government as a result of the actions of the Defendants. Specifically, the Act provides that, for each violation, the defendant:

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....[24]

A Federal administrative increase effectuated in 1999 increases the civil penalty range for false claims made on or after September 29, 1999 to $5,500.00 to $11,000.00.[25] The plain language of the False Claims Act and case law provides that courts must award at least the

---

[24] 31 U.S.C. § 3729(a).

[25] The statutory penalties are adjusted for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, § 5, 104 Stat. 891, note following 28 U.S.C. § 2461. 28 C.F.R. § 85.3(a)(9) (2003). *United States v. Williams*, 2003 U.S. Dist. LEXIS 9988, *18 n.3 (N.D. Ill. June 10, 2003).

minimum civil penalty for each submitted false claim, unless doing so would run afoul of the

Eighth Amendment prohibition against excessive fines.[26]

In this case, Defendants have in essence, already admitted that the annual accounting

certifications filed with OPM from 1996 through 2003 inclusive, in which they certified that all

"Income, rebates, allowances, refunds and other credits made or owed in accordance with the

terms of the contract and applicable cost principles have been included in the statement" (*see*

Exhibit G) were false.  In addition, Defendants' forwarding of the second revised FEP True-Ups,

constitute an admission that the both the original and first revised FEP True-Ups from at least

1996 through 2003 were false.  Accordingly, the limited information obtained by Relator without

the benefit of conducting any formal discovery, already indicates that Defendants' have made at

least 24 false statements that relate to only the rebate fraud, all of which are subject to the

imposition of mandatory civil penalties.

More importantly, the Government is not receiving <u>any</u> consideration for the majority of

---

[26] *United States v. Bieri*, 68 F.3d 232, 234-236 (8th Cir. 1995); *United States v. Killough*, 848 F.2d 1523, 1533-34 (11th Cir. 1988) (imposition of FCA statutory forfeitures is not discretionary, but is mandatory for each claim found to be false);*United States ex rel. Luther v. Consolidated Indus.*, 720 F. Supp. 919, 924 (N.D. Ala. 1989) ("the government does not have to actually pay or approve a false claim for there to be recovery under the Act.  Once an individual knowingly submits a false claim for payment or approval, that individual is liable for a forfeiture of not less than $5,000 and not more than $10,000"); *United States ex rel. Marcus v. Hess*, 41 F. Supp. 197, 218 (W.D. Pa. 1941), *aff'd.*, 317 U.S. 537 (1943) (even when the government does not pay out money because it discovers the fraud, the False Claims Act "makes it plain that regardless of damages sustained, the United States would still be entitled to recover the penalty"); *United States v. Mackby*, 221 F. Supp. 2d 1106 (N.D. Cal. 2002), *aff'd* 203 U.S. App. LEXIS 11152 (9th Cir. June 3, 2003); *United States v. Williams*, 2003 U.S. Dist. LEXIS 9988, *6 (N.D. Ill June 10, 2003) ("A plain reading of the statute, the relevant case law and the legislative history confirms that the Court is not free to depart from these mandatory amounts.").

the fraud alleged by Relator in Counts I, II, and III.  While the settlement does provide for

payment for the fraud relating to Print Mail and APM's improper retention of prescription

rebates, these payments do not even equal single damages.  Nor does the settlement include any

restitution for lost Investment Income mandated by the Contracts and normally obtained from

FEP contractors that over state their expenses or under state their rebates.  In reality, the

Defendants financially benefits from the fraud it committed under the proposed settlement.

### D.    Award to the Relator

The False Claims Act rewards relators who bring *qui tam* actions by providing them a

share in a percentage of "the proceeds of the action or settlement of the claim, depending upon

the extent to which the person substantially contributed to the prosecution of the action."[27]  This

percentage is separately negotiated by the relator and the Government after the settlement has

been decided upon.  Relator, therefore, poses no objection at this time to any percentage since

such a discussion would be premature.

