# PART I - GENERAL PROVISIONS

## SECTION 1.1
## DEFINITIONS OF FEHB TERMS (JAN 1996)

For purpose of this contract, the following definitions apply:

FEHBP: Federal Employees Health Benefits Program.

Enrollee: The Federal employee, annuitant, former spouse, temporarily-covered former Federal employee or dependent, enrolled under this contract.

Member: The Enrollee and/or an eligible dependent for benefit purposes, and sometimes referred to as subscriber.

Act: The Federal Employees Health Benefits Act, as amended; chapter 89 of title 5, United States Code.

Regulations: (1) The Federal Employees Health Benefits Regulations; part 890, title 5, Code of Federal Regulations, and (2) Chapters 1 and 16 of title 48, Code of Federal Regulations.

Benefits: Covered services or payment for covered services set forth in Appendix A, to which Members are entitled to the extent provided by this contract.

Carrier: As defined by chapter 89 of title 5, United States Code, and may be used interchangeably with the term Contractor.

## SECTION 1.2
## ENTIRE CONTRACT (JAN 1991)

(a)  This document as described in the *Table of Contents* constitutes the entire contract between the parties. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this contract. All modifications to the contract must be made in writing by the duly authorized Contracting Officer.

(b)  All statements concerning coverage or benefits made by OPM, the Carrier or by any individual covered under this policy shall be deemed representations and not warranties. No such statement shall convey or void any coverage, increase or reduce any benefits under this policy or be used in the prosecution of or defense of a claim under this policy unless it is contained in writing and a copy of the instrument containing the statement is or has been furnished to the Member or to the person making the claim.

## SECTION 1.3
## ORDER OF PRECEDENCE (JAN 1996)

Any inconsistency in this contract shall be resolved by giving precedence in the following descending order: The Act, the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract.

## SECTION 1.4
## INCORPORATION OF LAWS AND REGULATIONS (JAN 1996)

(a)  The applicable provisions of (1) chapter 89 of title 5, United States Code; (2) OPM's regulations as contained in part 890 of title 5, Code of Federal Regulations; and (3) chapters 1 and 16 of title 48, Code of Federal Regulations constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith.

(b)  If the Regulations are changed in a manner which would increase the Carrier's liability under this contract, the change will be made effective for the contract period subsequent to the period in which the change is promulgated and, if the change is promulgated in November or December, the change will not be effective until the second contract year following the year in which the change is promulgated; unless (i) The Carrier

agrees to an earlier date or (ii) the change is ordered by the Contracting Officer pursuant to the *Changes--Fixed Price--ALTERNATE I* clause of the contract.

## SECTION 1.5
## RECORDS AND INFORMATION TO BE FURNISHED BY OPM (JAN 1996)

(a) The OPM shall maintain or cause to be maintained records from which may be determined the names and social security numbers of all Enrollees. Such information shall be furnished to the Carrier by the OPM, or other agencies of the Federal Government, at such times and in such form and detail as will enable the Carrier to maintain a currently accurate record of all Enrollees.

(b) The Carrier shall be entitled to rely on information furnished to it, as provided in subsection (a) of this Section, and the OPM agrees that any liabilities incurred under this contract in reliance upon such information shall be a valid charge against the contract. Errors or delays in keeping or reporting data relative to coverage shall not invalidate coverage which would otherwise be validly in force or shall not continue coverage which would otherwise be terminated but, upon discovery of such errors or delays, an equitable adjustment shall be made.

(c) Neither clerical error (whether by the OPM, by any other Government agency, or by the Carrier) in keeping any records pertaining to coverage under this contract, nor delays in making entries thereon, nor failure to make or account for any deduction of enrollment charges, shall invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated, but upon discovery of such error or delay or failure an equitable adjustment of premiums shall be made. If any relevant facts pertaining to any individual to whom coverage under this contract relates shall be found to have been misstated, and if such misstatement affects the existence or the amount or extent of coverage, the true facts shall be used in determining whether coverage is in force under the terms of this contract and in what amount or to what

extent. Any claim payments made by the Carrier before any such adjustment or determination shall be a valid charge against this contract.

(d) OPM shall provide the Carrier, not less often than semi-annually, the number of Enrollees enrolled under the contract by payroll office. The Carrier shall at least annually reconcile its enrollment records with those provided by the Government.

## SECTION 1.6
## CONFIDENTIALITY OF RECORDS (JAN 1991)
## (FEHBAR 1652.224-70)

(a) The Carrier shall use the personal data on employees and annuitants that is provided by agencies and OPM, including social security numbers, for only those routine uses stipulated for the data and published annually in the *Federal Register* as part of OPM's notice of systems of records.

