## PART III - PAYMENTS, CHARGES AND ACCOUNTING

**SECTION 3.1**
**PAYMENTS (JAN 1995) (FEHBAR 1652.232-71)**

(a)  OPM will pay to the Carrier, in full settlement of its obligations under this contract, subject to adjustment for error or fraud, the subscription charges received for the Plan by the Employees Health Benefits Fund (hereinafter called the Fund) less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM, plus any payments made by OPM from the Contingency Reserve.

(b)  The specific subscription rates, charges, allowances and limitations applicable to the contract are set forth in Appendix B.

(c)  Recurring payments from premiums shall be made available for Carrier and/or underwriter drawdown not later than thirty days after receipt by the Fund.  The Contracting Officer may authorize special non-recurring payments from the Contingency Reserve in accordance with OPM's regulations.

(d) In the event this contract between the Carrier and OPM is terminated or not renewed in accordance with General Provision 1.15, Renewal and Withdrawal of Approval, the Contingency Reserve of the Carrier held by OPM shall be available to the Carrier to pay the necessary and proper charges against this contract to the extent that the Carrier reserves are insufficient for that purpose.

**SECTION 3.2**
**ACCOUNTING AND ALLOWABLE COST (JAN 1991) (FEHBAR 1652.216-71)**

(a)  Annual Accounting Statement.

(1)  The Carrier, not later than the date specified by the contract, shall furnish to OPM for that contract period an accounting of its operations under the contract.  The accounting shall be in the form prescribed by OPM and shall include, among other things, a Balance Sheet and a Summary Statement of FEHBP Financial Operations.  The Summary Statement of FEHBP Financial Operations shall include the following items for each option provided by the contract:

(i)  Subscription income received and accrued (including amounts received from the Contingency Reserve);

(ii)  Health Benefits charges paid and accrued;

(iii)  Administrative expenses and other charges paid and accrued;

(iv) Income on investments;

(v) Other adjustments;

(vi) Sum of items (i) minus (ii) minus (iii) plus (iv) plus or minus (v).

(2)  The Carrier shall have its most recent financial statement and that of its underwriter, if any, audited by an accounting firm that ascribes to the standards of the American Institute of Certified Public Accountants. The report shall be submitted to OPM not later than 180 days after the end of the contract period.

(3)  Based on the results of either the independent audit or a Government audit, the Carrier's annual accounting statements may be (i) adjusted by amounts found not to constitute allowable costs; or (ii) adjusted for prior overpayments or underpayments.

(b)  Definition of costs.

(1)  The allowable costs chargeable to the contract for a contract period shall be the actual, necessary and reasonable amounts incurred with proper justification and accounting support, determined in accordance with the terms of this contract, Subpart 31.2 of the Federal Acquisition Regulation (FAR) and Subpart 1631.2 of the Federal Employees Health Benefits Acquisition Regulation (FEHBAR) applicable on the first day of the contract period.

(2)  In the absence of specific contract terms to the contrary, contract costs shall be classified in accordance with the following criteria:

(i)  Benefits.  Benefit costs consist of payments made and liabilities incurred for covered health care services on behalf of

FEHBP subscribers less any refunds, rebates, allowances or other credits received.

(ii) Administrative expenses. Administrative expenses consist of all allocable, allowable and reasonable expenses incurred in the adjudication of subscriber benefit claims or incurred in the Carrier's overall operation of the business. Unless otherwise stated in the contract, administrative expenses include, in part: all taxes (excluding premium taxes, as provided in section 1631.205-41), insurance and reinsurance premiums, medical and dental consultants used in the adjudication process, concurrent or managed care review when not billed by a health care provider and other forms of utilization review, the cost of maintaining eligibility files, legal expenses incurred in the litigation of benefit payments and bank charges for letters of credit. Administrative expenses exclude the cost of Carrier personnel, equipment, and facilities directly used in the delivery of health care services, which are benefit costs, and the expense of managing the FEHBP investment program which is a reduction of investment income earned.

