*For additional information or copies of this publication, please contact:*

Office of the Inspector General
U.S. Office of Personnel Management
1900 E Street, NW. Room 6400
Washington, DC 20415-1100

Telephone: (202) 606-1200   Fax: (202) 606-2153

Web site: *www.opm.gov/oig*



OFFICE OF
THE INSPECTOR GENERAL

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, D.C. 20415-0001

*October 31, 2001*

*Honorable Kay Coles James*
*Director*
*U.S. Office of Personnel Management*
*Washington, D.C. 20415*

*Dear Mrs. James:*

*I respectfully submit the Office of the Inspector General's Semiannual Report to Congress for the period April 1, 2001 to September 30, 2001. This report describes our office's activities during the past six-month reporting period.*

*Should you have any questions about the report or any other matter of concern, please do not hesitate to call upon me for assistance.*

*Sincerely,*

*Patrick E. McFarland*
*Inspector General*

OIG Semiannual Report

# Table of Contents

Message from the IG .......................................... i
Productivity Indicators ....................................... iii
Statutory and Regulatory Review ............................ 1
Audit Activities .............................................. 5
    Health and Life Insurance Carrier Audits .................... 5
    Information Systems Audits ............................... 18
    Other External Audits .................................... 24
    OPM Internal Audits ..................................... 26
Investigative Activities ....................................... 33
    Health Care-Related Fraud and Abuse ..................... 33
    Retirement Fraud and Special Investigations ................ 35
    OIG Hotlines and Complaint Activity ...................... 37
Index of Reporting Requirements ............................ 39
Appendix I:
    Final Reports Issued With Questioned Costs ................ 41
Appendix II:
    Final Reports Issued With Recommendations
    for Better Use of Funds ................................... 41
Appendix III-A:
    Insurance Audit Reports Issued *(Standard Audits)* .............. 42
Appendix III-B:
    Insurance Audit Reports Issued *(Rate Reconciliation Audits)* ......... 44
Appendix IV:
    Internal Audit Reports Issued ............................. 46
Appendix V:
    Information Systems Audit Reports Issued ................. 46
Appendix VI:
    Combined Federal Campaign Audit Reports Issued ......... 47
Investigations Tables
    Table 1: Investigative Highlights ........................... 36
    Table 2: Hotline Calls and Complaint Activity .............. 37

## Message from the IG

During this reporting period, the U.S. Office of Personnel Management (OPM) won an important victory in the courts that will have a significant impact on the Federal Employees Health Benefits Program (FEHBP) in the years to come. On September 24, 2001, the United States Court of Appeals for the Federal Circuit, in *Qualmed Plans for Health of New Mexico, Inc. v. United States*, supported the ability of my office to identify, and OPM's right to collect, interest the FEHBP loses when a health insurance carrier overcharges the program through its premium rates.

The Court of Appeals decision will allow OPM to continue collecting millions of dollars of interest due the FEHBP. Since the interest will be paid directly back to the FEHBP trust fund, this will help offset any future increases in FEHBP premium rates.

Specifically, this ruling by the U.S. Court of Appeals for the Federal Circuit reverses a U.S. Court of Federal Claims decision that took away our agency's right to collect lost investment income on certain defective pricing audit findings involving rate overcharges to the FEHBP in 1991 and 1992. Our auditors identified these overcharges after discovering that Qualmed, in developing the FEHBP's premium rates, had made a mistake in selecting the two subscriber groups used to determine if the FEHBP's rates were equitable and reasonable.

After selecting the appropriate groups and recalculating the FEHBP's rates, we found that Qualmed had overcharged the FEHBP. Qualmed did not deny the overcharge and reached agreement with OPM on the overcharge amount. The plan paid that amount within 30 days, notwithstanding the lost investment income still due. The issue over lost investment income owed to the FEHBP remained unresolved.

Qualmed contended that no interest was due and filed a complaint with the U.S. Court of Federal Claims. Qualmed argued that simply not selecting a subscriber group closest in subscriber size to the FEHBP did not represent defective pricing and, therefore, any interest on the overcharge was due only from the date that it was notified of the overcharge and then only if the amount was not paid within 30 days.

The U.S. Department of Justice, with the assistance of OPM's Office of General Counsel, argued that Qualmed had engaged in defective pricing and that the FEHBP contract and applicable regulations provide for interest from the date of the overcharge. With this decision, the court voiced strong disagreement with the

lower court's position, ruling that the selection of inappropriate groups did, in fact, represent defective pricing and that Qualmed must pay OPM interest from the date of the FEHBP overcharges.

