## Proposed Administrative Sanctions Regulations Resubmitted to OMB

enrollees who have previously received services from debarred providers and are seeking waivers to permit them to continue receiving treatment from those providers, notwithstanding the debarment.

*Government-wide inquiries.* The debarment common rule is designed to be truly government-wide in its applicability. Thus, the health care providers whom we debar may in turn be debarred from participating in any federal program, whether it is health care-related or not. For example, debarred providers may also be ineligible to receive federally sponsored or guaranteed mortgage or education loans, to contract with federal agencies or to serve as an employee of a federal contractor.

Implementing the government-wide aspect of common rule debarments necessarily involves extensive coordination among agencies. In fact, approximately half our inquiries workload stems collectively from other federal agencies and private-sector firms who contract with federal agencies to carry out federal program requirements. For example, the latter would include financial institutions processing applications for federally insured loans.

These debarment inquiries include: (1) seeking additional information on debarments that these agencies intend to apply to their own programs; and (2) verifying our debarments before disqualifying persons from participating in their respective programs.

*Debarment and suspension regulations.* Our proposed regulations to implement the debarment and suspension provisions of the Federal Employees Health Care Protection Act of 1998 were forwarded for clearance by the Office of Management and Budget (OMB) in August 2000. Under the blanket withdrawal of pending regulatory actions directed by the Bush administration, these regulations were returned to OPM for review and for a decision to resubmit them by the agency's new policy leadership.

The new OPM management team has indicated its strong and continuing support for these regulations to become part of the overall health care anti-fraud effort. The broad importance of these regulations, and of the underlying sanctions provisions of the Federal Employees Health Care Protection Act of 1998, are also noted in the preceding article regarding our office's overall health care fraud plans.

With the Senate confirmation of OPM Director Kay Coles James in July 2001, we have been able once again to initiate the formal agency clearance process. We are extremely appreciative that Director James approved the sanctions regulatory package in August 2001 and subsequently resubmitted it to OMB.

At this time, these proposed regulations are still pending OMB approval for publication in the *Federal Register*.

# Audit Activities

## Health and Life Insurance Carrier Audits

*The Office of Personnel Management (OPM) contracts with private-sector firms to underwrite and provide health and life insurance benefits to civilian federal employees, annuitants, and their dependents and survivors through the Federal Employees Health Benefits Program (FEHBP) and the Federal Employees' Group Life Insurance program (FEGLI). Our office is responsible for auditing these benefits program activities to ensure that these various insurance entities meet their contractual obligations with our agency.*

Our audit universe contains approximately 320 audit sites, consisting of health insurance carriers, sponsors, and underwriting organizations, as well as two life insurance carriers. The number of audit sites are subject to yearly fluctuations due primarily to contracts not being renewed or because of plan mergers and acquisitions. Annual premium payments are in excess of $19 billion for this contract year.

The health insurance plans that our office is responsible for auditing are divided into two categories: *community-rated* and *experience-rated*. Within the first category are comprehensive medical plans, commonly referred to as health maintenance organizations (HMOs). The second category consists of mostly fee-for-service plans, with the most popular among these being the various Blue Cross and Blue Shield health plans.

The critical difference between the categories stems from how premium rates are calculated for each. A community-rated carrier generally sets its subscription rates based on the average revenue needed to provide health benefits to each member of a group, whether that group is from the private or public sector. Rates established by an experience-rated plan reflect a given group's projected paid claims, administrative expenses and service charges for administering a specific group's contract. With respect to the FEHBP, each experience-rated carrier must maintain a separate account for its federal contract, adjusting future premiums to reflect the FEHBP group enrollees' actual past use of benefits.

During the current reporting period, we issued 45 final reports on organizations participating in the FEHBP, 24 of which contain recommendations for monetary adjustment in the aggregate amount of $65.3 million due the FEHBP. Of the 45 reports issued, 21 audits were HMO rate reconciliation audits (RRAs), with findings amounting to $2.5 million. See pages 10-11 for a more in-depth discussion of RRAs.

