OPM's performance and accountability report for FY 2000. At Chairman Burton's specific request, we examined the following:

- OPM's most significant measures.
- Why these measures are, or are not, useful indicators of performance.
- The steps taken to verify the validity of the results of the measures.
- The extent to which the results are valid and accurate.

*OPM's most significant measures.* As described on page 27, OPM's performance and accountability report established five general agency goals, 117 program goals, along with 458 performance measures. OPM's report further defined some of the performance measures as critical to the mission of our agency. From these measures, we concluded that the following 12 measures were OPM's most significant:

- Human resource management policy and policy leadership (*includes 5 of the 12 measures*).
- Workforce planning.
- Merit systems principles oversight.
- Trust fund financial management.
- Annuitant customer satisfaction.
- Information technology solutions for retirement and human resource data (*includes 2 of the 12 measures*).
- Information security.

*Usefulness of performance measures.* We reported on OPM's new measurement framework, designed to provide a clearer picture of agency achievement at the strategic goal level. Specifically, this framework will permit OPM to begin aligning program goals and measures to the strategic goal level in its FY 2001 performance plan.

The impact of this new framework will be more evident in the FY 2003 plan and beyond. But, specifically regarding the FY 2000 report we reviewed for Chairman Burton, we reported that seven of the 12 measures we identified could be improved by making them outcome-oriented.

*Verification and validation process.* We also reported that we had verified the validity of the performance measures by conducting verification and validation audits and testing internal controls over OPM's FY 2000 performance data. These audits are discussed in more detail on pages 27-28.

Our verification and validation audits covered six of the 12 most significant measures on our list. Two of those 12 significant measures were verified and validated by an independent public accountant (IPA) during its audit of OPM's FY 2000 consolidated financial statements audit. The IPA's results of this audit were contained in our semi-annual report issued this past spring. The remaining four of the 12 significant measures were not subject to verification and validation by us or the IPA. Regarding the latter, we will consider examining these four measures during next year's audit of performance data.

*Verification and Validation process findings.* We determined that seven of the eight measures subject to verification and validation by us and the IPA were valid and accurate, while one was not.

### Improper Payments

In a letter dated June 26, 2001, Senators Joseph I. Lieberman and Fred Thompson, Chairman and Ranking Member of the Committee on Governmental Affairs, respectively, requested the 24 major departments and agencies, including OPM, to review a U.S. General Accounting Office (GAO ) report on *Strategies to*



IG Identifies 12 Key Agency Performance Measures

## Need for Improved FEHBP Payment Controls Cited

*Managing improper payments.* They also asked agencies to evaluate the adequacy of their respective internal controls and to consider implementing any GAO strategies that were appropriate for each agency.

In a separate letter to OPM Inspector General Patrick McFarland, Chairman Lieberman and Senator Thompson requested our office to assess OPM's efforts in response to the June 26 letter they had also sent to OPM.

As a result of this request to Inspector General McFarland, we examined OPM's internal controls and overall strategies to manage improper payments made in association with the retirement, life and health insurance programs administered by our agency.

These programs are formally identified as the Civil Service Retirement System and the Federal Employees' Retirement System, the Federal Employees Health Benefits Program (FEHBP) and the Federal Employees' Government Life Insurance program. These programs account for approximately 99.7 percent of OPM's program costs.

OPM responded to Chairman Lieberman and Senator Thompson by providing them with the status of the four items relating to improper payments involving the benefits programs, which they specifically requested in their June 26, 2001 letter to the agency. These items are as follows:

- Adequacy of OPM's control environment over improper payments.
- OPM's risk assessment of improper payments.
- Monitoring improper payments.
- Actions taken regarding improper payments.

Based on our audit work over the past few years, and that of KPMG, LLP, the independent public accounting firm that audits OPM's financial statements, we agreed with OPM's response with one exception.

The exception concerned the FEHBP, wherein we reported to Chairman Lieberman and Senator Thompson that OPM's program managers in the FEHBP did not consider in their risk assessments and systematic controls the entire transaction cycle. These controls only extended to the insurance carrier and did not address the service providers (physicians, hospitals and labs) at the end of the health benefit payment cycle.

## OPM Is Addressing Top Management Challenges

### OPM's Top Management Challenges

Inspector General McFarland received an October 12, 2000 letter from several House and Senate leaders, including the chairman and ranking minority member of the committees having jurisdiction over OPM program operations. In it, our OIG was asked to provide an assessment of the most serious management challenges facing OPM. In our response to that letter last fall, we identified six challenges. These were discussed in our semiannual report issued last spring.

