## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel. ANDREW M. GARNER, III,** | | **CASE NO. 1:00cv00463** |
| | **:** | |
| **Plaintiffs,** | **:** | **Senior Judge S. Arthur Spiegel** |
| **v.** | **:** | |
| **ANTHEM INSURANCE COMPANIES, INC., et al.** | **:** | |
| | **:** | |
| **Defendants.** | | |

---

### DEFENDANT ANTHEM INSURANCE COMPANIES, INC.'S MEMORANDUM (1) IN SUPPORT OF UNITED STATES' NOTICE OF DISMISSAL AND SETTLEMENT AND (2) IN OPPOSITION TO RELATOR'S MEMORANDUM

---

{00187793.DOC/1}

## <u>TABLE OF CONTENTS AND SUMMARY</u>

I.    INTRODUCTION......................................................................................1

Anthem respectfully submits that there is no legal justification for a hearing. With respect to the counts dismissed by the Government without prejudice, the law is clear.  The Government, as prosecutor, has discretion to dismiss without prejudice claims without merit, pursuant to Rule 41(a).  Moreover, the evidence demonstrates that dismissal without prejudice of these counts was inherently reasonable.  As to the remainder of Count I, for which Anthem has agreed to pay $1.5 million (a sum Relator's counsel agreed was acceptable), there is no evidence that the Settlement Agreement, which reaches two years beyond Relator's allegations in his Complaint, is not fair, adequate and reasonable under all the circumstances.

II.    FACTUAL BACKGROUND ......................................................................2

A.    Allegations in Count I were dismissed with prejudice against AdminaStar PrintMail ("Print Mail") and Anthem Prescription ("APM"), and all other claims were dismissed without prejudice pursuant to Rule 41(a).....4

1.    Relator is not entitled to challenge settlement of PrintMail.................4

Relator's claim, as described in his deposition, is not against affiliated PrintMail, but an <u>un</u>affiliated third party vendor – Personix.  Additionally, the Relator has no personal proof or reason to suspect that PrintMail, as opposed to Personix, engaged in improper conduct.  Garner Depo., pp. 307-08.  However, even if Mr. Garner's allegation about Personix was really about PrintMail, *and* his allegation was about the same issue settled by the Government, then he still cannot challenge the fairness of this Settlement because he was neither the original source nor the first to file on this issue. *See United States ex rel. Calabrese v. AdminaStar Federal*, Case No. 3:99-cv-00599-CRS (W.D. Ky. 1999) (J. Simpson).  Mr. Garner even admits he is not the original source of this allegation.  Garner Depo., pp. 307-08.

2.    Relator's claim against APM differs materially from the issue settled.................................................................................................6

As to APM, Relator's allegations also do not reflect the issue settled between Anthem/FEP and the Government.  The Relator misunderstood the true-up process between Anthem/FEP and its affiliate, APM.  It is Relator's steadfast refusal to allow Anthem to explain a labeling error (which happened years ago) and the Relator's omission of a key page of an exhibit produced by Anthem/FEP to support APM's 2000 true-up exercise that has lead to the Relator's misunderstanding or misreading of a portion of the supporting

documentation to the APM true-ups for 1999 and 2000 at Exs. K and L to the
Objections.  The Government concluded that there was a real risk that (1)
there would be no liability because there was "no evidence of a deliberate
effort to exclude any of the mail-order drug rebates . . . only poor
accounting" and (2) there would be no damages due to the Government
because the investigation revealed that Anthem had actually undercharged the
Government.  August 9, 2005 Government Settlement Service Letter, p. 2.

**3.  The claims against Wright Health, Paragon and American Health are meritless...................................................................................................11**

Neither the Government nor Anthem/FEP investigations found any
improper conduct regarding these allegations.  As a result, the Government
dismissed these allegations without prejudice pursuant to Rule 41(a).

**B.    Count II was dismissed without prejudice pursuant to Rule 41(a) because the allegations were meritless......................................................................12**

After its investigation of the Count II claims, the Government
dismissed them without prejudice pursuant to Rule 41(a) because the
allegations had either already been disclosed and addressed or there was no
proof of any wrongdoing.

**C.    Count III was dismissed without prejudice pursuant to Rule 41(a) because the allegations are meritless.........................................................13**

Relator's Complaint offers insufficient details in Count III to state a
claim of fraud. Moreover, Anthems internal investigation found no indication
of wrongdoing as described by the Relator.  Thus, the Government properly
dismissed Count III without prejudice pursuant to Rule 41(a).

**D.    Counts IV and V were dismissed without prejudice pursuant to Rule 41(a)..............................................................................................................14**

Both Counts IV and V involve issues that were disclosed, discussed
and settled between Anthem/FEP and OPM as contract administration
matters, years earlier.  The Relator admits that he was not the original source
these claims, and thus he will not likely pursue those claims.  *See* Objections,
p. 6.  Thus, the Government correctly dismissed Counts IV and V without
prejudice pursuant to Rule 41(a).

**E.    Court VI, Relator's retaliatory discharge count is neither settled nor dismissed..................................................................................................14**

The current settlement does not include a settlement of the retaliatory
discharge claim pursuant to 31 U.S.C. § 3730(h) as set forth in Count VI.

{00187793.DOC/1}

However, like the *qui tam* claims, the evidence clearly establishes that
Mr. Garner's retaliatory discharge claim is meritless. Mr. Garner was not
discharged based on his allegations of fraud or any threats to bring a False
Claims Act action. Mr. Garner was discharged because he made
inappropriate comments to other workers, creating an atmosphere that caused
other workers great anxiety and interfered with their ability to do their jobs.

III.    **THE GOVERNMENT'S DECISION TO DISMISS CERTAIN
COUNTS WITHOUT PREJUDICE, PURSUANT TO RULE
41(A), DOES NOT REQUIRE A HEARING** ............................................................**19**

Rule 41(a)(1) was a valid mechanism for dismissal of these claims without
order of court. *Swift v. United States*, 318 F.3d 250, 252-254 (D.C. Cir. 2003). "A
dismissal pursuant to Rule 41(a)(1)(i) is not subject to judicial review." *Id.*
Specifically, a hearing is not required where, as here, the decision to dismiss is
"inherently reasonable" and no showing of a benefit to the Court can be made. *See
United States ex rel. Pentagen Techs. Int'l v. United States*, No. 00 Civ. 6167 (DAB),
2001 U.S. Dist. LEXIS 9645, at *24-27 (S.D.N.Y. 2001); *United States v. Fiske*, 968
F. Supp. 1347, 1355 (E.D. Ark. 1997).

IV.    **AS TO THE CLAIMS SETTLED, THE COURT CAN AND
SHOULD APPROVE THE SETTLEMENT WITHOUT AN
EVIDENTIARY FAIRNESS HEARING** ...............................................................**20**

The Relator wrongly contends that an evidentiary fairness hearing is
necessary concerning the fairness of the $1.5 million dollar settlement of Count I with
regard to PrintMail and APM. Relator's repeated accusations and a fundamental
misunderstanding of accounting do not satisfy his burden of showing a "substantial
and particularized need" required for an evidentiary fairness hearing. S. Rep. No. 99-
345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291; *Ridenour v. Kaiser-
Hill Co, LLC,* 397 F.3d 925, 931 (10th Cir. 2005).

V.    **THE RELATOR HAS NOT MET HIS BURDEN TO DISPROVE
THE GOVERNMENT'S VALUE OF THE CLAIMS, AS "FAIR,
ADEQUATE AND REASONABLE."** ....................................................................**21**

The Court should approve the Settlement Agreement because the Relator has
not shown that it is not "fair, adequate and reasonable under all the circumstances."
31 U.S.C. § 3730 (c)(2)(B). In analyzing any such settlement agreement, Courts
should afford the Government's decision to settle a "very high degree of deference."
John T. Boese, Civil False Claims and Qui Tam Actions, § 4.07[A][2], at 4-156.1
(2004-1 supp.). *Accord: Clark Equipment Co. v. International Union, Allied
Industrial Workers*, 803 F.2d 878, 880 (6th Cir. 1986). Further, to prevail at a fairness
hearing, Relator must disprove the Government's estimate of the value of the settled
claims that the Government explained to Relator in its August of 2005 letter. *United*

*States v. United States ex rel. Thornton*, 207 F. 3d 769, 772-73 (5th Cir. 2000). Relator has not met this burden, nor has it offered any reason for this Court to believe that he can.

**VI.     THE SETTLEMENT OF ADMINASTAR PRINTMAIL IS "FAIR, ADEQUATE AND REASONABLE UNDER ALL THE CIRCUMSTANCES." ............................................................26**

Relator's PrintMail claim should be dismissed because after April 1997, well before Relator's discharge, PrintMail was sold to FiServe Solutions, Inc. Another basis for dismissal of Relator's Count I is that Relator himself now avers, in his deposition, that he was not the original source of this allegation. Garner Depo., pp. 307-08. Relator was also not the first to file. *United States ex rel. Calabrese v. AdminaStar Federal*, Case No. 3:99-cv-00599-CRS (W.D. Ky. 1999) (J. Simpson). Moreover, the Government explained, in its August 9, 2005 letter to Relator, that the "defendants raised the colorable argument [for a defense] that the commercial price exception to the related entity rule, FAR § 31.205-26(c), applied allowing the inclusion of profit" because the contractor typically priced inter-organizational transfers at other than cost for commercial work. Even the Relator admits, in his Objections, that the settlement for the PrintMail and APM issues was an "*adequate* amount." Objections, p. 8 (italics in original). Based upon the foregoing, there can be no question whatsoever that the Government's settlement with Anthem for the PrintMail claim is "fair, adequate and reasonable under all the circumstances."

**VII.    THE SETTLEMENT OF APM'S CLAIM REIMBURSES THE GOVERNMENT FOR THE COSTS ASSOCIATED WITH THE HUMAN ERROR AND IS "FAIR, ADEQUATE AND REASONABLE UNDER THE CIRCUMSTANCES." ..........................................29**

As for the APM issue, after concluding the investigation, both Anthem and the Government are confident that the errors themselves were human mistakes and do not rise to the level a False Claim under the statute. *United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F.Supp. 2d 822, 833 (S.D. Mich. 2000). *Accord: United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995). There is no evidence of fraud and no evidence of reckless disregard. Moreover, the mistakes made benefited the Government since Anthem had *undercharged* the OPM. Under these circumstances, the small portion the settlement allocable to the APM claim is "inherently reasonable."

