# ASCHEMANN KELLER LLC
## ATTORNEYS AT LAW

108 WEST JACKSON
MARION, ILLINOIS 62959
(618) 998-9988
FAX (618) 998-0796
www.quitamlaw.org

DALE J. ASCHEMANN
TIMOTHY KELLER

May 18, 2005

**Via Facsimile to (937) 222-6554 and E-Mail**

Ms. Barbara A. Duncombe
Mr. Jim Dyer
Sebaly Shillito + Dyer
1900 Kettering Tower
Dayton, Ohio 45423

    RE: U.S. *ex rel.* Andrew Garner v. Anthem *et al.*,
           S.D. of Ohio, Western Division
           **UNDER SEAL AND CONFIDENTIAL**

Dear Barbara and Jim:

    Per your request, please consider this letter a settlement demand in regards to the government's damages flowing from Mr. Garner's complaint allegations. I realize some of these numbers are "hard" numbers while others are not. However, as we discussed yesterday, we all must appreciate that settlement of this matter will require reliance by both parties on incomplete data.

    The evidence and allegations upon which I base this demand are outlined within the complaint and have been discussed previously with you during our phone conferences. Therefore, I will only summarize them in this letter.

    Count I - <u>Subsidiary Corporation's Profit on Cost Basis Government Contracts</u>:
    While the complaint alleges this practice applies to several of the wholly owned subsidiaries of Anthem, this demand only focuses on improper profits earned by Print Mail from 1993 through 1996 inclusive. The previous document produced by Anthem reflects total charges over this period of $4,533,774.50. Deducting postage costs of $2,251,826.44 (for purposes of this demand) leaves total charges of $2,281,948.06. Assuming a profit component of 10% results in damages of **$228,000**.

    Count II - <u>Subsidiary Corporation's Shifting of Costs to Cost Basis Government Contracts</u>

-Costs associated with 10 members of FEP Management's attendance at a political rally in support of then current Ohio Governor O'Bannon in Indianapolis, Indiana in late 1996. Damage=**$0** assessed at this time due to lack of information;

EXHIBIT
A

Ms. Barbara Duncombe and Mr. Jim Dyer
May 18, 2005
Page 2

-Costs associated with utilization of the two FEP marketing representatives to sell and service Federal Dental Blue ("FDB") private plan from 94'-00'. Assuming their salaries with benefits were $40,000.00 per year and that they spent 20% of their time on FDB. Damages=$96,000;

-Costs associated with utilization of mail sorting services and claims processors charged to FEP for administration of the FDB claims from 94'-00'. I estimate these annual costs at $25,000 per year. Damages=$150,000;

-Improper charge of $25,000 for development of physician network in connection with the Point of Service "POS" pilot programs ("POS Pilot Plan") in four adjoining Ohio Counties for the 1997 benefit year. Damages=$25,000;

-Salary and costs associated with FEP Management meeting and activities related to the Community Mutual and Associated merger during a six month period from 1994 through 1995. FEP Management from Associated and Community Mutual spent approximately 20% of their time on these activities during this time frame and there was not a separate cost center established to which to expenses these items. Damages=$0 assessed at this time due to lack of information;

-Salary and costs associated with Cathy Hinkle's salaries and benefits that were all charged to FEP. Hinkle spent approximately 20% of her time with unassociated items including but not limited to Anthem's application to NCQA, corporate meetings, the Medicare HMO program, and, Anthem's annual corporate budgets preparation. Damages=$0 assessed at this time due to lack of information;

-Salary and costs associated with Scott Badger's salaries and benefits that were all charged to FEP. Badger expended considerable time and incurred expenses related to establishing a corporate computer imaging system utilized across the board at Anthem. Damages=$0 assessed at this time due to lack of information;

Count III-<u>Violating Provisions of the Cost Basis Government Contracts</u>
-excessive costs resulting from failure to use competitive bidding. Damages=$0 assessed at this time due to lack of information;
-received incentive payments as result of misrepresentation of performance levels from BCBSA; Damages=$0 assessed at this time in regards to due to lack of information on incentive payments.
-received service charge payments for alleged compliance with annual administrative expense caps on SBP. In the event defendant claims it is entitled to reimbursement of additional expenses related to mail in rebates, total administrative expenses exceed the cap for 1999 through 2003. At this point, I am only aware of service charges received for 99'-01'. Damages=$611,561;
-Lost reimbursement resulting from defendant's failure to implement subrogation from January 1, 1997 through sometime in 1998. Damages=$0 assessed at this time due to lack of information.

Ms. Barbara Duncombe and Mr. Jim Dyer
May 18, 2005
Page 3

<u>Prescription Rebates</u>

This aspect of the case is the most difficult to estimate at this point. It is, however, important because it most likely contains the most significant damages. What we do know beyond a doubt is that the annual "Certificate of Annual Accounting Statement" filed by defendant with OPM for fiscal years 1996 through 2004 were either false or, at the very least, made with reckless disregard, either of which is actionable under the False Claims Act. Specifically, Defendant represented in each of these years that the "Income, rebates, allowances, refunds and other credits made or owed with the terms of the contract and applicable cost principles have been included in the statement." These certifications were false because defendant did not report or credit *all* of the retail rebates and *none* of the mail in rebates it received. This is clearly illustrated by the most recent revisions to the previous True Ups, dated 4/05.

