Case 1:00-cv-00463-SAS   Document 65-4   Filed 11/14/2005   Page 1 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                    Andrew M. Garner, III

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4                      *   *   *

 5   THE UNITED STATES OF AMERICA,

 6   ex rel, ANDREW M. GARNER, III,

 7   and ANDREW M. GARNER, III,

 8   Individually,

 9          Plaintiffs,

10      vs.                         CASE NO. 1:00CV463

11   ANTHEM INSURANCE COMPANIES,

12   et al.,

13          Defendants.

14                      *   *   *

15          Deposition of ANDREW M. GARNER, III,

16   Plaintiff herein, called by the Defendants for

17   cross-examination pursuant to the Rules of Civil

18   Procedure, taken before me, Karen M. Rudd, a

19   Notary Public in and for the State of Ohio, at the

20   offices of Helmer, Martins, Rice & Popham Co.,

21   L.P.A., 105 East Fourth Street, Suite 1900,

22   Cincinnati, Ohio, on Wednesday, November 2, 2005,

23   at 9:16 a.m.

24                      *   *   *

25
```

EXHIBIT C

Case 1:00-cv-00463-SAS    Document 65-4    Filed 11/14/2005    Page 2 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.    Andrew M. Garner, III

Page 82

1  deletion of claims took place, there was a
2  rumor that started swirling around the FEP
3  organization that someone in Anthem FEP was
4  deleting claims in an inappropriate fashion,
5  right?
6     A.  Correct.
7     Q.  And you criticized Ms. Hayes'
8  management skills and abilities because she
9  didn't bring that rumor to anyone's attention
10 to address, right?
11    A.  Correct.
12    Q.  And it's accurate to say that in
13 your position as a supervisor of Ms. Hayes, you
14 felt that managers had a higher level of
15 responsibility to protect the company by
16 immediately informing higher level management
17 if there were issues related to compliance with
18 laws or government contracts, right?
19    A.  I wouldn't say higher level
20 management, but a manager responsible for those
21 issues.
22    Q.  I'm going to direct your attention
23 down to the second to last sentence under rumor
24 of deleted claims.  In this memo to Mr. Brown,
25 you said as a member of management, Nanette had

Page 83

1  a higher level of responsibility to protect the
2  company from issues such as this.  That was
3  your words, wasn't it?
4     A.  Yes.
5     Q.  And you were accurate when you
6  said that then, weren't you?
7     A.  Yes.
8     Q.  And you still believe that to be
9  true today, don't you?
10    A.  Yes.
11    Q.  So, in essence, you were
12 criticizing Ms. Hayes' management ability for
13 ignoring information that might suggest that
14 there was some kind of compliance issue or
15 illegal activity going on within Anthem FEP,
16 right?
17    A.  Correct.
18    Q.  As a manager on the Anthem FEP
19 team, one of the reasons you were unhappy with
20 Ms. Hayes is because you felt that higher duty
21 to call to the attention of upper management
22 any concerns about compliance issues or illegal
23 activities, correct?
24    A.  Correct.
25    Q.  And so you couldn't fulfill your

Page 84

1  duty to immediately report the circumstances
2  unless Ms. Hayes had fulfilled hers, right?
3     A.  Correct.
4     Q.  And as a result, you thought that
5  her poor management skills and not reporting up
6  the chain had, in fact, caused you to look bad,
7  as well, right?
8     A.  No, I didn't feel it made me look
9  bad.
10    Q.  But you felt it interfered with
11 your ability to do your job, correct?
12    A.  No, I didn't feel like I -- me not
13 knowing that she didn't report it, I had no
14 knowledge of that, so, therefore, it had
15 nothing to do with my ability to do my job.
16    Q.  Here was my point.  I thought we
17 were on the same plane.  Maybe I have gotten
18 off track, in which case I apologize.
19        I thought I understood that one of
20 the criticisms you had of Ms. Hayes was that
21 she had a higher duty as a manager to report to
22 upper management any concerns about compliance
23 issues or violations of the law by Anthem FEP,
24 right?
25    A.  Yes.

Page 85

1     Q.  And if she would have reported
