The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.    Andrew M. Garner, III

Page 242

1  A. No.
2  Q. And so when you went to Mr. Jensen
3  and talked to him about the False Claim Act, is
4  it accurate to say that you were telling him
5  that this was something that was in the back of
6  your mind that you were at least thinking over?
7  A. Jim, you make it sound like I went
8  specifically to Mr. Jensen. Mr. Jensen and I
9  had -- our offices were right next door to each
10 other. We were friends. We went to lunch
11 together often. We would ride to Indianapolis
12 together often. We would run together. We
13 would do things together. We had conversations
14 standing in a urinal in the men's room. I
15 can't remember every single conversation that
16 we had and where it took place and the intent
17 of the conversation.
18      MR. DYER: Could you read the
19 question back, please?
20      (Record read.)
21      THE WITNESS: Yes.
22 Q. And is that also true essentially
23 what you told Mrs. O'Rourke on that day, as
24 well?
25 A. I believe so.

Page 243

1  Q. Is that also true essentially what
2  you told Mr. Dundes on this day, as well?
3  A. I believe so.
4  Q. Now --
5      THE WITNESS: Can we take a break
6  for just a second? Can we take a break for
7  just a second?
8      MR. DYER: Can we do it fast? If
9  you need a break, let's --
10     THE WITNESS: Yes, I do. I
11 apologize. I didn't go to the bathroom.
12     THE VIDEOGRAPHER: We are off the
13 record.
14     (Thereupon, an off-the-record
15 discussion was held.)
16     THE VIDEOGRAPHER: We are on the
17 record.
18 Q. Mr. Garner, I want to go back to
19 the Exhibit 14 and the conversation with
20 Ms. O'Rourke. I think you started to tell me
21 that you were agitated when you had this
22 conversation with Ms. O'Rourke in part because
23 you were feeling pressure as a result of your
24 report to Mr. Jensen about concerns having to
25 do with Personix, right?

Page 244

1  A. Yes.
2  Q. And hopefully we will have time to
3  talk about the Personix memo in a little bit.
4  But tell me exactly what it was that caused you
5  to believe you were being pressured or under
6  pressure as a result of sending an E-mail to
7  Mr. Jensen about Personix.
8  A. Well, it's been seven years, so
9  it's hard to recall a hundred percent of the
10 detail, but I just remember in some of the
11 conversations I had with Michael over time that
12 the company doesn't want to know about the
13 fraud, and that if it gets ugly, what will
14 happen is there will be pressure coming down on
15 you from -- that won't be related to that, and
16 that you may be put on disciplinary action, you
17 may be put -- you know, you may be demoted, you
18 may wind up even losing your job within the
19 organization, but to get you away from your
20 access to the data which may be damning of the
21 organization.
22      So I started feeling those kind of
23 pressures, you know, from within the
24 organization. You know, calls from Kathy
25 Hinkle, you know, wanting to know -- it's hard

Page 245

1  to recall exactly what she wanted to know at
2  that point, but just -- I just felt pressure,
3  under pressure.
4  Q. I can understand it's been a long
5  time, but what I am trying to understand is,
6  and please accept my stipulation on this, you
7  may remember, but the date of your E-mail on
8  Personix that we hope to look at yet today was
9  sometime in mid March, March 15th, March 18th.
10 Does that ring a bell with you?
11 A. I recall it was sometime in the
12 month of March. I don't remember the specific
13 day.
14 Q. And what I'm trying to get at is
15 from the date you wrote that E-mail until
16 April the 1st, when you had this conversation
17 with Ms. O'Rourke, what do you remember about
18 conversations or communications of any kind
19 that heightened your concern and resulted in
20 you being so agitated that morning?
21 A. Right. I don't recall the
22 specific conversations that I had. I just
23 recall at the time feeling very threatened as a
24 result of me bringing this information forward
25 to Michael. You know, he had always told me

Mike Mobley Reporting
937-222-2259

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                                                  Andrew M. Garner, III

Page 270

1  Q. Now, in the interim between the
2  first meeting and the second meeting, I just
3  want to be sure I had the timeline right when I
4  asked you this before, did you make any effort
5  to contact Ms. Gross or Mr. Brown or anyone
6  else at Anthem to explain why you thought your
7  termination was not proper?
8      A. I don't believe so, because I was
9  warned not to contact anyone, so I did not
10 speak to anyone, and I was in fear of telling
11 Gross or Brown, based upon what I had been told
12 from Michael, that they don't want to know
13 about it, and if you are the one that brings it
14 up, you are out of here, that I wasn't going to
15 bring it up.
16     Q. So you thought you were going to
17 be fired, but you were afraid to raise the
18 issue?
19     A. I wasn't sure until I was fired
20 that that was what was happening, and I wanted
21 to preserve any possibility of a false claims
22 suit, because what I had been told was that we
23 will just fix whatever you bring up. So if I
24 had given all of the details, that would have
25 given them opportunity to clean all the mess

