Case 1:00-cv-00463-SAS    Document 65-6    Filed 11/14/2005    Page 1 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                Andrew M. Garner, III

Page 298

1  second conversation with Mr. Jensen about this
2  Personix E-mail?
3      A.  I don't recall taking any notes
4  from the conversation at this time.
5      Q.  Did Mr. Jensen take any notes to
6  your best recollection?
7      A.  I don't recall that Mr. Jensen
8  took any notes regarding our conversation at
9  this time.
10     Q.  And so have you told me about all
11 of the communications you had with Mr. Jensen
12 about Personix that you can recall in
13 reference -- by referencing this E-mail and
14 that second conversation with Mr. Jensen?
15     A.  The E-mail and the second
16 conversation are the only things that I recall
17 speaking to Mr. Jensen about Personix at this
18 time.
19     Q.  Did you talk to anybody else
20 within Anthem FEP's management organization
21 about your concerns related to Personix?
22     A.  I believe that I also mentioned
23 this to Ms. Hinkle.
24     Q.  When?
25     A.  Subsequent to the E-mail, but I

Page 299

1  don't recall the specific date.
2      Q.  Do you remember where the
3  conversation occurred?
4      A.  I do not recall where the
5  conversation occurred at this time.
6      Q.  Do you remember what you said to
7  Ms. Hinkle?
8      A.  My recollection is, Kathy, I sent
9  an E-mail to Michael about possible impropriety
10 in billing from Personix.  I just want to make
11 sure you are aware of it, so if you have any
12 interest, you can look into it.
13     Q.  And what did Mrs. Hinkle say to
14 you?
15     A.  I don't recall what Ms. Hinkle
16 said at this time.
17     Q.  But that conversation with
18 Ms. Hinkle and the conversation with Mr. Jensen
19 is what had you so agitated on the date that
20 you talked to Mary O'Rourke?
21     A.  I don't recall if that's the
22 impetus for my agitation or not at this time.
23     Q.  Is there anything else you
24 remember, any facts at all, related to your
25 concerns that Personix might not -- that

Page 300

1  payments to Personix might not comply with the
2  FEP government contracts?
3      A.  Specifically, no.
4      Q.  Well, generally.  Was there
5  something we are missing that you haven't told
6  us about concerning --
7      A.  Not that I can think of at this
8  time.
9      Q.  Now, I heard you mention the name
10 Print Mail earlier.
11     A.  Administar Print Mail.
12     Q.  What was Administar Print Mail?
13     A.  Administar Print Mail, to the best
14 of my recollection, was a division or
15 subsidiary of Anthem.  They performed services
16 such as mail handling, scanning, those sorts of
17 things.  I don't recall everything that they
18 do.  I think they may have also did -- they may
19 have also done directory printing.
20     Q.  And do you know if there is any
21 relationship between Personix and Administar
22 Print Mail?
23     A.  You're testing my memory, but I
24 don't recall if Administar Print Mail was the
25 name of Personix after a change of organization

Page 301

1  or something.  I don't recall at this point.  I
2  may be able to recall that, you know, at a
3  later point.  I just don't recall.
4      Q.  Well, I only have this point.
5      A.  I understand.
6      Q.  So what could you look at, what
7  would you want to look at to refresh your
8  memory?
9      A.  Probably if I could look at the
10 affidavit, I may be able to recall that.
11     Q.  Now, was that affidavit written by
12 you in your own handwriting?
13     A.  No.
14     Q.  It was written in conjunction with
15 your lawyers; is that right?
16     A.  Yes.
17     Q.  And you -- the actual typing was
18 done at your lawyer's office, wasn't it?
19     A.  I don't know where the actual
20 typing was done.
21     Q.  You didn't type it up, did you?
22     A.  No, but that's a different
23 question.  No, I did not type it up.
24     Q.  All right.  It could have been
25 typed up at a shopping mall for all we know,

