lynnegrossroughASCII
                                                                    1

1  ******************************************************
2  REPORTER'S NOTE:
3         Since this deposition is in rough draft
   form, please be aware that there may be a
4  discrepancy regarding page and line number when
   comparing the rough draft, rough draft disk and
5  the final transcript.
          Also, please be aware that the uncertified
6  rough draft transcript may contain untranslated
   steno, reporter's notes, misspelled proper
7  names, incorrect or missing Q/A symbols or
   punctuation and/or nonsensical English word
8  combinations.  All such entries will be correct
   on the final, certified transcript.  There may
9  also be portions of the transcript that are
   missing that will also be correct on the final,
10 certified transcript.

11                       Victoria S. Stuart
                         RPR
12                       Court Reporter
                         CONNOR + ASSOCIATES
13
   ******************************************************
14

15 DIRECT EXAMINATION,

16    QUESTIONS BY MR. TIMOTHY KELLER:

17 Q  Ms. Gross, my name is Tim Keller, and I'm taking

18    your deposition today, in response to a notice

19    that was provided to your counsel, asking that

20    Anthem provide certain persons with knowledge of

21    certain events.  And it has been indicated that

22    you have information responsive to the actual

23    basis for Mr. Garner's discharge, including any

24    investigation of complaints made by or about

25    Mr. Garner during 1997 or 1998.

        ***ROUGH DRAFT***UNCERTIFIED COPY***
                                                                    2

1         Are you prepared to testify on those events
2    today?

Page 1


EXHIBIT G

lynnegrossroughASCII

24   date of February 13, 1998; correct?
25 A Yes.

***ROUGH DRAFT***UNCERTIFIED COPY***

27

1  Q  Okay. Turning to the last page of Plaintiff's
2     Exhibit No. 37, marked Anthem 89?
3  A  Uh-huh.
4  Q  Is that your signature at the bottom of the
5     document?
6  A  Yes.
7  Q  And you would have signed this on February 20,
8     1998; is that correct?
9  A  Yes.
10 Q  Do you recall reviewing this, now, in
11    February 20, of 1998?
12 A  Actually, my name is on there, so I must have
13    reviewed it.
14 Q  You just don't recall at this --
15 A  I really don't recall.
16 Q  Okay. Well, since this one has your name on it,
17    I want to talk about this one, so --
18 A  Okay.
19 Q  -- turning to the first page, which is Anthem
20    86, first of all, the numbering system utilized
21    on this document runs from one through four;
22    correct?
23 A  Yes.
24 Q  With four being the highest rating and one being
25    the lowest; is that correct?

***ROUGH DRAFT***UNCERTIFIED COPY***
Page 24

lynnegrossroughASCII
28

1   A   Yes.
2   Q   And for all the categories in which Mr. Garner
3       was ranked on this performance appraisal, he
4       received either a three or the highest rating of
5       four; is that accurate?
6   A   Yes.
7   Q   Now, back on the first page, Anthem 86, I'd like
8       to ask you about the information appearing in
9       the third box down that starts with provide
10      direction to the HMP staff; do you see what I'm
11      referring to?
12  A   Yes.
13  Q   And what's in the first box, the job
14      responsibilities and measures; correct?
15  A   Correct.
16  Q   And that were -- that's -- that would have been
17      Mr. Garner's job responsibilities and measures
18      through February of '98; correct?
19  A   Yes.
20  Q   And one of his responsibilities was ensure the
21      compliant with government regulations and pre
22      serve the integrity of the plan; correct?
23  A   That was a responsibility of all of our
24      managers.
25  Q   And it was certainly Mr. Garner's

***ROUGH DRAFT***UNCERTIFIED COPY***

29

1       responsibility, as indicated on the performance
2       plan appraisal?