### E.    The Settlement Standard and Burden of Proof

The False Claims Act provides that the Government may settle an action over the

Relator's objections only if there is: (1) a hearing; and, (2) a judicial determination that the

proffered settlement between the Government and the defendant is fair, adequate and reasonable

under all the circumstances.

> The Government may settle the action with the defendant notwithstanding
> the objections of the person initiating the action if the court determines, after

---

[27] 31 U.S.C. § 3730(d).  *See*, James B. Helmer, Jr., How Great is Thy Bounty:  Relator's
Share Calculations Pursuant to the False Claims Act, 68 U. Cin. L. Rev. 737 (2000).

a hearing, that the proposed settlement is fair, adequate, and reasonable under
all the circumstances.  Upon a showing of good cause, such hearing may be
held in camera.[28]

While the statute is silent as to whether the proponent or the objector has the burden of
proof, Sixth Circuit case law in class action cases which use the same standard in evaluating
proposed settlements is instructive.[29]  As recognized by this court in *Bowling v. Pfizer, Inc.*,
143 F.R.D. 141 (S.D. Ohio, 1992), "The burden of proving the fairness of the settlement rests
with the proponents."  *Id.* at 151.  Furthermore, this Court should consider the judgment of
experienced counsel for the parties in determining whether a proffered settlement is fair,
adequate and reasonable.[30]  Here, Relator's counsel has extensive experience in evaluating,
trying, and settling False Claims Act cases.  Thus, this objection should be entitled to some
degree of weight.

Government counsel's attempt to simply "Notify" this Court of his decision to settle and
dismiss this action is specifically prohibited by §§ 3730(c)(2)(B) and 3730(c)(2)(A) of the False
Claims Act.   Government counsel should not benefit by his attempt to improperly utilize
F.R.C.P. 41 to circumvent the protections and safeguards that Congress enacted in 1986.  Relator
requests that this Court specifically find that the Government has the burden of proving by a
preponderance of the evidence that the proposed settlement is fair, reasonable, and adequate

---

[28] *Id.* at § 3730(c)(2)(B).

[29] *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38 (6th Cir., 1990).

[30] *Stotts v. Memphis Fire Dept.*, 679 F.2d 541, 554 (6th Cir. 1982); *Alvarado v. Memphis-Shelby
County Airport Authority*, 2000 U.S. App. LEXIS 21259 (6th Cir. 2000).

under the circumstances.

**F.      The Relator's Right To Discovery**

The False Claims Act unequivocally confers upon the Relator the right to object to the Government's proposed settlement as well as the right to a hearing to determine the fairness, adequacy, and reasonableness of the proffered settlement.[31]  The right to conduct limited discovery is a necessary corollary to Relator's right to object to the settlement.[32]

Facts similar to these arose in *United States ex rel. McCoy v. California Medical Review, Inc.*, 133 F.R.D. 143 (N.D. Cal. 1990).  There, the Relator was excluded from settlement negotiations and was not fully informed as to the details of how settlement damages were calculated.[33]  In ruling that the relator was entitled to conduct limited discovery, including "a limited number of depositions," McCoy made the following observation:

> it is difficult to see how the court could properly evaluate a settlement that is "fair, adequate, and reasonable under all the circumstances" without the opportunity for some disclosure.  To exclude *qui tam* plaintiffs from some reasonable discovery that will shed light on the settlement and enlighten the court invites collusion under a statute that was intended to achieve the opposite purpose....Limited discovery regarding the fairness of the proposed settlement therefore is appropriate here.[34]

---

[31] 31 U.S.C. § 3730(c)(2)(B).

[32] *United States ex rel. McCoy v. California Medical Review, Inc.*, 133 F.R.D. 143, 149 (N.D. Cal. 1990); *United States ex rel. Thornton v. Science Applications Int'l Corp.*, 207 F.3d 769, 771-73 (5th Cir. 2000).

[33] *McCoy*, 133 F.R.D. at 149 (N.D. Cal. 1990).

[34] *Id.*

31

Likewise, in *United States ex rel. Gravitt v. General Electric Co*., this Court sustained the

Relator's objection to a proffered settlement and ordered that the Relator could conduct limited

discovery.