(b) The Carrier shall also hold all medical records, and information relating thereto, of Federal subscribers confidential except as follows:

(1) As may be reasonably necessary for the administration of this contract;

(2) As authorized by the patient or his or her guardian;

(3) As disclosure is necessary to permit Government officials having authority to investigate and prosecute alleged civil or criminal actions;

(4) As necessary to audit the contract;

(5) As necessary to carry out the coordination of benefit provisions of this contract; and

(6) For bona fide medical research or educational purposes. Release of information for medical research or educational purposes shall be limited to aggregated information of a statistical nature that does not identify any individual by name, social security number, or any other identifier unique to an individual.

(c) If the Carrier uses medical records for the administration of the contract, or for bona fide research or educational purposes, it shall so state in the Plan's brochure.

## SECTION 1.7
## STATISTICS AND SPECIAL STUDIES (JAN 1996)

(a) The Carrier shall maintain or cause to be maintained statistical records of its operations under the contract and shall furnish OPM, in the form prescribed by the Contracting Officer, the statistical reports reasonably necessary for the OPM to carry out its functions under Section 1308 and Chapter 89 of title 5, United States Code.

(b) The Carrier shall furnish such other reasonable statistical data and reports of special studies as the Contracting Officer may from time to time request for the purpose of carrying out its functions under Chapter 89 of title 5, United States Code.

(c) The Carrier shall furnish the routine reports in the number of copies to the addresses specified in Appendix C, *Contract Administration Data.*

## SECTION 1.8
## NOTICE (JAN 1991)

Where the contract requires that notice be given to the other party, such notice shall be given in writing to the address specified in Appendix C, *Contract Administration Data.*

## SECTION 1.9
## FEHB QUALITY ASSURANCE (JAN 1996)

(a) The Carrier shall develop and apply a quality assurance program specifying procedures for assuring contract quality. At a minimum the program must include procedures to address:

(1) Accuracy of Payments and Recovery of Overpayments

(i) Processing Accuracy - the number of FEHB claims processed accurately and the total number of FEHB claims processed for the given time period.

REQUIRED STANDARD: An average of 95 percent of FEHB claims must be processed accurately.

(ii) Coding Accuracy - the number of FEHB claims coded accurately divided by the total number of FEHB claims coded for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 98 percent of FEHB claims must be coded accurately.

(iii) Overpayment Recovery - the average number of working days required to commence overpayment collection action against either an FEHB provider or FEHB member following identification of an FEHB overpayment during the given time period.

REQUIRED STANDARD: An average of 30 days following identification of an FEHB overpayment are taken to commence overpayment collection action.

(iv) COB Processing - the Carrier must demonstrate that a statistically valid sampling technique is routinely used to identify FEHB claims prior to or after processing that require(d) coordination of benefits (COB) with a third party payer. As an alternative, the Carrier may provide evidence that it pursues all claims for COB.

(2) Timeliness of Payments to Members or Providers

(i) Average Processing Time (All FEHB Claims) - the average number of working days from the date an FEHB claim is received to the date it is adjudicated (paid, denied or a request for further information is sent out), for the given time period, expressed as a cumulative percentage.

REQUIRED STANDARD:

(A) An average of 87 percent of FEHB claims received over the given time period are adjudicated within 20 working days (28 calendar days).

(B) An average of 92 percent of FEHB claims received over the given time period are adjudicated within 30 working days (42 calendar days).

(C) An average of 97 percent of FEHB claims received over the given time period are adjudicated within 60 working days (84 calendar days).

(3) Quality of Service and Responsiveness to Members

(i) Member Inquiries - the number of working days taken to respond to an FEHB member's written inquiry, expressed as a

cumulative percentage, for the given time period.

REQUIRED STANDARD:

(A) An average of 60 percent of FEHB member written inquiries are responded to within 10 working days (14 calendar days).

(B) An average of 90 percent of FEHB member written inquiries are responded to within 30 working days (42 calendar days).

(ii) Telephone Access - the Carrier shall report on the following statistics concerning telephone access to the member services department (or its equivalent) for the given time period. <u>Except that</u>, if the Carrier does not have a computerized phone system, report results of periodic surveys on telephone access.

(A) Telephone Waiting Time - the average number of seconds elapsed before a member's telephone call is connected to a Carrier representative.

REQUIRED STANDARD: On average, no more than 1.5 minutes elapse before a member's telephone call is connected to a Carrier representative.

(B) Telephone Blockage Rate - the percentage of time that callers receive a busy signal when calling the Carrier.

REQUIRED STANDARD: On average, callers receive a busy signal no more than 10 percent of the time.

(C) Telephone Abandonment Rate - the number of calls attempted but not completed (presumably because callers tired of waiting to be connected to a Carrier representative) divided by the total number of calls attempted (both completed and not completed), expressed as a percentage.

REQUIRED STANDARD: On average, no more than 8 percent of calls are abandoned.

(4) Responsiveness to FEHB Member Requests for Reconsideration.

REQUIRED STANDARD: For 100 percent of written FEHB disputed claim requests received for the given time period, within 30 days after receipt by the Carrier, the Carrier must affirm the denial in writing to the FEHB member, pay the claim, provide the service, or request additional information reasonably necessary to make a determination.