(iii) Investment income. The Carrier is required to invest and reinvest all funds on hand, including any in the Special Reserve or any attributable to the reserve for incurred but unpaid claims, which are in excess of the funds needed to discharge promptly the obligations incurred under the contract. Investment income represents the net amount earned by the Carrier after deducting investment expenses as a result of investing the FEHBP funds. The direct or allocable indirect expenses incurred in managing the investment program, such as consultant or management fees, are chargeable against the investment income earned.

(iv) Other charges. (A) Mandatory statutory reserve. Charges for mandatory statutory reserves are not allowable unless specifically provided for in the contract. When the term "mandatory statutory reserve" is specifically identified as an allowable contract charge without further definition or explanation, it means a requirement imposed by State law upon the Carrier to set aside a specific amount or rate of funds into a restricted reserve that is accounted for separately from all other reserves and surpluses of the Carrier and which may be used only with the specific approval of the State official designated by law to make such approvals. The amount chargeable to the contract may not exceed an allocable portion of the amount actually set aside. If the statutory reserve is no longer required for the purpose for which it was created, and these funds become available for the general use of the Carrier, a pro rata share based upon FEHBP's contribution to the total Carrier's set aside shall be returned to the FEHBP in accordance with FAR 31.201-5.

(B) Premium taxes. When the term "premium taxes" is used in this contract without further definition or explanation, it means a tax imposed by State or local statutes upon the Carrier's gross or net premiums received.

(c) Certification of Accounting Statement Accuracy.

(1) The Carrier shall certify the annual accounting statement in the form set forth in paragraph (c)(3) of this clause. The certificate shall be signed by the chief executive officer and the chief financial officer of the Carrier.

(2) The Carrier shall require an authorized agent of its underwriter, if any, also to certify the annual accounting statement.

(3) The certificate required shall be in the following form:

CERTIFICATION OF ACCOUNTING
STATEMENT ACCURACY

This is to certify that I have reviewed this accounting statement and to the best of my knowledge and belief:

1. The statement was prepared in conformity with the guidelines issued by the Office of Personnel Management and fairly presents the financial results of this contract period in conformity with those guidelines;

2. The costs included in the statement are allowable and allocable in accordance with the terms of the contract and with the cost principles of the Federal Employees Health Benefits Acquisition Regulation and the

Federal Acquisition Regulation;

3. Income, rebates, allowances, refunds and other credits made or owed in accordance with the terms of the contract and applicable cost principles have been included in the statement;

4. If applicable, the letter of credit account was managed in accordance with 5 CFR Part 890, 48 CFR Chapter 16, and OPM guidelines.

CARRIER NAME:
NAME OF CHIEF EXECUTIVE OFFICER:
   (TYPE OR PRINT NAME)
NAME OF CHIEF FINANCIAL OFFICER:
   (TYPE OR PRINT NAME)
SIGNATURE OF CHIEF EXECUTIVE OFFICER:
DATE SIGNED:
SIGNATURE OF CHIEF FINANCIAL OFFICER:
DATE SIGNED:
UNDERWRITER:
NAME AND TITLE OF RESPONSIBLE CORPORATE OFFICIAL:
   (TYPE OR PRINT NAME)
SIGNATURE OF RESPONSIBLE CORPORATE OFFICIAL:
DATE SIGNED:  (END OF CERTIFICATE)

*[NOTE: As required by subsection (a)(1) of this section, the Carrier, not later than 90 days after the end of the contract period, shall furnish OPM for that period an accounting of its operations under the contract.]*

## SECTION 3.3
## SPECIAL RESERVE (JAN 1996)

(a) This contract is experience rated. The Special Reserve represents the cumulative difference between income to the plan (subscription income plus interest on investments [item (a)(1)(vi) in Section 3.2 *Accounting and Allowable Cost*, which also includes income gain or loss]) and plan expenses (benefit costs plus allowable administrative expenses and retentions). The Special Reserve held by or on behalf of the Carrier is to be used only for payment of charges against this contract.