If the court had ruled against OPM, the decision would have had a decidedly negative impact on the FEHBP. First, OPM would not have been able to collect interest amounting to more than $28 million, owed not only by Qualmed but by numerous other plans which also had refused to pay any lost investment income while the court case was pending. Second, future overcharges resulting from the selection of improper subscriber groups would no longer be subject to lost investment income charges. The FEHBP would lose millions of dollars as a consequence, because my office would no longer be in a position to recommend an interest assessment on overcharges in these cases.

We cannot overstate how potentially critical this ruling is for the FEHBP since such a large portion of the overcharges we identify in our audits result from plans selecting inappropriate subscriber groups.

I believe it is entirely appropriate for plans to pay interest when they overcharge the FEHBP, particularly since the FEHBP is losing money by not having the funds available to it. Furthermore, the FEHBP and its subscribers are able to realize a specific benefit when lost investment income is returned to the FEHBP trust fund: the return of this money will have a positive impact on future premium rates. I am hopeful that the decision the court made in this case will end any question that plans may have concerning OPM's right to collect lost investment income in the future.

I would like to offer a special thanks to OPM's Retirement and Insurance Service and Office of General Counsel for their diligence and determination in bringing this case to a successful conclusion. Without their efforts to protect the FEHBP and its subscribers, the FEHBP would have continued to be financially harmed indefinitely by these insurance carriers' actions. Now, the government, our agency, and FEHBP subscribers alike will benefit for years to come.

# Productivity Indicators

## Financial Impact:

Audit Recommendations for
  Recovery of Funds ............................. $65,309,332

Recoveries Through
  Investigative Actions .......................... $1,483,547

Management Commitments to
  Recover Funds ............................... $174,242,861*

*Note: OPM management commitments for recovery of funds during this reporting period reflect amounts covering current and past reporting period audit recommendations.*

## Accomplishments:

Audit Reports Issued ..................................... 60

Investigative Cases Closed ............................... 17

Cases Accepted for Prosecution ........................... 17

Indictments .............................................. 16

Convictions .............................................. 12

Hotline Contacts and Complaint Activity ................. 483

Health Care Provider Debarments
  and Suspensions ..................................... 1,918

# Statutory and Regulatory Review

*As is required under section 4 (a)(2) of the Inspector General Act of 1978, as amended, (IG Act) our office monitors and reviews legislative and regulatory proposals for their impact on the Office of the Inspector General (OIG) and the Office of Personnel Management (OPM) programs and operations. Specifically, we perform this activity to evaluate their potential for encouraging economy and efficiency and preventing fraud, waste and mismanagement. We also monitor legal issues that have a broad effect on the Inspector General community and present testimony and other communications to Congress as appropriate.*

Our oversight of legislative and regulatory issues affecting our office and the Inspector General community continued to be one of our highest operational priorities during this reporting period. One area of particular and long-standing concern is the need for permanent law enforcement authority for OIG investigators. As we indicated in detail in our last semiannual report, we are committed to bringing about the statutory changes necessary for the efficient operation of the law enforcement responsibilities of the OIGs.

Another concern that we have addressed frequently in our semiannual reports is providing an appropriate statutory basis for health care anti-fraud efforts within the Federal Employees Health Benefits Program (FEHBP). For some time, we believed that extending the FEHBP certain provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) would resolve the shortcomings in our legal authorities. However, a recent and careful reanalysis of this issue now leads us to believe that a more selective approach may be preferable.

The multiple terrorist attacks on America have caused us—as they have all parts of the federal government and, indeed, all Americans—to reconsider the ways that we can contribute to the overriding national priority of ensuring the safety of our democracy and all its citizens.

It is clear that the Inspector General community can serve an important role through its cooperative actions with other law enforcement agencies.

These issues, as well as our health care administrative sanctions activities, are discussed in the articles which follow in this section.

## Legislative and Regulatory Review

### OIG Support for Terrorist Investigations

The FBI has always been one of the lead agencies in protecting Americans from terrorist acts. Beginning with the tragic events of September 11 and the subsequent bioterrorism episodes, this has become its number one priority.

As has been widely reported in the news media, the FBI has been conducting investigations to identify all those who may have been involved in these terrorists act, to unravel the complexities of their support structure, and to take all actions necessary to deter future acts that could undermine the integrity of our way of life.

The Federal Aviation Administration (FAA) is also contributing significantly

## IG Community Assists in Federal Anti-Terrorist Activities

to revitalizing America's sense of safety and security. Its federal sky marshal program protects airline employees and passengers by having armed federal law enforcement officers on many commercial flights.

Both the FBI and the FAA need additional trained law enforcement personnel to assist them in their tasks. The IG community, with over 2,600 well-trained special agents, has such personnel. Our OIG, as well as others, has already made many of its agents available to the FBI and FAA for roles directly related to America's response to terrorism.