The OIG issued 191 reports and questioned $507.6 million in inappropriate charges to the FEHBP during the previous six semiannual reporting periods. We believe it is important to note the dollar significance resulting from our audits of FEHBP carriers and the monetary implications for the FEHBP trust fund. These audit results are reflected in the graph on the following page.

A complete listing of all health plan audit reports issued during this reporting period can be found in Appendices III-A and III-B on pages 42-45, and Appendix V on page 46.



The graph above is even more significant in view of the September 24, 2001 decision of the U.S. Court of Appeals for the Federal Circuit concerning monies due the FEHBP from certain HMOs for lost investment income we questioned.

Specifically, this decision validates our OIG's audit findings concerning the collection of FEHBP lost investment income on certain HMO premium rate overcharges that have occurred since contract year 1991. Ultimately, this will ensure additional monetary recoveries in the millions from these and other HMOs in our audit universe. This court decision and its impact on the FEHBP are discussed in more detail in the *Message from the IG* appearing at the beginning of this report.

The sections that immediately follow provide additional details concerning the two categories of health plans described on the prior page, along with audit summaries of significant final reports we issued within each during the past six months.

### Community-Rated Plans

Our community-rated HMO audit universe includes approximately 220 rating areas. Audits of these plans are designed to ensure that the plans assess the appropriate premium rates in accordance with their respective FEHBP contracts and applicable federal regulations.

With few exceptions, these rates derive from two predominant rating methodologies. The key rating factors for the first methodology (*community rating by class*) are the age and sex distribution of a group's enrollees. In contrast, the second methodology (*adjusted community rating*) is based on the projected use of benefits by a group using actual claims experience from a prior period of time adjusted for increases in medical cost. However, once a rate is set, it may not be adjusted to actual costs incurred.

The inability to adjust to actual costs, including administrative expenses, distinguishes community-rated plans from experience-rated plans. The latter in-

clude experience-rated HMOs and fee-for-service plans:

For the period 1991 through 1994, the applicable regulations for HMOs required that subscription rates charged to the FEHBP be equivalent to the rates charged the two subscriber groups closest in size (*actual number of enrollees*) to the FEHBP and whose respective contracts contained similar benefits.

In 1995, the provision requiring similar benefits was eliminated. Under these revised regulations, each carrier must certify that the FEHBP is being offered rates equivalent to the rates given to the two groups closest in enrollment size to the FEHBP. It does this by submitting to OPM a certificate of accurate pricing. These rates are determined by the FEHBP-participating carrier, which is responsible for selecting the appropriate groups. Should our auditors determine that equivalent rates were not applied to the FEHBP, a condition of defective pricing exists. The FEHBP is entitled to a downward rate adjustment to compensate for any overcharges resulting from this practice.

We issued 36 audit reports on community-rated plans during this reporting period. These reports contain recommendations for OPM's contracting officer to require the plans to return over $61.4 million to the FEHBP. Fifteen of these reports resulted from traditional HMO audits, ten of which contained findings of $58.9 million. The remaining 21 audits are HMO rate reconciliation audits (RRAs), with findings amounting to $2.5 million. We have provided on the following pages a summary of two traditional HMO audits, along with a discussion of the results of our RRA audits.

## *Kaiser Foundation Health Plan, Inc. (California Division)*
in Pasadena, California

Report No. 62-00-98-052
May 8, 2001

Kaiser Foundation Health Plan, Inc. (California Division) has participated in the FEHBP as a community-rated comprehensive medical plan since 1960. This particular plan provides primary health care services to its members throughout the state of California. The audit covered contract years 1993 through 1998 for the Kaiser plan's Southern California region (Southern region) and 1998 for its Northern California region (Northern region). The Southern region received approximately $1.4 billion in FEHBP premiums from 1993 through 1998. The Northern region received about $262.5 million in 1998.