OPM continues to work towards meeting these challenges. While we believe that with sufficient time and resources agency management will be successful in addressing them, these challenges remain serious operational issues for our agency.

The table on the following page provides an update regarding six management challenges, as well as OPM's efforts to resolve them, that we identified in our semiannual report released last April.



### Summary of OPM's Top Management Challenges

| Issue Reported | Agency Actions |
|---|---|
| OPM's Financial Management Oversight of the FEHBP (CRC enrollment reconciliations) | OPM is developing a centralized enrollment system. |
| Reconciliation of OPM's Fund Balance with U.S. Treasury Account | OCFO has improved reconciliation procedures, but is still resolving large differences between cash balances. OPM has contracted for assistance in reconciling balances with the independent accounting firm KPMG, LLP. |
| Data Reconciliation and Control | OCFO has developed detailed general ledger reports, increased contractor support, implemented several critical transaction codes, and assigned responsibility for all transaction code work to a senior-level manager to aide in better data reconciliation controls. |
| Revolving Fund and Salaries & Expense Accounts Financial Statement Preparation | OCFO has contracted for development of needed transaction codes and improved the audit trail for year-end adjusting entries. OPM prepared a Statement of Financing, including RF and S&E accounts, in its FY 2000 consolidated financial statements. |
| Retirement Systems Modernization (RSM) | OPM has put in place an RSM project team for reengineering business processes related to the federal civilian retirement program. |
| OPM's GPRA Implementation | OPM plans to strengthen its data validation and verification procedures to clarify the link between each performance measure and overall strategic goals and explain how continuing goals and objectives address the agency's management challenges. |
| Human Resources Management | OPM has designed a workforce planning model for use by the federal government and will perform oversight reviews in federal agencies. |
| Health Care Fraud and Abuse in the Federal Employees Health Benefits Program | OPM management has submitted to OMB proposed regulations implementing the FEHBP Protection Act of 1998. OPM management and the OIG also are working together to strengthen FEHBP statutory provisions to provide additional tools to fight FEHBP health care provider fraud and abuse. |

## OPM Implements New Financial Systems

We have continued to work with the Office of the Chief Financial Officer (OCFO) to enhance their operations. During this reporting period, we focused on OCFO's financial system implementation efforts. These efforts and our assistance are summarized below.

*Financial accounting and reporting.* OCFO is implementing a new financial accounting and reporting system to replace the old accounting and reporting system. The old system became outdated and could not provide sufficient information to support auditable financial statements.

OCFO has contracted with an outside entity to install this system to meet its

## OIG Participates in OPM's Financial System Implementation

financial, accounting and reporting needs. Meanwhile, OPM program offices and the OIG are participating in the planning, setup and implementation of the new system. Our participation includes:

- Communicating OIG financial, accounting and reporting needs to ensure a system that will meet our requirements.

- Communicating our auditing needs to ensure that adequate audit trails are available for us to perform our duties under the Inspector General Act of 1978, as amended.

- Ensuring that adequate system planning, development and implementation controls are being used by OCFO and its contractor.

*Payroll outsourcing.* As we described in our last semiannual report, OPM has entered into a contract with the U.S. General Services Administration (GSA) to administer our agency's payroll activities. This type of federal interagency support is known as *cross-servicing*. Our role in this process is to ensure that controls are in place to maximize the accuracy of OPM's payroll activities and GSA information transfers to OPM financial systems.

We will continue monitoring this program and the agency's financial accounting and reporting system, reporting on their status through our office's audits of OPM's consolidated financial statements audits.

# Investigative Activities

*The Office of Personnel Management (OPM) administers benefits from its trust funds for all federal civilian employees and annuitants participating in the federal government's retirement, health and life insurance programs. These trust fund programs cover approximately 9.5 million current and retired civilian employees, their spouses and dependents (coverage for these latter two categories is limited by law) and disburse about $61 billion annually. This agency also oversees the federal government's only federal fundraising activity, the Combined Federal Campaign (CFC). Investigating potential fraud involving these trust funds, the CFC, OPM employee misconduct and other wrongdoing occupies the majority of our OIG investigative efforts.*

The majority of our case work during the current reporting period involved fraud committed by individuals and corporate entities against the three trust fund programs described in the shadow box above.