**VIII.   THE RELATOR'S PERSONAL CONFLICT OF INTEREST UNDERMINES OBJECTIVITY IN INTERPRETING THE SETTLEMENT VALUE .......................................................................36**

The Objections raised by the Relator's must be viewed in context. The

iv

Relator risks very little by objecting to the Settlement Agreement.  Under normal circumstances, a relator receives a share of settlement for those issues that he brought to the Government.   Thus, any increase in the overall settlement increases the Relator's potential recovery.   Furthermore, Relator's counsel advised the Government on May 19, 2005 that it concurred in the Government's decision to settle for $1.5 million – the amount of the actual settlement.  Accordingly, Relator should not now be heard to complain about a settlement he has previously confirmed is fair and adequate.

**IX.     CONCLUSION** ...........................................................................................**37**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D. Ohio 1992) ............................................................23

*Brotherton v. Cleveland*, 141 F.Supp. 2d 894 (S.D. Ohio 2001)...................................................22

*Heckler v. Chaney*, 470 U.S. 821, 831-33, 84 L.Ed.2d 714, 105 S.Ct. 1649 (1985)...............17, 18

*Newman v. United States*, 127 U.S. App. D.C. 263, 382 F.2d 479, 480 (D.C. Cir. 1967) ...........17

*Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982)..............................23

*Randall v. Merrill Lynch*, 261 U.S. App. D.C. 138, 820 F.2d 1317, 1320 (D.C. Cir. 1987).........18

*Ridenour v. Kaiser-Hill Co, LLC*, 397 F.3d 925, 931 (10th Cir. 2005)..........................................21

*Swift v. United States*, 318 F.3d 250, 252-54 (D.C. Cir. 2003) ..............................................17, 19

*United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995) ...............................................................................................................................................31

*United States ex rel. Ervin & Associates v. Hamilton Securities Group*, 298 F. Supp. 2d 91, 101-02 (D.D.C. 2004) ...........................................................................................................31

*United States ex rel. Gravitt v. General Electric Co.*, 680 F.Supp. 1162, 1164-65 (S.D. Ohio 1988) ...................................................................................................................................32

*United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ...............................................................................................................................31

*United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 n. 11 (9th Cir. 1993).........................21

*United States ex rel. Mathews v. Health South Corp.*, 140 F. Supp. 2d 706 (W.D. La. 2001) ..........................................................................................................................................32

*United States ex rel. McCoy v. California Medical Review, Inc.*, 133 F.R.D. 143, 148 (N.D. Cal. 1990)....................................................................................................................22

*United States ex rel. Nudelman v. International Rehabilitation Associates, Inc.*, Civil Action No. 00-1837, 2004 U.S.Dist. LEXIS 8951, AT *4 (e.d. Pa. May 14, 2005) ...................22

*United  States ex rel. Pentagen Techs. Int'l v. United States*, No. 00 Civ. 6167 (DAB), 2001 U.S.Dist. LEXIS 9645, at *24-27 (S.D. N.Y. 2001).............................................................20

{00187793.DOC/1}

*United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.*, 912 F.Supp. 1325 (E.D. Cal. 1995), *aff'd sub nom. United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.,* 151 F.3d 1139, 1145 (9th Cir. 1998) ........................................................18

*United States ex rel. Swafford v. Borgess Medical Ctr.*, 98 F.Supp. 2d 822, 23 (S.D. Mich. 2000) *aff'd,* No. 00-1288, 2001 U.AS. App. LEXIS 26669 (6th Cir. Dec. 12, 2001) ........31

*United States v. Fiske*, 968 F.Supp. 1347, 1354-55 (E.D. Ark. 1997)....................................19, 20

*United States v. United States ex rel. Thornton*, 207 F.3d 769, 770, 772-73 (5th Cir. 2000) ..23, 24

*White v. Morris,* 811 F. Supp. 341, 342 (S.D. Ohio 1992).........................................................23

*Wilkins ex rel. United States v. Ohio*, 885 F. Supp. 1055, 1059-60 (S.D. Ohio 1995)................31

*Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983) ........................................................37

## DOCKETED CASES

*United States ex rel. Calabrese v. AdminaStar Federal*, Case No. 3:99-cv-00599-CRS ..........5, 28

*United States, ex rel. Moore v. AdminaStar Federal, Inc.*, Civil Action No. 3:00CV-277-4 (W.D. Ky. May 18, 2000) ........................................................................................................28

## FEDERAL CONSTITUTION STATUTES
## AND OTHER FEDERAL SOURCERS

U.S. CONST., at II, 83................................................................................................17, 18

31 U.S.C. §3729(a) ........................................................................................................26

31 U.S.C. § 3730(b) ........................................................................................................27

31 U.S.C.§3730(b)(5)........................................................................................................28

31 U.S.C. § 3729(b) ........................................................................................................30

31 U.S.C. § 3730 (c)(2)(A) ........................................................................................................19

31 U.S.C. § 3730 (c)(2)(B) ........................................................................ 20, 21-22, 29, 36

31 U.S.C. § 3730(e)(4)(A)-(B) ........................................................................................................28

31 U.S.C. §3730(h)........................................................................................................14

S. Rep. No. 99-345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291 ..........................21

{00187793.DOC/1}

viii

## I.    INTRODUCTION

Defendant, Anthem Insurance Companies, Inc. ("Anthem"), submits this memorandum in support of the United States' Notice of Dismissal (Doc. No. 55) (filed August 8, 2005), and in opposition to the Relator's Memorandum in Opposition to United States' Notice of Dismissal and Settlement (Doc. No. 57) ("Objections") (filed September 14, 2005).

Attached to the Government's Notice of Dismissal was the Settlement Agreement negotiated between Anthem and the Government concluding the Government's five-year investigation into various issues related to Anthem's operation of its Federal Employees Health Care Program ("FEP") contracts.  Anthem agreed to repay the Government $1.5 million to address two issues – one raised by the Government (PrintMail) and one issue tangentially raised by Relator.

Although the Relator had initially consented to the Government's settlement, Relator later threatened to challenge the fairness of the Settlement after he was unable to settle the unrelated retaliatory discharge claim.  When Relator's demands for payment on his personal claim remained unmet, he filed his Objections on September 14, 2005. Relator's Objections appear to rely upon two conclusions.  First and foremost, the Relator equates any error with fraud and demands any fraud be punished to the fullest extent of the False Claims Act.  Relator's position is not only wrong; it is not shared by the Government.

Second, Relator insists upon _mis_understanding how Anthem's prescription benefits manager ("PBM") for the HMP, Anthem Prescription Management ("APM"), reconciles the share of administrative expenses and drug rebates allocable annually to Anthem/FEP and, in turn, to the United States Office of Personnel Management ("OPM").  Indeed, Anthem/FEP's inter-company true-up process (designed to be sure that only actual costs are passed through to

{00187793.DOC/1}

the Government) demonstrates that while human errors were made, no fraud occurred.  As such, the Government's settlement is both fair and reasonable.

For the reasons that follow, Anthem respectfully submits that there is no legal justification for a hearing.  With respect to the counts dismissed by the Government without prejudice, the law is clear.  The Government, as prosecutor, has discretion to dismiss without prejudice claims without merit, pursuant to Rule 41(a).  Moreover, the evidence demonstrates that dismissal without prejudice of these counts was inherently reasonable.  As to the remainder of Count I, for which Anthem has agreed to pay $1.5 million, there is no evidence that the Settlement Agreement, which reaches two years beyond Relator's allegations in his Complaint, is not fair, adequate and reasonable under all the circumstances.

Moreover, Relator's Objections must be put in context.  On May 19, 2005, Mr. Keller (the Relator's counsel) told counsel for the United States that the tentative settlement of $1.5 million was acceptable to the Relator.  In fact, Mr. Keller said that a $1.5 million recovery was what he really sought in the case, although the day before he made a demand on Defendant for $2,050,000.  *See* the United States' Response to Relator's Motion for Partial Lifting of the Stay and for Status Conference (Doc. No. 54) (filed July 21, 2005) (citing letter dated May 18, 2005 from Timothy Keller to Barbara Duncombe and Jim Dyer ("Relator's Settlement Letter," p. 4, attached as Ex. A to this Memorandum).

Accordingly, Anthem respectfully requests that this Court approve the settlement and dismissals as submitted by the Government to the Court.

## II.    FACTUAL BACKGROUND

The Relator filed this False Claims Act Complaint on June 13, 2000.  The Complaint contained five false claims counts and a retaliatory discharge count.  The Government served a

subpoena *duces tecum* shortly thereafter on Anthem/FEP.  Anthem responded by producing a

roomful of documents and affording the OPM Office of Inspector General ("OIG") auditors (1)

limitless access and (2) the opportunity to expand its requests without further subpoenas.  The

OPM OIG auditors reviewed thousands of documents and analyzed fully the allegations in the

Complaint.  The Defense Criminal Investigation Service ("DCIS") investigator assigned to this

matter interviewed witnesses no longer employed by Anthem.  Both DOJ counsel and the DCIS

investigator asked to question various Anthem employees.  Anthem made them available for

questioning without limitation.  Throughout the five years involved, Anthem cooperated fully

with the Government.  At the conclusion of the investigation, the Defendants settled with the

Government and there were no findings of fraud.  Letter dated August 9, 2005 from Stanley

Anderson to Timothy Keller ("Government Settlement Service Letter") (attached as Ex. B) (also

attached at Ex. C to Objections).

On May 19, 2005, the Government orally advised Relator of the proposed settlement with

Anthem.  Initially, Relator informed the Government that he had no objection.  *Id.*  On August 8,

2005, the Government filed a Notice of Dismissal (Doc. No. 55) that stated as follows:

> The United States dismisses Count I of the Complaint with respect
> to AdminaStar PrintMail and Anthem Prescription with prejudice
> and dismisses the remainder of the complaint, with the exception
> [of the retaliatory discharge claim in Count VI and Relator's
> claims for expenses, attorneys' fees and costs or entitlement to a
> share of the proceeds for the settlement agreement], without
> prejudice.

The Government attached the Settlement Agreement as an exhibit to the Notice of Dismissal

filed with this Court.

On September 14, 2005, the Relator filed objections, challenging the fairness of the

Settlement as well as the Government's right to dismiss remaining counts without prejudice.

**A.    Allegations in Count I were dismissed with prejudice against AdminaStar PrintMail ("Print Mail") and Anthem Prescription ("APM"), and all other claims were dismissed without prejudice pursuant to Rule 41(a).[1]**

Count I included claims against five companies:  PrintMail, APM, Wright Health, Paragon and American Health.