In addition to these false certifications, both the witnesses and the Defendant have made false statements to the government during the course of the government's investigation into the complaint allegations. The government agents have verified that several of the witnesses interviewed stated that Defendant had returned to OPM all rebates due under the FEP program. In this regard, Mr. Rasp explained to Agent Edminston that the adjustments made between APM and AMW were "based on the <u>actual</u> rebate amounts received. (Barbara's March 18, 2003 Memorandum to Agent Ediminston, ¶ 5(b), p. 3). It appears Defendant also made misrepresentations to Barbara in regards to this issue, which led her to convey to Agent Edminston in her March 18, 2003 memorandum that Defendant had reported in its true up summaries "FEP/HMP's *actual* 100% share of the realized amount of rebates" (Id., p. 4).

Defendant received a copy of the Relator's complaint sometime in the fall of 2001. Aware of Relator's allegations that Defendant did not return all of the prescription rebates due OPM, Defendant claimed in early 2003 that it discovered mathematical errors in connection with the 98', 99', 00', and 01' rebate True Up Summaries. Defendant revised these True Ups for these years and apparently paid additional funds to OPM sometime in 2003. A review of the revised True Ups attached to Barbara's March 18, 2003 memorandum reveal the total amount of these initial underpayments to be $229,627.17. However, even Defendant's second attempt at accuracy failed.

After substantial inquiries from Relator's counsel regarding whether or not the original and/or revised True Ups included mail in rebates, Defendant finally admitted in April 2005 that they did not. However, Defendant claims that when one takes into account the additional administrative expenses to which it is entitled, it undercharged OPM by several hundred thousand dollars. As I have relayed to both of you previously, I do not accept this justification. Nor do I believe the Defendant has included all rebates, discounts, education grants or other credits received from the pharmaceutical manufacturers in even its latest revised True Ups. Nevertheless, for settlement discussion purposes, I will utilize the increase in the "Rebates

Ms. Barbara Duncombe and Mr. Jim Dyer
May 18, 2005
Page 4

Allocated to FEP" between Defendant's original True Ups and 04/05 submission, which equals $412,402 for 1998 through 2004.

### Damage Summary

To resolve the Government's claims arising from the allegations of the qui tam action filed by Mr. Garner, I would strongly recommend to the Government that it accept $2,050,000.00. This demand consists of the following single damage components:

| | |
|---|---|
| Print Mail | = $228,000.00 |
| FEP Marketing Reps | = $ 96,000.00 |
| FDB Claims Processing | = $150,000.00 |
| POS Pilot Plan | = $ 25,000.00 |
| Prescription Rebates | = $412,400.00 |
| | TOTAL $911,400.00 |

I believe the application of a 2.5 multiplier is appropriate in this case due to the remaining questions relating to the prescription rebate issues, our exclusion of many of the unliquidated items of damages as well as civil penalties. Pursuant to United States v. Bornstein, 423 U.S. 303 (1976) and United States ex rel. Roby v. Boeing, 79 F.Supp.2d 877 (S.D.Ohio 1999), we first apply the multiplier to the single damages, which equals $2,278,500 and then credit Defendant for the $229,627.17 in payments that I believe Defendant has already made to OPM[1], resulting in a total demand of roughly $2,050,000.00.

### Attorney Fees and Expenses

As you are aware, Defendant is further responsible for the fees and expenses expended by Relator's counsel. As of the date of this letter, total fees and expenses for Aschemann Keller LLC, Ronald E. Osman & Associates, LTD, and Helmer & Martins are $289,490.54. If we are able to resolve this matter through settlement, Relator's counsel are agreeable to accepting this amount plus any additional fees incurred in concluding the settlement. If not, we will request the court apply a lodestar computation to the hourly fees.

I hope your client will appreciate several factors about this settlement demand which inure to your client's benefit. First, prior cases handled by Judge Spiegel indicate that he looks upon Relators very favorably. If we proceed with discovery, I am confident we will be able to prove that the magnitude of the damages are greater than referenced herein, damages which will be subject to mandatory trebling under the False Claims Act. As you know, the Act also provides for civil penalties. Also missing from our demand is any calculation relating to damages that would accrue under the investment income provision of the FEP contract (calculated at 5% per year on any damages). Perhaps most important for your client, settlement of this matter

---

[1] I will need to receive verification on this repayment.

Ms. Barbara Duncombe and Mr. Jim Dyer
May 18, 2005
Page 5

means there will be no further discovery of its prescription rebate practices, among other practices we sincerely question, liability for plaintiff's attorneys fees is extinguished, and your client sharply curtails the cost of defense.

As with the 3730(h) demand made this morning, this demand/offer will remain open until 4:00 p.m. on Friday, May 20, 2005. To be clear, both deadlines are under Central time.

Thank you in advance for your consideration of this matter.

Very truly yours,

*Timothy Keller*

Timothy Keller

JTK/lar