2  that to you, it would then become your burden.
3  You would have had that same high duty to
4  report that up the chain to be sure that the
5  company did something about it, right?
6     A.  Yes.
7     Q.  So it was part of your job to be
8  sure that issues related to compliance or
9  issues related to rumors of illegal conduct
10 were called to the attention of the appropriate
11 people within Anthem.  You would agree with
12 that, wouldn't you?
13    A.  Yes.
14    Q.  And you would say that was the
15 duty of all managers at FEP given it was a
16 government contract related organization,
17 right?
18    A.  Yes.
19    Q.  And it was your position that it
20 was simply improper for a manager within Anthem
21 FEP to ignore rumors of misconduct that could
22 cause serious damage to Anthem's reputation or
23 potentially cause it to be out of compliance
24 with a government contract or acting illegally,
25 right?

Page 86

1    A. Yes.
2        MR. KELLER: Objection as to the
3    form of the question.
4    Q. It was your position that it was
5    improper for a manager within the Anthem FEP
6    organization to ignore rumors of misconduct
7    that could cause serious damage to Anthem's
8    reputation. You would agree with that,
9    wouldn't you?
10       It was your position as a manager
11   within the Anthem FEP organization that it was
12   improper for a manager that worked for you to
13   ignore rumors of misconduct that could cause
14   serious damage to Anthem's reputation. Fair
15   statement?
16   A. Yes.
17   Q. And that was true for all
18   managers? In other words, all managers in your
19   view had an important duty to report even
20   rumors of misconduct that could cause damage to
21   Anthem FEP's reputation, right?
22   A. Yes.
23   Q. And you would also agree that it
24   was improper for a manager within the Anthem
25   FEP organization to ignore rumors of misconduct

Page 87

1    that could cause Anthem to be out of compliance
2    with a government contract, right?
3    A. Yes.
4    Q. And you would also agree that it
5    was your duty and the duty of all managers
6    within the Anthem FEP organization to be sure
7    that any rumors of illegal activity within the
8    Anthem FEP organization were immediately
9    addressed and reported up the chain to the
10   proper authorities, correct? That was part of
11   your job, wasn't it?
12   A. I'm -- the part I'm struggling
13   with is when you say up the chain. There was a
14   compliance officer. If you would consider that
15   up the chain, then, yes. I think that it was
16   the responsibility of the employee to report to
17   their manager, to the compliance officer.
18   Q. To any appropriate authority,
19   whether it's the compliance officer or a more
20   senior officer within Anthem, as long as you
21   reported it to an appropriate authority, you
22   were fulfilling your duty, right?
23   A. Yes.
24   Q. But it was part of your job to do
25   that, correct?

Page 88

1    A. Yes.
2    Q. And it was a part of the job of
3    any manager within the Anthem FEP organization
4    to report to appropriate authorities, be it the
5    compliance officer or some other senior
6    executive, illegal rumors or suspicions of
7    illegal misconduct, correct?
8    A. I can't speak to the accuracy of
9    that. I don't know what was the responsibility
10   of all managers within the entire organization.
11   Q. I only meant the Anthem FEP
12   organization.
13   A. Yes, and that's why we had a
14   compliance officer.
15   Q. Okay. So let me see if I can
16   clean that up since you and I were a little
17   disjointed --
18   A. Right.
19   Q. On the question and the answer.
20   It's going to be repetitive, but I want to be
21   sure that you and I are on the same page.
22       You would agree that it was the
23   duty of all managers within the Anthem FEP
24   organization as part of their job to report
25   suspicions or allegations or accusations of

Page 89

1    potential illegal misconduct within the
2    organization to either the compliance officer
3    or someone else within the chain. You would
4    agree with that, wouldn't you?