Page 271

1  up.
2      (Thereupon, Defendants' Exhibit 21
3  was marked for purposes of identification.)
4      Q. Let me hand you what has been
5  marked as Exhibit 21. Just before you turn to
6  that and look at that, Mr. Garner, if I
7  understand it, then, one of the reasons that
8  you decided not to communicate with Ms. Gross
9  and Mr. Brown, who you knew you could
10 communicate with, right --
11     A. I wasn't sure I could communicate
12 with them.
13     Q. I mean, they were the ones that
14 had met with you, and they told you to contact
15 at least Kathy O'Neill, right? She was in HR.
16 Didn't they? Yes?
17     A. Yes. That's what it states here.
18 I don't recall that specifically though.
19     Q. But one of the reasons that you
20 decided not to raise any of the issues you had
21 raised about fraud or noncompliance with
22 contracts with Ms. O'Neill or Mr. Brown or
23 Ms. Gross is because you were afraid the
24 company would fix it. Is that what I heard you
25 say?

Page 272

1      A. Yes.
2      Q. And if -- you were afraid if the
3  company fixed the issues that they were out of
4  compliance on, that that might hurt you in your
5  ability to pursue a lawsuit? Is that what you
6  are saying?
7      A. At that point, yes, after I had
8  been -- knew that my termination was immediate,
9  you know, I was going to be terminated.
10     Q. Well, but you didn't know that
11 after the first meeting, did you?
12     A. No.
13     Q. And, in fact, what you said was
14 you were afraid to call anybody, because you
15 were afraid that might precipitate getting
16 fired, right?
17     A. True.
18     Q. But in the interim, it was -- the
19 thought in your mind was if I tell them what's
20 wrong, they will figure it out and fix it,
21 right?
22     A. And, therefore, I would be fired,
23 and I would have no recourse. Yes.
24     Q. Handing you what has been marked
25 as Exhibit 21. I know these aren't your notes,

Page 273

1  and I know it's not your handwriting, but,
2  fortunately, they are fairly legible, and I am
3  going ask you to look at the bracketed
4  materials at the top of Exhibit 21 and ask you
5  if that is an accurate summary of some of the
6  comments that were made to you at this second
7  meeting in Mason by Ms. Gross.
8      A. That's not what I remember.
9      Q. Do you deny that any of these
10 comments were made?
11     A. No. What I'm saying is that's not
12 what I recall.
13     Q. Okay.
14     A. What I recall is saying that I was
15 being terminated because that I had made
16 statements that caused management to no longer
17 trust me.
18     Q. Is there anything else you recall
19 that you were told?
20     A. Specifically towards the bracketed
21 items or to the entire memo?
22     Q. For the whole conversation.
23     A. Okay. I do remember that I was
24 given two options. One option would be to be
25 terminated for cause and be given two weeks'

Case 1:00-cv-00463-SAS   Document 65-5   Filed 11/14/2005   Page 3 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.    Andrew M. Garner, III

Page 282

1  Q. And those were all items that
2  Anthem FEP needed to purchase from a vendor in
3  the ordinary course of business, correct? It
4  needed those items in order to do its business,
5  didn't it?
6  A. Correct.
7  Q. And you are not suggesting that
8  these were services that Anthem FEP didn't
9  need, right, that Personix provided?
10  A. No, I don't believe so. But there
11  may have been bills that showed up for services
12  that weren't related to FEP from Personix, but
13  I'm not stating that the services that they
14  provided FEP were not necessary services for
15  FEP. There's a slight nuance in that.
16       MR. KELLER: Jim, are you getting
17  ready -- can we go off the record a second?
18       MR. DYER: Sure.
19       THE VIDEOGRAPHER: We are off the
20  record.
21       (Thereupon, an off-the-record
22  discussion was held.)
23       (Thereupon, Defendants' Exhibit 32
24  was marked for purposes of identification.)
25       THE VIDEOGRAPHER: We are on the

Page 283

1  record.
2  Q. Handing you what has been marked
3  as Exhibit 32. Can you identify that as the
4  E-mail you have referred to earlier in your
5  testimony that you sent to Michael Jensen on or
6  about March 13, 1998?
7  A. It appears to be.
8  Q. That's your Bates number, your
9  name at the bottom of this, isn't it?
10  A. I'm not familiar with the term
11  Bates number. I'm sorry.
12  Q. Well, that is your name at the
13  bottom, isn't it?
14  A. Yes.
15  Q. All right. And this is a document
16  that you recall taking with you from Anthem
17  when you left, right?
18  A. I believe so, yes.
19  Q. Now, Exhibit 31 is -- subject is
20  Personix potential fraud. Do you see that?
21  A. I do.
22  Q. And at the time you wrote this
23  E-mail, am I accurate in saying that it was
24  your understanding that Personix was owned in
25  part by Anthem?