Page 302

1  but what you are saying is you didn't type the
2  affidavit that you signed?
3      A.  That's correct.
4      Q.  And the affidavit you signed was
5  after you had sat down with your lawyers and
6  reviewed what they had written up for you to
7  sign, right?
8      A.  That's my recollection.
9          (Thereupon, Defendants' Exhibit 33
10 was marked for purposes of identification.)
11     Q.  I'm going to hand you what's been
12 marked as Exhibit 33.
13         MR. KELLER:  33?
14         MR. DYER:  I believe it's 33.  The
15 last one was 32.  This is my all time best,
16 guys, in terms of messing up the exhibit
17 numbers.  I apologize.
18     Q.  Now, with all that discussion,
19 what's the exhibit number in front of you?
20     A.  33.
21     Q.  Handing you what has been marked
22 as Exhibit 33.  Have you seen that document
23 before?
24     A.  I never -- I don't recall ever
25 seeing that document.

Page 303

1      Q.  This is a document that, again,
2  was, I will represent to you, was produced to
3  us by your counsel.  And do you recognize at
4  the bottom the name N. Hayes underneath okay to
5  pay?
6      A.  I do.
7      Q.  Do you have any idea why this
8  document would have been one that you --
9  whether you took this document with you when
10 you left Anthem?
11     A.  I don't recall.
12     Q.  Now, do you see that okay to pay,
13 and then there's some stuff in the middle of
14 the invoice there?
15     A.  I do.
16     Q.  Does that -- is that basically
17 what was stamped on an invoice when an invoice
18 had to be approved by a manager in order to be
19 paid?
20     A.  I don't recall.
21     Q.  Did you ever sign any invoices
22 when you were a manager?
23     A.  Yes, I recall signing some
24 invoices.
25     Q.  And is this the kind of format

Page 304

1  that was used when you signed invoices for
2  approval?
3      A.  It does not look familiar to me,
4  that stamp.
5      Q.  But the okay to pay would suggest
6  that somebody stamped this invoice and made a
7  decision on paying the invoice, right?
8          MR. KELLER:  Objection as to form.
9          THE WITNESS:  There is no
10 signature.  There is a printed person's name,
11 and there is no date.  So to me, I would not
12 think that that invoice had been approved for
13 payment.
14     Q.  But I guess what I'm trying to do
15 is distinguish this invoice from one where you
16 said it was automatically approved because of a
17 purchase order.  Would you expect to see an
18 okay to pay stamp on an invoice that was
19 automatically approved by a purchase order?
20     A.  I don't recall.
21     Q.  You just don't know one way or the
22 other?
23     A.  I don't know.
24     Q.  And so you can't solve the mystery
25 of why this one invoice for 40 bucks from

Page 305

1  Personix was in your document production?
2      A.  I can't.
3      Q.  All right.
4      A.  I don't even know -- I can't read
5  it.  I don't know what it says.
6      Q.  And as we leave the Personix
7  issue, you don't have any reason to conclude
8  that Anthem FEP in some way profited from
9  Personix billing Anthem for services that
10 weren't performed, do you?
11     A.  I don't have any reason to believe
12 or disbelieve that Anthem FEP profited from
13 Personix's submission of invoices for services
14 not performed for FEP.
15     Q.  Personix, you would be concerned,
16 might have profited, but you don't have any
17 reason to think Anthem FEP did, right?
18     A.  Well, another division of Anthem
19 may have profited, because the charges, which
20 may have been legitimate, were not charged to
21 the appropriate contact -- contract.
22     Q.  Now, I didn't see that referenced
23 in your E-mail.  Is that a different issue for
24 Personix?
25     A.  No.