lynnegrossroughASCII

```
 3   A   Yes.
 4   Q   Do you see under comments, now, this is
 5       something that do you know who would have placed
 6       these comments on to the performance plan
 7       appraisal.
 8   A   Jim's manager, Kathy Hinkle.
 9   Q   Okay.  And under the comments on this
10       responsibility, it states, exceeded performance
11       in each category except accuracy, which was
12       related to the APM issue; do you see that?
13   A   Yes.
14   Q   Do you know what the APM issue was?
15   A   Specific to this, to this I know there were some
16       issues with -- with -- APM, when we made a
17       benefit plan change and I'm not certain whether
18       that is referring to that is.  It doesn't give
19       us any specifics.
20   Q   Do you recall what APM issues do you recall?
21   A   We made a benefit change, as we did with the HMO
22       annually to make the benefits better.  And one
23       year we gave the FEP beneficiary I didn't say
24       access to mail order forms in addition to
25       retail.
```

***ROUGH DRAFT***UNCERTIFIED COPY***

30

```
 1   Q   And as a result, is it your understanding APM
 2       did not understand the addition of that benefit
 3       for the FEP employee plan?
 4   A   FEP understood because they administered it and
 5       they, you know, they administered the benefit
```

```
                          lynnegrossroughASCII
 6      line of questioning.
 7            Ms. Gross, Mr. Garner was well thought of
 8      as of at least February 13, 1998, by Anthem;
 9      correct?
10  A   Yes.
11  Q   And he was I valid employee of the FEP team was
12      he not?
13  A   Jim made contributions to the FEP team.
14  Q   And.  Would you not consider hell a valid
15      employee of the FEP team at least in February of
16      1998?
17  A   Candidly, it was too soon for me to tell.  I
18      know that he made contributions to the FEP team.
19  Q   Well, you certainly reviewed Plaintiff's
20      Exhibit 37, which was his employee evaluation;
21      correct?
22  A   Yes.
23  Q   And you were aware of what Ms. Hinkle thought of
24      Mr. Garner as of February of '98; correct?
25  A   Right.

        ***ROUGH DRAFT***UNCERTIFIED COPY***
                                                    49

 1  Q   Prior to February of 1998, would it be accurate
 2      to say you were not aware of any deficiencies in
 3      Mr. Garner's performance at Anthem?
 4  A   That's correct.
 5          (A discussion was held off the record.)
 6  Q   Subsequent to February of 1998, some events
 7      occurred which led to the termination of
 8      Mr. Garner; correct?
 9  A   Yes.
```

lynnegrossroughASCII

```
10  Q    And are you aware of what led to the termination
11       of Mr. Garner?
12  A    Yes, I am.
13  Q    And can you explain to me what led to his
14       termination?
15  A    Yes, I can.  And let me get my thoughts
16       together.
17            Sue Ulrey had launched an investigation,
18       and this investigation was in the March time
19       period.  I got a call from Kathy Hinkle, stating
20       that Jim was quite anxious about his interview
21       with Sue Ulrey, and would like to move that
22       interview up not only for Jim but for herself.
23            Apparently, this was causing some anxiety
24       within the organization.  Sue Ulrey was not
25       scheduled to come to Ohio, I guess for another
```

***ROUGH DRAFT***UNCERTIFIED COPY***
                                                              50

```
1        week or so.  And so Kathy asked my permission to
2        drive to than into conduct the interview.  And
3        that took place, I believe at the end of March.
4             During that time, as any company
5        investigation, societies are told not to discuss
6        the interview or the audit or the investigation.
7        And this certainly was the case with Mr. Garner.
8             Based on information from Kathy Hinkle, and
9        from HR, Mr. Garner was discussing the audit
10       process, was making slanderous comments, about
11       his manager, and upset her secretary to the
12       point where she had left office and needed to go
```

lynnegrossroughASCII

13   home because she was in tears. Obviously,.
14 Q  Just a second.
15      MR. DYER: You can continue at your pace
16   you don't have to waited for him to take notes
17   he can have your answer read back so collected
18   your answer and go at your own is pace and he
19   will go back and read, do you wanted to hear
20   back what you just said are or are you okay.
21 A  Well, I was describing the period of time the
22   week between I don't know whether it was a week
23   or it was actually about four or five days
24   between the interview and the time that I met
25   with Jim along with Fred Brown.