Therefore, Relator is requesting discovery from the Government, the Defendants, as well

as Defendants third party vendors, including depositions, concerning:

1)  all information appearing on the FEP True Ups, including, but not limited to the total amount of prescription rebates, credits, discounts, etc. received and reported by Defendants, the number of all beneficiaries and FEP Federal Employees and dependents to whom Anthem provided prescription benefits from 1995 through 2004; total expenses claimed by Defendants and that portion allocated to FEP; Defendants' methodology utilized in creating and verifying the information reported in the original, revised, and second revised FEP True Ups;

2)  methodology and due diligence employed in connection with the execution of annual accounting statement and associated documentation;

3)  internal relationships between parent and subsidiary Defendants, including, but not limited to written agreements, inter-company charge-backs and credits, cost documentation, end of the year statements, contractual agreements, fee schedules, and expense allocations;

4)  annual accounting statements submitted to OPM with all work papers and supporting documentation from which the statements were prepared;

5)  information relating to administrative member rates established and charged under the Contracts and private commercial accounts;

6)  information relating to agreements with pharmaceutical manufacturers from whom Defendants received rebates and Defendants formularies;

7)  information relating to Defendants' annual numerical cost centers related to FEP and HMP;

8)  information relating to Federal Dental Blue and its vendors, including but not limited to Delta Dental;

9)      all information relating to Print Mail a/k/a Personix and its sale;

10)      information relating to Defendants level of performance under the Contracts, including, but not limited performance and telephone service level reports; and

11)      information relating to the allegations contained in Counts I, II, and III.

## VI.    CONCLUSION

One of the most egregious aspects of the fraud perpetrated and partially admitted by Defendants is the population at whom it is directed, that being Federal Employees and their dependents.  Men and women who in these trying times, have dedicated their lives to serving their country and the common good.

The False Claims Act contemplates unleashing an army of private citizens with direct knowledge of fraud to both report and combat such raids on the Treasury.   But the potential for deterring those who would routinely make a business decision to cheat when the law of their circuit requires that "square corner be turned" can never be reached if numerous provisions of the False Claims Act are ignored by those entrusted to prosecute under the Act.

The role envisioned by Congress for relators to play in these cases has not occurred in this case.  As a result, the damages the Government is satisfied to recover are woefully inadequate.  Not only is the settlement not fair, adequate and reasonable, if it were accepted there would be no deterrent value obtained.  Instead, these Defendants will merely have paid a small license fee for constructing and pursuing a scheme which will remain an extremely profitable one for them and others to emulate.

Relator stands ready and is assisted by knowledgeable counsel to pursue this case at no cost to the Government.  Rejecting the proposed settlement and Government counsel's Notice of

33

Dismissal is in the public's interest.  We urge the Court to find the settlement unfair, unreasonable and inadequate under the circumstances of this case, reject the Notice of Dismissal, and allow Relator to conduct discovery on the underlying facts that give rise to the proffered settlement.

Respectfully submitted,

/s/ Timothy Keller
Timothy Keller
Illinois Bar #6225309
Aschemann Keller LLC
108 West Jackson Street
Marion, Illinois 62959
Telephone:  (618) 998-9988
Facsimile: (618) 998-0796
E-Mail:  tkeller@quitamlaw.org
*Counsel for Relator*

Paul Martins (0007623)
Helmer, Martins, Rice, Popham Co. L.P.A.
Fourth & Walnut Centre
Suite 1900
105 East Fourth Street
Cincinnati, Ohio  45202
Telephone:  513) 421-2400
Facsimile:  (513) 421-7902
E-Mail:  pmartins@fcalawfirm.com
*Trial Counsel for Relator*

34

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Relator's Memorandum in Opposition to United States' Notice of Dismissal and Settlement was electronically filed on September 14, 2005. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Parties without access to the Court's electronic filing system will be served by ordinary U.S. Mail.

/s/ Paul B. Martins