(5) Quality Assurance Plan - the Carrier must demonstrate that a statistically valid sampling technique is routinely used prior to or after processing to randomly sample FEHB claims against Carrier quality assurance/fraud and abuse prevention standards.

(b) The Carrier shall keep complete records of its quality assurance procedures and the results of their implementation and make them available to the Government as determined by OPM. If the Carrier cannot separate FEHB claims from all other claims, the Carrier may report compliance based on all claims and indicate this on the report.

(c) The Contracting Officer may order the correction of a deficiency in the Carrier's quality assurance program. The Carrier shall take the necessary action promptly to implement the Contracting Officer's order. If the Contracting Officer orders a modification of the Carrier's quality assurance program pursuant to this paragraph (c) after the contract year has begun, the costs incurred to correct the deficiency may be excluded from the administrative expenses — for that contract year — that are subject to the administrative expenses limitation specified at Appendix B; *provided* the Carrier demonstrates that the correction of the deficiency significantly increases the Carrier's liability under this contract.

(d) Assessing Member Satisfaction. In addition to any other means of surveying Plan members that the Carrier may develop, the Carrier shall participate in a uniform customer satisfaction survey as directed by OPM, to permit comparisons across FEHB carriers. The Carrier shall take into account the published results of the uniform survey, or other results as directed by OPM, in identifying areas for improvement as part of the Carrier's quality assurance program.

SECTION 1.10
NOTICE OF SIGNIFICANT EVENTS (JAN 1991) (FEHBAR 1652.222-70)

(a) The Carrier agrees to notify the Contracting Officer of any Significant Event within ten (10) working days after the Carrier

becomes aware of it. As used in this section, a Significant Event is any occurrence or anticipated occurrence that might reasonably be expected to have a material effect upon the Carrier's ability to meet its obligations under this contract, including, but not limited to, any of the following:

(1) Disposal of major assets;

(2) Loss of 15% or more of the Carrier's overall membership;

(3) Termination or modification of any contract or subcontract if such termination or modification might have a material effect on the Carrier's obligations under this contract;

(4) Addition or termination of provider agreements;

(5) Any changes in underwriters, reinsurers or participating plans;

(6) The imposition of, or notice of the intent to impose, a receivership, conservatorship, or special regulatory monitoring;

(7) The withdrawal of, or notice of intent to withdraw State licensing, HHS qualification, or any other status under Federal or State law;

(8) Default on a loan or other financial obligation;

(9) Any actual or potential labor dispute that delays or threatens to delay timely performance or substantially impairs the functioning of the Carrier's facilities or facilities used by the Carrier in the performance of the contract;

(10) Any change in its charter, constitution, or by-laws which affects any provision of this contract or the Carrier's participation in the Federal Employees Health Benefits Program;

(11) Any significant changes in policies and procedures or interpretations of the contract or brochure which would affect the benefits available under the contract or the costs charged to the contract;

(12) Any fraud, embezzlement or misappropriation of FEHB funds; or

(13) Any written exceptions, reservations or qualifications expressed by the independent accounting firm (which ascribes to the standards of the American Institute of Certified Public Accountants) contracted with

by the Carrier to provide an opinion on its annual financial statements.

(b) Upon learning of a Significant Event OPM may institute action, in proportion to the seriousness of the event, to protect the interest of Members, including, but not limited to--

(1) Directing the Carrier to take corrective action;

(2) Suspending new enrollments under this contract;

(3) Advising Enrollees of the Significant Event and providing them an opportunity to transfer to another plan;

(4) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account;

(5) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by he Significant Event; or

(6) Terminating this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (b) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall insert this clause in any subcontract or subcontract modification if both the amount of the subcontract or modification charged to the FEHBP (or, in the case of a community-rated carrier, applicable to the FEHBP) exceeds $100,000 and the amount of the subcontract or modification to be charged to the FEHBP (or, in the case of a community-rated carrier, applicable to the FEHBP) exceeds 25 percent of the total cost of the subcontract or modification. If the Carrier is a CMP, it shall also insert this clause in all provider agreements over $25,000. If the Carrier is not a CMP, it shall also insert this clause in the contract with its underwriter, if any. The Carrier shall substitute "Contractor" or other appropriate reference for the term "Carrier."

## SECTION 1.11
## FEHB INSPECTION (JAN 1991) (FEHBAR 1652.246-70)

(a) The Government or its agent has the right to inspect and evaluate the work performed or being performed under the contract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work. If the Government or its agent performs inspection or evaluation on the premises of the Carrier or a subcontractor, the Carrier shall furnish and require the subcontractor to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

(b) The Carrier shall insert this clause in all subcontracts for underwriting and administrative services and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

## SECTION 1.12
## CORRECTION OF DEFICIENCIES (JAN 1996)

(a) The Carrier shall maintain sufficient financial resources, facilities, providers, staff and other necessary resources to meet its obligations under this contract. If the OPM determines that the Carrier does not demonstrate the ability to meet its obligations under this contract, the OPM may notify the Carrier of the asserted deficiencies. The Carrier agrees that, within ten (10) working days following notification, it shall present detailed plans for correcting the deficiencies. These plans shall be presented in a form prescribed by the OPM. Pending submission or implementation of plans required under this Section, the OPM may institute action as it deems necessary to protect the interests of Members, including, but not limited to:

(1) Suspending new enrollments under this contract;

(2) Advising Enrollees of the asserted deficiencies and providing them an opportunity to transfer to another plan;

(3) Withholding payment of subscription income or restricting access to the Carrier's

Letter of Credit account; or

(4) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the deficiency.