(b) If this contract is terminated or not renewed and there is a positive balance remaining in the Special Reserve after all allowable costs chargeable to the contract in accordance with Section 3.2 plus an agreed-

upon amount of administrative expenses for contract liquidation have been paid, the balance of any funds held by the Carrier, including current income on its investment, shall be paid to OPM for credit to the Carrier's Contingency Reserve maintained by OPM when the Carrier submits its annual accounting statement for the final contract year.

(c) The Carrier shall incorporate this clause in all agreements with underwriters of the Carrier's FEHB Plan.

## SECTION 3.4
## INVESTMENT INCOME (JAN 1991) (FEHBAR 1652.215-71)

(a) The Carrier shall invest and reinvest all FEHB funds on hand that are in excess of the funds needed to promptly discharge the obligations incurred under this contract. The Carrier shall seek to maximize investment income with prudent consideration to the safety and liquidity of investments.

(b) All investment income earned on FEHB funds shall be credited to the Special Reserve on behalf of the FEHBP.

(c) When the Contracting Officer concludes that the Carrier failed to comply with paragraphs (a) or (b) of this clause, the Carrier shall credit the Special Reserve with investment income that would have been earned, at the rate(s) specified in paragraph (f) of this clause, had it not been for the Carrier's noncompliance. "Failed to comply with paragraphs (a) or (b)" means: (1) making any charges against the contract which are not allowable, allocable, or reasonable; or (2) failing to credit any income due the contract and/or failing to place excess funds, including subscription income and payments from OPM not needed to discharge promptly the obligations incurred under the contract, refunds, credits, payments, deposits, investment income earned, uncashed checks, or other amounts owed the Special Reserve, in income producing investments and accounts.

(d) Investment income lost as a result of unallowable, unallocable, or unreasonable charges against the contract shall be paid

from the first day of the contract term following the contract term in which the unallowable charge was made and shall end on the earlier of: (1) the date the amounts are returned to the Special Reserve (or the Office of Personnel Management); (2) the date specified by the Contracting Officer; or (3) the date of the Contracting Officer's Final Decision.

(e) Investment income lost as a result of failure to credit income due the contract or failure to place excess funds in income producing investments and accounts shall be paid from the date the funds should have been invested or appropriate income was not credited and shall end on the earlier of: (1) the date the amounts are returned to the Special Reserve (or the Office of Personnel Management); (2) the date specified by the Contracting Officer; or (3) the date of the Contracting Officer's Final Decision.

(f) The Carrier shall credit the Special Reserve for income due in accordance with this clause. All amounts payable shall bear lost investment income compounded semiannually at the rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraphs (d) and (e) of this clause. Thereafter, the rate shall be the rate applicable for each 6-month period as fixed by the Secretary until the amount is paid.

(g) The Carrier shall incorporate this clause into agreements with underwriters of the Carrier's FEHB plan and shall substitute "underwriter" or other appropriate reference for the term "Carrier".

## SECTION 3.5
NON-COMMINGLING OF FUNDS (JAN 1991) (FEHBAR 1652.232-72)

(a) The Carrier and/or its underwriter shall keep all FEHBP funds for this contract (cash and investments) physically separate from funds obtained from other sources. Accounting for such FEHBP funds shall not be based on allocations or other sharing mechanisms and shall agree with the Carrier's accounting records.

(b) In certain instances the physical separation of FEHBP funds may not be practical or desirable. In such cases, the Carrier may request a waiver from this requirement from the Contracting Officer. The waiver shall be requested in advance and the Carrier shall demonstrate that accounting techniques have been established that will clearly measure FEHBP cash and investment income (i.e., subsidiary ledgers). Reconciliations between amounts reported and actual amounts shown in accounting records shall be provided as supporting schedules to the Annual Accounting Statements.