A number of IG community law enforcement personnel have been assigned on a rotating basis to assist in ongoing investigations and to act as sky marshals. IG auditors with financial expertise also have been made available to the FBI to help follow the terrorists' various money trails.

As a direct result of these efforts, the IG community has become aware of statutory issues concerning the IG Act and appropriation law that limit our flexibility to make personnel available quickly to assist in emergency situations. As a consequence, we are considering statutory and regulatory options to allow the IG community to respond more readily when called upon in the future. We expect to discuss those options in more detail in a future semiannual report.

## IG & Agency Developing New Health Care Anti-Fraud Strategy



### Health Care Fraud Authority for OPM

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) substantially expanded the system of enforcement tools and sanctions authorities available for use against health care provider fraud in Medicare and other federal health programs. Specific statutory language in HIPAA excluded the FEHBP from coverage by these provisions.

For nearly five years after passage of HIPAA, we deemed legislation to remove this exclusion to be an urgent priority on the basis that OPM was seriously disadvantaged, vis-a-vis other agencies, in its anti-fraud activities. However, a thorough reexamination of recent cases has led us to question the premise that making HIPAA applicable to FEHBP would be advantageous, or even necessary, as a means to improve health care provider integrity.

Our belief that FEHBP must be included in the HIPAA provisions has changed because of the enactment of the Federal Employees Health Care Protection Act of 1998. We now have a better understanding of how the anti-kickback provisions of HIPAA may affect the FEHBP.

During the past two years, we have been drafting regulations to implement the Federal Employees Health Care Protection Act of 1998, which contains administrative sanctions provisions, including debarment, suspension and civil monetary penalties, designed specifically to safeguard the FEHBP and its enrollees from untrustworthy health care providers. We believe this statute as implemented by the proposed regulations will deter FEHBP health care fraud in a manner similar to many of the HIPAA provisions. *(A fuller discussion of the status of the proposed regulations can be found in the Administrative Sanctions Activities article which immediately follows.)*

In addition, it is possible that applying HIPAA's anti-kickback provisions, which are tied to Medicare's system of payment limitations, could adversely affect the FEHBP's operation as a market-based provider of health coverage.

We plan to work closely with OPM's Retirement and Insurance Service to develop proposals that may include a

mix of administrative, regulatory and legislative action to ensure that the FEHBP has the best possible protection against health care provider fraud.

## Administrative Sanctions Activities

*Common rule debarments.* Our OIG currently participates in a government-wide regulatory mechanism known as the nonprocurement debarment and suspension common rule (common rule) and which provides an efficient but limited debarment authority.

The common rule permits debarment actions taken by any federal agency to be applied within all other federal programs. We use the common rule to debar from participation in the Federal Employees Health Benefits Program those health care providers previously debarred by the Department of Health and Human Services from participating in the Medicare program.

A *debarment* is an administrative action that disqualifies a health care provider from receiving FEHBP funds. A *suspension* has the same effect as a debarment, but is taken on an immediate basis without prior procedures, because the provider represents either a risk to the health and safety of FEHBP enrollees or to the integrity of the FEHBP.

During this reporting period, our office issued 1,915 debarments and three suspensions of health care providers from the FEHBP. This total represents the second highest number of debarments by our OIG during any semiannual reporting period, exceeded only by the 2,031 issued during the previous six months. The full fiscal year total of 3,946 debarments is substantially larger than for any prior twelve-month period.

*Debarment-related inquiries.* The rapid growth of our OIG's debarment workload has generated a corresponding increase in inquiries associated with debarments from FEHBP carriers, debarred providers, and other federal agencies and departments.

These inquiries come mostly in the form of letters, telephone calls and Internet communications. We refer to these corollary activities as our *inquiry workload*. These inquiries demonstrate the broad impact of debarments within the FEHBP, as well as the efforts required by agencies issuing common rule debarments to help make them effective on a government-wide basis.

During the current reporting period, we responded to 1,181 debarment-related inquiries, divided in approximately equal numbers between FEHBP-related and government-wide sources as described below.

*FEHBP-related inquiries.* Within the FEHBP, the insurance carriers that contract with OPM to provide health coverage to federal enrollees, their spouses and dependents bear the immediate responsibility to enforce debarment orders issued through our office in accordance with guidelines we have furnished to them. The carriers contact us frequently regarding implementing these guidelines and for specific information concerning the procedural requirements for denying payment of FEHBP funds to debarred health care providers.

The debarred providers themselves also cause an equally active and complex inquiry workload, consisting of administrative appeals of debarments under the common rule and requests for stays of debarment and reinstatement into the FEHBP.

A further, although somewhat smaller, inquiry workload relates to FEHBP



OIG Debarment-Related Workload Increases Dramatically