Through this audit, we identified $30,755,852 in questioned costs, including $23,212,726 for improper health benefit charges and $7,543,126 for lost investment income. Improper health benefit charges amounted to $15,961,891 for the Southern region and $7,250,835 for the Northern region. The lost investment income amount represents the interest the FEHBP would have earned on money the plan overcharged the FEHBP.

### Premium Rates

A key objective of the audit was to determine if Kaiser had met its contract requirement to offer the FEHBP the same premium rate discounts it offered to



**Inappropriate Costs to FEHBP Total Over $23 Million**



## Kaiser Plan Consistently Overcharged the FEHBP for Medicare-Related Costs

two other groups comparable in subscriber size to the FEHBP. Another was to determine if specific health benefit premium charges that were not part of the plan's basic benefits package were fair and reasonable to the FEHBP. These particular charges are known as *loadings*. We also looked at whether the rates were in compliance with the laws and regulations governing the FEHBP. The audit findings discussed in the report are summarized below.

*Southern region.* Our review of the 1993 rates for this region showed that the outpatient copayment amount increased for the FEHBP and for one of the two subscriber groups closest to it in size. Usually, when a copayment is increased, subscribers do not use their benefits as often, thereby lowering claims costs to their plans. In this case, the plan lowered the rates of the subscriber group closest in size to the FEHBP in recognition of the copayment increase, but not for the FEHBP. By federal regulation, the FEHBP must be rated consistently with its comparable subscriber group. To correct this inequity, we adjusted the FEHBP's rates to account for the copayment increase.

We also determined that the plan overstated its FEHBP Medicare loading, which, in turn, inflated the FEHBP's premium rates. A Medicare loading (a benefit cost increase) represents additional costs a plan incurs to cover individuals age 65 and older. To address this rating discrepancy, we lowered the FEHBP's Medicare benefit charge. Taking the above two adjustments into account, we determined that the FEHBP was overcharged $3,554,782 in 1993.

In 1994, Kaiser inexplicably gave a benefit adjustment to one of the two groups closest in size to the FEHBP when there had been no benefit changes for that contract year. Since the rating documentation contained no explanation for this adjustment, we assumed it reflected benefit changes for contract years 1992 to 1993. Consequently, we developed an adjustment factor for the FEHBP based on the change in benefits for contract years 1992 to 1993 and applied it to the FEHBP's rates for 1994. Kaiser also overstated the FEHBP Medicare loading.

After adjusting the FEHBP rates by applying the benefit adjustment factor and reducing the Medicare loading charge, the final corrective measure we took was to apply a discount that the plan gave to one of the groups closest in enrollment size to the FEHBP in 1994. Our calculations revealed that Kaiser overcharged the FEHBP $5,958,812 for contract year 1994.

In 1995, Kaiser changed the way it calculated the additional contract costs associated with those FEHBP members age 65 and older. The plan opted to use a different methodology. Instead of adding a Medicare benefit charge to the premium rates, the plan opted to employ a per-member per-month revenue requirement for Medicare-eligible members.

In using this approach, Kaiser understated the amount of revenue it received from the Centers for Medicare and Medicaid Services (CMS), which is responsible for administering the Medicare program within the Department of Health and Human Services. Until earlier this year, this agency was known as the Health Care Financing Administration. By understating the revenue Kaiser received from CMS, additional costs were shifted unfairly to the FEHBP for those federal subscribers covered by Medicare and the FEHBP.

In addition to the Medicare issue, we found that one of the groups closest in subscriber size to the FEHBP received a discount not given the FEHBP. After ad-

justing the age 65 and older revenue requirement and applying the discount, we found that the FEHBP rates were overstated by $4,533,305.

The plan again overstated the FEHBP revenue requirement for age 65 and older members in 1996. One of the groups closest in size to the FEHBP received a discount in its rates not given to the FEHBP. Therefore, we recalculated the FEHBP rates by once again adjusting the revenue requirement and applying the discount. We determined that overcharges to the FEHBP totaled $1,914,992.