We continued to pursue aggressively criminal and civil prosecutions against all persons and businesses we identified as having engaged in some form of trust fund fraud. Our efforts resulted in 17 arrests and 12 convictions, along with $1,483,547 in judicial and administrative monetary recoveries. We opened 39 investigations, closed 17, and 91 were still in progress at the end of the period. For additional information on investigative activity during this reporting period, refer to Table 1 on page 36 of this section as well as the OIG's productivity information at the beginning of this report.

We received a total of 483 hotline calls and complaints during this reporting period. These calls and complaints included such areas as health care fraud, retirement fraud, employee misconduct or other suspected wrongdoing by individuals. Information we obtain through these hotline calls, as well as written complaints received in the office, continue to be extremely helpful to us in our investigative efforts to protect the programs under the jurisdiction of our agency. Please consult page 37 in this section for additional statistical data relating to our OIG hotline and complaint activity.

## Health Care-Related Fraud and Abuse

In keeping with the emphasis that Congress and various departments and agencies in the executive branch place on combating health care fraud, we coordinate our investigations with the Department of Justice (DOJ), the FBI, and other federal, state and local law enforcement agencies.

At the national level, we are participating members of DOJ's health-care fraud working groups. We work actively with the various U.S. Attorney's offices in their efforts to further consolidate and increase the focus of investigative resources in those regions that have been particularly vulnerable to fraudulent schemes and practices engaged in by unscrupulous health care providers. Additionally, our office maintains a close liaison with other federal law enforcement agencies participating in health care fraud investigations throughout the country. As a consequence, we participate in many health-care fraud working groups that simultaneously

represent governmental interests at the federal, state and local levels.

Our OIG special agents also work closely with the various health insurance carriers participating in the Federal Employees Health Benefits Program (FEHBP). This cooperative effort provides an effective means for reporting instances of possible fraud by FEHBP health care providers and subscribers. Our investigators, of course, continue to have a close working relationship with our OIG auditors on fraud issues that may arise during the course of FEHBP health carrier audits.

The following case summaries represent three typical, but significant, health care fraud activities carried out against the FEHBP, culminating in federal prosecution, guilty pleas or settlements during this reporting period.

## Physician Commits Major Medical Fraud

On June 22, 2001, in U.S. District Court in Jacksonville, Florida, Dr. Sammir Najjar of Orange Park, Florida, pleaded guilty to making false claims for payment of medical services. These claims were paid by insurance carriers participating in the Federal Health Employees Benefit Program and the federal Medicare program and which also provided health insurance coverage to private citizens, businesses, and state employees in the state of Florida where Dr. Najjar practiced medicine.

Dr. Najjar's plea and sentencing were the culmination of a three-year investigation conducted by the Florida Division of Insurance Fraud, the FBI, our office and that of the Office of Inspector General at the Department of Health and Human Services (HHS). HHS is responsible for overseeing and administering the Medicare program on behalf of the federal government.

The investigation disclosed that Dr. Najjar submitted over $5 million in false claims for services he never performed. These services all related to women purportedly having silicone breast implant-related problems. While there was no evidence that Dr. Najjar gave a false diagnosis to any of his patients, the claims for treatment were all fraudulent.

Following his plea, Dr. Najjar was sentenced to a three-year prison term and ordered to pay $5 million in restitution, $85,790 of which was to be returned to the FEHBP.

## Diagnostic Services Firm Agrees to Settlement

The Department of Justice and UroCor, Inc. (UroCor), an Oklahoma City-based corporation providing medical diagnostic services, signed a settlement agreement on June 11 of this year in which UroCor agreed to pay the federal government $9 million for billing fraud involving federal health insurance programs, including the FEHBP.

The fraud included billing for laboratory tests and pathology services that:

- Were medically unnecessary.
- Were never performed.
- Had never been ordered.
- Contained falsified billing codes that led to a higher rate of reimbursement.

This settlement followed a four-year investigation initiated as a result of a referral to the Department of Justice by the affected federal parties whose health care programs had been defrauded. Specifically, this included the Department of Defense, the Department of Health and Human Services and OPM. Consequently, our respective OIGs conducted this investigation.

**FEHBP Receives $252,200 in Settlement Agreement**

By agreeing to pay the federal government the sum of $9 million, UroCor will have resolved its federal liability for the alleged submission of false and fraudulent claims for services it provided to the various victimized federal health insurance programs involved. UroCor is to pay $252,200 to our agency, which represents the amount UroCor owes the FEHBP trust fund.