**1.    Relator is not entitled to challenge settlement of PrintMail.**

Relator claimed in Count I that Anthem allowed its affiliate, Personix, to include a 10% profit in its billings passed through to OPM.  Complaint ¶¶50-53.  An affiliate or related entity is only entitled to charge its costs, no profit, for work performed, on behalf of another affiliate, for a Government customer.  Relator, however, has no right to challenge this portion of the Settlement.  That is, Relator's claim, as described in his deposition, is not against affiliated PrintMail, but an <u>un</u>affiliated third party vendor – Personix.

Count I alleges that Personix, not PrintMail, made improper charges.  Anthem sold PrintMail to FiServe Solutions, Inc., dba Personix, in April 1997 and therefore, at the time of Relator's allegations, Personix was not under Anthem's control.

Additionally, the Relator has no personal proof or reason to suspect that PrintMail, as opposed to Personix, engaged in improper conduct.  At his deposition on November 2, 2005, Relator stated:

> Q.    Do you have any facts to suggest that Administar Print Mail was in any way engaged in a fraud or did something improper with regard to its billing practices?

---

[1]    The Court should note that there are several inaccuracies in the Relator's Objections.  For instance, the Relator stated that "The dismissal would be with prejudice as to Counts I and II and without prejudice as to Counts III through V."  Objections, p. 7.  In reality, as the Notice of Dismissal (Doc. No. 55) (filed Aug. 8, 2005) states: "The United States dismisses Count I of the Complaint with respect to AdminaStar PrintMail and Anthem Prescription with prejudice and dismisses the remainder of the complaint, with the exception [of the retaliatory discharge claim in Count VI and Relator's claims for expenses, attorneys' fees and costs or entitlement to a share of the proceeds for the settlement agreement] without prejudice."

> A.  I thought I read recently about a settlement that Administar
> had made with the Government for handling Medicare claims
> improperly, so that would be the only evidence that I would
> know is something from the press that stated that they had
> done something that was incorrect.

Deposition of Andrew M. Garner, III, taken November 2, 2005 ("Garner Depo." attached as Ex.

C), pp. 307-08.

A further irony is that, at his deposition, Mr. Garner's only complaint against Personix

was that described in Count II of his Complaint.  *See* Complaint, ¶¶169-177.  In his deposition,

Mr. Garner alleged that Personix was sending invoices to FEP for services that were not actually

ordered by or delivered to FEP.  Garner Depo., pp. 286-87.  For reasons described hereinafter,

that claim, in Court II, has been dismissed without prejudice by the Government.

However, even if Mr. Garner's allegation about Personix was really about PrintMail, *and*

his allegation about improper invoices was really about Anthem's affiliate including profit in

charges passed through to the Government, he still cannot challenge the fairness of this

Settlement.  He was neither the original source nor the first to file on this issue.  The issue settled

here was settled for the same reasons[2] in *United States ex rel. Calabrese v. AdminaStar Federal*,

Case No. 3:99-cv-00599-CRS (W.D. Ky. 1999) (J. Simpson).  Mr. Garner's counsel represented

relators who participated in a companion action to Mr. Calabrese's case; the companion case was

filed in May 2000.  According to the Government, Relator's counsel was apprised immediately

of Mr. Calabrese's claims.  This action was filed in June 2000, raising a similar claim about

---

[2]    As shown below in Section V of this Memorandum, the Government understood that there was a real risk
that this claim is subject to the commercial price exception to the related entity rule, FAR § 31.205-26(c).
Accordingly, the Government and Anthem agreed to settle the matter in the earlier action for 10% of the total
charges.  The Government adopted the same approach in this investigation—$461,000 is 10% of the total PrintMail
charges passed through to OPM for the period 1992-2002.  *Id.*  The settlement provides for compensation at twice
this amount ($922,000).  *Id.*  Contrast this with Relator's Settlement Demand.  Relator suggested an appropriate
settlement for the PrintMail charges of $570,000 (2.5 times the Relator's estimated single damages of $288,000).

Personix/PrintMail.  Apparently, from his deposition testimony, Mr. Garner admits he is not the original source of this allegation.  Garner Depo., pp. 307-08.

> ## 2.      Relator's claim against APM differs materially from the issue settled.

As to APM, Relator's allegations also do not reflect the issue settled between Anthem/FEP and the Government.  The Complaint, ¶78, describes the inclusion of an impermissible profit assessment.  Specifically, in his Complaint, ¶78, Relator states:  "Anthem Prescription's average rebate for Preferred Medications is $4.00 per prescription; however, Anthem Prescription has only refunded an average $1.00 per prescription to OPM.  Anthem Prescription has retained the $3.00 per prescription rebate as an unallowable profit."  Not only is Relator's allegation untrue, it is unrelated to the issued settled.

Rather, the Relator misunderstood the true-up process between Anthem/FEP and its affiliate, APM, which provided drug benefits to the FEP members of the Ohio Health Benefit Plan ("HMP").  Throughout the calendar year, Anthem/FEP charged OPM a budgeted proportion of APM expenses and credited OPM with a proportion of the rebates.[3]  In the process of preparing the Annual Accounting Statement, due to OPM several months after each calendar year close, Anthem/FEP directs APM, and any other Anthem affiliate charging expenses to FEP, to reconcile their charges to "cost."  Accordingly, APM, since its inception in 1995, performed a true-up.

---

Relator's Settlement Letter, pp. 1-4.

[3]        In point of fact, rebates credited to OPM throughout the year were calculated at $1 per script – for every script – not just scripts for which a rebate was paid.  After 1998, the rebates credited to OPM throughout the calendar year were based on 80% of the total rebates collected.  However, regardless of the methodology used to credit rebates throughout the year, Anthem/FEP and APM reconciled, or trued-up, both expenses and rebates as part of the process in support of compiling the Annual Accounting Statement.  Prior to, during and subsequent to the Government investigation, OPM auditors have been aware of the process and acknowledge its reasonableness under the applicable regulations.

In the course of the Government's investigation, Government auditors and investigators confirmed that the APM true-up exercise employed a reasonable methodology to charge OPM its allocable share of expenses and to credit OPM its allocable share of the rebates.  That is, APM calculates rebates credited and expenses charged to OPM for the HMP prescription program based upon OPM's share of the scripts in proportion to the total number of scripts processed by APM, for all its Anthem accounts, during the year.  Objections, Ex. D, p.2.

Relator, reconfiguring his claim from his Complaint, asked whether OPM had received its share of all rebates.  In its efforts to cooperate with the Government's investigation into drug rebates, Anthem/FEP determined that the APM accounting department had not been told that a mail order prescription benefit was added to Anthem/FEP's HMP program in 1999.  Anthem advised the Government of this fact.  Objections, Ex. I, p.3.

In response to the Government's questions and the Relator's demands, APM further explained that its accounting department did not track rebates by source – retail, mail or generic (*i.e.*, volume discount)—because, regardless of the source, the rebates function to reduce costs.  *Id*. APM explained, however, that there was an internal determination made to identify a percentage of the rebates as mail, retail or generic.[4]  *Id*.  Thus, Anthem/FEP explained that, because of the way APM allocated rebates, OPM already had received most of its share of mail order rebates, notwithstanding APM's error.  *Id*.  Moreover, Anthem/FEP explained to the Government that while OPM <u>had</u> received <u>most</u> of its mail order rebates, it had <u>not</u> been charged <u>any</u> of its share of the expenses to operate APM's mail order operation.  *Id*.  The net result of APM's mistake had been to the Government's benefit.

---

[4] According to antidotal evidence, that percentage undervalued mail order rebates and overvalued retail rebates.

APM's error was an oversight. It was not intentional, and it certainly was not a fraud. By letter of May 2, 2005, Anthem/FEP explained the situation and forwarded to the Government revised true-ups and supporting documentation for the years 1999 to present, identifying the under and overpayments to OPM. Objections, Ex. I. The outcome, set forth below, confirms that APM's error benefited the Government:

| Year | Underpayment of Rebates | Administrative Expenses[5] |
|------|-------------------------|----------------------------|
| 1999 | $36,518[6] | $130,970 |
| 2000 | $31,976 | $122,741 |
| 2001 | 0[7] | $193,915 |
| 2002 | $53,883 | $256,466 |
| **TOTALS** | **$122,377** | **$704,092** |

Based upon Anthem/FEP's disclosure, the Government auditors reviewed the supporting documentation. Thereafter, the Government advised Relator that there was a real risk that (1)

---

[5]     Pursuant to the Settlement Agreement, Part II, ¶ F, Anthem/FEP has waived its right to pursue recovery of these administrative expenses from OPM.

[6]     These figures are determined by subtracting the amount of rebates which OPM already has received/has been credited–based either upon the original true-up or, if appropriate, from the adjusted true-up prepared in February 2003─from the amount which *should have been* OPM's share of the total rebates. For example, in 1999, when Anthem/FEP and APM trued-up the rebates, they calculated $409,639 as OPM's share of the total rebate amount. OPM received an adjustment *at that time* to reconcile between the $375,235 in rebates allocated to OPM throughout the year and what was then determined to be OPM's share of the total rebates, $409,639. In February 2003, Anthem/FEP adjusted OPM's share of the rebate pool to $431,663. Ultimately, with the inclusion of the remaining mail order rebates, it was determined that OPM's share of the rebates should have been $468,181. The difference between the amounts previously paid/credited to OPM, $431,663, and the amount now due, $468,181, is $36,518.