5    A. Yes.
6    Q. I want to direct your attention
7    now to the third page of this memo and at the
8    bottom. Another reason that you justified the
9    actions you took with regard to Ms. Hayes was
10   that she had engaged in insubordination,
11   correct?
12   A. Yes.
13   Q. And you would agree that
14   insubordination by a manager to her boss or by
15   any manager to their boss was considered a
16   matter of serious misconduct within the Anthem
17   organization, wouldn't you?
18   A. I don't know if I would classify
19   it as serious misconduct.
20   Q. Insubordination was not serious
21   misconduct in your view?
22   A. Not necessarily.
23   Q. It was misconduct?
24   A. Yes.
25   Q. And it was significant misconduct?

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                              Andrew M. Garner, III

Page 202

1  Q. And the point of service project
2  had to do with whether or not you, as a
3  manager, were going to include a certain charge
4  in your budget, right?
5  A. I'm sorry?
6  Q. I thought the point of service
7  product, the issue that you were raising --
8  A. Right.
9  Q. -- of wrongdoing had to do with
10 whether you were going to include a certain
11 charge in your budget?
12 A. Correct.
13 Q. And you were responsible for the
14 budget; were you not?
15 A. I was responsible for the budget,
16 but it was approved by Kathy.
17 Q. And I understand that. And you
18 felt like it was important that it was part of
19 doing your job to go to Kathy and say, hey,
20 that's not right --
21 A. Correct.
22 Q. -- it shouldn't be in there,
23 right?
24 A. Correct.
25 Q. And so as the manager, in essence,

Page 203

1  of the budget, you were complaining to Kathy
2  about the propriety of putting that charge in
3  the budget, right?
4  A. Correct.
5  Q. And as a result of that, you felt
6  like the company made a decision that was not
7  proper, right?
8  A. Correct.
9  Q. Now, do you know that that money
10 actually was put into the budget?
11 A. I was instructed to put the money
12 in the budget and then submit it to Kathy.
13 Where it went from there, I don't know.
14 Q. So do you know if Anthem ever
15 received a dollar as a result of your putting
16 it into the budget or not?
17 A. I do not know.
18 Q. Do you know if that was ever
19 audited by either OPM outside auditors or
20 auditors from the Blue Cross and Blue Shield
21 Association?
22 A. I do not know.
23 Q. And you are not really an expert
24 in the field of government accounting, are you,
25 sir?

Page 204

1  A. I wouldn't claim to be an expert.
2  Q. You have an accounting background?
3  A. I have a bachelor's degree in
4  accounting.
5  Q. Did you ever sit for the CPA exam?
6  A. I did not.
7  Q. Did you ever try to take any part
8  of the CPA exam?
9  A. Absolutely not.
10 Q. And have you ever had education
11 and training at any school or seminar related
12 to government accounting?
13 A. A seminar provided by Blue
14 Cross/Blue Shield Association on FEP budgeting
15 process, and I would consider that, yes, to
16 your answer -- to your question.
17 Q. But that was a seminar designed
18 for managers, correct?
19 A. Correct.
20 Q. It wasn't designed to make
21 accountants who already had an expertise in
22 accounting specialists in the area of
23 government accounting, was it?
24 A. No.
25 Q. And so, again, you don't for

Page 205

1  the -- you don't hold yourself out as an expert
2  in government accounting or contract compliance
3  matters, do you?
4  MR. KELLER: Objection as to the
5  form of the question.
6  MR. DYER: You can answer.
7  THE WITNESS: No.
8  Q. And so all you could do as a
9  manager was when you saw things that didn't
10 sound right or look right to you is to do your
11 job, you felt like you needed to raise the flag
12 and say, hey, somebody ought to look at this.
13 Is that a fair summary?
14 A. That's a fair summary.
15 Q. Now, let's move on, then, with
16 regard -- after that point of service flag had
17 been raised by you, you said you went and
18 talked and explained the situation to Mary, the
19 administrative assistant?
20 A. Yes.
21 Q. And during the course of that