Page 284

1  A. I believe that they were.
2  Q. Okay. And you wrote this letter
3  to Michael, and -- let me back up, though. You
4  have told us what services Personix provided.
5  In essence, Personix was a vendor to Anthem
6  FEP, just like Kinko's would be or some other
7  printing service kind of a company, right,
8  although very specialized?
9  A. That would probably be a good
10  analogy.
11  Q. And you had money in your budget
12  at Anthem FEP both for the service benefit plan
13  and the HMO to pay for printing expenses
14  performed by vendors like Personix, right?
15  A. Yes, that's what I recall.
16  Q. And, in fact, as the marketing
17  manager, many of the expenses that were
18  incurred as a result of services provided by
19  Personix were for your budget, right?
20  A. I believe so.
21  Q. And that's because things like
22  membership cards and open enrollment materials
23  and membership directories all were under the
24  function of marketing; is that right?
25  A. Some of the items you spoke about,

Page 285

1  yes. Membership cards, I don't believe so.
2  But provider directories and benefit brochures,
3  yes.
4  Q. And provider directories was one
5  of the larger ticket items that vendors like
6  Personix were hired to print, correct?
7  A. For FEP, correct.
8  Q. For Anthem FEP, correct?
9  A. Yes.
10  Q. And so as part of your duties and
11  responsibilities as the director of marketing,
12  your job was to be sure that the invoices you
13  got from Personix and other outside vendors
14  charging the marketing department were fair and
15  appropriate for the services that were
16  delivered, right?
17  A. I recall that that was part of my
18  responsibility.
19  Q. And when an invoice came in from
20  Personix or any other vendor that had a
21  discrepancy in it, that didn't look to you or
22  one of your people like it was accurate, then
23  it was your job to track that down and be sure
24  that the company was only getting charged for
25  services performed for it, right?

Case 1:00-cv-00463-SAS   Document 65-5   Filed 11/14/2005   Page 4 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                              Andrew M. Garner, III

Page 286

1  A. Yes.
2  Q. And in this E-mail, you alerted
3  Mr. Jensen, then, to a billing problem with
4  Personix, correct?
5  A. Yes.
6  Q. In essence, you were complaining
7  that Personix was sending invoices to FEP for
8  services that were not actually delivered to
9  FEP, right?
10  A. That's what I recall.
11  Q. And sending this E-mail to
12  Mr. Jensen was a response to the fact that
13  ultimately, as director of marketing, your
14  budget was going to get hit for services that
15  were being performed -- or, excuse me, for
16  payments made for services that weren't
17  performed, right?
18  A. Payments were being made for
19  services that were not performed for FEP.
20  Q. But actually what this memo is
21  talking about is billings, correct?
22  A. Invoices.
23  Q. Yeah. There's nothing in here
24  that suggests that payments had actually been
25  made, right? You are not complaining about

Page 287

1  improper payments. You are complaining about
2  improper billings. Am I reading that
3  correctly?
4  A. Correct.
5  Q. And from the time you wrote this
6  memo until the time you left as an employee a
7  couple weeks later of Anthem FEP, is it
8  accurate to say that you had no facts or
9  information to know whether payments had
10  actually been made based on improper billings
11  received from Personix. Fair statement?
12  A. No. I don't recall the outcome of
13  the investigation that was undertaken. I
14  remember having discussions with Michael, not
15  in a formal setting, that he was looking into
16  this practice. But I also recall him stating
17  you shouldn't have put that in writing. We
18  don't want these kind of things in writing.
19      And when I was terminated, there
20  was no resolution that I'm aware of at that
21  time about what happened with Personix and the
22  invoices that I felt were being submitted
23  improperly.
24  Q. So as you sit here today, you
25  can't say to the ladies and gentlemen of the