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.                                    Andrew M. Garner, III

Page 306

1  Q. I'm confused. Is that an issue
2  you were concerned about when you were at
3  Anthem FEP with Personix, even though it's not
4  mentioned in your E-mail?
5  A. You had asked me if FEP profited
6  from this practice, and my answer would be no.
7  However, the division for whom services were
8  provided that was not being billed would have
9  lower expenses; therefore, they would have
10 profited from Personix's mistaken invoice or
11 misdirected invoice or whatever it may have
12 been.
13 Q. So how -- is it your -- is it your
14 position, and I don't see that in your E-mail,
15 but is it your position that Personix was
16 providing services and deserved to be paid,
17 they were just providing services to one
18 division and billing another?
19 A. I couldn't draw that conclusion
20 from what I had seen. I'm purely speculating
21 that if those services were actually delivered,
22 then the division for which the services were
23 performed were not being billed for it.
24 Q. So if we put speculation aside, as
25 you sit here today, is it accurate to say you

Page 307

1  have no evidence to suggest that Anthem FEP or
2  any part of the Anthem organization profited
3  from the allegations you made against Personix,
4  even if they were true?
5  MR. KELLER: Object as to form.
6  THE WITNESS: I have no evidence
7  before me today.
8  Q. Well, even if you don't have it in
9  front of you, do you have any that you could
10 point to that you have gathered or collected
11 over the years of -- since you brought this
12 suit?
13 A. No, not that I can recall today.
14 Q. Now, is there anything else that
15 we haven't talked about that you have
16 information that would suggest there was any
17 wrongdoing by Personix or Administar Federal
18 Print Mail other than what we have talked about
19 already?
20 A. Not that I can recall at this
21 moment.
22 Q. Do you have any facts to suggest
23 that Administar Print Mail was in any way
24 engaged on a fraud or did something improper
25 with regard to its billing practices?

Page 308

1  A. I thought I read recently about a
2  settlement that Administar had made with the
3  government for handling Medicare claims
4  improperly, so that would be the only evidence
5  that I would know is something from the press
6  that stated that they had done something that
7  was incorrect.
8  Q. Let's go back to the last day of
9  employment that you had at Anthem FEP, which I
10 believe was in the first week or so of April of
11 1998, right?
12 A. Yes.
13 Q. At the time you left Anthem FEP,
14 did you have any facts that caused you to be
15 concerned that there was any irregularity or
16 fraud going on with respect to Administar
17 Federal Print Mail's dealings with Anthem FEP?
18 A. Not that I can recall at this
19 moment.
20 Q. And are you aware of any documents
21 that you had that would in any way have
22 suggested that Administar Print Mail was in any
23 way engaged in a wrongdoing or illegal conduct
24 with respect to its business dealings with
25 Anthem FEP?

Page 309

1  A. I have a recollection of something
2  regarding Administar Print Mail, but I can't
3  recall the details.
4  Q. Well, let me see if I can put it
5  this way. If I was interviewing you on the
6  last day that you were at work at Anthem FEP,
7  and I asked you to give me a list of concerns
8  that you had about compliance issues or illegal
9  misconduct or fraudulent misconduct that might
10 be going on with respect to the business of
11 Anthem FEP, would you have put anything about
12 Administar Print Mail on that list?
13 A. I can't recall, but if I could see
14 the complaint that was filed, it may be able to
15 jog my memory about that specifically.
16 Q. Do you have any recollection as
17 you sit here today without reading the 90- or
18 100-page complaint that would suggest that
19 Administar Print Mail was engaged in
20 wrongdoing?
21 A. Without looking at that document,
22 I -- I can't recall at this moment. I may
23 after I look at that document.
24 Q. Did you have any discussions with
25 anyone within the Anthem organization or Anthem

78 (Pages 306 to 309)

Page 310

1  FEP in specific at any time during the time
2  that you were an employee of Anthem FEP related
3  to concerns about the business practices or
4  business dealings between Administar Print Mail
5  and Anthem FEP?
6      A.  Again, through the passage of
7  time, I don't recall specifically --
8      Q.  But you read --
9      A.  -- at this moment.  At this
10 moment.
11     Q.  You read your affidavit, as I
12 think you told me, at least three times in the
13 last 30 days, didn't you?
14     A.  I believe it was three times.
15     Q.  And as you sit here today, you
16 don't have any recollection of that occurring?
17     A.  Late in the day, Mr. Dyer.  I
18 apologize.
19     Q.  We will sit here for as long as
20 you think you need to.  This is my only chance.
21     A.  I understand.
22     Q.  I am looking for any facts you
23 know or have that relate to Administar Print
24 Mail.  And you have told me everything you can
25 recall; is that right?