***ROUGH DRAFT***UNCERTIFIED COPY***

51

1       And this was after an episode that occurred
2   with Mary O'Rourke, that Mary was extremely
3   upset with regard to information and discussion
4   that Jim had had with her.
5       He made.slanderous comments about Kathy, he
6   threatened to quoted take her down, and creed a
7   very uncomfortable, unproductive work
8   environment. The next day, we summoned Jim to
9   the Mason office, and Fred Brown led the
10   discussion with Jim, and we recommended that Jim
11   be suspended from his current position for a
12   period of time not only so that he could think
13   but give us some time to think about whether it
14   would be acceptable for Jim to continue his
15   employment with us. And that discussion
16   occurred on April 2nd.

Page 45

lynnegrossroughASCII

17    The following week, I had discussions with
18    Kathy Hinkle, to determine if she felt that she
19    could have confidence in Jim and Jim's ability
20    to perform his function to retain his
21    employment. And if we could move into a
22    productive none hostile work environment for all
23    associates. And with her advice and counsel
24    from HR, we viewed that that was not possible.
25    Therefore we found it necessary to terminate

***ROUGH DRAFT***UNCERTIFIED COPY***                         52

1     Mr. Garner's employment. Because we had lost
2     confidence in him, and his behavior and
3     decision-making ability.
4  Q  Is that it?
5  A  Yes.
6     MR. KELLER: Can you read back her
7     response.
8     MR. DYER: As it reads it back if you noted
9     anything that you wanted to add details or
10    otherwise just mentally make a noted on it and
11    you can figure out later to add to it.
12    (The requested material was read by the
13    reporter.)
14 Q  Ms. Gross, the event you just described, in your
15    in answer to my last question all of this
16    occurred in 1998; correct?
17 A  Yes.
18 Q  So the investigation, the Ulrey investigation
19    that you referred to, would that be the

Page 46

```
                       lynnegrossroughASCII
20       investigation that we discussed earlier the
21       findings depicted in plaintiff's Exhibit No. 34?
22   A   Yes, it is.
23   Q   And Ms. Hinkle requested that both her interview
24       and Mr. Garner's interview be moved up; correct?
25   A   Yes.

         ***ROUGH DRAFT***UNCERTIFIED COPY***
                                                              53


 1   Q   And she asked that she be allowed to drive to
 2       Ohio -- no, withdraw that question.
 3           She asked that she be allowed to drive to
 4       Indianapolis, to --
 5   A   Yes.
 6   Q   -- conduct her interview with Ms. Ulrey?
 7   A   Yes.
 8   Q   And I guess she was also requesting that
 9       Mr. Garner be allowed to do the same thing?
10   A   That's correct.
11   Q   Now, did you hear anyone tell Mr. Garner that oh
12       was not to discuss his interview, the audit, or
13       the investigation that Ms. Ulrey was connecting
14       with anyone?
15   A   That is typical protocol.
16   Q   Okay.  But my question is, did you hear anyone
17       give Mr. Garner those instructions?
18   A   No.  I was not with Mr. Garner when he had his
19       interview.
20   Q   Okay.  Normally, when an investigation
21       sufficient as this is done though you understand
22       that to be the protocol is that correct?
23   A   That's correct.
```

lynnegrossroughASCII

```
 6         Mr. Garner had stated?
 7    A    No.
 8    Q    Did you ever speak with Ms. O'Rourke?
 9    A    I never spoke to Ms. O'Rourke.
10    Q    Did you?
11    A    No, actually I don't know whether Michael's,
12         whether Jim said that to Michael or Michael was
13         repeating what Mary said.  Oh --
14    Q    Okay?
15    A    To be fair now that I think about it I'm not
16         sure okay.
17    Q    Now that you have had the chance to think about
18         your previous response, could it be that
19         Mr. Jensen?
20    A    Was repeating what Mary said, right.
21    Q    Okay.  To your knowledge, does the information
22         about taking Kathy down, all originate from Mary
23         O'Rourke?
24    A    Too my up, it.
25    Q    You have no other information indicating
```