(b) The Carrier agrees that failure to submit or to diligently implement plans which are required under this Section shall constitute sufficient grounds for termination of this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (a) the OPM shall notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall include the substance of this clause in the contract with its underwriter and substitute an appropriate term for "Carrier."

## SECTION 1.13
## INFORMATION AND MARKETING MATERIALS (JAN 1996)

(a) OPM and the Carrier shall agree upon language setting forth the benefits, exclusions and other language of the Plan and shall certify to that language in the Certified Brochure Text (Appendix A of this contract). OPM in its sole discretion, may order the Carrier to print and distribute the Certified Brochure Text, in a format and quantity approved by OPM. This formatted document is referred to as the FEHB brochure. The Carrier shall distribute the FEHB brochure to all Federal employees, annuitants, former spouses and former employees and dependents enrolled in the Plan. The Carrier shall also distribute the document(s) to Federal agencies to be made available to such individuals who are eligible to enroll under this contract. At the direction of OPM, the Carrier shall produce and distribute an audio cassette version of the approved language. The Carrier may print additional FEHB brochures for distribution or its own use, but only in the approved format and at its own expense.

(b) Supplemental material. Only marketing materials or other supplemental literature prepared in accordance with FEHBAR 1625.203-70 (Section 1.14 of this contract) may be distributed or displayed at or through

Federal facilities.

(c) Carrier certifications. The Carrier shall certify to OPM each year that the statement of FEHB benefits in the Certified Brochure Text included as Appendix A, is reflected, verbatim, in the FEHB brochure and, if the Carrier intends to have supplemental marketing materials distributed by Federal agencies, that the materials have been prepared in accordance with FEHBAR 1652.203-70.

(d) OPM may order the Carrier to prepare an addendum or reissue the FEHB brochure or any piece(s) of supplemental marketing material at no expense to the Government if it is found to not conform to the certifications described in paragraph (c) of this section.

## SECTION 1.14
MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (JAN 1991)(FEHBAR 1652.203-70)

(a) The Carrier agrees that any advertising material, including that labeled promotional material, marketing material, or supplemental literature, shall be truthful and not misleading.

(b) Criteria to assess compliance with paragraph (a) of this clause are available in the *FEHB Supplemental Literature Guidelines* which are developed by OPM and should be used, along with the additional guidelines set forth in FEHBAR 1603.702, as the primary guide in preparing material; further guidance is provided in the NAIC *Rules Governing Advertising of Accident and Sickness Insurance With Interpretive Guidelines.* Guidelines are periodically updated and provided to the Carrier by OPM.

(c) Failure to conform to paragraph (a) of this clause may result in a reduction in the service charge, if appropriate, and corrective action to protect the interest of Federal Members. Corrective action will be appropriate to the circumstances and may include, but is not limited to the following actions by OPM:

(1) Directing the Carrier to cease and desist distribution, publication, or broadcast of the material;

(2) Directing the Carrier to issue

corrections at the Carrier's expense and in the same manner and media as the original material was made; and

(3) Directing the Carrier to provide, at the Carrier's expense, the correction in writing by certified mail to all enrollees of the Plan(s) that had been the subject of the original material.

(d) Egregious or repeated offenses may result in the following action by OPM:

(1) Suspending new enrollments in the Carrier's Plan(s);

(2) Providing Enrollees an opportunity to transfer to another plan; and

(3) Terminating the contract in accordance with Section 1.15, *Renewal and Withdrawal of Approval.*

(e) Prior to taking action as described in paragraphs (c) and (d) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(f) The Carrier shall incorporate this clause in subcontracts with its underwriter, if any, and other subcontractors directly involved in the preparation or distribution of such advertising material and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

## SECTION 1.15
RENEWAL AND WITHDRAWAL OF APPROVAL (JAN 1991)(FEHBAR 1652.249-70)

(a) The contract renews automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by OPM or the Carrier not less than 60 calendar days before the renewal date, or unless modified by mutual agreement.

(b) This contract also may be terminated at other times by order of OPM pursuant to 5 U.S.C. 8902(e). After OPM notifies the Carrier of its intent to terminate the contract, OPM may take action as it deems necessary to protect the interests of Members, including but not limited to--

(1) Suspending new enrollments under the contract;

(2) Advising Enrollees of the asserted deficiencies; and

(3) Providing Enrollees an opportunity to transfer to another plan.