(c) The Carrier shall incorporate this clause in all subcontracts that exceed $25,000 and shall substitute "contractor" or other appropriate reference for "Carrier and/or its underwriter".

## SECTION 3.6
UNCASHED CHECKS (JAN 1996)

Payment of checks issued pursuant to this contract shall be voided if the checks have been outstanding for two (2) years. The amounts represented by these checks shall be credited to the Special Reserve of this contract no later than the 25th month after issuance. The term "Check" shall include any written instrument issued to pay or reimburse the payment of benefits, or any services, supplies or subcontracts hereunder.

## SECTION 3.7
SERVICE CHARGE (JAN 1996)

(a) Any service charge negotiated shall be set forth in Appendix B and shall be the total profit that can be charged to the contract. The amount set forth in Appendix B shall encompass all profit (whether entitled service charge, profit, fee, contribution to reserves or surpluses or any other title) that may be included in major subcontracts in accordance with the provisions of FEHBAR 1631.205-80, Major Subcontractor Service Charges.

(b) One-twelfth of the service charge for the contract term accrues on the last day of each month during the contract term. The Carrier shall withdraw the service charge from the Special Reserve when it accrues.

(c) If this contract is renewed by operation of section 1.15(a), the amount of the service charge accrued under (b) shall be "one-twenty-fourth" rather than "one-twelfth." The remainder of the service charge not otherwise accrued during the contract term shall accrue on the last day of the contract term.

## SECTION 3.8
## CONTRACTOR RECORDS RETENTION (JAN 1991) (FEHBAR 1652.204-70)

Notwithstanding the provisions of Section 5.7 [FAR 52.215-2(d)] *Audit-Negotiation* and the SF 1412, the Carrier will retain and make available all records applicable to a contract term that support the annual statement of operations and the rate submission for that contract term for a period of 5 years after the end of the contract term to which the records relate, except that individual enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

## SECTION 3.9
## APPROVAL FOR ASSIGNMENT OF CLAIMS (JAN 1991) (FEHBAR 1652.232-73)

(a) Notwithstanding the provisions of Section 5.35 [FAR 52.232-23] *Assignment of Claims,* the Carrier shall not make any assignment under the Assignment of Claims Act without the prior written approval of the Contracting Officer.

(b) Unless a different period is specified in the Contracting Officer's written approval, an assignment shall be in force only for a period of one year from the date of the Contracting Officer's approval. However, assignments may be renewed upon their expiration.

## PART IV – SPECIAL PROVISIONS

### SECTION 4.1
### ALTERATIONS IN CONTRACT (JAN 1996)

(a) Section 1.15 Renewal and Withdrawal of Approval (FEHBAR). The following subsections are added:

(d) If the agency suspends payment of the subscription charges for any reason, the Carrier may (1) suspend making benefit payments until payment of all subscription charges due is fully restored; or (2) terminate the contract without prior notice.

(e) In the event the contract is terminated for any reason, no Member shall be entitled to benefits for services or supplies received after the last day of his or her pay period in which such termination occurs. Nor shall the Member be entitled to the conversion privilege set forth in section 2.4 after contract termination.

(b) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Notwithstanding subsection (f) of section 2.3, benefits provided under the contract are not assignable by the Member to any person without express written approval of the Carrier, and in the absence of such approval, any such assignment shall be void. Notwithstanding such approval, no assignment of benefits may be made in any case prior to the time that a valid claim for benefits arises.

(c) Section 2.4 Termination of Coverage and Conversion Privileges. The conversion contract set forth in section 2.4(c) may be a contract that is regularly offered by the local Blue Cross and/or Blue Shield Plan.