*Northern region.* In 1998, we found that the FEHBP did not receive a discount that Kaiser gave one of the two groups closest in size to the FEHBP. The discount resulted from the plan's understating that group's Medicare loading and its failure to recoup the lost revenue from that group in the subsequent year. By applying the discount to the FEHBP rates, we determined that Kaiser overcharged the FEHBP $7,250,835 in 1998.

### Lost Investment Income

The FEHBP contract with community-rated carriers states that the FEHBP is entitled to recover lost investment income on defective pricing findings. We determined that the FEHBP is due $7,543,126 from the plan for lost investment income through December 31, 2000, on the overcharges identified in the report. Beginning January 1, 2001, additional amounts of lost investment income will accrue until such time as all questioned costs have been returned to the FEHBP. The lost investment income totals are in addition to the $23,212,726 in overcharges to the FEHBP resulting from improper rate development.

## Lovelace Health Plan
in Santa Ana, California

Report No. 1C-Q1-00-00-071
August 22, 2001

The Lovelace Health Plan (Lovelace), a wholly owned subsidiary of CIGNA Health Corporation, began participation in the FEHBP in 1981. The plan provides comprehensive medical services to its members throughout the state of New Mexico. The audit, conducted at CIGNA offices in Santa Ana, California, covered contract years 1995 through 2000. During this six-year period, the plan received over $219 million in premiums from the FEHBP.

As a result of the audit, we identified $16,468,134 in inappropriate health benefit charges to the FEHBP, representing inappropriate charges to the FEHBP for all contract years except 1996. In addition, the FEHBP is due $2,670,214 for investment income lost as a result of the overcharges. The plan agrees with only $8,942,748 of the inappropriate charges exclusive of lost investment income.

The primary objectives of the audit were to determine if the Lovelace plan offered market price rates to the FEHBP and if any additional health benefit charges (*loadings*) the FEHBP received were fair and reasonable. We also looked at whether the rates were in compliance with those laws and regulations governing the FEHBP.

*Discounted rates.* We found that the FEHBP did not receive a market price adjustment equivalent to the largest discount given to one of the two groups closest in subscriber size to the FEHBP



Auditors Determine FEHBP Due $19.1 Million

## FEHBP Rates Not Appropriately Discounted in 4 of 6 Contract Years

in four of the six years reviewed. In 1995, Lovelace could not provide documentation to support the rates it had given one of these two groups. Consequently, we redeveloped the rates of this group by using the plan's 1994 community rates. After adjusting those rates based on additional rating information provided by Lovelace, we determined that this group had received a discount not afforded the FEHBP.

As a result of applying this discount to the FEHBP's rates, we also had to adjust two additional charges to the rates. The first charge, an *extension of coverage* loading, covers a plan's costs for providing benefits to federal employees whose employment with the U.S. government has ended and who are no longer eligible to receive FEHBP benefits. *Note: To assist these employees in their transition to retirement or other employment, they remain covered for the first 31 days after leaving federal service.*

The second charge is an *enrollment discrepancies* loading, which compensates a plan for unresolved discrepancies between its and OPM's enrollment figures. In the case of Lovelace, we corrected the loadings and determined that the plan owed the FEHBP $2,867,888 in contract year 1995.

In 1997, the discount the plan gave the FEHBP was substantially lower than the largest discount given to one of the two groups closest in size to the FEHBP. During our review, we determined that the rates for this subscriber group had been frozen over an 18-month period, starting January 1, 1997. We determined that group's discount by calculating the revenue amount the plan needed from this group during the 18-month period and comparing it to the group's billed rates. After applying the discount to the FEHBP rates and making appropriate adjustments to the discrepancies in the loadings described in the previous two paragraphs, we determined that Lovelace owed the FEHBP $2,157,083 for 1997.

Our review of the 1998 and 1999 rates showed that in each of these years the plan gave significant discounts to one of the two groups closest in size to the FEHBP. The FEHBP did not receive discounts equal to that particular subscriber group in either year. Thus, when we adjusted the FEHBP discounts, we determined that Lovelace overstated the FEHBP's rates by $2,764,652 in 1998 and $6,795,972 in 1999.