## Physicians Group Agrees to Settle Fraud Charges

A continuing five-year investigation being conducted by our office in conjunction with the Department of Justice, has culminated in a civil settlement with a corporation representing emergency room physicians.

Emergency Physicians Medical Group, PC (EPMG), of Michigan, Pennsylvania and Ohio, agreed to pay the federal government $1.9 million. This payment represents EPMG's liability for its alleged involvement in a billing scheme to defraud federal and state health insurance programs. Under the agreement, the FEHBP is to receive $176,955, representing its portion of the settlement.

We initiated this investigation based on a referral by a Blue Cross Blue Shield plan that had alleged that an emergency room physicians' billing service (Emergency Physicians Billing Service), routinely charged for high-end services involving emergency room physicians when, in reality, lower-priced basic services had actually been provided. This activity inflated costs charged to the FEHBP and to other federal and state health insurance programs.

We learned through this investigation how the billing service initially succeeded in its fraudulent billing practices. When billing these federal health insurance programs for medical services, the billing service deliberately changed specific treatment codes to indicate higher-priced service. This type of billing fraud is known in the insurance industry as "upcoding." EPMG was a customer of the billing service and willingly participated in this fraud.

Inasmuch as this is an ongoing investigation of the billing service, we expect to realize additional recoveries from other corporate entities involved in the scheme. These, of course, will be reported in future semiannual reports.

## Retirement Fraud and Special Investigations

In addition to health care fraud, our office works closely with other federal, state and local law enforcement officials to uncover fraud involving OPM's retirement and life insurance program trust funds.

Our office's proactive efforts to identify fraud against OPM's retirement fund takes two forms: (1) we routinely review Civil Service Retirement System (CSRS) annuity records for indications of unusual circumstances, and (2) we maintain contact with the federal annuitant population, including telephone calls and on-site visits to the homes of annuitants listed in OPM's retirement records. While our fraud recoveries in this area are, for the most part, smaller than in the health care fraud area, criminal prosecutions and sentences tend to be more significant.

In addition, this office conducts special investigations in other areas having to do with serious criminal violations and misconduct by OPM employees. These cases primarily involve the theft of government funds and property.

**Exposed Billing Scheme Results in $176,955 FEHBP Recovery**



## Guilty Plea Results in Confinement and $71,156 Recovery for CSRS

The three case narratives that follow illustrate the various types of retirement fraud our OIG can expect to encounter. These investigations were closed during this reporting period.

### CSRS Annuity Overpayment Linked to Former Spouse

The investigation, pursued jointly with the FBI, disclosed that James T. Bond of Fort Walton Beach, Florida, misappropriated his former spouse's CSRS annuity funds following her death in 1996. Mr. Bond gained access to the funds, located in the deceased annuitant's checking account, by using her ATM card.

Our office entered into this investigation after receiving a referral from the FBI office in Jacksonville, Florida. After being interviewed by federal authorities, Mr. Bond admitted to illegally taking money out of his former spouse's checking account, including her government annuity funds. Loss to the government was $82,780.

After pleading guilty to theft of government funds, Mr. Bond appeared in U.S. District Court in Jacksonville, Florida, on April 26, 2001, for sentencing. Mr. Bond received a sentence of eight months in prison, followed by three years' supervised probation. He also was ordered to make restitution to our agency in the amount of $59,055, which represented a major portion of his former wife's federal annuity he had accessed illegally. Our OIG also recovered another $12,101 that had remained in the checking account after Mr. Bond's arrest.

### Annuitant's Son Admits to Retirement Fraud

On July 27, 2001, in U.S. District Court, in Pensacola, Florida, Michael S. Hurst, a resident of the city, was sentenced to eight months' imprisonment, five years of supervised probation and ordered to make restitution in the amount of $32,262 to the federal government for theft of government funds.

### Table 1: Investigative Highlights

Judicial Actions:
    Arrests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Indictments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Administrative Actions[1]: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Judicial Recoveries:
    Fines, Penalties, Restitutions and Settlements . . . . . . . . . . . $955,426
Administrative Recoveries:
    Settlements and Restitutions . . . . . . . . . . . . . . . . . . . . . . . . $528,121
        Total Funds Recovered . . . . . . . . . . . . . . . . . . . . $1,483,547

[1] Includes suspensions, reprimands, demotions, resignations, removals, and reassignments.