[7]     In 2001, Anthem/FEP paid $680,095 to OPM in rebates throughout the calendar year. At year end, it was determined that OPM's share of the rebates was $640,151, indicating that OPM had been overpaid. In February 2003, Anthem/FEP determined that OPM's share of the rebates should have been $840,680, resulting in an underpayment to OPM, which was returned to OPM as part of a year-end adjustment. OPM/OIG is aware of these calculations/adjustments. Therefore, when mail order rebates were included, but OPM's share of the overall script pool was dropped, OPM's share of the rebates also dropped to $827,327─a reduction from the prior adjustment. As such, Anthem/FEP overpaid OPM by $13,353 and, obviously, no further rebate payment is due OPM for 2000.

there would be no liability because there was "no evidence of a deliberate effort to exclude any of the mail-order drug rebates . . . only poor accounting" and (2) there would be no damages due to the Government because the investigation revealed that Anthem had actually undercharged the Government.  Government Settlement Service Letter, p. 2.  The settlement provided for damages of approximately $578,000 for a $122,377 documented underpayment issue attributable to the APM.[8]  Furthermore, Anthem waived its right to pursue recovery of approximately $704,092 in expenses that Anthem would otherwise have charged to OPM as its share of administrative expenses to operate the mail order function.  The Relator's Counsel admits that the Government, through Mr. Alderson, informed him that the Defendants had overpaid OPM approximately $700,000.  *See* Objections, p. 16.  Thus, the cost to Anthem of its settlement for PrintMail and APM is approximately $2.2 million.[9]

Notwithstanding Anthem's and the Government's explanations, the Relator continues with his misunderstanding of APM's true-up of expenses and rebates.  Before opposing the Settlement, Anthem offered – but Relator's counsel repeatedly <u>turned</u> <u>down</u> – an open opportunity for him to sit down with APM personnel, to review its process and ask his questions.  Unfortunately, Relator's counsel, despite contrary representations to this Court, has not yet hired a competent accounting expert to help him understand the process.

---

[8]     The Settlement covers the period 1992-2002.  In addition to the mail order rebates, the Settlement also covers the early years of APM's operation (1995-1997) where, like PrintMail, the Government recognizes that HMP drug services were provided and rebates were credited to OPM, but Anthem/FEP has been unable, thus far, to provide sufficient documentation to satisfy that similar true-ups were performed during that time.

[9]     Inasmuch as Relator's Settlement Demand was for $2,050,000 (Relator's Settlement Letter, p. 4), his attempt to question the overall fairness of the Settlement seems moot.

Indeed, the basis for Relator's demand for further discovery into APM's rebates involves his misunderstanding or misreading of a portion of the supporting documentation to the APM true-ups for 1999 and 2000 at Exs. K and L to the Objections. *See* Objections, pp. 14-15.

The Relator's focus is on one label, "Total Shared Rebates," in a four-page computer query of all drug expenses charged to FEP programs in 2000 (Objections Ex. K). While this particular label is in error, this type of query is requested annually by APM to obtain: (1) the total amount of APM's administrative expenses charged to OPM for HMP throughout the previous twelve months; and (2) the total amount of drug rebates credited to OPM for the HMP contract throughout the calendar year. Without this information, APM cannot determine the difference between what had been charged versus what should be charged to true-up to cost.

For both years (1999 and 2000), the query first details those journal entries charging drug expenses to Anthem under the FEP Service Benefit Plan.[10] For 2000, those drug expenses total $142,829,214. These are expenses, NOT rebates.[11] The second series of entries are drug expenses, not administration expenses, charged during the year for APM to provide the pharmaceutical drugs to HMP FEP members. Rebates credited to OPM throughout the year appear as a reduction of the drug expenses, thereby reducing HMP's total drug expense to $7,717,789. The last series of journal entries represents the APM administrative expense charged to HMP (a subsidiary of CIC) throughout the calendar year—$111,948.

---

[10]     The fact that these entries, totaling $142,829,914, represent drug benefits charged to Anthem/FEP's SBP is supported by two facts. First, the FEP SBP is performed by an entity which is part of Anthem Insurance Companies, Inc. ("AICI")—as opposed to drug expenses charged to HMP which is part of Community Insurance Inc. ("CIC"). Second, as confirmed in the Affidavit of Clinton Shatzer, Director of Program Financial Services for the Blue Cross & Blue Shield Association ("BCBSA"), the BCBSA acknowledges that those journal entries correspond to the drug charges BCBSA allocated to Anthem/FEP as its share of the drug benefit provided by the SBP PDM. Affidavit ¶¶8-11, attached as Ex. D. That is, $142,289,214 are NOT rebates at all. Therefore, the label describing the sum of $142,289,214 AICI drug expenses and $7,717,7689 CIC drug expenses, labeled as "Total Shared Rebates" must be, as Anthem has said all along, incorrect or mislabeled.

Unfortunately, Relator's exhibit omits a key page produced by Anthem/FEP to support APM's 2000 true-up exercise.  That page (which is attached as Ex. E of this Memorandum) repeats the credits included in CIC's drug expense journal entries and labels the total of those credits, $362,328, as "Total Shared Rebates."  A quick glance back to APM 2000 True-Up Summary (p. 1 of Objections Ex. K) confirms that APM represents $111,948 as the total administrative expenses charged to OMP throughout 2000 and $362,328 as the total rebates shared with OPM in 2000.  The mystery of misrepresented rebates in 1999 is similarly debunked. Relator's Objections Ex. L.[12]  In point of fact, it is Relator's steadfast refusal to allow Anthem to explain this labeling error (which happened years ago) that gave rise to his discovery demand for further discovery of APM at the September 15, 2005 status conference.  Curiously, after obtaining leave of Court to conduct discovery on this basis, Relator never asked for an explanation of this disconnect in his requests for production of documents, his interrogatories or his deposition examination of eight Anthem/FEP witnesses.

### 3.     The claims against Wright Health, Paragon and American Health are meritless.

The Relator also alleged that Anthem/FEP improperly earned a profit through three health care provider networks – Wright Health, Paragon and American Health.  Neither the Government nor Anthem/FEP investigations found any improper conduct.  As a result, the Government dismissed these allegations without prejudice pursuant to Rule 41(a).  Accordingly, the Relator cannot challenge the fairness of the Settlement for counts not settled therein.

---

[11]     See note 10 above.

[12]     Of the five years of APM True-Ups provided to Relator in April 2005, all contain similar but not identical ledger queries to obtain the same two pieces of information─the amount of administration expense charged and the amount of rebates credited to OPM during the calendar year.  The incorrect label occurred in only the two years cited by Relator in his Objections.  Notwithstanding Defendant's counsel's attempt to explain the error, based upon this error alone, Relator's counsel demanded discovery into APM.

**B.    Count II was dismissed without prejudice pursuant to Rule 41(a) because the allegations were meritless.**

Count II alleged misallocation of time expended by FEP management personnel on special projects or work related to the 1994/95 merger between Anthem and Community Mutual Insurance Companies.  This issue is not new, nor is it undisclosed.  It has been the subject of discussions between OPM and Anthem since 1996.

Count II also alleged misallocation of time expended by FEP personnel to market Federal Dental Blue ("FDB") or to sort, copy or mail the FDB claims to another company for processing. The FDB issue actually arose in 1996, and Relator was not involved.  Based on discussions between OPM and Anthem FEP, Anthem eliminated the problem by allowing for an allocation which was included on the representatives' timesheets.  Deposition of Michael E. Jensen (FEP's Compliance Officer), taken November 7, 2005 ("Jensen Depo."), p. 150-55 (relevant portions of the rough draft attached at Ex. F).  Thus, OPM and FEP had addressed and worked out the FDB issue in 1996–four years before Mr. Garner filed his Complaint (Jensen Depo., p. 153)–so the Government found this claim meritless.[13]

Count II further alleged that unnecessary amounts were included in the Point of Service Pilot Plan budget.  Anthem's investigation into these issues confirmed either there was nothing of substance, or that the matter had, in fact, been addressed previously with OPM to its satisfaction.  Further, Mr. Garner's deposition testimony confirmed that he had no <u>knowledge</u> or <u>proof</u> of actual wrongdoing by Anthem.  Garner Depo., pp. 202-05.  Rather, all Mr. Garner offers is his speculation of what "could" have been improper.  *Id.,* p. 205.  For example, he alleged

---

[13]    The Relator's assessment of the FEP Marketing Representatives and the "FDB claims processing" (both FDP issues) at $615,000 (2.5 times the Relator's estimate of single damages of $246,000, is erroneous.  Relator's Settlement Letter, pp. 2,4.  The true value is $0.

"fraud" because his boss directed him to include monies in a proposed budget for a point of service project with OPM. *Id.*, pp. 202-05. He testified that he did not know if Anthem/FEP actually billed OPM for the budget item or ever was paid anything by OPM for the budget item. *Id.*, p. 203. [14]

Finally, Count II included Mr. Garner's allegations about improper invoice charges to FEP by Personix. In this deposition testimony, Mr. Garner does not even know if the questioned amounts were paid. Garner Depo., p. 286-88. It is not surprising then that, after its investigation into the hodge-podge of Count II claims, the Government dismissed the allegations in Count II without prejudice pursuant to Rule 41(a).[15]

     **C.**     Count III was dismissed without prejudice pursuant to Rule 41(a) because the allegations are meritless.

Count III alleged a splitting of subcontract amounts to avoid competitively outsourcing the data entry work and a falsification of the FEP performance levels. Relator's Complaint offers insufficient details to state a claim of fraud. Moreover, Anthem's internal investigation found no indication of wrongdoing as described by Relator. Additionally, the Government, exercising its prosecutorial discretion, dismissed the allegations in Count III without prejudice pursuant to Rule 41(a).

     **D.**     **Counts IV and V were dismissed without prejudice pursuant to Rule 41(a).**

Count IV alleged Anthem/FEP failed to recover a greater amount of overcharges caused by an increase in the amount of co-pay required for prescription drugs that was not implemented

---

[14]     The Relator assessed the "POS Pilot Plan" issue at $75,000 (2.5 times the Relator's estimate of single damages of $25,000). Relator's Settlement Letter, pp. 2, 4. However, given that the investigation and Garner's own testimony establish there is no merit to this allegation, the true value is $0.

[15]     Count II also included other allegations, all of which even the Relator valued $0 in Relator's Settlement Letter, p. 2.

for several months after it went into effect.  Count V alleged a failure to pay OPM a higher

amount for overcharges identified in an OPM audit of AICI's (Indiana) Comprehensive Medical

Plan ("CMP").  Both matters involve issues that were disclosed, discussed and settled between

Anthem/FEP and OPM as contract administration matters, years earlier.  The Relator admits that

he was not the original source these claims, and thus he will not likely pursue those claims.  *See*

Objections, p. 6.  Thus, the Government correctly dismissed Counts IV and V without prejudice

pursuant to Rule 41(a).

As a final note, Relator fails to recognize that issues like those detailed in Counts IV and

V typify the open, cooperative, working relationship that exists today, and has existed, between

Anthem/FEP and OPM.  Relator fails to acknowledge, in his insistence that Anthem/FEP be

punished to the fullest extent of the law, that OPM knows this contractor and knows its protocol

of informing the Government whenever mistakes or errors occur under its FEP contracts.  OPM

also recognizes, even if Relator does not, the difference between a mistake and a fraud.