22 dialogue, did you tell her that you were going
23 to file a QUI TAM suit?
24 A. During the course of that
25 dialogue, I don't recall telling her that I was

Case 1:00-cv-00463-SAS   Document 65-4   Filed 11/14/2005   Page 5 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                                    Andrew M. Garner, III

Page 206

1 going to file a QUI TAM suit. However, I said
2 that if I do file a QUI TAM suit, this will be
3 one of the issues.
4     Q.  And so at least what you were
5 trying to convey to Mary was that it was
6 something that was in the back of your mind,
7 but you hadn't made any decisions, right?
8     A.  Correct.
9     Q.  And did you specifically say to
10 Mary that you were -- at least in the back of
11 your mind you were thinking about filing a
12 QUI TAM action, as opposed to simply raising a
13 stink about this?
14     A.  My recollection is that in that --
15 with having probably three or four
16 conversations daily with Mary over a period of
17 years, that on, you know, many occasions that
18 that subject was -- that was the subject of our
19 conversation.
20     Q.  So what you are saying is that
21 just routinely on a daily basis you told Mary
22 you were going to be filing -- you were at
23 least thinking about filing a QUI TAM action?
24     A.  No, not routinely on a daily
25 basis.  I just said that in three or four

Page 207

1 conversations daily over a period of years that
2 I'm sure that that subject was discussed on
3 more than one occasion.
4     Q.  But the only three you can come up
5 with and tell the ladies and gentlemen of the
6 jury about today in the course of your only
7 deposition so far in this case is the three you
8 have told us about, right, with regard to Mary?
9     A.  Those were the three that I could
10 recall.  I also do recall speaking to Mary
11 about Ms. Hinkle was obtaining her master's
12 degree in business through Xavier University,
13 and part of the master's degree program
14 included an international trip to Singapore and
15 Bali, and we talked about whether or not she
16 had submitted those expenses through the normal
17 process and whether or not they were going to
18 be reimbursed under the federal contract, which
19 would have been improper, at least I believed
20 it was going to be improper.  So, you know,
21 that was another specific instance.
22     Q.  All right.  There's four.  Can you
23 think of any others?
24     A.  At this very moment, no.
25     Q.  All right.  So we've talked about

Page 208

1 the first one.  I want to move on to the second
2 one.  And that is where you said that you were
3 speaking with Mary about work she was doing
4 with Kathy and going to conferences of some
5 kind; is that right?
6     A.  NCQA committee meetings.
7     Q.  And in the course of that
8 dialogue, what you told Mary was that you
9 thought that that might be an issue with regard
10 to the government contract, right?
11     A.  Yes.
12     Q.  And, again, in doing that, is
13 there -- did you tell Ms. Hinkle that, as well?
14     A.  Yes.
15     Q.  And when you reported that to
16 Ms. Hinkle, you felt like you were doing your
17 job again as a manager in the FEP organization
18 to be sure that something you thought might be
19 out of whack or out of compliance was brought
20 to the attention of the appropriate people,
21 right?
22     A.  Yes.
23     Q.  And then after you had brought
24 that to the attention as part of your job
25 duties to Ms. Hinkle about possible contract

Page 209

1 compliance issues, you talked to Mary about it,
2 as well?
3     A.  Yes.
4     Q.  And you talked to her to say that
5 she might be doing something wrong?
6     A.  Yes.
7     Q.  Did Ms. Hinkle ask you to do that?
8     A.  No.
9     Q.  And, again, you just felt like
10 this was part of your job to let people know
11 that they ought to be careful to be sure they
12 were in full compliance, right?
13     A.  Yes.
14     Q.  Do you know whatever happened?
15 Did Ms. -- either Ms. Hinkle or Ms. O'Rourke's
16 time get billed inappropriately?
17     A.  I don't know.
18     Q.  And so you really have no idea as
19 you sit here today whether your efforts to do