Page 288

1  jury with any certainty that Anthem FEP
2  actually paid money to Personix that Personix
3  didn't deserve to get?
4  A. No, because they got rid of me
5  before I was able to determine whether or not
6  that's the case.
7  Q. It's accurate to say that as you
8  sit here today, you have no way to know whether
9  or not any of the improper invoices you were
10  talking about were paid by Anthem FEP. Is that
11  a fair statement?
12      MR. KELLER: Objection, asked and
13  answered.
14  Q. Is that a fair statement, sir?
15  A. Based on my knowledge that I have
16  today, I cannot tell you whether or not these
17  invoices were paid or not.
18  Q. And so if we go back to this memo,
19  in essence, you were raising a red flag in
20  writing about a billing problem with Personix,
21  right?
22  A. Based on this memo, yes.
23  Q. And you directed that to Mr. Jensen,
24  and an investigation was undertaken, correct?
25  A. Yes.

Page 289

1  Q. And when you left, the
2  investigation was still ongoing as best you
3  knew, right?
4  A. As best I knew.
5  Q. And as you sit here today, you
6  have no idea of the outcome of that
7  investigation, do you?
8  A. Not to my knowledge.
9  Q. Now, Mr. Garner, as the director
10  of marketing, when a vendor sends you an
11  invoice, you had the ability to simply say we
12  are not going to pay that invoice, or if a
13  payment had been made to stop paying future
14  invoices, didn't you?
15  A. As I previously stated that what
16  would happen in the invoicing process is that a
17  purchase order would be initiated by Anthem.
18  Those purchase orders would be placed on file
19  within the accounts payable department, and
20  when an invoice came in that had that purchase
21  order number on it, they would get paid without
22  having further signature from the manager or
23  director or vice president of the department
24  for whom the services were rendered based upon
25  the invoice with that purchase order.

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                                      Andrew M. Garner, III

Page 290

1 So my complaint was was that they
2 were using purchase orders that they had on
3 file and were using those purchase orders in
4 order to get invoices paid. And I don't recall
5 today whether or not my inquiry was based upon
6 invoices that I knew had been paid and I was
7 looking at a report subsequent to the payment,
8 or if they were invoices that had been paid --
9 had been waiting to be paid, and I was looking
10 at it pre. But I think it was on invoices that
11 had been paid if I -- as I speak about it now
12 and think about what the process was.
13    Q. Well, you don't say anything about
14 being paid in this memo. We have already
15 looked at it for that, right? If I'm missing
16 something --
17    A. It does not state that they were
18 paid.
19    Q. And, in fact, you say they may be
20 attempting to get costs paid by the government,
21 don't you?
22    A. They may, but they may just have
23 been putting it down because they had the wrong
24 number.
25    Q. But as far as you knew at this

Page 291

1 time, and your testimony today is you don't
2 know one way or another whether money had
3 actually gone out the door or whether you had
4 bad invoices being stacked up?
5    A. I don't recall.
6    Q. Now, with regard to the billing
7 problems, is it accurate to say that as you go
8 down in that second paragraph, you say that I
9 am not making an accusation, and then you put
10 in parentheses, spelling, but rather feel that
11 there is evidence which may suggest an
12 investigation be taken on. Did I read that
13 correctly?
14    A. Yes.
15    Q. And, in fact, you weren't making
16 an accusation. You were just raising some
17 evidence that caused you a concern. Fair
18 statement?
19    A. Yes.
20    Q. What you really wanted was for
21 somebody to look into this and see if this was
22 a billing snafu or if it was intentional
23 misconduct by someone at Personix, right?
24    A. I was concerned that since I had
25 repeatedly spoken to Personix, the account

Page 292

1 manager, about stopping this practice and it
2 was ongoing, that there may be more to it than
3 just putting the wrong purchase order number on
4 there. So as a result of that concern, I
5 wanted to bring it to Michael's attention.
6    Q. But even though you had that
7 concern, you still didn't feel like you had
8 enough evidence to say they were committing
9 fraud, and, as a result, you wanted to make
10 clear you weren't making an accusation. Fair
11 statement?
12    A. I -- yes.
13    Q. And as a result of that, it's
14 accurate to say that at the time you wrote this
15 memo, you didn't know if there was a billing
16 glitch going on at Personix or an incompetent
17 accounting person you were talking to, or if
18 there was a scheme or an intent to commit
19 fraud, right?
20    A. I did not know that at the time.
21    Q. You didn't know one way or the
22 other, did you?
23    A. No, that's why I suggested there
24 be an investigation taken on.
25    Q. And that's because you didn't want