Page 311

1      A.  You have asked me not to
2  speculate; therefore, I am not.
3      Q.  Thank you.
4      A.  I don't recall at this moment, but
5  I suspect that if that was part of my
6  complaint, maybe reviewing the affidavit or the
7  complaint would be sufficient in order to jog
8  my memory.
9      Q.  Let's talk about Anthem
10 Prescription Management, or APM.
11     A.  Okay.
12     Q.  Do you have any facts or
13 information, did you have, on the last day of
14 your employment at Anthem FEP that caused you
15 to believe that there was some illegal or
16 noncompliant business practice going on at
17 Anthem FEP in its dealings with Anthem --
18 excuse me, with APM?
19     A.  Yes.
20     Q.  What facts did you have?
21     A.  I had through conversations with
22 Anthem Prescription Management employees been
23 told that the rebate that came to APM from
24 pharmaceutical manufacturing companies was not
25 being completely credited to the FEP account or

Page 312

1  other Anthem accounts.  They considered that
2  part of their profit.
3      Q.  Who told you that?
4      A.  Ron Bectol.
5      Q.  Did anybody else tell you that?
6      A.  I had a conversation with Chet
7  Spykowski.
8      Q.  Can you spell that one for us?
9      A.  Good luck on spelling it.  I have
10 no --
11     Q.  Spykowski?
12     A.  It's S P Y something.  I can't
13 recall.
14     Q.  And what -- I'm sorry.  Go ahead.
15     A.  And I can't -- I don't recall if
16 that was part of the discussion or not, but
17 my -- to the best of my recollection, I made
18 him aware that the FEP HMP program was a cost
19 plus program, and that all we could turn over
20 to OPM for cost in the HMP program were the
21 actual costs minus rebates.
22         And I -- I don't recall whether or
23 not Chet specifically addressed what the rebate
24 was or not, but I do recall having a discussion
25 with him.  It took place after the discussion

Page 313

1  that we had regarding the overpayment of claims
2  by FEP -- or, I'm sorry, APM.
3         So I do recall having that
4  conversation.  I don't recall Chet telling me
5  that they were not returning the entire rebate.
6      Q.  What did Ron Bectol tell you about
7  APM's failure to return the entire -- or to
8  credit the entire rebate to FEP?
9      A.  I had called him on several
10 occasions trying to get a definitive answer as
11 to whether or not the rebate was being credited
12 back to FEP, to the HMP program.  Ron did not
13 know.  Ron was the liaison, so to speak, I
14 don't know his full title, between APM and the
15 business divisions of Anthem.  So, in essence,
16 I was his customer.
17         I had become aware of prescription
18 benefit managers failing to return rebates
19 through magazine articles, through FEP
20 meetings, through OPM plan documents and
21 bulletins, those kind of things.  So I felt
22 that I needed to make sure that any rebates
23 that were being returned to Anthem Prescription
24 Management found its way back to the charges
25 and were a credit against any charges that we

Case 1:00-cv-00463-SAS    Document 65-6    Filed 11/14/2005    Page 5 of 6

The United States of America, ex rel., Andrew M. Garner, III v. Anthem Insurance Companies, et al.    Andrew M. Garner, III

Page 314

1  were submitting to the government for
2  prescriptions paid for for their members.
3      Ron told me after several
4  conversations that he was having a hard time
5  getting a definitive answer, and finally he
6  told me that what he was able to find out was
7  that the rebates run between $1 and $10 per
8  prescription, that the average was about four,
9  and that as a general rule, APM credits a
10 dollar per prescription back to whoever their
11 customer would be, whether it's Ford Motors or
12 an administrative services only client or even
13 the commercial insurance division of Anthem,
14 and including FEP HMP.
15     Q.  Anything else you recall Ron
16 telling you?
17     A.  I asked him why he only returned
18 the dollar, and he said because the division
19 considers anything in excess of that their
20 profit.  I said but you can do that with
21 everyone else if you want, you just can't do
22 that with the federal government program.
23     And he said, look, I'm just the
24 sales guy.  I'm just the marketing rep, the
25 liaison.  I don't have any control over that.