***ROUGH DRAFT***UNCERTIFIED COPY***
                                                        76

```
 1         Mr. Garner allegedly made this statement to
 2         anyone but Ms. O'Rourke; correct?
 3    A    Not to my knowledge.
 4    Q    Okay.  Did anyone in human resources relay to
 5         you that Mr. Garner had made that statement to
 6         anyone else other than Ms. O'Rourke?
 7    A    I really wouldn't know that, I would think we
 8         would have to check with human resources.
 9    Q    Okay.  Is it fair to say in reaching you're
```

lynnegrossroughASCII

10      decision to terminated Mr. Garner, you believed
11      statement he had allegedly made to Ms. O'Rourke
12      was actually made?
13   A  Yes.
14   Q  What steps did you take to verify Mr. Garner had
15      made that statement?
16   A  The HR area did verify that and did talk with
17      Mary about that.  And so there was a validation
18      that was done at that juncture with Kathleen
19      O'Neil.
20   Q  Would it surprise you to learn that Mary
21      O'Rourke testified that no one from human
22      resources spoke with her?
23         MR. DYER:  Surprises happen every day in
24      life.  That's not a fair question.  Object.
25   A  I didn't know that.

***ROUGH DRAFT***UNCERTIFIED COPY***                              77

1    Q  Did you see any written report from HR regarding
2       an interview they conducted of Mary O'Rourke?
3    A  I did not.
4    Q  Did you see any handwritten notes of anyone
5       regarding an interview they cocked of Mary
6       O'Rourke?
7    A  No, I did not.
8    Q  Mary O'Rourke.  And you didn't speak with Mary
9       O'Rourke?
10   A  I did not speak with Mary directly.
11   Q  Okay.  So in believing that Mr. Garner had made
12      that's statements to Ms. O'Rourke, you were

Page 68

lynnegrossroughASCII

| | | |
|---|---|---|
| 13 | | relying on the information provided to you by |
| 14 | | Ms. Hinkle? |
| 15 | A | Yes. |
| 16 | Q | And meetings O'Neil is that correct? |
| 17 | A | Yes. |
| 18 | Q | Anyone else? |
| 19 | A | I just think that the conversation that I had |
| 20 | | with Michael reiterating how upset Mary was, and |
| 21 | | you know, the fact that the, you know, the |
| 22 | | entire office was in a state of acknowledge |
| 23 | | station. |
| 24 | Q | Okay did Mr. Jensen relay to you any complaints |
| 25 | | Mr. Garner had brought to his attention |

***ROUGH DRAFT***UNCERTIFIED COPY***

78

| | | |
|---|---|---|
| 1 | | regarding compliance in the FEP program in this |
| 2 | | time period? |
| 3 | A | Not at all. |
| 4 | Q | Did Ms. Hinkle bring to your attention any |
| 5 | | compliance issues Mr. Garner had raised with her |
| 6 | | during this time frame? |
| 7 | A | Not at all. |
| 8 | Q | Okay.  Did Ms. Ulrey tell you -- oh, did you |
| 9 | | have any discussions with Ms. Ulrey regarding |
| 10 | | these statements of Mr. Garner we have been |
| 11 | | discussing or his termination? |
| 12 | A | Actually, I did check with Ms. Ulrey prior for |
| 13 | | the termination. |
| 14 | Q | Okay? |
| 15 | A | Because the termination was behavioral based, |
| 16 | | there was no other reason.  Other than that. |

Page 69

lynnegrossroughASCII

```
17      Decision-making behavioral based I wanted to
18      make sure that you know this would not impinge
19      upon her investigation or anything about you
20      that regard, and she viewed it as purely an HR
21      issue, and agreed that and agreed to support the
22      decision the.
23   Q  Okay.  Would you have had this discussions
24      before or after the first meeting with
25      Mr. Garner?
```