(c)    OPM may, after proper notice, terminate the contract at the end of the contract term if it finds that the Carrier did not have at least 300 Enrollees enrolled in its Plan at any time during the two preceding contract terms.

## SECTION 1.16
SUBCONTRACTS (JAN 1991) (FEHBAR 1652.244-70)

(a) The Carrier shall notify the Contracting Officer reasonably in advance of entering into any subcontract or subcontract modification, or as otherwise specified by this contract, if both the amount of the subcontract or modification charged to the FEHB Program (in the case of community-rated carriers, applicable to the FEHB Program) exceeds $100,000 and is 25 percent of the total cost of the subcontract.

(b) The advance notification required by paragraph (a) of this clause shall include the information specified below:

(1)    A description of the supplies or services to be subcontracted;

(2)    Identification of the type of subcontract to be used;

(3)    Identification of the proposed subcontract and an explanation of why and how the proposed subcontractor was selected, including the competition obtained;

(4) The proposed subcontract price and the Carrier's cost or price analysis;

(5) The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions;

(6)    The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract; and

(7) A negotiation memorandum reflecting--

(i)    The principal elements of the subcontract price negotiations;

(ii)    The most significant consideration controlling establishment of initial or revised prices;

(iii) The reason cost or pricing data were or were not required;

(iv) The extent, if any, to which the Carrier did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(v) The extent to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Carrier and the subcontractor; and the effect of any such defective data on the total price negotiated;

(vi)    The reasons for any significant difference between the Carrier's price objective and the price negotiated; and

(vii)    A complete explanation of the incentive fee or profit plan when incentives are used. The explanation shall identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

(c) The Carrier shall obtain the Contracting Officer's written consent before placing any subcontract for which advance notification is required under paragraph (a) of this clause. However, the Contracting Officer may ratify in writing any such subcontract. Ratification shall constitute the consent of the Contracting Officer.

(d) The Contracting Officer may waive the requirement for advance notification and consent required by paragraphs (a), (b) and (c) of this clause where the Carrier and subcontractor submit an application or renewal as a contractor team arrangement as defined in FAR Subpart 9.6 and--

(1) The Contracting Officer evaluated the arrangement during negotiation of the contract or contract renewal; and

(2) The subcontractor's price and/or costs were included in the Plan's rates that were reviewed and approved by the Contracting Officer during negotiation of the contract or contract renewal.

(e)    Unless the consent or approval specifically provides otherwise, consent by the



Contracting Officer to any subcontract shall not constitute a determination (1) of the acceptability of any subcontract terms or conditions; (2) of the allowability of any cost under this contract; or (3) to relieve the Carrier of any responsibility for performing this contract.

(f)     No subcontract placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis.     Any fee payable under cost reimbursement type subcontracts shall not exceed the fee limitations in FAR 15.903(d). Any profit or fee payable under a subcontract shall be in accordance with the provision of Section 3.7, *Service Charge.*

(g)  The Carrier shall give the Contracting Officer immediate written notice of any action or suit filed and prompt notice of any claim made against the Carrier by any subcontractor or vendor that, in the opinion of the Carrier, may result in litigation related in any way to this contract with respect to which the Carrier may be entitled to reimbursement from the Government.

## SECTION 1.17
## NOVATION AGREEMENT (JAN 1996)

The agreement at FEHBAR 1642.1204 shall be submitted for approval to OPM when the Carrier's assets or the entire portion of the assets pertinent to the performance of this contract, as determined by the Government, are transferred.

## SECTION 1.18
## AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (JAN 1996)

The agreement at FEHBAR 1642.1205 shall be submitted for approval to OPM when the carrier changes its name and the Government's and Contractor's rights and obligations remain unaffected.

## SECTION 1.19
## UNDERWRITER (JAN 1991)

(a) If this Plan is underwritten, the Carrier agrees not to modify (except as allowed in Section 2.3 *Payment of Benefits and Provision of Services and Supplies*) or terminate the policy issued by the Underwriter of the Plan or give notice of termination or intent not to renew the policy without prior express approval of the Contracting Officer.     The Carrier shall notify the Contracting Officer in writing of its decision to change Underwriters as soon as is reasonable after the decision is made but no later than at the time the Carrier submits its benefit and rate proposal to OPM for the succeeding contract term.

(b)  In the event of any inconsistency between the terms of this contract between OPM and the Carrier and the terms of the policy issued by the Underwriter to the Carrier, the terms of this contract shall prevail.

(c)  If this Plan is underwritten, the policy issued to the Carrier by its Underwriter is a part of this contract and is incorporated therein by reference. The Carrier shall include paragraph (b) in the contract with its Underwriter.

**PART II - BENEFITS**

## SECTION 2.1
### ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT (JAN 1996)

(a) Enrollment.

(1) Each eligible individual who wishes to be enrolled in the plan offered by this Carrier shall, as a prerequisite to such enrollment, complete a Health Benefits Registration Form within the time and under the conditions specified in the regulations. The Government personnel office having cognizance over the Enrollee shall promptly furnish notification of such registration to the Carrier.