(d) Section 2.5 Subrogation. The following subsections are added:

(c) To the extent that a Member has received benefits for covered services under this contract for an injury or illness caused by a third party, the Carrier shall have the right to be subrogated and succeed to any rights of recovery against any person or organization from whom the Member is legally entitled to receive all or part of those same benefits, including insurers of individual (non-group) policies of liability insurance that are issued to and in the name of the Member.

The obligation of the Carrier to recover amounts through subrogation is limited to making a reasonable effort to seek recovery of amounts to which it is entitled to recover in cases which are brought to its attention. The Carrier shall not be required to recover any amounts from any person or organization who causes an injury or illness for which a Member makes claims for benefits.

(d) The Carrier may also recover directly from the Member all amounts received by the Member by suit, settlement, or otherwise from any third party or its insurer, or the Member's insurer under an individual policy or liability insurance, for benefits which have also been paid under this contract.

(e) The Member shall take such action, furnish such information and assistance, and execute such papers as the Carrier or its representative believes are necessary to facilitate enforcement of its rights, and shall take no action which would prejudice the interests of the Carrier to subrogation.

(f) All Participating Plans shall subrogate under a single, nation-wide policy to ensure equitable and consistent treatment for all Members under this contract.

(e) Section 2.6 Coordination of Benefits (FEHBAR). The following subsections are added:

(g) In computing liability, when the Blue Cross and Blue Shield Service Benefit Plan ("this Plan") is not the Primary payer:

(1) the benefits payable by this Plan shall be determined on a claim by claim basis, except that (i) the benefits payable are limited to benefits for services and supplies set forth in the Certified Brochure Text; and (ii) the benefits payable shall be determined only for those claims in excess of $100, except in the case where the Primary payer is Medicare; and

(2) benefits shall not be payable for services and supplies that are provided beyond the day and visit limitations and the lifetime maximums set forth in the Certified Brochure Text.

•     •

(h) Whenever payments which should have been made under this provision have been made under any other group health coverage, the Carrier shall have the right, exercisable alone and in its sole discretion, to pay over to any organizations making such other payments any amount it shall determine to be warranted in order to satisfy the intent of this provision, and amounts so paid shall be deemed to be benefits paid under this contract and, to the extent of such payments discharged from liability under this contract.

(f) Section 3.1 Payments (FEHBAR). The following subsection is added:

(e) In the event this contract is terminated or not renewed, the agency shall be liable for all sums due and unpaid, including subscription charges, for the period up to the last day of the Member's entitlement to benefits.

(g) Section 3.2. Accounting and Allowable Cost (FEHBAR). As required by Public Law 101-508, § 8909 of title 5, U.S.C., Sections 3.2(b)(2)(ii) and 3.2(b)(2)(iv)(B) of this contract are amended by the following:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a Carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any Carrier or subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such Carrier or underwriting or plan administration subcontractor from business conducted under this Chapter, if that tax, fee, or payment is applicable to a broad range of business activity.

(h) Section 3.2 Accounting and Allowable Cost (FEHBAR). The provision in Section 3.2(b)(2)(iv)(A) is supplemented as follows: Charges for mandatory statutory reserves (Section 3.2(b)(2)(iv)(A)) to satisfy mandatory statutory reserve requirements of Participating Plans are allowable to the extent that such requirements exceed that portion of the service charge at Appendix B, Subscription Rates, Charges, Allowances and Limitations applicable to such Plans.

(i) Section 3.2 Accounting and Allowable Cost (FEHBAR). The note at the end of this section is modified as follows: [NOTE: As required by subsection (a)(1) of this section, the Carrier, not later than 120 days after the end of the contract period, shall furnish OPM for that period an accounting of its operations under the contract.]

(j) Section 3.3 Special Reserve. The provision in Section 3.3(a) is supplemented as follows: The Special Reserve held by or on behalf of the Carrier is to be used only for

payment of charges against this contract, including advance payments to Participating Plans and to hospitals.