*Rating factors.* Our review of the FEHBP rates for contract year 2000 identified problems with two rating factors. We found that: (1) the plan could not support the experience factor it used in developing the FEHBP's rates; and (2) it did not use updated community-wide age/sex data in developing the FEHBP age/sex factor. Consequently, in redeveloping the FEHBP's rates, we lowered both factors. Changes to these factors also necessitated adjustments to the extension of coverage and enrollment discrepancies loadings as described previously. Once we compared the redeveloped rates to the rates the plan actually charged the FEHBP, we determined the FEHBP should have been charged $1,882,539 less in contract year 2000.

## Rate Reconciliation Audits

In addition to the standard community-rated audits, we also conduct rate reconciliation audits (RRA) of health maintenance organization plans. These audits are performed prior to the settlement of the FEHBP's final rates for any given contract year.

Since 1996, the first year our office conducted RRA audits, significant dollar savings have accrued to the FEHBP.

A total of 101 RRAs have been completed, with dollar savings to the FEHBP amounting to over $61 million. In addition, the RRA process has increased carrier compliance with FEHBP rating requirements. For instance, in 1996, only about 20 percent of the plans we audited under the RRA process were in compliance. This year, 13 out of the 21 plans audited (62 percent) complied with the requirements. For the eight plans with audit findings, overcharges amounted to just over $2.5 million dollars.

OPM requires each community-rated plan to submit its proposed premium rates by May 31 of each year, seven months before the rates take effect in January of the following year. Because of these early submissions, plans must estimate the FEHBP premium rates for the next contract year. The rate reconciliation process allows plans to adjust their estimated rates to the rates actually being charged for the current contract year.

The RRA process assists OPM contracting officials negotiate the best premium rates possible for FEHBP subscribers by ensuring that the agency is provided with current, complete and accurate information by the participating plans. RRAs are limited to the current year's rate reconciliation and are performed and completed from mid-May through early August, just prior to the time OPM's Office of Actuaries must finalize the rates.

In addition to achieving the best premium rates, RRA audits provide significant benefits to OPM and participating community-rated carriers as follows:

- Rating data is reviewed shortly after it is produced when both carrier records and staff who prepare the reconciliation are usually readily available to assist in the audit and the subsequent resolution of any audit issues that may arise.

- Representatives from OPM's Office of Actuaries and plan officials receive almost immediate feedback relating to our audit results.

- The audit resolution process begins immediately, thus benefiting both the plans and OPM through timely resolution of audit issues.

- RRAs result in more timely and frequent audit coverage of the HMOs participating in the FEHBP.

- The RRAs reduce carrier uncertainty regarding any future liabilities that could result from a post-award audit, including any potential interest accruals.

The RRA audit with the most significant findings was the 2001 rate reconciliation for Independent Health Association. This community-rated plan is located in Buffalo, New York.

Our audit showed that the plan's calculation of the Medicare benefit charge for our over-65 subscriber group included an amount to recoup a payment actually made to the Centers for Medicare and Medicaid Services, the agency under the Department of Health and Human Services that administers the Medicare program. Since under FEHBP regulations it was not appropriate to charge the FEHBP for such a payment, we did not include it in our recalculation of the Medicare loading.

In addition, we excluded a ten percent administrative charge the plan had added to the FEHBP rates. This charge was not permissible, because the plan's administrative costs are already accounted for in the base rates it charged the FEHBP. After lowering the Medicare loading and eliminating the administrative charge, we determined that the FEHBP's premium rates were overstated by approximately $830,000.



**RRAs Show Improved Compliance with OPM Rating Requirements**



**RRA Audit Reveals $830,000 in Rate Overcharges**

### Experience-Rated Plans

The Federal Employees Health Benefits Program offers a variety of experience-rated plans, including fee-for-service plans, the latter which constitute the majority of federal contracts in this category. Certain comprehensive medical plans qualify as experience-rated HMOs rather than community-rated plans. For an overview of these rating categories, refer to page 5 at the beginning of the Audits Activities section.