Mr. Hurst's plea and sentencing were the results of an OIG investigation that disclosed that he had misappropriated CSRS retirement funds intended for his mother after her death in 1995. When questioned by OIG investigators, the son admitted to the theft, which he accomplished by forging his mother's signature on checks and cashing them in a local bar and package store.

### Daughter Guilty of CSRS Annuity Theft

Mary Ann Gerson of Laurel, Maryland, entered into a settlement agreement with OPM, approved by the Department of Justice, on July 27, 2001, whereby Ms. Gerson agreed to reimburse the CSRS trust fund the sum of $146,994. These funds represented part of $253,265 in payments intended for her father, a deceased CSRS annuitant.

The settlement agreement and recovery of funds were the results of an investigation initiated by our office that disclosed that Ms. Gerson had successfully accessed the annuity payments intended for her father over an 11-year period following his death in 1987. During the investigation, Ms. Gerson admitted to investigators that she had converted the funds to her own use.

### OIG Hotlines and Complaint Activity

The information we receive on our OIG hotlines is generally concerned with FEHBP health care fraud, retirement fraud and other complaints that may warrant special investigations. Our office receives inquiries from the general public, OPM employees, contractors and others interested in reporting waste, fraud and abuse within the agency.

In addition to hotline callers, we receive information from individuals who choose to write letters or who appear in our office. Those who report information can do so openly, anonymously or confidentially without fear of reprisal.



**Settlement Results in $146,994 Recovery to CSRS**

```
Table 2: Hotline Calls and Complaint Activity
Retirement and Special Investigations Hotline
    and Complaint Activity:
        Retained for Investigation.................................100
        Referred to:    OIG Office of Audits........................0
                        OPM Groups and Offices.....................54
                        Other Federal Agencies.....................48
                            Total.................................202
Health Care Fraud Hotline and Complaint Activity:
        Retained for Investigation................................140
        Referred to:    OPM Groups and Offices.....................54
                        Other Federal/State Agencies...............36
                        Health Insurance Carriers or Providers.....51
                            Total.................................281
        Total Contacts........................483
```

## OIG Proactive Efforts Play Key Role in Retirement Fraud Cases

### Retirement Fraud and Special Investigations

The Retirement and Special Investigations hotline provides the same assistance as traditional OIG hotlines in that it is used for reporting waste, fraud and abuse within the agency and its programs.

The Retirement and Special Investigations hotline and complaint activity for this reporting period included 93 telephone calls, 55 letters, 4 agency referrals, 2 walk-ins, and 48 complaints initiated by the OIG, for a total of 202. Our administrative monetary recoveries resulting from retirement and special investigation complaints totaled $219,387.

### Health Care Fraud

The primary reason for establishing an OIG hotline was to handle complaints from subscribers in the Federal Employees Health Benefits Program administered by OPM. The hotline number is listed in the brochures for all the health insurance plans associated with the FEHBP.

While the hotline was designed to provide an avenue to report fraud committed by subscribers, health care providers or FEHBP carriers, frequently callers have requested assistance with disputed claims and services disallowed by the carriers. Each caller receives a follow-up call or letter from either the OIG hotline coordinator, the insurance carrier or another OPM office as appropriate.

The Health Care Fraud hotline and complaint activity for this reporting period involved 164 telephone calls and 117 letters, for a total of 281. During this period, the administrative monetary recoveries pertaining to health care fraud complaints totaled $308,734.

### OIG-Initiated Complaints

As illustrated earlier in this section, we respond to complaints reported to our office by individuals, government entities at the federal, state and local levels, as well as FEHBP health care insurance carriers and their subscribers. We also initiate our own inquiries as a means to respond effectively to allegations involving fraud, abuse, integrity, and occasionally malfeasance. Our office will initiate an investigation if complaints and inquiries can be substantiated.

An example of a specific type of complaint that our office will initiate involves retirement fraud. This might occur when our agency has already received information indicating an overpayment to an annuitant has been made. At that point, our review would determine whether there were sufficient grounds to justify our involvement due to the potential for fraud. There were 22 such complaints associated with agency inquiries during this reporting period.

Another example of an OIG-initiated complaint occurs when we review the agency's automated annuity records system for certain items that may indicate a potential for fraud. If we uncover some of these indicators, we initiate personal contact with the annuitant to determine if further investigation is warranted. This investigative activity resulted in 26 instances where our office initiated personal contacts to verify the status of an annuitant.

We believe that these OIG initiatives complement our hotline and outside complaint sources to ensure that our office can continue to be effective in its role to guard against and identify instances of fraud, waste and abuse.