**E.     Court VI, Relator's retaliatory discharge count is neither settled nor dismissed.**

The current settlement does not include a settlement of the retaliatory discharge claim

pursuant to 31 U.S.C. § 3730(h) as set forth in Count VI.  As a result, the Relator's Objections

do not address this issue (except to re-allege that Mr. Garner was fired after threatening to bring

a *qui tam* action).

However, like the *qui tam* claims, the evidence clearly establishes that Mr. Garner's

retaliatory discharge claim is meritless.  Part of Mr. Garner's responsibilities as a director was to

be alert for and report suspicions of fraud.  Garner Depo. pp. 83-89, 208-09, 285, 317;

Deposition of Lynne Gross (vice present and general manager of government programs) taken

November 10, 2005 ("Gross Depo.") (relevant portions of the rough draft attached at Ex. G), pp. 28-29. Thus all his allegations of fraud were, in fact, part of doing his job.

However, Mr. Garner was not discharged based on his allegations of fraud or any threats to bring a False Claims Act action.[16] Instead, his employment was first suspended and then terminated after he threatened to his boss's secretary that he intended to take his boss "down" if he were disciplined for terminating an employee that has worked for her. This extraordinary behavior, coupled with other inappropriate comments in the work place, caused his boss's boss (Lynne Gross) to decide she had lost faith in him and his decision making. Gross Depo. at 49-52. Significantly, Ms. Gross had no knowledge that Garner had ever even complained about compliance issues! Gross Depo., pp. 44-52; 77-79; 97-99.

In short, Garner was discharged because he made inappropriate comments to other workers, creating an atmosphere that caused other workers great anxiety and interfered with their ability to do their jobs. Deposition of Kathleen O'Neill Carroll (Director of Human Resources) taken November 8, 2005 ("O'Neill Depo.") (relevant portions of the rough draft attached to Ex. H), pp. 29-37, 45-56, 52, 60-61. Indeed, Mr. Garner had opportunities to report fraud during a meeting with the Chief Compliance Officer for Anthem on March 24, 1998; his suspension meeting (with Lynne Gross and Fred Brown); and his termination meeting (with Ms. Gross and Ms. O'Neill), but chose not do so on any of those occasions. Deposition of Susan Ulrey (Vice President Internal Audit and Chief Compliance Officer) taken November 9, 2005 ("Ulrey Depo.") (relevant portions of the rough draft attached at Ex. I), pp. 22-23; Gross Depo., pp. 77-79; 97-99; O'Neill Depo., p. 37. Furthermore, Mr. Garner testified that he did not report the

---

[16]     Interestingly, where other relators disclose to their employers their pursuit of a *qui tam* action to prevent retaliation, this Relator, by his own testimony, threatened to bring such an action if his employment was terminated.

allegations of fraud at these meetings because he "wanted to preserve any possibility of a false

claims suit, and "if [he] had given all of the details, that would have given [Anthem] opportunity

to clean all the mess up," thereby mooting his *qui tam* action.  Garner Depo., pp. 270-72.

### III.    THE GOVERNMENT'S DECISION TO DISMISS CERTAIN COUNTS WITHOUT PREJUDICE, PURSUANT TO RULE 41(A), DOES NOT REQUIRE A HEARING

The Complaint initiated by Relator was filed in 2000.  Upon its filing, the Government

commenced its investigation of the allegations raised by Relator.  Government Auditors served

subpoenas, reviewed <u>rooms</u> of documents, interviewed unknown numbers of persons and

questioned Anthem FEP personnel frequently over a five-year period.  On or about May 26,

2005, the Government formally intervened in this action by filing a pleading entitled The United

States Notice of Election to Intervene.

At the conclusion of its extensive five-year investigation, the Government determined, in

a completely proper exercise of prosecutorial discretion, that, excepting the allegations in Count

I as it relates to PrintMail and APM and Count VI which is Relator's retaliatory discharge claim,

all remaining counts should be dismissed without prejudice. On August 8, 2005, the Government

filed its Notice of Dismissal and on September 15, 2005, Anthem accepted service of the

Complaint.  No responsive pleading has been filed by Anthem Insurance Companies, Inc.

Anthem is the only defendant that has been served.

Notwithstanding Relator's arguments to the contrary, the facts of this case permit the

Government to exercise fully its prosecutorial discretion, dismissing the counts in the Complaint

without prejudice and without further burdening this Court and the Government with a hearing.

---

Garner Depo., p. 242.  Moreover, in his testimony, Relator represented that he intentionally did not disclose his concerns for fear that he would lose his right to sue under the False Claims Act.  *Id.* at 270-72.

Pursuant to Rule 41(a)(1), a plaintiff may voluntarily dismiss claims "without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs." As stated previously, Anthem, an adverse party, only accepted service of the Complaint on September 15, 2005, and has not served any answer or motion for summary judgment. Thus, Rule 41(a)(1) was a valid mechanism for dismissal of these claims without order of court. *Swift v. United States*, 318 F.3d 250, 252-254 (D.C. Cir. 2003).

In *Swift v. United States*, 318 F.3d 250, 252-254 (D.C. Cir. 2003), the D.C. Circuit was asked to review whether a relator was entitled to a hearing before the Government intervened to dismiss her complaint without prejudice. The Court confirmed and also explained that any attempt to hinder the Government's ability to dismiss claims pursuant to Rule 41(a) raises separation of powers issues under the Constitution.

> But we cannot see how § 3730(c)(2)(A) gives the judiciary general oversight of the Executive's judgment in this regard. The section states that "The Government"--meaning the Executive Branch, not the Judicial--"may dismiss the action," which at least suggests the absence of judicial constraint. To this must be added the presumption that decisions not to prosecute, which is what the Government's judgment in this case amounts to, are unreviewable. *Cf. Heckler v. Chaney,* 470 U.S. 821, 831-33, 84 L. Ed. 2d 714, 105 S. Ct. 1649 (1985); *Newman v. United States*, 127 U.S. App. D.C. 263, 382 F.2d 479, 480 (D.C. Cir. 1967). Reading § 3730(c)(2)(A) to give the government an unfettered right to dismiss an action is also consistent with the Federal Rules of Civil Procedure. Rule 41(a)(1)(i) permits a plaintiff to dismiss a civil action "without order of the court" if the adverse party has not yet filed an answer or a motion for summary judgment. **A dismissal pursuant to Rule 41(a)(1)(i) is not subject to judicial review**. *See Randall v. Merrill Lynch*, 261 U.S. App. D.C. 138, 820 F.2d 1317, 1320 (D.C. Cir. 1987).

*Id*. (emphasis added). The *Swift* court specifically rejected the notion of judicial review over such decisions under § 3730(c)(2)(A):

> The Constitution entrusts the Executive with duty to 'take Care that the Laws be faithfully executed.' U.S. CONST., art. II, § 3. The decision whether to bring an action on behalf of the United States is therefore 'a decision generally committed to [the government's] absolute discretion' for the reasons spelled out in *Heckler v. Chaney*, 470 U.S. at 831. Nothing in § 3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States. The provision neither sets "substantive priorities" nor circumscribes the government's "power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. at 833.

*Id.*

Even if this Court were disinclined to follow *Swift*, preferring to follow *United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.*, 912 F. Supp. 1325, 1339 (E.D. Cal. 1995), *aff'd sub nom. United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998), under *Sequoia*, the Government is still permitted to dismiss this action over Relator's objection if (1) the Government shows that the dismissal is rationally related to a valid purpose, and (2) once the Government satisfies this burden, Relator fails to show that the decision to dismiss was fraudulent, illegal, or arbitrary and capricious. *Sequoia*, 151 F.3d at 1145.

Here, the Government explained the basis for its dismissal in its August 9, 2005 service letter of the Notice of Dismissal to Relator. S*ee* Government Settlement Service Letter. The Government explained that it dismissed without prejudice everything but the "allegations in the Relator's Complaint that [the Relator] seriously pursued, or that appeared to have any significant merit." *Id*., p. 2. "[T]he Government's proffered reason for urging dismissal--that the allegations are without merit – is a legitimate Governmental reason and that dismissal is rationally related to the Government's desire to clear from the Court docket a meritless claim." *United States v. Fiske*, 968 F. Supp. 1347, 1354-1355 (E.D. Ark. 1997) (dismissing the claims

*without* a hearing, holding that the Government neither failed to investigate the claims nor arbitrarily rejected them). The United States has satisfied the first part of the test.

Relator has failed to *prove* the second part of the test, namely that there was anything arbitrary and capricious, illegal or fraudulent about the Government's exercise of its prosecutorial judgment. Relator repeatedly questions Anthem's motives in the submission of the "FEP True-Up Summaries" (Objections, pp. 8-9) in many ways. In point of fact, Relator seems to attribute dark and foul motives to Anthem's willingness to cooperate with its contracting partner. However, neither innuendo nor insinuations, amount to actual proof of anything illegal or fraudulent.

Neither the False Claims Act nor the case law required a hearing to consider the fairness of the Government's decision to dismiss these claims without prejudice. However, even if the Court were to grant Relator a hearing as to the counts dismissed without prejudice, pursuant to Rule 41(a), the Court cannot second-guess the prosecutorial discretion of the Government as to those claims. Rather, "the function of a hearing when the relator requests one is simply to give the relator a formal opportunity to convince the *Government* [not the Court] not to end the case." *Swift v. United States*, 318 F.3d 250, 252-254 (D.C. Cir. 2003) (emphasis added).

Moreover, 31 U.S.C. § 3730 (c)(2)(A) does *not* provide the disappointed Relator "an opportunity for a *hearing* on the motion," it provides the Relator with an "opportunity" and it has already received it. Specifically, a hearing is not required where, as here, the decision to dismiss is "inherently reasonable" and no showing of a benefit to the Court can be made. *See United States ex rel. Pentagen Techs. Int'l v. United States*, No. 00 Civ. 6167 (DAB), 2001 U.S. Dist. LEXIS 9645, at *24-27 (S.D.N.Y. 2001) (granting the Government's motion to dismiss without conducting a hearing, where the Government's decision to dismiss was "inherently

reasonable," and where relators were given an opportunity to be heard on the Government's motion through a formal opposition filed with the court); *United States v. Fiske*, 968 F. Supp. 1347, 1355 (E.D. Ark. 1997) (granting Government's motion to dismiss without a hearing for the relator, where the relator failed to show that a hearing would benefit the court in reaching a decision on the motion to dismiss for failure to state a False Claims Act claim).  The Relator, having exhausted its "opportunity," is not entitled to more.