20 your job and alert people were listened to or
21 not, right?
22     A.  I don't know.
23     Q.  And you really don't know whether
24 you were right in the first place or not, do
25 you?

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                                           Andrew M. Garner, III

Page 210

1  A. I believe I was.
2  Q. I know you believe you were. But
3  from a government accounting point of view,
4  you're not here to say as an expert that what
5  Anthem was doing or you thought they were doing
6  was wrong. You just suspected it was wrong,
7  correct?
8  A. From seminars that I had attended
9  from Blue Cross/Blue Shield meetings, I
10 understood that billing time to the federal
11 government that was spent working on projects
12 that were not related to the federal government
13 was illegal. And because of that, I believed
14 that it was wrong.
15 Q. But there are lots of ways to do
16 cost allocations under government accounting
17 rules, aren't there?
18 A. There may be.
19 Q. And you don't know about the
20 various cost allocation methodologies that
21 either OPM or outside auditors or Blue Cross
22 and Blue Shield Association auditors would
23 approve, do you?
24 A. Specifically, no. Generally, yes,
25 those were topics that came up in the seminars.

Page 211

1  Q. Now, I want to talk specifically
2  about your conversation with Ms. O'Rourke. Is
3  this, again, a conversation where you said to
4  her that in the back of your mind, some day you
5  might file a QUI TAM action if this kind of
6  conduct kept on?
7  A. I don't recall if I said that
8  specific to that incident.
9  Q. So in this incident, you don't
10 recall talking about a QUI TAM action with
11 Ms. O'Rourke?
12 A. Which incident are we speaking
13 about?
14 Q. This is the one about the NCQA
15 conference and the inappropriate billing of
16 time.
17 A. Okay. I don't specifically
18 remember in that one, but --
19 Q. Well, that's what I am trying to
20 get is the list. So let's go on to the number
21 three. This had to do with invoices that came
22 across her desk, and you said that there were
23 invoices periodically you would talk to her
24 about?
25 A. Right.

Page 212

1  Q. What invoices?
2  A. Invoices for services that were
3  performed for FEP, maybe printing or copying or
4  mail room services. Just different things like
5  that that would come across the desk.
6  Q. And who was the vendor?
7  A. Different vendors, Personix,
8  Administar Print Mail. Boy, I can't recall the
9  name of the vendor that did some open season
10 work for us, but just different vendors.
11 Q. And what was it about these
12 invoices that caused you to talk to an
13 administrative assistant about there being a
14 potential compliance issue?
15 A. Sometimes she would bring them to
16 me and say what do you -- does this look right
17 or why do you think this is happening and so
18 forth. Other times I would see them and maybe
19 ask her. She was working on her degree in
20 accounting and had a curiosity about the
21 accounting function and had told me that she
22 had hoped some day to actually get into
23 internal audit, because she was intrigued by
24 those topics. So that's why we talked about
25 it.

Page 213

1  Q. So, again, you felt like you were
2  doing your job helping your boss's
3  administrative assistant understand that there
4  might be some issues with invoices that were
5  coming across her desk?
6  A. Correct.
7  Q. And as I understand it, invoices
8  don't get paid unless someone with
9  responsibility for the budget line item signs
10 off on the invoice, right?
11 A. No, what -- if a purchase order is
12 signed off on, then invoices generally will be
13 paid without a signature on a given invoice.
14 Sometimes they do require signature.
15 Q. But in any event, Anthem is always
16 free not to pay a bill that they think is
17 inappropriate, right?
18 A. I would guess.
19 Q. I mean, what I am trying to get at
20 is this sounds like it was a billing problem
21 from vendors that were charging Anthem
22 inappropriately. Am I describing that
23 accurately?
24 A. Correct.
25 Q. And you thought these billing