Page 293

1 this money coming out of your marketing budget
2 if, in fact, it was an overpayment or a payment
3 for services that weren't provided, right?
4    A. My recollection was is that the
5 services were definitely not provided to me,
6 and I should not be paying it, so I was
7 concerned -- I did not want the money coming
8 out of my marketing budget, correct.
9    Q. You go on to say you may want to
10 check with Mark. Is that Mark Johnson?
11    A. Yes.
12    Q. Why did you say check with Mark
13 Johnson?
14    A. Oh, because he was in Indiana, and
15 he was most likely receiving invoices from
16 Personix, as well. So I thought that maybe he
17 would -- Mark was the senior person on staff in
18 Indiana, so he probably would be a person who
19 would have noticed that activity over there, as
20 well.
21    Q. But that was speculation on your
22 part that you just wanted Mr. Jensen to follow
23 up on and track down, right?
24    A. It was speculation that there may
25 be activity in Indiana? Is that what you are

74 (Pages 290 to 293)

Case 1:00-cv-00463-SAS   Document 65-5   Filed 11/14/2005   Page 6 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                             Andrew M. Garner, III

Page 294

1   saying?
2       Q.  Exactly. You had no evidence that
3   Personix was --
4       A.  Correct.
5       Q.  -- doing this in Indiana, did you?
6       A.  No, I said you may just want to
7   check with Mark to see if there is any pattern
8   there.
9       Q.  And, in essence, what you were
10  trying to do was to give a full and accurate
11  description of your concern to Mr. Jensen so
12  that he could go about his business and his job
13  of tracking this down to see if, in fact, this
14  was a billing problem or fraud, right?
15      A.  I was alerting him that there may
16  be potential fraud, and I wanted to make sure
17  that he got involved in it. My previous
18  discussions with him had been orally, and I did
19  not find that he took sufficient measures to
20  make sure. So I finally decided I have got an
21  item, I'm going to put it in writing.
22      Q.  But, in essence, what you put in
23  writing is what you are saying is what you told
24  him earlier?
25      A.  Yes. I didn't tell him

Page 295

1   specifically about this incident earlier. I
2   had talked to him about other issues earlier.
3       Q.  And the other issues had been --
4   had also related to concerns you had about
5   Personix?
6       A.  No, about other issues -- other
7   things within Anthem.
8       Q.  Including some of those we have
9   talked about earlier today?
10      A.  Yes.
11      Q.  All right. But had you ever
12  talked to Mr. Jensen, to your recollection,
13  about Personix before you sent this E-mail?
14      A.  I think I may have. Just in
15  passing, I may have said something is not right
16  about these. He said, well, take -- you know,
17  look at them and see, and if anything comes of
18  it, let me know. But I don't know
19  specifically.
20      Q.  Now, is that a conversation you
21  recall or a conversation that might have
22  happened?
23      A.  It's a conversation that may have
24  happened.
25      Q.  So you don't really recall it?

Page 296

1       A.  No.
2       Q.  Okay. Let's stick to things you
3   do recall. Do you recall having any
4   communications that you can say from memory
5   occurred with Mr. Jensen about Personix prior
6   to the time that this E-mail was sent?
7       A.  I don't recall at this time.
8       Q.  And after this E-mail was sent up
9   until the time of your last day of employment
10  at Anthem FEP, did you have any communications
11  with Mr. Jensen or anyone else about the
12  Personix issue?
13      A.  I believe so.
14      Q.  Who?
15      A.  Mr. Jensen.
16      Q.  Tell me what you recall about any
17  additional conversations with Mr. Jensen.
18      A.  I recall a week or so after this
19  him saying I haven't been able to find
20  anything. You shouldn't have put that in
21  writing. I said why? He said, you know, you
22  know we are not putting stuff like this in
23  writing. I said why? He said we just don't
24  want it in writing.
25          So I said, well, Michael, you

Page 297

1   know, I needed to put it in writing, because I
2   felt that I was not getting any attention from
3   Personix, and I wanted you to take this one
4   seriously. And he said I haven't found
5   anything at this point. And then I don't
6   recall speaking to him about that since that
7   point.
8       Q.  And where did that conversation
9   take place?
10      A.  I don't recall the specific place
11  at this time.
12      Q.  How long did the conversation
13  last?
14      A.  I don't recall the length of the
15  conversation at this time.
16      Q.  Did you talk about any other
17  issues with Mr. Jensen on that occasion besides
18  the Personix issue?
19      A.  I don't recall the entire scope of
20  the conversation at this time.
21      Q.  Was anybody else included in that
22  conversation?
23      A.  I don't recall if anyone else was
24  included in the conversation at this time.
25      Q.  Did you take any notes in that