Page 315

1  I said, well, you need to make sure that people
2  know.
3      Q.  And let's back up.  Ron Bectol,
4  then, really was having to go ask other people
5  for -- to get the information you wanted,
6  right?
7      A.  That's my understanding.
8      Q.  What he told you was he didn't
9  have any personal knowledge, but he made some
10 inquiries to people to try and find out what
11 was going on with rebates, right?
12     A.  That's my understanding.
13     Q.  And Ron Bectol was somebody you
14 had worked with before at FEP, correct?
15     A.  Correct.
16     Q.  And he was then an APM employee?
17     A.  Correct.
18     Q.  And you have seen Ron Bectol since
19 the time you left Anthem FEP, haven't you?
20     A.  Yes.  Yes.
21     Q.  You remain friends with him, don't
22 you?
23     A.  Yes.
24     Q.  You have sold him insurance at
25 Eppa Rixey, right?

Page 316

1      A.  Yes.
2      Q.  And have you sold him insurance in
3  some of your other businesses?
4      A.  I don't think so.  I bought some
5  from him recently.
6      Q.  Where does Ron work now?
7      A.  A company in Kentucky called
8  Business Benefits.
9      Q.  So you and Ron have remained
10 social friends since the time you left, right?
11     A.  On and off.  He has younger
12 children; I have older children.  He is going
13 to soccer games; we are going to high school
14 events, you know, so our -- I will run into him
15 at a Buffalo Wild Wings, and we may sit down
16 together and have wings or something.
17     Q.  With regard to this Anthem FEP
18 rebate issue, when Ron told you that
19 information, what did you do?
20     A.  I don't recall specifically what I
21 did, other than tell him that that practice had
22 to stop.  I believe that I made Michael Jensen
23 aware of my findings, as well.  And this had to
24 be probably in early '98, because it was
25 subsequent to the meetings that took place

Page 317

1  regarding the overpayment of the benefits.  It
2  would be late '97 or early '98.
3      Q.  Is there anyone else besides
4  Mr. Jensen that you recall telling what you had
5  learned from Ron Bectol?
6      A.  I don't recall at this time.
7      Q.  And have you told me everything
8  that you recall about your conversation with
9  Mr. Jensen concerning APM rebates?
10     A.  Everything that I can recall at
11 this time.
12     Q.  This whole APM rebate issue, I
13 think we said at the outset of this deposition,
14 relates to the FEP HMO product, right?
15     A.  I believe that's the case, yes.
16     Q.  And you had some responsibilities
17 for operating the FEP HMO product; is that
18 correct?
19     A.  Yes, you could say that.
20     Q.  And so it's accurate to say that
21 you viewed getting to the bottom of this rebate
22 issue as part of your duties and
23 responsibilities at FEP, right?
24     A.  That's correct.
25     Q.  And, in fact, when you were

```
                                                              353

 1  STATE OF OHIO              )
 2  COUNTY OF MONTGOMERY       )    SS: CERTIFICATE
 3           I, Karen M. Rudd, a Notary Public within
 4  and for the State of Ohio, duly commissioned and
 5  qualified,
 6           DO HEREBY CERTIFY that the above-named
 7  ANDREW M. GARNER, III, was by me first duly sworn
 8  to testify the truth, the whole truth and nothing
 9  but the truth; that said testimony was reduced to
10  writing by me stenographically in the presence of
11  the witness and thereafter reduced to typewriting.
12           I FURTHER CERTIFY that I am not a relative
13  or Attorney of either party nor in any manner
14  interested in the event of this action.
15           IN WITNESS WHEREOF, I have hereunto set my
16  hand and seal of office at Dayton, Ohio, on
17  this   5th   day of   November   , 2005.
18
19           _____Karen M Rudd / TMM_____
             KAREN M. RUDD
20           NOTARY PUBLIC, STATE OF OHIO
             My commission expires 5-21-2007
21
22
23
24
25
```