***ROUGH DRAFT***UNCERTIFIED COPY***

79

```
1    A  I believe that I had that discussion during that
2       week period of time.
3    Q  The week between your first meeting and your
4       setting meeting with Mr. Garner?
5    A  Yes, uh-huh.  Because the first meeting took
6       place very quickly.
7    Q  Okay.  Well that conversation with Ms. Ulrey
8       would have been after she had conducted her
9       interview of Ms. Hinkle; correct?
10   A  Yes, because I think that both Jim and Kathy
11      were interviewed around the same time.
12   Q  Okay.  Did Ms. Ulrey advise you that Ms. Hinkle
13      had told Ms. Ulrey during her investigation, or
14      during her interview, that Jim had indicated
15      items had billed as covered but shouldn't have
16      been?
17   A  No, she didn't.
18   Q  Did she relay to you that Jim -- that Ms. Hinkle
19      said that Jim had relayed to her a lack of
```

Page 70

lynnegrossroughASCII

13      he was a strong member of the FEP team, and one
14      who is always willing to added extra effort and
15      enthusiasm to achieve a goal; correct?
16  A   That's what she said.
17  Q   You were aware she said that about Jim?
18  A   Yes.
19  Q   You were also aware that he was very much
20      involved in the reorganization of the marketing
21      department at FEP; correct?
22  A   Yes.
23  Q   You were aware that he had made the proposed
24      organizational reorganization; correct?
25  A   Correct.

        ***ROUGH DRAFT***UNCERTIFIED COPY***                              87

1   Q   You were aware that he was in the process of
2       implementing that reorganization; correct?
3   A   Yes.
4   Q   And you were aware that Ms. Hinkle said that his
5       vision is clear and supports Anthem goals and
6       strategies; correct?
7   A   That's what she said.
8   Q   Yet in less than two months time, you reached
9       the conclusion based on what Ms. Hinkle told
10      you, what HR told you, and what Mr. Jensen told
11      you, that he did not have sufficient management
12      skills for his position?
13          MR. DYER:  Objection misstates her
14      testimony.
15  A   No.  That his -- that his professionalism, his
16      decision-making, was not acceptable.  His

Page 77

lynnegrossroughASCII

17       behavior.
18    Q  Well his decision-making was?
19    A  His decision-making with regard to his behavior
20       and speaking about the audit with other people,
21       when he was told not to, he made the decision to
22       do that. That showed poor judgment, bad
23       decision making.
24    Q  And who did he discuss the audit with?
25    A  He discussed audit with a number of people.

***ROUGH DRAFT***UNCERTIFIED COPY***
0                                                                    88

 1    Q  And?
 2    A  One of which I think is noted, believe is node
 3       on the Julie Townsend.
 4    Q  And who is Julie Townsend?
 5    A  I don't know Julie Townsend personally, and
 6       those were Fred's notes, when Julie had some I
 7       believe was in her Kentucky office.
 8    Q  And what did Jim say to Julie Townsend?
 9    A  I was not a patient to that consideration.
10    Q  So whatever statements he made to Julie
11       Townsend, was that not something you relied upon
12       in deciding to terminate him?
13    A  Yes, it is.
14    Q  It is?
15    A  Right.
16    Q  How do you know he made these statement toss
17       Ms. Townsend?
18    A  Because HR told me that he did.
19    Q  Did HR tell you what the alleged statements

```
                            lynnegrossroughASCII
20         consisted of --
21    A    I don't recall specifically what the word by
22         word was but basically discusses the audit.
23    Q    Does Ms. Ulrey tell you that she had instructed
24         Jim not to discuss the audit with anyone?
25    A    That is standard operating procedure, for her to

      ***ROUGH DRAFT***UNCERTIFIED COPY***
                                                          89


 1         say that.
 2    Q    Well I understand that?
 3    A    I did not she did not specifically tell me that
 4         he does that.
 5    Q    Okay.
 6    A    But that is the protocol.
 7    Q    That is standard protocol?
 8    A    Right.
 9    Q    But no one told you they had told Jim not to
10         discuss his interview or the audit is that
11         correct?
12    A    That is correct.
13    Q    Okay. No, would it be a fair statement,
14         Ms. Gross, to say that you relied on the
15         information provided by human resources, to
16         ensure you had all of the necessary information
17         when deciding whether or not to terminate
18         Mr. Garner?
19    A    It was information from human resources, and
20         from Kathy Hinkle.
21    Q    Okay. What other alternative disciplinary
22         actions were considered regarding Mr. Garner?
23    A    Actually, there were none. Because of his level
                            Page 79
```