(2) A person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or directions of OPM given pursuant to chapter 89, title 5, United States Code.

(b) Special Limitations With Regard To Employee Organizations.

(1) A plan sponsored by an employee organization as defined by the Act, is available only to eligible employees, annuitants, former spouses, and former employees and dependents (and eligible members of their families) who must be or must become members of the sponsoring organization to enroll in the Plan.

(2) Employees with membership status in an employee organization at the time they become annuitants may retain their membership in the organization and, if eligible, continue their enrollment in the Plan. Survivor annuitants of Enrollees in the Plan may continue their enrollment in the Plan without becoming members of the sponsoring employee organization.

(c) The Carrier shall issue evidence of the Enrollee's coverage and furnish to the Enrollee copies of any forms necessary to make claim for benefits.

## SECTION 2.2
### BENEFITS PROVIDED (JAN 1996)

(a) The Carrier shall provide the benefits as described in the Certified Brochure Text found in Appendix A.

(1) Benefits offered under this contract may be modified by the Carrier to permit methods of treatment not expressly provided for, but not prohibited by law, rule or Federal policy, if otherwise contractually appropriate, and if such treatment is medically necessary and is as cost effective as providing benefits to which the Member may otherwise be entitled.

(2) The Carrier may pay for or provide a health service or supply in an individual case which does not come within the specific benefit provisions of the contract, if the Carrier determines the benefit is within the intent of the contract, and the Carrier determines that the provision of such benefit is in the best interests of the Federal Employees Health Benefits Program.

(3) In individual cases, the Carrier (or Plan), after consultation with and concurrence by the Member and provider(s), may offer a benefit alternative not ordinarily covered under this contract which will result in equally effective medical treatment at no greater cost. The decision to offer an alternative benefit is solely the Carrier's and is not subject to OPM review under the disputed claims process.

(b) In each case when the Carrier provides a non-covered benefit in accordance with the authority of (a)(1), (2) or (3) the Carrier shall document in writing prior to the provision of such benefit the reasons and justification for its determination. Such payment or provision of services or supplies while a valid charge under the contract shall not be considered to be a precedent in the disposition of similar cases.

(c) Except as provided for in (a) above, the

Carrier shall provide benefits for services or supplies in accordance with Appendix A.

(d) The Carrier, subject to (e) below, shall determine whether in their judgment a service or supply is medically necessary or payable under this contract.

(e) The Carrier agrees to pay for or provide a health service or supply in an individual case if OPM finds that the Member is entitled thereto under the terms of the contract.

## SECTION 2.3
## PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES (JAN 1996)

(a)  By enrolling or accepting services under this contract, Members are obligated to all terms, conditions, and provisions of this contract. The Carrier may request Members to complete reasonable forms or provide information which the Carrier may reasonably request; *provided,* however, that the Carrier shall not require Members to complete any form as a precondition of receiving benefits unless the form has first been approved for use by OPM. Notwithstanding Section 2.9 *Claims Processing,* forms requiring specific approval do not include claim forms and other forms necessary to receive payment of individual claims.

(b)  All benefits shall be paid (with appropriate documentation of payment) within a reasonable time after receipt of reasonable proof covering the occurrence, character, and extent of the event for which the claim is made. The claimant shall furnish satisfactory evidence that all services or supplies for which expenses are claimed are covered services or supplies within the meaning of the contract.

(c)  The procedures and time period for filing claims shall be as specified in the Certified Brochure Text *(Appendix A).* However, failure to file a claim within the time required shall not in itself invalidate or reduce any claim where timely filing was prevented by administrative operations of Government or legal incapacitation, provided the claim was submitted as soon as reasonably possible.

(d)  The Carrier may request a Member to submit to one or more medical examinations to determine whether benefits applied for are for services and supplies necessary for the diagnosis or treatment of an illness or injury or covered condition of the Member and may withhold payment of such benefits pending completion of the examinations. The examinations shall be made at the expense of the Carrier by a physician selected by the Member from a panel of at least three physicians whose names are furnished by the Carrier, and the results of the examinations shall be made available to the Carrier and the Member.

(e)  As a condition precedent to the provision of benefits hereunder, the Carrier, to the extent reasonable and necessary and consistent with Federal law, shall be entitled to obtain from any person, organization or Government agency, including the Office of Personnel Management, all information and records relating to visits or examination of, or treatment rendered or supplies furnished to, a Member as the Carrier requires in the administration of such benefits. The Carrier may obtain from any insurance company or other organization or person any information, with respect to any Member, which it has determined is reasonably necessary to:

(1)  identify enrollment in a plan,

(2)  verify eligibility for payment of a claim for health benefits, and

(3)  carry out the provisions of the contract, such as subrogation, recovery of payments made in error, workers compensation, and coordination of benefits.