(k) PART V - REQUIRED CLAUSES Sections 5.30, 5.31, 5.32. Cost Accounting Standards, part 30 of the FAR, has not yet been implemented for the FEHBP. Sections 5.30, 5.31 and 5.32 are not applicable to this contract.

## SECTION 4.2
## HOSPITAL (FACILITY) BENEFIT PAYMENTS AND CONDITIONS (JAN 1991)

(a) Benefits described in the Certified Brochure Text shall be provided to the extent practicable in the form of services rendered by hospitals, freestanding ambulatory facilities, and home health care agencies, and payment, therefore, by or on behalf of the Carrier shall constitute a complete discharge of their obligations under this contract to the extent of services rendered in accordance with the terms and conditions of the contract.

(b) Benefits for inpatient hospital care shall be available only to a Member admitted to the hospital on the recommendation, and while under the active medical supervision of a duly licensed physician or alternative provider as described in section 8902(k)(1) of title 5 U.S.C. who is a member of the staff of, or acceptable to, the hospital selected.

(c) Hospital service is subject to all the rules and regulations of the hospital selected including rules governing admissions.

(d) While a Member may elect to be hospitalized in any hospital, the Carrier does not undertake to guarantee the admission of such Member to the hospital, nor the availability of any accommodations or services therein requested by the Member or his physician.

## SECTION 4.3

## DEFINITION OF CARRIER (JAN 1991)

The Carrier is the Blue Cross and Blue Shield Association, an Illinois not-for-profit corporation, acting on behalf of participating Blue Cross and Blue Shield Plans and pursuant to authority specified in Exhibit A for and in behalf of the organizations specified in Exhibit A (hereinafter sometimes referred to as "Participating Plans").

## SECTION 4.4
## AUDIT DISPUTES (JAN 1991)

A claim seeking, as a matter of right, the payment of money, in a sum certain, pursuant to 48 CFR section 52.233-1, shall not be made more than five years following the last day prescribed by the contract for filing the Annual Accounting Statement for the year with respect to which the claim arises. A claim includes, in the case of the Carrier, a charge to the contract.

## SECTION 4.5
## ASSOCIATION DUES (JAN 1996)

A Participating local Blue Cross and Blue Shield Plan may charge to this contract 90 percent of the Association dues which the Plan otherwise would charge to the contract.

## SECTION 4.6
## TRAVEL COSTS (JAN 1996)

The Carrier may charge and account for travel expenses related to administration of the contract on a per diem basis, subject to the maximums prescribed by the Federal Travel Regulations. For those travel costs for each contract term that are subject to the Federal per diem rates set forth at 48 CFR section 31.205-46, the Carrier shall charge to the contract an amount equal to the lesser of:
  (i) the actual aggregate charges for those costs, or
  (ii) the aggregate charges calculated using the per diem rates set forth in the Federal Travel Regulations.

**SECTION 4.7**
**MARKET RESEARCH COSTS (JAN 1996)**

(a) Costs of market research surveys or studies are generally allowable if the survey or study is:

1. directed to current Members and Members who left the Blue Cross and Blue Shield Service Benefit Plan in the most recent Open Season, or

2. focused on long-range planning, industry state-of-the-art developments, or product development issues for which a direct benefit or potential benefit to the FEHB Program can be identified, or

3. pre-approved by the Contracting Officer.

(b) Costs of market research surveys or studies are generally not allowable if the primary purpose is to survey or study an otherwise unallowable cost item, such as: to determine the effectiveness of advertising or sales strategies; to evaluate image effectiveness or ways to achieve image enhancement; or to perform a competitive analysis with other carriers in the FEHB Program. Such costs are unallowable, regardless of who receives the research surveys or studies.

(c) This provision does not supersede other contract requirements, such as prior approval for subcontracts under Section 1.16 Subcontracts (FEHBAR 1652.244-70).