The universe of experience-rated plans currently consists of 100 audit sites. When auditing these plans, our auditors generally focus on three key areas:

- Allowability of contract charges and the recovery of appropriate credits, including refunds.

- Effectiveness of carriers' claims processing, financial and cost accounting systems.

- Adequacy of internal controls to ensure proper contract charges and benefit payments.

During this reporting period, we issued eight audit reports on experience-rated plans. These were audits of Blue Cross and Blue Shield plans, since we issued no final reports on either experience-rated HMOs or employee organization plans. In these reports, our auditors recommended that OPM's contracting officer require the plans to return $3.9 million in inappropriate charges and lost investment income to the FEHBP.

The three types of experience-rated plans we audit are discussed below.

### Government-Wide Service Benefit Plan

This plan comes under the broad definition of a fee-for-service plan and is administered by the BlueCross BlueShield Association (BCBS Association), which contracts with our agency on behalf of its numerous member plans. Participating Blue Cross and Blue Shield plans throughout the United States underwrite and process the health benefits claims of their respective federal subscribers under the BCBS Service Benefit Plan. Approximately 46 percent of all FEHBP subscribers are enrolled in Blue Cross and Blue Shield plans nationwide.

While its headquarters are in Chicago, Illinois, for administrative purposes, the BCBS Association has established a Federal Employee Program (FEP) Director's Office in Washington, D.C., to provide centralized management for the Service Benefit Plan. Recently, the FEP Director's Office was the subject of a special audit regarding its internal operations. Details relating to this audit can be found on pages 22-23.

The association also oversees a national FEP operations center, also located in the Washington, D.C. area, whose activities include verifying subscriber eligibility; approving or disapproving reimbursement of local plan FEHBP claims payments (using computerized system edits); and maintaining an FEHBP claims history file and an accounting of all FEHBP funds.

During this reporting period, we issued eight Blue Cross and Blue Shield experience-rated reports in which our auditors cited $3,853,867 in costs charged to the FEHBP that were determined questionable under BCBS contracts. Our auditors also noted an additional $44,262 in lost investment income on these questioned costs, for a total of $3,898,129 owed to the FEHBP. The following audit narratives describe the major findings from two of these reports, as well as the questioned costs associated with them.

## Anthem BlueCross BlueShield

in Denver, Colorado, and Reno, Nevada

Report No. 1A-10-30-01-018
August 27, 2001

Our audit of the FEHBP operations at Anthem BlueCross BlueShield (Anthem) took place at the plan's offices in Denver, Colorado, and Reno, Nevada. The plan's financial and administrative operations are located in Denver, while the claims operations are in Reno.

The purpose of this audit was to determine whether Anthem charged costs to the FEHBP and provided services to FEHBP members in accordance with the terms of its contract. Our auditors reviewed health benefit payments made by the plan from 1997 through 1999, as well as miscellaneous payments, administrative expenses, and cash management covering contract years 1997 through 1999.

As a result of this audit, our auditors questioned $1,261,949 in health benefit costs; $214,042 in administrative expense charges; $3,181 in cash management; and $36,726 in lost investment income. As discussed elsewhere in this report, lost investment income represents those monies the FEHBP would have earned on the questioned costs. Final calculations by our auditors regarding amounts owed to the FEHBP totaled $1,515,898.

### Health Benefits

During the period 1997 through 1999, Anthem paid out $180 million in connection with FEHBP health benefit claims. For purposes of this audit, we selected claims for examination at random as well as in specific health benefit categories, principally those concerning coordination of benefits with Medicare and potential duplicate payments. We also reviewed specific financial and accounting areas, such as refunds and other miscellaneous credits relating to FEHBP claim payments. Our findings relating to inappropriate health benefit charges to the FEHBP totaled $1,261,949.