For all the foregoing reasons, Anthem respectfully maintains that the Government's decision to dismiss without prejudice all counts other than I and VI was proper.

## IV.     AS TO THE CLAIMS SETTLED, THE COURT CAN AND SHOULD APPROVE THE SETTLEMENT WITHOUT AN EVIDENTIARY FAIRNESS HEARING

The Relator wrongly contends that an evidentiary fairness hearing is necessary concerning the fairness of the $1.5 million dollar settlement of Count I with regard to PrintMail and APM.  The statute, 31 U.S.C. § 3730 (c)(2)(B), provides that the Government may settle, over the objections of the relator, if the Court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances.  However, the legislative history and applicable case law make clear that the relator has no *automatic* right to such a hearing.

> **The Committee does not intend, however, that evidentiary hearings be granted as a matter of right.**  We recognize that an automatic right could provoke unnecessary litigation delays. Rather, evidentiary hearings should be granted **when the *qui tam* relator shows a "substantial and particularized need" for a hearing**.  Such a showing could be made if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary and improper considerations.

S. Rep. No. 99-345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291; *Ridenour v.*

*Kaiser-Hill Co, LLC,* 397 F.3d 925, 931 (10th Cir. 2005).

In fact, a leading commentator notes:

> Congress' adoption of this ["substantial and particularized need"] standard indicates an intention that the government's decision to settle be given a high degree of deference.

John T. Boese, Civil False Claims and Qui Tam Actions, § 4.07[A][1], at 4-152-53 (2002-2 supp.).  Confirming that observation, courts have held that the fairness hearing for settlement agreements is not intended to "pose a significant burden to the government or courts."  *Ridenour,* 397 F.3d at 931; *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 754 n. 11 (9th Cir. 1993).

In this case, Relator simply has not met his burden of a "substantial and particularized need."  In lieu of proof, Relator relies upon its allegations, accusations and assertions that the human errors identified and disclosed by Anthem to the Government in the course of the investigation were committed with an intent to conceal or obfuscate the truth. Both the terms of the Settlement Agreement and the text of the Notice by the Government, however, support and explain that no such intent was existed.  Relator's repeated accusations and a fundamental misunderstanding of accounting do not satisfy the requisite "substantial and particularized need" required for an evidentiary fairness hearing.

## V.     THE RELATOR HAS NOT MET HIS BURDEN TO DISPROVE THE GOVERNMENT'S VALUE OF THE CLAIMS, AS "FAIR, ADEQUATE AND REASONABLE."

The Court should approve the Settlement Agreement because the Relator has not shown that it is not "fair, adequate and reasonable under all the circumstances."  31 U.S.C. § 3730 (c)(2)(B).  This "fair, adequate, and reasonable under all the circumstances" standard used to evaluate a False Claims Act settlements is the same standard used in fairness hearings to evaluate a class action settlement.  *United States ex rel. Nudelman v. Int'l. Rehab. Assocs., Inc.,* Civil Action No. 00-1837, 2004 U.S. Dist. LEXIS 8951, at * 4 (E.D. Pa. May 14, 2005) (False

Claims Act); *United States ex rel. McCoy v. California Medical Review, Inc.*, 133 F.R.D. 143, 148 (N.D. Cal. 1990) ("As the legislative history of the 1986 Amendments Act points out, this is the same test applied by the courts in reviewing settlements of class action claims. 132 Cong. Rec. 29,322 (1986)."). In *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 904-905 (S.D. Ohio 2001) (J. Speigel), this Court listed the relevant standards for approving a class action settlement:

> The district court may give its final approval of a class action settlement if it determines that the settlement is 'fair, adequate, and reasonable, as well as consistent with the public interest.' . . . This is determined by examining the settlement 'in its entirety and not as isolated components.' The court is not 'to determine the merits of the controversy or the factual underpinning of the legal authorities advanced by the parties.'
>
> When determining whether the proposed settlement is fair adequate, and reasonable, the court takes into account several factors:
> (1)  the plaintiff's likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement;
> (2)  the complexity, expense and likely duration of the litigation;
> (3)  the stage of the proceedings and the amount of discovery completed;
> (4)  the judgment of experienced trial counsel;
> (5)  the nature of the negotiations;
> (6)  the objections raised by the class members; and,
> (7)  the public interest.

*Id.* (citations omitted).  As noted above, a fairness hearing should not turn into a trial on the merits.  *Id.*

In analyzing any such settlement agreement, Courts should afford the Government's decision to settle a "very high degree of deference."  John T. Boese, Civil False Claims and Qui Tam Actions, § 4.07[A][2], at 4-156.1 (2004-1 supp.).

[T]he court's intrusion upon what is otherwise a private consensual

> agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned. Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.

*Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982) (class action) (citations omitted), *cited in White v. Morris*, 811 F. Supp. 341, 342 (S.D. Ohio 1992) (class action) (J. Spiegel) and *Bowling v. Pfizer, Inc*., 143 F.R.D. 141, 150 (S.D. Ohio 1992) (class action) (J. Spiegel) (citing *Clark Equipment Co. v. International Union, Allied Industrial Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (class action)).

Further, to prevail at a fairness hearing, Relator must disprove the Government's estimate of the value of the settled claims that the Government explained to Relator in its August of 2005 letter. Government Settlement Service Letter.  As such, it is the Relator's burden to disprove the Government's estimate of value.  Relator has not met this burden, nor has it offered any reason for this Court to believe that he can.

In *United States v. United States ex rel. Thornton*, 207 F. 3d 769, 770 (5th Cir. 2000)[17] the court held that "[t]he government has a duty to advise the relator of the value of the settlement at the times it notifies him that it intends to settle the case, and this representation should include

---

[17]    In *United States v. United States ex rel. Thornto*n, 207 F. 3d 769, 770 (5th Cir. 2000), the settlement included cash and the release of the defendant's administrative claims against the Government in exchange for a release of False Claims Act claims.

the government's estimate of the value of non-cash proceeds." *Id*. at 772.[18] "The value of non-cash proceeds, such as the government's release of potential criminal liability or the defendant's agreement to provide additional services in the future may not be ascertainable. Where no reasonable valuation is possible, it cannot be taken into account in calculating the realtor's share." *Id*. at 772. "**Ultimately he [*i.e.*, the Relator] bears the burden of disproving the government's estimate of value**." *Id*. at 772-773 (emphasis added).

Here, the Government did all that *Thornton* requires. In its August 9, 2005, letter the Government provided the "estimate of value" of the settlement to Relator. Government Settlement Service Letter. The Government told the Relator that many of its claims were without merit and the Government explained the estimated value of the remaining claims that it was settling. *Id*. If the value of some of the claims was zero, unascertainable or only estimable at that time, then the Government's statement to that effect is sufficient. The Government has satisfied its responsibility to Relator. Accordingly, the burden shifts to Relator to disprove the Government's "estimate of value." Relator has offered no real evidence to the contrary.

It is evident, from the Relator's long and confusing listing of various numbers, sums and totals, that the Relator has been granted access to a large number of supporting documents. Both the Government and Anthem have well satisfied Relator's requests for discovery and neither the Government nor Anthem is to blame if Relator misconstrues and misinterprets the information he has received. Relator's inability to comprehend the accounting and his unwillingness to hire an expert does not equate to concealment of the truth by Anthem nor a poor settlement by the Government.

---

[18]      The Thornton court held that the value of the settlement proceeds ordinarily includes the value of the released claims and the case "when the released claims are part of the bargain of the settlement and are not so

Relator argues that there are other items of additional consideration in the Settlement Agreement and attempts to claim that those items should be itemized as well.  Objections, p. 18. However, the values of these settlement covenants are either inestimable or irrelevant.  For instance, the Government's agreement not to disbar or suspend the Defendants from Government contracting (Settlement Agreement, § III, ¶A(3)) is to be expected given the findings of error rather than fraud.  Absent serious concerns about Anthem's operations or findings of fraud, the Government has no basis to disbar or suspend Defendants, thus the value of this representation is zero.

The Defendants also agreed not to seek reimbursement from the Government for any "unallowable costs."  Settlement Agreement, § III, ¶E(3).  This representation obligates Defendants not to submit for reimbursement costs associated with its investigation, its settlement with the Government and its efforts to defend against the Relator's continued accusations–e.g., Anthem's legal fees and expenses.  Anthem has not and, pursuant to the Settlement, agreed not to submit these costs for reimbursement from OPM.  Inasmuch as these expenses are unallowable and, as such, the Government would not be obligated or asked to pay these expenses, its value to the Settlement is zero.

Relator's Opposition also emphasizes the value of the Settlement representation wherein the Defendants agree to *repay* the Government for any "unallowable costs" previously submitted and paid by the Government.  Settlement Agreement, § III, ¶E(3).  There are none.  That is, in some False Claims Act cases, during the term of the investigation and litigation, a defendant will include the costs associated of its efforts in overhead cost centers which, in turn, may be charged

---

intertwined with the subject of the False Claims Act cause of action so as to present the equivalent of a compulsory counterclaim." *Id*. at 770.

to the Government.  Since the outset of this investigation, upon receipt of the OPM Subpoena in mid-2001, Anthem has segregated the costs of its defense and *not* charged them to the Government.  As such, nothing has been paid by the Government and nothing needs to be repaid by Defendants.  Again, the value is zero.

Settlements are not about one party receiving its "best day in court."  As the word itself conveys, settlements are about compromise – taking into consideration that the plaintiff may lose none, some, many or *all* issues.  Thus, Relator's objections that the Settlement does not reflect the Government's maximum potential recovery (*i.e.*, triple damages as described in 31 U.S.C. § 3729(a)), is flawed.  It fails to take into account the very *real* risk in this case liability cannot be proven.  Here, the Government weighed that risk and, using its discretion, settled claims in Count I regarding PrintMail and APM.  Neither the Government's risk assessment nor the Settlement itself is arbitrary or capricious.  Accordingly, Relator's challenge to the Government's failure to value inestimable claims must fail.