lynnegrossroughASCII

```
17        the oh second one.
18   Q    And he was told whichever meeting that he could
19        not correct?
20   A    I believe that was the case, yes.
21   Q    Was that you that told him no?
22   A    I believe it was the HR person who said no.
23   Q    Mr. Brown?
24   A    Yes or if it was Ms. O'Neil -- I remember him
25        asking that question, but I don't remember which
```

***ROUGH DRAFT***UNCERTIFIED COPY***

97

```
 1        meeting it was.
 2   Q    Okay.  Do you know why he was not allowed to
 3        record the conversation?
 4   A    I actually don't know why.
 5   Q    If the meeting had been court record, there
 6        would be no issues about what was actually said
 7        at it wound you agree?
 8            MR. DYER:  Object, argumentative calls for
 9        speculation you can answer.
10   Q    Subject to the objection.
11   A    Well, I suppose so, yes.
12   Q    We would definitely know what was said --
13   A    Yes.
14   Q    -- at the meeting if it had been recorded.
15            When this comment, the fourth, or let's
16        see -- the fifth bullet point, disruptive to the
17        staff, which staff members is that comment
18        referring to?
19   A    You know actually I think that a number of
```

lynnegrossroughASCII

20  members of the staff were disrupt and felt that
21  it was not a not the appropriate work
22  environment, not the least of which was Mary
23  O'Rourke and Kathy Hinkle but it also involved
24  other people in the department, as well.
25  Q   Mr. Jensen, was he?

***ROUGH DRAFT***UNCERTIFIED COPY***

98

1   A   Right.
2   Q   Okay?
3   A   And you know, and obviously when you have got
4       your management team that are upset, then all of
5       the societies are upset, you know it kind of has
6       this trickle down approach.
7   Q   I'm glad that brought up a question, you used
8       the terminology sobriety his previously, what do
9       you mean by that?
10  A   That's term that we use add Anthem for
11      employees.
12  Q   Is that?
13  A   That does, typically we use that for none
14      management people.
15  Q   Okay.  Do you recall Mr. Brown or yourself
16      asking Mr. Garner, do you understand all of that
17      is being said?
18  A   Yes, I recall that specifically.
19  Q   Okay?
20  A   That Fred said that.
21  Q   And what did Mr. Garner did he respond to that?
22  A   Yes, he did.
23  Q   And what did he say?

Page 87

lynnegrossroughASCII

24  A   I'm not sure if he said anything or if he
25      nodded. Jim didn't talk a lot during this

***ROUGH DRAFT***UNCERTIFIED COPY***

99

1       meeting.
2   Q   Well, he didn't do you believe he had any reason
3       to know the purpose of this meeting until he got
4       to your office?
5           MR. DYER: Objection calls for speculation.
6   A   I really don't know don't know.
7   Q   You can see based on information provided to
8       him, yes might be somewhat shocked or surprised?
9           MR. DYER: Objection calls for speculation.
10  A   I would be surprised if I would be surprised if
11      he was surprised, because it was creating quite
12      an unset link environment.
13  Q   Well, if you were called into your superior's
14      office and setting there is the vice president
15      of HR, and you're told that your being suspended
16      immediately with pay, would you not be
17      surprised?
18          MR. DYER: Objection it is argumentative,
19      you're squandering your time well.
20          MR. KELLER: Subject to the time.
21          MR. DYER: On argumentative and unnecessary
22      questions Mr. Keller. You're arguing with the
23      witness.
24          MR. KELLER: Mr. Dyer I don't want your
25      comments on the record if you wanted to object,

***ROUGH DRAFT***UNCERTIFIED COPY***
Page 88