(f)  Benefits are payable to the Enrollee in the Plan or his or her assignees. However, under the following circumstances different payment arrangements are allowed:

(1)  Reimbursement Payments for the Enrollee. If benefits become payable to the estate of an Enrollee or an Enrollee is a minor, or an Enrollee is physically or mentally not competent to give a valid release, the Carrier may either pay such benefits directly to a hospital or other provider of services or pay such benefits to any relative by blood or connection by marriage of the Enrollee determined by the Carrier to be equitably entitled thereto.

(2) Reimbursement Payments for a minor child. If a child is covered as a family member under the Enrollee's self and family enrollment and is in the custody of a person other than the Enrollee, and if that other person certifies to the Carrier that he or she has custody of and financial responsibility for the dependent child, then the Carrier may issue an identification card for the dependent child(ren) to that person and may reimburse that person for any covered medical service or supply.

(3) Reimbursement Payments to family members covered under the Enrollee's self and family enrollment. If a covered child is legally responsible, or if a covered spouse is legally separated, and if the covered person does not reside with the Enrollee and certifies such conditions to the Carrier, then the Carrier may issue an identification card to the person and may reimburse that person for any covered medical service or supply. In the case of a legally separated spouse, the Carrier may also furnish the explanation of benefits to the spouse when determined by the Carrier to be required.

(4) Reimbursement payments to Government programs, such as Medicaid. If Federal law provides that reimbursement is payable to a Government program under coordination of benefits or similar rules, in lieu of being payable to the Enrollee or other covered person, the Carrier may reimburse the other Government program for any covered medical service or supply. To the degree that the Carrier is able to identify Medicaid beneficiaries, the Carrier will process claims directly to the provider of service or reimburse the Medicaid agency if the Medicaid agency has already paid the provider and is seeking reimbursement. When this situation is identified, the Carrier will update the member's records to ensure proper adjudication of claims.

(5) Any payments made in good faith in accordance with paragraphs (f)(1) through (f)(4) shall fully discharge the Carrier to the extent of such payment.

(g) Overpayments. If the Carrier or OPM determines that a Member's claim has been paid in error for any reason, the Carrier shall make a diligent effort to recover an overpayment to the member from the member or, if to the provider, from the provider. The Carrier shall follow general business practice and procedures in collecting debts owed under the Federal Employees Health Benefits Program. Diligent effort to recover overpayments means that upon discovering that an overpayment exists, the Carrier shall--

(1) Send a written notice of overpayment to the member or provider that provides: (A) an explanation of when and how the overpayment occurred, (B) when applicable, cite the appropriate contractual benefit provision, (C) the exact identifying information (i.e., dollar amount overpaid, date paid, check number, date of service and provider name), (D) a request for payment of the debt in full, and (E) an explanation of what may occur should the debt not be paid, including possible offset to future benefits. The notice may also offer an installment option. In addition, the Carrier shall provide the debtor with an opportunity to dispute the existence and amount of the debt before proceeding with collection activities;

(2) After confirming that the debt does exist and in the appropriate amount, send follow-up notices to the member or the provider at 30, 60 and 90 day intervals, if the debt remains unpaid and undisputed;

(3) The Carrier may off-set future benefits payable to the member or to a provider on behalf of the member to satisfy a debt due under the FEHBP if the debt remains unpaid and undisputed for 120 days after the first notice.

(4) After applying the first three steps, refer cases when it is cost effective to do so to a collection attorney or a collection agency if the debt is not recovered;

(5) Make diligent effort to recover overpayments until the debt is paid in full or determined to be uncollectible by the Carrier because it is no longer cost effective to pursue further collection efforts or it would be against equity and good conscience to continue collection efforts.

(6) Suspend recovery efforts for a debt which is based upon a claim that has been

appealed as a disputed claim under Section 2.8, until the appeal has been resolved;

(7) The Carrier may charge the contract for benefit payments made erroneously but in good faith provided that it can document that it acted with due diligence as described above.

(8) Maintain records that document individual unrecovered overpayment collection activities for audit or future reference.

(h) Overpayment recoveries may be reduced by any legal or collection agency fees expended to obtain the recoveries and which are not otherwise payable under this experience-rated contract. The amount credited to the contract shall be the net amount remaining after deducting the related legal or collection agency fees.

(i) Notwithstanding subsection (f), the Carrier reserves the right to pay the Member directly for all covered services described in the Certified Brochure Text attached as Appendix A.

## SECTION 2.4
## TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES (JAN 1996)

(a) A Member's coverage is terminated as specified in regulations issued by the OPM. Benefits after termination of coverage are as specified in the regulations.

(b) A Member is entitled to a temporary continuation of coverage or an extension of coverage under the conditions and to the extent specified in the regulations.

(c) A Member whose coverage hereunder has terminated is entitled, upon application within the times and under the conditions specified in regulations, to a non-group contract regularly offered for the purpose of conversion from the contract or similar contracts. The conversion contract shall be in compliance with 5 U.S.C., chapter 89, and regulations issued thereunder.

(d) Costs associated with writing or providing benefits under conversion contracts shall not be an allowable cost of this contract.