## PART V - REQUIRED CLAUSES

### SECTION 5.1
### DEFINITIONS. (SEPT 1991) (FAR 52.202-1)

(a) "Head of the agency" (also called "agency head") or "Secretary" means the Secretary (or Attorney General, Administrator, Governor, Chairperson, or other chief official, as appropriate) of the agency; and the term "authorized representative" means any person, persons, or board (other than the Contracting Officer) authorized to act for the head of the agency or Secretary.

(b) Commercial component means any component that is a commercial item.

(c) Commercial item means--

(1) Any item, other than real property, that is of a type customarily used for nongovernmental purposes and that--

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (c)(1) of this clause through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (c)(1) or (c)(2) of this clause, but for--

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. "Minor" modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor;

(4) Any combination of items meeting the requirements of paragraphs (c)(1), (2), (3), or (5) of this clause that are of a type customarily combined and sold in combination to the general public;

(5) Installation services, maintenance services, repair services, training services, and other services if such services are procured for support of an item referred to in paragraphs (c)(1), (2), (3), or (4) of this clause, and if the source of such services--

(i) Offers such services to the general public and the Federal Government contemporaneously and under similar terms and conditions; and

(ii) Offers to use the same work force for providing the Federal Government with such services as the source uses for providing such services to the general public;

(6) Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed under standard commercial terms and conditions. This does not include services that are sold based on hourly rates without an established catalog or market price for a specific service performed;

(7) Any item, combination of items, or service referred to in subparagraphs (c)(1) through (c)(6), notwithstanding the fact that the item, combination of items, or service is transferred between or among separate divisions, subsidiaries, or affiliates of a Contractor; or

(8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local Governments.

(d) Component means any item supplied to the Federal Government as part of an end item or of another component.

(e) Nondevelopmental item means--

(1) Any previously developed item of supply

used exclusively for governmental purposes by a Federal agency, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement;

(2) Any item described in paragraph (e)(1) of this definition that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency; or

(3) Any item of supply being produced that does not meet the requirements of paragraph (e)(1) or (e)(2) solely because the item is not yet in use.

(f) "Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.    The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer.

(g) Except as otherwise provided in this contract, the term "subcontracts" includes, but is not limited to, purchase orders and changes and modifications to purchase orders under this contract.

SECTION 5.2
[RESERVED]

SECTION 5.3
GRATUITIES.  (APR 1984) (FAR 52.203-3)

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) The facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under

paragraph (a) above, the Government is entitled -

(1) To pursue the same remedies as in a breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee.    (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

SECTION 5.4
COVENANT AGAINST CONTINGENT FEES.
(APR 1984) (FAR 52.203-5)

(a) The Contractor warrants that no person or agency has been employed or retained to solicit or obtain this contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency.  For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee," as used in this clause, means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor

holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee", as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence," as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

SECTION 5.5
ANTI-KICKBACK PROCEDURES. (JUL 1995)
(FAR 52.203-7)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies,

materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract, and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b)  The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act), prohibits any person from --

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

(c)(1) The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships.

(2) When the Contractor has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such reports shall be made to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice.

(3) The Contractor shall cooperate fully with any Federal agency investigating a possible violation described in paragraph (b) of this clause.

(4) The Contracting Officer may (i) offset the amount of the kickback against any

monies owed by the United States under the prime contract and/or (ii) direct that the Prime Contractor withhold, from sums owed a subcontractor under the prime contract, the amount of any kickback. The Contracting Officer may order the monies withheld under subdivision (c)(4)(ii) of this clause be paid over to the Government unless the Government has already offset those monies under subdivision (c)(4)(i) of this clause. In either case, the Prime Contractor shall notify the Contracting Officer when the monies are withheld.

(5) The Contractor agrees to incorporate the substance of this clause, including this subparagraph (c)(5) but excepting subparagraph (c)(1), in all subcontracts under this contract which exceed $100,000.