Some of our significant findings included the following issues:

*Claim payment errors.* For the period January 1, 1999 through December 31, 1999, we selected 100 claims for the purpose of determining if Anthem paid these claims properly. As a result of this review, our auditors identified 25 claim payment errors, resulting in overcharges of $422,196 to the FEHBP. We also identified four additional claim payment errors during our review of claims where amounts paid by the plan were greater than amounts covered. This resulted in overcharges of $181,275 to the FEHBP. We recommended that OPM's contracting officer disallow these 29 claim overpayments, totaling $603,471, and instruct Anthem to make a diligent effort to collect these payments and credit all amounts recovered to the FEHBP.

*Coordination of benefits.* For the period 1997-1999, our auditors identified 154 hospital claims, totaling $933,898, and 447 physician claims, totaling $82,458, wherein the FEHBP paid as the primary insurer when Medicare Part A or B was the primary insurer. This type of inappropriate charge occurs when there is a failure to coordinate benefits properly with a patient's Medicare coverage when Medicare is the primary insurer. As a result, we estimated that the FEHBP was overcharged $440,735 for these 601 claims that represent payments to hospitals and physicians from the FEHBP trust fund.



**Auditors Determine $1,515,898 Owed to the FEHBP**



**Auditors Question $1,261,949 in Health Benefit Charges**

## Auditors Identify $214,042 in Administrative Expense Overcharges

We recommended that the contracting officer disallow these uncoordinated claim payments and instruct Anthem to make a concerted effort to collect these payments and credit all overpaid amounts to the FEHBP should the plan be successful in its recoveries.

> Medicare Part A helps pay for care in hospitals, skilled nursing facilities, hospices, and some home health care.
>
> Medicare Part B helps pay for doctors, outpatient hospital care, and some other medical services that Part A does not cover, such as services of physical and occupational therapists and some home health services. Part B helps pay for covered doctor services that are medically necessary.

*Duplicate payments.* Our auditors also determined that Anthem charged the FEHBP inappropriately for duplicate claim payments. During the period 1997-1999, we identified 237 duplicate claim payments, resulting in overcharges of $154,205 to the FEHBP. This relatively small number of duplicate claim payments indicated to our auditors that the plan had effective controls in place to minimize payments of this type. Nevertheless, we recommended that the contracting officer disallow the duplicate payments we identified, and instruct Anthem to be conscientious in attempting to collect these payments and credit all amounts recovered to the FEHBP.

*Inpatient hospital precertification.* Precertification is the process that allows a plan to evaluate the medical necessity of any patient's proposed stay and the number of days required to treat a condition.

For the contract periods 1997 through 1999, we identified 94 claims where the patient failed to obtain precertification from Anthem prior to admission. This should have resulted in the plan reducing the benefits payable to the provider by $500 in accordance with the BCBS Service Benefit Plan brochure. Since the plan did not reduce these claim benefits to reflect this oversight, overcharges to the FEHBP totaled $47,000. We recommended that the contracting officer disallow these claim overcharges and direct the plan to credit these overcharges to the FEHBP.

*Miscellaneous payments.* In reviewing Anthem's procedures for processing refunds, uncashed health benefit checks and miscellaneous credits, we identified one instance where the plan could not provide documentation to substantiate that uncashed checks totaling $16,538 were returned to the FEHBP. The FEHBP contract requires the carrier to retain and make available all records applicable to a contract year that support the annual statement of operations. As a result, we recommended that the contracting officer ensure that the plan returns these uncashed checks to the FEHBP.

*Note: Under its FEHBP contract, a plan should be able to demonstrate that claim overpayments cited in our audit report were made in good faith. It should also be able to show that it had made a reasonable effort to collect these funds. OPM's contracting officer then can consider all uncollected amounts (questioned costs by our auditors) to be allowable charges to the FEHBP. This applies to all FEHBP experience-rated plan contracts.*

### Administrative Expenses

During our review of administrative expenses from 1997-1999, we noted that Anthem overcharged the FEHBP for costs totaling $214,042, the majority of which related to pension costs. Under the terms of the FEHBP contract, Anthem can charge personnel expenses, including salary and pension costs, as