## VI.     THE SETTLEMENT OF ADMINASTAR PRINTMAIL IS "FAIR, ADEQUATE AND REASONABLE UNDER ALL THE CIRCUMSTANCES."

The Government maintained that AdminaStar PrintMail, an affiliate of Anthem/FEP, failed to pass through only costs of operation to Anthem/FEP, thus impermissibly receiving a profit from charges paid by the Federal Employee Benefits Program.  That is, under applicable Federal Acquisition Regulations, affiliates of a contractor which perform services under a Government contract are not entitled to pass through a profit in addition to that received by the contractor.  The purpose of the rule is to prevent multiple layers of profit being passed through to the Government when a contractor satisfies its performance obligations by using affiliated organizations.  There are exceptions to this rule.  Indeed, the primary exception to this rule, that of obtaining commercial services from an affiliate at market prices, that makes Relator's Count I

vulnerable to dismissal. Thus, *any* settlement recovery is "inherently reasonable."

One basis for the dismissal of Relator's PrintMail claim is that after April 1997, well before Relator's discharge, PrintMail was sold to FiServe Solutions, Inc. Once sold, becoming Personix, it was no longer an Anthem affiliate and the duty to pass only costs through to the Government customer ended.

Another basis for dismissal of Relator's Count I is that Relator himself now avers, in his deposition, that he was not the original source of this allegation. At his deposition on November 2, 2005, Relator stated that he had no reason to suspect any fraud for which he could be the original source.

> Q. Do you have any facts to suggest that Administar Print Mail was in any way engaged in a fraud or did something improper with regard to its billing practices?
>
> A. I thought I read recently about a settlement that Administar had made with the government for handling Medicare claims improperly, so that would be the only evidence that I would know is something from the press that stated that they had done something that was incorrect.

Garner Depo., pp 307-08.

Relator's testimony makes clear that he was not the original source of this allegation and, as such, would not be entitled to a Relator's share of any Government recovery for this matter.

Additionally, under the False Claims Act, a relator must be not only an original source, he must be the first to file.[19] Mr. Garner was not the first to file a claim that PrintMail

---

[19]    31 U.S.C. § 3730(e)(4)(A)-(B) requires that the relator be an original source and states:
"No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
For purposes of this paragraph, "original source" means an individual who

impermissibly passed through a profit to Anthem's Government programs while it was an

Anthem affiliate.  On September 13, 1999, Gary Calabrese filed a False Claims Act case raising

that allegation about PrintMail.  *United States ex rel. Calabrese v. AdminaStar Federal*, Case

No. 3:99-cv-00599-CRS (W.D. Ky. 1999) (J. Simpson) (notice of intervention and dismissal

filed by the Government on September 6, 2005, and the court dismissed the case in accordance

with the settlement agreement just 8 days later) (see Ex. J to this memorandum for *Calabrese*

complaint and Ex. K to this memorandum for *Calabrese* docket sheet).  The Government's letter

explains that the Government apprised the Relator of this circumstance and provided the Relator

with a copy of this *Calabrese* complaint.[20]  Government Settlement Service Letter, p. 3.

Moreover, the Government explained, in its August 9, 2005 letter to Relator, that the

"defendants raised the colorable argument that the commercial price exception to the related

entity rule, FAR § 31.205-26(c), applied allowing the inclusion of profit" because the contractor

typically priced inter-organizational transfers at other than cost for commercial work.  *Id*.  Thus,

even assuming that Relator could survive a motion to dismiss, Anthem has raised a complete

---

has direct and independent knowledge of the information on which the
allegations are based and has voluntarily provided the information to the
Government before filing an action under this section which is based on the
information."

31 U.S.C. § 3730(b)(5) requires that the relator be the first to file and states:
"When a person brings an action under this subsection, no person other than the
Government may intervene or bring a related action based on the facts
underlying the pending action."

[20]     As explained above, while Mr. Calabrese's complaint was still under seal, two other relators, Misses Moore
and Scott, filed their *qui tam* Complaint against AdminaStar Federal in May 2000.  *United States, ex rel. Moore v.
AdminaStar Federal, Inc.*, Civil Action No. 3:00CV-277-4 (W.D. Ky., May 18, 2000).  Misses Moore and Scott
were represented by Aschemann Keller LLC.  Shortly thereafter, the Government advised these relators, and their
counsel, that they were *not* the first to file a *qui tam* Complaint against AdminaStar Federal, Inc.  and the allegations
of Mr. Calabrese' complaint.  Significantly, one month later, Mr. Garner filed his Complaint under seal, also
represented by  Aschemann Keller, LLC.  His Complaint includes an allegation against PrintMail clearly not known
to Mr. Garner but remarkably similar to the allegation in Mr. Calabrese's complaint.

defense that even the Government recognizes as "colorable."

Based upon the foregoing, there can be no question whatsoever that the Government's settlement with Anthem for the PrintMail claim is "fair, adequate and reasonable under all the circumstances."  31 U.S.C. § 3730 (c)(2)(B).  The Government estimated that single damages would amount to $461,000.[21]  *Id*.  The settlement provides for double (not single) damages for PrintMail, thus valuing the PrintMail portion of the $1.5 million Settlement at $922,000.

Finally, even the Relator admits, in his Objections, that the settlement for the PrintMail and APM issues was an "*adequate* amount."  Objections, p. 8 (italics in original).  Thus any such settlement, deemed "adequate" by the challenger, must be recognized by this Court as "fair, adequate and reasonable under all the circumstances."

## VII.   THE SETTLEMENT OF APM'S CLAIM REIMBURSES THE GOVERNMENT FOR THE COSTS ASSOCIATED WITH THE HUMAN ERROR AND IS "FAIR, ADEQUATE AND REASONABLE UNDER THE CIRCUMSTANCES."

Count I also charged that APM failed to pass on to the Federal Employee Benefits Program the full amount of drug rebates received.  After concluding the investigation, both Anthem and the Government are confident that the errors themselves were human mistakes and do not rise to the level a False Claim under the statute.  There is no evidence of fraud and no evidence of reckless disregard.  Moreover, the mistakes made benefited the Government since Anthem had *undercharged* the OPM.  Under these circumstances, the small portion the settlement allocable to the APM claim is "inherently reasonable."

Relator's challenge to this portion of the Settlement maligns the nature of the errors, as

---

[21]     After five years, Anthem settled this claim to avoid the cost of litigating.  Moreover, for the same reasons, Anthem previously settled Mr. Calabrese's claim using the same formula – 10% of the amount charged to the Government for services provided by PrintMail.  In that action, as here, the Government never disputed or challenged that PrintMail had provided services to the Government contracts or the quality of those services provided.

well as Anthem's intention to correct them. Curiously, the OPM Auditor and DCIS investigator, both credentialed and experienced at investigating fraud, did not share Relator's view. Rather, they understood Anthem's disclosures and explanations as efforts to correct errors found in the course of the investigation. As noted above, if Relator were to have shared his impression, he would have nothing to challenge. Hence, the Relator has embarked on this exercise. In fact, there is no evidence of any intent to make a false statement let alone reckless disregard for the facts.

To illustrate this point, Tom Rasp, the APM employee responsible for preparing true-ups, noted that his failure to initially include all rebates from the mail order program starting in 1999, was the unfortunate result of the failure of the right people at Anthem (or the failure of the right people at APM to tell Tom) about the commencement of mail order prescription benefits for Anthem/FEP members. As a result of this (and certain mathematical errors), the true-ups initially prepared by Mr. Rasp were inaccurate. Quite simply, neither innocent mistake nor mere negligence can form the basis for False Claims Act liability:

> The knowledge element of the [False Act] claims is defined in 31 U.S.C. § 3729(b). Under that section, the terms 'knowing' and 'knowingly' mean that a person, with respect to information—
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information,
>
> and no proof of specific intent to defraud is required. **Mere negligence or innocent mistake is insufficient to satisfy the above standards for knowledge.** *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991). **Rather, defendant must act at least with 'deliberate**

> **ignorance' or 'reckless disregard' of the truth or falsity of the information.**

*Wilkins ex rel. United States v. Ohio*, 885 F. Supp. 1055, 1059 (S.D. Ohio 1995) (emphasis added).  "The gist of the violation is not an intent to deceive but the knowing presentation of a claim, record or statement that is either 'fraudulent' or 'false' and the requisite intent is the knowing presentation of what is 'known to be false' or 'a lie.' *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1412 (9th Cir. 1992) (citing *Hagood*, 929 F.2d at 1421)." *Wilkins ex rel. United States*, 885 F. Supp. at 1059-60 (emphasis added).

Indeed, many cases have held that mistakes are not false claims.  For instance, in *United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F.Supp. 2d 822, 833 (S.D. Mich. 2000), the court held that the plaintiff failed to prove defendants acted with reckless disregard or deliberate ignorance, where defendants showed concern about proper interpretation of regulations "and investigated the question of what procedures were required to submit a proper claim for reimbursement."), *aff'd*, No. 00-1288, 2001 U.S. App. LEXIS 26669 (6th Cir. Dec. 12, 2001). *Accord: United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995) ("'The requisite intent is the knowing presentation of what is known to be false,' as opposed to innocent mistake or mere negligence.  'Bad math is no fraud,' proof of mistakes 'is not evidence that one is a cheat,' and 'the common failings of engineers and other scientists are not culpable under the Act.'  The statutory phrase 'known to be false' does not mean 'scientifically untrue'; it means 'a lie.'")(citations omitted); *United States ex rel. Ervin & Assocs. v. Hamilton Secs. Group*, 298 F. Supp. 2d 91, 101-02 (D.D.C. 2004) ("The severity of conduct required to constitute 'reckless disregard' underscores that innocent mistakes, mere negligence, or even gross negligence (without more) are not actionable under the False Claims Act." Although defendant could have used better quality controls, the failures of the contractors and

subcontractors in this case did not constitute reckless disregard or extreme gross negligence.);

*United States ex rel. Mathews v. Health South Corp.*, 140 F. Supp. 2d 706 (W.D. La. 2001)

(dismissing relator's claims, holding that at worst, relator alleged that defendant negligently

failed to monitor its compliance with applicable Medicare regulations).

Consequently, Relator is, at best, incorrect when he argues "Defendants continued to

submit false annual certifications and failed to report and return all rebates due OPM for at least

*two years* after receiving a copy of the Complaint" and that this "clearly demonstrates their

conduct during 2002 and 2003 was intentional." Objections, p. 27 (italics in original).[22] Relator

also argues that prior to Defendants' receipt of the Complaint in late 2001, Defendants' conduct,

at the very least, constitutes reckless disregard, which is all that is necessary to establish

liability." [23] Objections, p. 27.