(e) The Carrier shall maintain on file with OPM copies of the conversion policies offered

to persons whose coverage under this contract terminates and advise OPM promptly of any changes in the policies. The Contracting Officer may waive this requirement where because of the large number of different conversion policies offered by the Carrier it would be impractical to maintain a complete up-to-date file of all policies. In this case the Carrier shall submit a representative sample of the general types of policies offered and provide copies of specific policies on demand.

## SECTION 2.5
## SUBROGATION (JAN 1996)

(a) The Carrier's subrogation rights, procedures and policies, including recovery rights, shall be in accordance with the provisions of the Certified Brochure Text.

(b) Subrogation recoveries may be reduced by any legal fees expended to obtain the recoveries and which are not otherwise payable under this experience-rated contract. The amount credited to the contract shall be the net amount remaining after deducting the related legal fees.

## SECTION 2.6
## COORDINATION OF BENEFITS (JAN 1991)
## (FEHBAR 1652.204-71)

(a) The Carrier shall coordinate the payment of benefits under this contract with the payment of benefits under Medicare, other group health benefits coverages, and the payment of medical and hospital costs under no-fault or other automobile insurance that pays benefits without regard to fault.

(b) The Carrier shall not pay benefits under this contract until it has determined whether it is the primary carrier or unless permitted to do so by the Contracting Officer.

(c) In coordinating benefits between plans, the Carrier shall follow the order of precedence established by the NAIC Model Guidelines for Coordination of Benefits (COB) as specified by OPM.

(d) Where (1) the Carrier makes payments under this contract which are subject to COB

provisions; (2) the payments are erroneous, not in accordance with the terms of the contract, or in excess of the limitations applicable under this contract; and (3) the Carrier is unable to recover such COB overpayments from the Member or the providers of services or supplies, the Contracting Officer may allow such amounts to be charged to the contract; the Carrier must be prepared to demonstrate that it has made a diligent effort to recover such COB overpayments.

(e)   COB savings shall be reported by experience-rated carriers each year along with the Carrier's annual accounting statement in a form specified by OPM.

(f)   Changes in the order of precedence established by the NAIC Model Guidelines implemented after January 1 of any given year shall be required no earlier than the beginning of the following contract term.

*[NOTE: In the event that benefits are payable to the Member under no-fault automobile insurance, the no-fault automobile insurer shall be the Primary Carrier if it is obligated legally to pay benefits for health care expenses without regard to other health benefits coverage that the Member may have. The term "no-fault automobile insurance" includes any automobile insurance policy under which the insurer pays benefits for health care expenses resulting from the accident without regard to whether the insured's conduct contributed to the accident.]*

## SECTION 2.7
## DEBARMENT AND OTHER SANCTIONS (JAN 1996)

(a)   Notwithstanding 5 U.S.C. 8902(j) or any other provision of the law and regulations, if, under 5 U.S.C. 8902a, 5 C.F.R. 970, or Public Law 103-123 (or other applicable appropriations law), a provider is barred from participating in the Program under 5 U.S.C. or the provider's services under 5 U.S.C. are excluded, the Carrier agrees that no payment shall be made by the Carrier pursuant to any

contract under 5 U.S.C. (either to such provider or by reimbursement) for any service or supply furnished by such provider during the period of the debarment, except as provided in 5 C.F.R. 970.200(b).

(b)   The OPM shall notify the Carrier when a provider is barred from the FEHBP.

## SECTION 2.8
## FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS (JAN 1996)

The processes for filing health benefit claims and for court review of disputed health benefit claims under the FEHB are as described at FEHBAR 1652.204-72.

## SECTION 2.9
## CLAIMS PROCESSING (JAN 1996)

A standardized claims filing process shall be used by all participating fee-for-service, individual-practice prepaid, or mixed-model prepaid FEHB carriers. Beginning in 1996, the Carrier shall develop and apply procedures for using the standard claims process.   At a minimum the Carrier's program must achieve the following objectives:

(1)   By the year 2000, the majority of provider claims should be submitted electronically;

(2)   By January 1996, all physicians shall be notified that future claims must be submitted electronically or on the Health Care Financing Administration 1500 form;

(3)   Beginning no later than June 1996, the Carrier shall not use any unique physician claim form(s) for such FEHB member claims;

(4)   Beginning September 1996, Carrier should reject all such claims submitted on forms other than the HCFA 1500 form and shall explain the reason on the Explanation of Benefits form; and

(5)   Carrier shall advise OPM of its progress in implementing this policy as directed by the Contracting Officer.

## SECTION 2.10 CALCULATION OF COST SHARING PROVISIONS (JAN 1996)

When the Member is required to pay a specified percentage of the cost of covered services, the Member's obligation for covered services shall be based on the amount the provider has agreed to accept as full payment, including future discounts that are known and that can be accurately calculated at the time the claim is processed.  This includes for example, prompt pay discounts as well as other discounts granted for various business reasons. Any discount not determined at the time of the actual adjudication shall be placed in the Special Reserve upon its determination.