**SECTION 5.6**
**[RESERVED]**

**SECTION 5.7**
**AUDIT AND RECORDS-NEGOTIATION. (OCT 1995) (FAR 52.215-2)**

(a)  As used in this clause, records includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) Examination of costs. If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) Cost or pricing data. If the Contractor has been required to submit cost or pricing data in connection with any pricing action relating to this contract, the Contracting

Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to--

(1)  The proposal for the contract, subcontract, or modification;

(2)  The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4)  Performance  of  the  contract, subcontract or modification.

(d)  Comptroller  General--(1)  The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder.

(2)  This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) Reports. If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating (1) the effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports and (2) the data reported.

(f) Availability. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statue or by other clauses of this

contract. In addition--

(1) If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement; and

(2) Records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (a) [sic], in all subcontracts under this contract that exceed the simplified acquisition threshold in FAR Part 13, and--

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

SECTION 5.8
PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA. (OCT 1995) (FAR 52.215-22)

(a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because (1) the Contractor or a subcontractor furnished cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data, (2) a subcontractor or prospective subcontractor furnished the Contractor cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data, or (3) any of these parties furnished data of any

description that were not accurate, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

(b) Any reduction in the contract price under paragraph (a) above due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract or (2) the actual cost to the Contractor, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor; provided, that the actual subcontract price was not itself affected by defective cost or pricing data.

(c)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Contractor agrees not to raise the following matters as a defense--

(i) The Contractor or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost of pricing data had been submitted;

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Contractor or subcontractor took no affirmative action to bring the character of the data to the attention of the Contracting Officer;

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract; or

(iv) The Contractor or subcontractor did not submit a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (c)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if--

(A) The Contractor certifies to the Contracting Officer that, to the best of the Contractor's knowledge and belief, the

Contractor is entitled to offset in the amount requested; and

(B) The Contractor proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if--

(A) The understated data was known by the Contractor to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(d) If any reduction in the contract price under this clause reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the Contractor shall be liable to and shall pay the United States at the time such overpayment is repaid--

(1) Simple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and

(2) A penalty equal to the amount of the overpayment, if the Contractor or subcontractor knowingly submitted cost or pricing data which were incomplete, inaccurate, or non-current.

SECTION 5.9
[RESERVED]

SECTION 5.10
SUBCONTRACTOR COST OR PRICING DATA. (OCT 1995) (FAR 52.215-24)

(a) Before awarding any subcontract expected to exceed the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1), on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1), the Contractor shall require the subcontractor to submit cost or pricing data (actually or by specific identification in writing), unless an exception under FAR 15.804-1 apples.

(b) The Contractor shall require the subcontractor to certify in substantially the form prescribed in subsection 15.804-4 of the Federal Acquisition Regulation (FAR) that, to the best of its knowledge and belief, the data submitted under paragraph (a) of this clause were accurate, complete, and current as of the date of agreement on the negotiated price of the subcontract or subcontract modification.

(c) In each subcontract that exceeds the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1), when entered into, the Contractor shall insert either --

(1) The substance of this clause, including this paragraph (c), if paragraph (a) above requires submission of cost or pricing data for the subcontract; or

(2) The substance of the clause at FAR 52.215-25, Subcontractor Cost or Pricing Data - Modifications.

SECTION 5.11
[RESERVED]

SECTION 5.12
FACILITIES CAPITAL COST OF MONEY. (SEP 1987) (FAR 52.215-30)

(a) Facilities capital cost of money will be an allowable cost under the contemplated contract, if the criteria for allowability in subparagraph 31.205-10(a)(2) of the Federal Acquisition Regulation are met. One of the allowability criteria requires the prospective contractor to propose facilities capital cost of money in its offer.

(b) If the prospective Contractor does not propose this cost, the resulting contract will include the clause Waiver of Facilities Capital Cost of Money.

SECTION 5.13
WAIVER OF FACILITIES CAPITAL COST OF