Relator's obsession with Anthem/FEP's subsequent Certifications of its Annual

Accounting Statement is something of a mystery. Those Certifications were not false. Neither

the Relator's Count I, nor the initiation of the Government's investigation nor Anthem's

identification of errors in APM's calculation of rebates in 2003 renders them false. Those

certifications represent that the contents therein are made "to the best of my knowledge and

belief." *See* Objections, Ex. G.

After the Government, upon seeking the permission of the Court, disclosed the contents

---

[22]     Notwithstanding Relator's allegations of intent and reckless disregard, the Government, unlike the Relator, *investigated* and found that "there is no evidence of a deliberate effort to exclude any of the mail-order drug rebates, approximately $400,000, only poor accounting." Government Settlement Service Letter, p. 2. This case is not like *United States ex rel. Gravitt v. General Electric Co.*, 680 F. Supp. 1162, 1164-65 (S.D. Ohio 1988) (*see* Objections, p. 25), where the court refused to approve the settlement because there, the court found that the Department of Justice has not taken any depositions, interviewed witnesses and generally opposed all attempts by the relator to get discovery. In this case, the Government has been investigating for over five years and has cooperated with the Relator to provide reasonable discovery.

[23]     In fact, Anthem only received service of the Complaint in September 2005.

of Relator's Complaint to Anthem/FEP in November 2001, Defendants initiated an internal investigation. It was not until January 2003, that Anthem identified an error in APM's allocation methodology for passing back to OPM its fair share of the rebates in years 1998-2002.[24] Thus, it was not until 2003 that Anthem identified an error and, having corrected it in 2003, there would have been no reason to believe that its prior (2001 and 2002) certifications were false when made nor that its 2003 Certification, having included the correction disclosed to the Government contemporaneous, was false. Relator simply prefers to accuse rather than look at the 'facts' at issue.

Moreover, the second and last error, that the accounting department of APM did not know of the change in FEP benefits, was discovered in late April 2005.[25] This error created a significant undercharge, rather than an overcharge, to the Government. This error is what the Government and Anthem have settled. Based upon these facts, given the language of the Certification, there is no reason for Anthem/FEP to have believed its 2004 Certification was false when made.

Anthem already has agreed to repay the Government the amount of omitted rebates (without consideration of the additional expenses) to resolve this case. Anthem has corrected the error prospectively and ironically, the OPM will now pay more than it had previously for the mail order prescription benefit provided its HMP members. As the Government explained:

---

[24] After discovering the error, Anthem immediately corrected its true-ups of APM's rebate calculations and passed back $224,627 to OPM via a prior period adjustment in April 2003. Significantly, the second oversight that of not including either the rebates or the expenses allocable to the mail order prescription benefit provided to FEP members beginning in 1999, effectively reverses that payment. In other words, if APM had discovered the second error initially, the additional monies paid to OPM in 2003 would not have been paid.

[25] However, as both the Government and Relator know, the benefits at issue, those of mail order prescription benefits were actually provided to all FEP members during the correct time periods.

"[T]here was no net loss to OPM because defendants also excluded the costs related to drug rebates, resulting in no net loss to OPM.  If anything, Relator's pursuit of this issue uncovered potential claims against OPM by defendants."  Government Settlement Service Letter, p. 2. Indeed, after Mr. Scott (the OPM auditor) reviewed Ms. Duncombe's letter of May 2, 2005, he agreed that Defendants overpaid by $700,000.  Objections, p. 16.

Relator compounds his erroneous argument by demanding that the settlement include an "investment income" assessment.  Investment income is the money that the Government would have earned had it not been deprived of the revenue to which it was entitled.  First and foremost, as detailed above, the Government actually owed APM money, not the reverse.  So, there is no "investment income" to be earned because there was no lost revenue.  Second, the portion of the Settlement allocable to the APM error is well in excess of the amount of lost rebates, thereby compensating the Government, by way of factoring, for whatever other elements of damages the Relator believes is appropriate.[26]   In short, Relator is simply wrong when he claims that the settlement should include additional money for investment income.

Similarly, the issues settled by agreement should not affect the award of the service benefit charges.  Objections, p. 11.  What Relator characterizes as bonuses of $3,166,571 over a ten year period (1992-2002) equate to Anthem/FEP's profit.  Over all, these bonuses are not determined by OPM.  Rather, OPM identifies the pool of bonus or profit dollars and allows the Blue Cross Blue Shield Association ("BCBSA") to allocate those dollars among all plans providing FEP benefit services to Federal employees based upon factors determined by BCBSA to measure the quality of performance.  The issues settled neither question nor relate to the

---

[26]    Additionally, although Anthem's *entitlement* to recover expenses not previously charged to the Government, in the amount of $704,092, has not been determined, Anthem understands that it has waived its right to

quality of services afforded federal employees by Anthem. Moreover, neither of the issues settled rise to the level of fraud, requiring the Defendants to be punished. The Government, unlike the Relator, understood these realities and did not demand forfeiture of the profit earned by Anthem over the past decade. That position is reasonable.

Finally, as he admitted in connection with the PrintMail settlement amount, Relator also characterized the APM settlement as an "*adequate* amount" in his Objections. Objections, p. 8 (italics in original). Thus, as with the PrintMail settlement, Relator challenges the Government for not settling for its best day in court. That, however, is not the standard that entitles Relator to a "fairness hearing." Rather, that standard is whether the Government's Settlement is "fair, *adequate* and reasonable under all the circumstances."[27] It is. It is more than fair, imminently adequate and very reasonable.

## VIII.    THE RELATOR'S PERSONAL CONFLICT OF INTEREST UNDERMINES OBJECTIVITY IN INTERPRETING THE SETTLEMENT VALUE

The Objections raised by the Relator's must be viewed in context. The Relator risks very little by objecting to the Settlement Agreement. Under normal circumstances, a relator receives a share of settlement for those issues that he brought to the Government. Thus, any increase in the overall settlement increases the Relator's potential recovery. Moreover, a relator's counsel generally seeks reimbursement for the reasonable portion of cost associated with challenging the fairness of any settlement, even where that challenge fails.

Thus, Relator's statement that "Objecting to a settlement proposed by the Government is

---

pursue them, under the terms of the Settlement.

[27]    It must be noted that, contrary to Relator's argument, civil penalties are not assessed where they are unwarranted. As discussed repeatedly throughout this Memorandum, the Government's investigation satisfied the Department of Justice and the OPM that the issues settled were not fraud. As such, the assessment of civil penalties is neither required, nor warranted.

not done lightly and in reality, is a right afforded Relator's [*sic*] that is seldom utilized" is open

to question.  Objections at p. 23.  As John T. Boese, Civil False Claims and Qui Tam Actions,  §

4.07[A], at 4-151 (2002-2 supp.) explains:

> Although many *qui tam* actions are settled with the agreement of
> all the parties, there is increasing recognition that the *qui tam*
> plaintiff loses nothing by objecting to the proposed settlement
> under 31 U.S. C. § 3730(c)(2)(B).  After all, the threat of the
> plaintiff's objection to the proposed settlement can be used to drive
> up both the settlement amount paid by the defendant and the
> percentage of the final settlement paid to the relator.  Because
> there is no "downside" to the relator, and because such opposition
> enhances the relator's negotiating position in future cases, both the
> government and *qui tam* defendants should expect that settlements
> reached with the government will be routinely challenged by
> relators.

Illustrating this concern about objectivity, Relator submitted an initial settlement demand

of $2,050,000.  Then, Relator's counsel advised the Government on May 19, 2005 that it

concurred in the Government's decision to settle for $1.5 million – the amount of the actual

settlement.  Government Settlement Service Letter, p. 1.  Relator reneged on his agreement when

Anthem proposed to mediate his retaliatory discharge claim.  *Id*.  In its Opposition, however,

Relator re-couches his rescission as due to Defendants' misrepresentations of the amount of

overall rebates due to the Government.  As shown above, his challenges to Defendants' numbers

were neither correct nor well founded.  Accordingly, Relator should not now be heard to

complain about a settlement he has previously confirmed is fair and adequate.[28]

---

[28]    To the extent that the Relator's counsel argues that his extensive experience in evaluating the settlement relevant, the Court must also consider the extensive experience of the Government's and Defendant's counsel in assessing the value of this case and arriving at a fair and reasonable settlement.  The experience of counsel only relates to the deference that the Court must give to the parties to arrive at their own settlement; the experience of an objector's counsel is not sufficient to prove that a settlement is unfair. *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983) ("the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered").  Here, the Relator's counsel has produced no evidence suggesting the settlement is unfair.

IX.     **CONCLUSION**

For all of the foregoing reasons, this Court should approve the Settlement Agreement.

Respectfully submitted,


/s/ James A. Dyer

| | |
|---|---|
| James A. Dyer, Trial Attorney | (0006824) |
| Barbara A. Duncombe | (0072199) |
| Katherine L. Early | (0075380) |

SEBALY SHILLITO + DYER
A Legal Professional Association
1900 Kettering Tower
Dayton, OH 45423
937/222-2500
937/222-6554 (fax)
jdyer@ssdlaw.com

Of Counsel:

Timothy P. Spears (0046652)
Wellpoint, Inc.
120 Monument Circle
Indianapolis, IN  46204
317/488-5263
317/488-6764
tim.spears@anthem.com
Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

I certify that true copies of the foregoing document were filed and served electronically through the Court's ECF system on November 14, 2005, and also served by regular U.S. mail upon:

Gerald F. Kaminski, Esq.
U.S. Attorney
221 East Fourth Street, Suite 400
Cincinnati, OH 45202
*Attorneys for United States of America*

Kenneth F. Affeldt, Esq.
U.S. Attorney's Office
303 Marconi Boulevard, 2nd Floor
Columbus, OH 43215
*Attorneys for United States of America*

Michael F. Hertz, Esq.
Department of Justice
Civil Division/Commercial Litigation Branch
601 D Street NW, Room 9705
Washington, DC 20530
*Attorneys for the United States of America*

Stanley E. Alderson, Esq.
U.S. Department of Justice
Civil Division
P.O. Box 261
Washington DC 20044
*Attorneys for United States of America*

James B. Helmer, Jr., Esq.
Helmer Martins & Morgan
105 East 4th Street, Suite 1900
Cincinnati, OH 45202
*Attorneys for Andrew M. Garner, III*

J. Timothy Keller, Esq.
Aschemann Keller LLC
108 West Jackson Street
Marion, IL 62959
*Attorneys for Andrew M. Garner, III*

/s/ James A. Dyer
James A. Dyer

{00187793.DOC/1}                                        38