1108CARR

1

```
1                 UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
2                     WESTERN DIVISION

3

4     THE UNITED STATES OF AMERICA,
      ex rel., ANDREW M. GARNER, III,
5     and ANDREW M. GARNER, III,
      Individually,
6
                  Plaintiffs
7
          vs.                        CASE NO.:  1:00CV463
8
      ANTHEM INSURANCE COMPANIES,
9     et al.,

10                Defendants.
                                          /
11

12
                       CONFIDENTIAL
13

14                     ROUGH DRAFT

15

16

17           The deposition of KATHLEEN CARROLL, taken by the

18      attorney for the Plaintiffs, commencing at approximately

19      1:10 p.m., on the 8th day of November 2005, at 125 West

20      Romana Street, Pensacola, Florida, before Connie L. Morse,

21      Registered Professional Reporter and Notary Public at Large

22      in and for the State of Florida.

23

24

25
```

⬚

2

```
1                      APPEARANCES

2
      FOR THE PLAINTIFFS:    PAUL B. MARTINS, ESQUIRE
```

Page 1



EXHIBIT
H

1108CARR
21          Q    And that would be the next day, February 20,
22    1998?
23          A    Correct.
24          Q    I forgot to say if you ever need a break, just
25    say so.

28

1           A    Thank you.
2           Q    Okay.
3                (Plaintiff's Exhibit 9 was marked for
4           identification.)
5           Q    (By Mr. Martins)  I've handed you what's
6     marked as Plaintiff's Exhibit No. 9.  It is a sheet dated
7     April 2, 1998.  At the top it's typed Jim Garner.  Do you
8     see that?
9           A    Yes.
10          Q    Is this one of the documents that you were
11    shown in preparation for the deposition?
12          A    Yes.
13          Q    And explain to me what this is.
14          A    This appears to be an outline of discussion of
15    meeting that was held with Jim with regard to his
16    suspension.
17          Q    Were you involved in drafting this document?
18          A    I don't recall exactly.  I probably worked
19    with Fred Brown on it.
20          Q    Do you recall whether it was prepared before
21    meeting with Mr. Garner or after meeting with Mr. Garner?
22          A    No, it would have been done before meeting
23    with Mr. Garner.
24          Q    Okay.  And so this is a guide, if you will, of
25    topics to cover with Mr. Garner?

1108CARR

1        A      Correct.

2        Q      And as I understand your testimony, you're

3    unsure whether or not you worked with Mr. Brown in preparing

4    this document?

5        A      Correct.

6        Q      Would it have been your practice to be

7    involved at this level in preparing this checklist for Mr.

8    Garner's suspension?

9        A      Yes.

10       Q      The first item, aware of an internal audit

11   review underway, do you recall what that relates to?

12       A      Well, there was an internal audit being done,

13   and -- so it's just a statement of fact.

14       Q      What was the internal audit?

15       A      The internal audit department was conducting

16   an audit of something in FEP.

17       Q      Do you have any knowledge of what that was?

18       A      Not really.  It wouldn't have been any of my

19   business, really.

20       Q      Is there a reason why this would be listed on

21   a checklist for a meeting with Mr. Garner to advise him that

22   he was under suspension?

23       A      Well, because of the second bullet, two

24   instances wherein appropriate comments to staff were made

25   regarding the audit and other matters.

1        Q      What were the inappropriate comments?

2        A      I don't remember.  I don't know.

1108CARR

3  Q At the time did you, as of April 2 or before

4 that, were you aware of inappropriate comments to the staff

5 regarding the audit and other matters?

6  A I would have been made aware of them by, more

7 than likely, Kathy Hinkle.

8  Q Do you have any recollection as you sit here

9 today of such an either conversation or an e-mail or some

10 communication between Ms. Hinkle and you concerning

11 inappropriate comments?

12  A It would have been, in all probability, a

13 conversation where she would have brought the concerns and

14 her issues to my attention.

15  Q What I'm asking, you said it would in all

16 likelihood be or something or in all probability it would

17 have been.  What I'm asking is, do you have any recollection

18 of such a conversation with Ms. Hinkle?

19  A Yes.

20  Q Before this document, Exhibit 9, was drafted?

21  A Yes.

22  Q What do you recall about the conversation with

23 Ms. Hinkle?

24  A Kathy came to me and discussed with me that

25 Jim had been making some inappropriate comments, that she

31

1 had asked him and counseled him to refrain from making such

2 statements and comments, that they were interfering with

3 morale, and she didn't want any interference with the audit,

4 they were not appropriate for management, and so she

5 counseled him that his actions were inappropriate, were

6 unprofessional, and she wanted him to stop.

7  Q When did Ms. Hinkle have this conversation

Page 26

1108CARR

8    with you?

9           A     I'm not sure.

10          Q     Do you recall was this face to face or by

11   phone?

12          A     I don't recall, probably both.

13          Q     Do you recall if this was a day before April 2

14   or a week or a month?

15          A     No, I don't.

16          Q     Do you recall where you were when you had the

17   conversation with Ms. Hinkle?

18          A     No, I don't.

19          Q     At this time your office would have been

20   located in Mason, correct?

21          A     Correct.

22          Q     And if I understand things correctly, Mr.

23   Garner and Ms. Hinkle's office would have been at William

24   Howard Taft?

25          A     Correct.


                                                              32


1           Q     Do you recall whether or not you went down to

2    William Howard Taft to meet with Ms. Hinkle or whether she

3    came to Mason to meet with you when you discussed this

4    matter?

5           A     No, I don't.

6           Q     Do you recall what Ms. Hinkle was wearing?

7           A     No.

8           Q     Do you recall what you were wearing?

9           A     No.

10          Q     Okay.  Did Ms. Hinkle tell you what the

11   statements were that she considered inappropriate?

**Page 27**

1108CARR

12    A    I'm sure she did, but I don't remember what
13    they were.
14        Q    Did you write down what the statements were?
15        A    I don't know.
16        Q    Did you then, having received this
17    communication from Ms. Hinkle, did you initiate some sort of
18    investigation to determine whether or not Mr. Garner was, in
19    fact, making whatever the inappropriate comments?
20        A    At this point in time, what Ms. Hinkle was
21    informing me of was that the comments had been made and
22    these couple of instances, she had counseled him, and after
23    that point in time he continued to make inappropriate
24    comments.  I looked into for sure the Mary O'Rourke piece,
25    so I did that piece of that investigation.  But in terms of

33

1    other -- of what had occurred that had caused her to counsel
2    him in the first place, I don't recall enough of the detail
3    about that.  I don't recall any detail.
4        Q    Do you know whether or not this counseling
5    that Ms. Hinkle told you she provided to Mr. Garner was in
6    writing or oral?
7        A    No, I don't.
8        Q    To your knowledge, was there ever any
9    discussion of a possible written reprimand or written
10    counseling to Mr. Garner?
11        A    Prior to this meeting, I'm not aware of any,
12    no.
13        Q    Was there any attempt on your part to talk
14    with Mr. Garner to find out his side?
15        A    Well, he was told in this meeting that he
16    should contact me if there was anything that he thought we,

Page 28

1108CARR

17    Anthem, needed to know or that he needed to say.

18         Q    This is the meeting where he's informed that

19    he's been suspended, right?

20         A    That is correct.

21         Q    I'm asking before the suspension, when you

22    talked with Ms. Hinkle and she says he's making

23    inappropriate comments, I know you said you can't remember

24    what the comments were or if she told you what the comments

25    were, but setting that aside, when she tells you that he's

34

1    making inappropriate comments, did you attempt to contact

2    Mr. Garner to get his side of it?

3         A    That wasn't necessary.

4         Q    Why not?

5         A    She had counseled him on the first couple of

6    instances, and they had had a discussion with regard to

7    that.  After that point in time, when he continued to make

8    comments that were inappropriate, I got the investigation

9    going in terms of the Mary O'Rourke piece, so I had

10   validation of the fact that that was true.  And in this

11   meeting he had an opportunity to make any statements, tell

12   his side of the story, and he had the opportunity after this

13   meeting to contact me and tell his side of the story and was

14   invited to do so.

15        Q    Am I correct in understanding that what you've

16   just said as far as him being counseled and him not

17   following the counsel is based upon what Ms. Hinkle told

18   you?

19        A    Only partially based upon what she told me

20   because I went and looked into the comments that he made to

Page 29

1108CARR
21    Mary and verified them.

22        Q    To Ms. O'Rourke?

23        A    Correct.

24        Q    Other than looking into the comments made to

25    Ms. O'Rourke, did you do anything else?

35

1        A    I don't recall if I talked to anybody else.

2        Q    Do you recall ever approaching Mr. Garner

3    before April 2, 1998, to get his side of it?

4        A    No, I don't recall.

5            MR. DYER:  Asked and answered.  Now you can

6        answer.  When I make an objection, I'm making a

7        record.  Then you can go ahead and answer unless I

8        were to tell you otherwise, and I will only do that

9        if it's privileged.

10            THE WITNESS:  Okay.  I don't remember the

11        question.

12            MR. DYER:  That happens when lawyers start

13        talking.

14            MR. MARTINS:  Just lawyer noises that we make.

15        Q    (By Mr. Martins)  Before April 2, 1998, did

16    you talk with Mr. Garner to get his side of it?

17        A    I don't remember doing that.  I may have.  I

18    may not have.

19        Q    When Ms. Hinkle either came to you or spoke to

20    you by phone reporting this complaint about Mr. Garner

21    making inappropriate comments, did you discuss with her the

22    option of some lesser administrative action rather than

23    suspension?

24        A    I don't recall.

25        Q    Just so that we're clear, lesser actions would

Page 30

1108CARR

36

1    include such things as a written reprimand, poor evaluation
2    of some sort, some sort of written record or even an oral
3    reprimand by maybe somebody, Ms. Gross or somebody like
4    that?
5        A    I don't recall.  But it's important to
6    remember that this suspension was with pay.  It wasn't
7    disciplinary suspension from the standpoint of he wasn't
8    doing his technical job.  This was primarily to get him away
9    from the workplace to stop the comments, stop the confusion
10   of the -- the uproar, the disruption that was occurring due
11   to his behaviors.
12       Q    Did you know that there was an uproar?
13       A    You know, I should take back the uproar.  It
14   was disruption; it was people being upset, concern about the
15   fact that he wasn't following management directives.  It was
16   insubordination.  There was a need to remove him from the
17   workplace to have some time to really think through what's
18   the right thing and to give Jim the opportunity to pick up
19   the phone and call if there was something that we needed to
20   know, which as far as I recall didn't happen.
21       Q    All of what you've said just now is based on
22   what you got from what Ms. Hinkle told you and what you got
23   concerning the O'Rourke issue; is that right?
24       A    And talking with Lynn Gross.  It wasn't all
25   Kathy's decision.  It was primarily operating management's

37

1    decision, but it would have been Lynn Gross' ultimate
2    decision.

Page 31

1108CARR
3      Q    Did you ever hear that Mr. Garner was
4  complaining that the FEP program was failing to pass on
5  rebates that it should be providing to the government?
6      A    No.
7      Q    Did you ever hear that Mr. Garner had been
8  complaining that there were overcharges and either --
9  overcharges of expenses or administrative expenses to the
10  government under the FEP program?
11      A    No.
12      Q    Did you ever hear that he was looking into
13  those matters?
14      A    No.
15      Q    Do you know a Mr. Jensen, a Michael Jensen?
16      A    I recall the name.
17      Q    Do you recall that he was a compliance person
18  at the FEP marketing?
19      A    I honestly don't remember what he did.
20      Q    I take it in conducting your investigation or
21  in doing whatever you did from a human resources standpoint
22  for the suspension and then the termination, I take it you
23  did not discuss anything with Mr. Jensen?
24      A    I don't recall discussing anything with him.
25      Q    Do you recall having any discussion with

38

1  anyone in management about a lesser form of administrative
2  punishment for Mr. Garner?
3      A    Lesser form meaning the suspension or the
4  termination?
5      Q    At the suspension level, when you got to the
6  point of you were going to bring him in on April 2 and tell
7  him he was suspended, leading up to that, was there any
8  Page 32

1108CARR

3    O'Rourke concerning a racism complaint?

4         A    I don't recall, but my normal operating

5    procedure would be if I got a complaint of any kind, racism

6    or harassment or whatever, would be to investigate to some

7    extent.

8         Q    And my follow-up question to that is do you

9    have a recollection of conducting an investigation after

10   hearing about this from Ms. O'Rourke into this issue of

11   racism?

12        A    I just don't recall.

13        Q    Do you have a recollection of conducting an

14   investigation into any of the matters listed here based upon

15   the oral conversation that you had with Ms. O'Rourke?

16        A    I just don't remember.

17        Q    The last paragraph talks about intimate

18   relationships.  You see that?

19        A    Yes.

20        Q    Again, do you have any recollection of in the

21   oral conversation you had with Ms. O'Rourke a discussion of

22   intimate relationships?

23        A    I don't remember.

24        Q    I want to turn back to Exhibit 9.  And you can

25   keep 10 there in front of you.

45

1         A    Okay.

2         Q    There's a bullet point, "Comments to a Julie

3    Townsend in Louisville."

4         A    Yes.

5         Q    Do you recall what that relates to?

6         A    I don't.

7         Q    There's a next bullet point, "Most recently

Page 38

1108CARR

8    comments you made to Mary O'Rourke about taking Kathy down
9    with you." Do you recall what that relates to?
10        A    Well, it relates to the report from Mary
11   that's documented in this Exhibit 10.
12        Q    At the time this Exhibit 9 was prepared, these
13   bullet points, do you recall whether or not that statement
14   was entered there based on what Ms. Hinkle told you, or was
15   it based on what O'Rourke told you?
16        A    I don't recall.
17        Q    The next bullet point is, "We can't have a
18   member of management making such comments. Disruptive to
19   the staff, impedes the audit process being conducted." Do
20   you see that?
21        A    Yes.
22        Q    Do you have any recollection of a discussion
23   with anyone before April 2, 1998, concerning this matter?
24        A    Well, yes. I would have talked primarily to
25   Lynn but also to Kathy, as well as Fred, Kathy Hinkle, Fred

46

1    Brown, because this was the whole construction of the matter
2    was that Mr. Garner was being insubordinate, going against
3    the directives of his management; his comments were being
4    disruptive to the staff; he was told to cooperate with the
5    audit. There was concern that his actions were impeding it.
6    So this was the bottom line as to why the action was being
7    taken.
8        Q    Do you have a recollection, as you sit here
9    today, of such a discussion before April 2, 1998?
10       A    I would have had to have had it with Lynn,
11   Kathy, et cetera.

Page 39

1108CARR

12      Q      And you're saying that just because, I mean,

13  that's how it would have to then result in this memo?

14      A      Well, I don't see how it could have been part

15  of the meeting outline if that whole subject had not been

16  discussed.

17      Q      And my question is, do you have a recollection

18  of that conversation before April 2, '98, before Mr. Garner

19  is brought in and suspended?

20      A      Yes, I spoke with both Kathy and Lynn about

21  that.

22      Q      You have an independent recollection of that?

23      A      I think so.  It's hard to remember that far

24  away.

25      Q      Okay.  As I understand your testimony, you're

47

1  unsure whether or not you drafted what is Exhibit 9,

2  correct?

3      A      That is correct.  I don't know if I did it,

4  Fred did it, the two of us did it together.

5      Q      And so if someone else drafted it, they may

6  have put this information down without you having had such a

7  conversation; is that right?

8      A      I would be very surprised.  It would be

9  bordering on impossible.

10      Q      Why is that?

11      A      Well, for one thing, the way Fred and I

12  worked, we worked together on a lot of things, and my name

13  was in it as to a person that he was to contact.  So I

14  certainly would have known about it even if I wasn't

15  intimately involved in putting the words on paper.  But they

16  sure look familiar.

Page 40

1108CARR

17          Q     The meeting with Mr. Garner on April 2, 1998,
18    took place at Mason; is that right?
19          A     I believe it took place in Lynn's office, Lynn
20    Gross' office.
21          Q     The Mason office?
22          A     Correct.
23          Q     And were you present for that meeting?
24          A     I'm told it was Fred who was at that meeting.
25    I was at the termination meeting.

48

1          Q     Okay.  Do you have a recollection of whether
2    or not you were or were not at that meeting?
3          A     No.
4          Q     The suspension meeting?
5          A     No.  I don't remember, certainly don't
6    remember being there.
7          Q     You just told me I'm told I was there?
8          A     No.  I was told I was not, that it was Fred
9    who handled that meeting.
10          Q     Oh, that you were not there.  I don't want to
11    get into what the attorneys told you.  Did anyone else tell
12    you that you were not at this meeting?
13          A     No, but then I haven't spoken to anyone else.
14          Q     Okay.  The next bullet point is, "As a result,
15    we are suspending you effective immediately with pay.  We
16    will call you when it is appropriate regarding your
17    returning to work."  Do you see that?
18          A     Yes.
19          Q     Do you recall whether or not Mr. Garner was
20    ever called concerning it being appropriate for him to

Page 41

1108CARR
21  return to work?

22         A    As far as I know, he was contacted to come in
23  for the April 7th meeting.  I don't believe he was contacted
24  at any other point between the 2nd and the 7th.

25         Q    What is the April 7th meeting?

D

49

1          A    The termination meeting.

2          Q    Okay.  Even though you weren't at this
3  suspension meeting, I understand that if we look down at the
4  second to last bullet point, your name is given as the point
5  of contact?

6          A    Correct.

7          Q    Did you ever contact Mr. Garner?

8          A    Not that I recall.  He was asked to contact me
9  if there was anything that he felt we needed to know, should
10  know, et cetera.

11         Q    And I take it since you were not at the
12  suspension meeting, you're unsure what exactly was said
13  between whoever was there and Mr. Garner; is that right?

14         A    I'd say that's right.

15         Q    When you spoke to Ms. O'Rourke, whenever that
16  was, did you either personally conduct an investigation or
17  cause an investigation to be conducted based on what Ms.
18  O'Rourke had told you?

19         A    I don't recall.

20         Q    Based on your years of human resources
21  experience, would you expect that before suspending or
22  terminating an employee, particularly somebody that had a
23  good performance record with the company, that good human
24  resources practices would have been to conduct such an
25  investigation?

Page 42

1108CARR

50

1        MR. DYER:  I'm unsure who's investigating
2    what.  We've had like three levels of investigation
3    discussed.  Could you clarify the question, please,
4    Paul.
5        MR. MARTINS:  Sure, sure.
6    Q    (By Mr. Martins)  Based on your years of
7    experience and based on the information given to you by Ms.
8    O'Rourke and Ms. Hinkle, and my understanding is that's the
9    sum total of the information that was given to you, correct?
10        MR. DYER:  Object, misstates her testimony.
11        THE WITNESS:  I also spoke with Lynn.
12    Q    (By Mr. Martins)  Ms. Gross?
13    A    Correct.
14    Q    Anything else?
15    A    I counseled with Fred Brown and others that I
16    needed to counsel with, but I don't remember who everybody
17    was.
18    Q    Okay.  Do you agree that good human resources
19    practice would be before terminating an employee who has the
20    performance and potential documented in the evaluations that
21    we've covered that there should be some investigation into
22    the allegations before there is a termination?
23    A    Well, there's really two separate issues going
24    on here.  We were investigating the appropriateness of
25    action that the management -- that the operating management

51

1    wanted to take in terms of Mr. Garner's actions, and so yes,
2    I agree with you that good human resource practice is to

Page 43

1108CARR

3   conduct an appropriate investigation before taking action.

4   The allegations that he made in this memo from Mary to me

5   don't have anything to do with the reasons why Anthem took

6   the action it did with him.

7           Q      When you say from Mary to me, you're referring

8   to Exhibit 10?

9           A      Correct.

10          Q      So am I correct in understanding that the

11  allegations reported to you by Ms. O'Rourke in Exhibit 10

12  play no part in the decision of Anthem to either suspend or

13  terminate Mr. Garner?

14                 MR. DYER:  Can you clarify which allegations.

15           There's three sets of them.

16                 MR. MARTINS:  All of them.

17                 MR. DYER:  You can go ahead.

18                 THE WITNESS:  And I'm trying to answer

19           your question.  If I don't, I'm sure you'll tell me.

20           Part of my role in working with Lynn Gross and Kathy

21           Hinkle and others on this situation with Mr. Garner

22           was to assess the extent to which it made sense to

23           take appropriate action with regard to him.  The

24           actions and comments and behaviors that he was

25           exhibiting were the things I was looking into.  Any

                                                              52

1           allegations that he made in these statements to Mary

2           would have been a whole separate investigation and

3           wouldn't have had anything to do with whether action

4           was taken with regard to him.  Does that make sense?

5           Q      (By Mr. Martins)  I think I'm following what

6   you're saying.  So what is reported in Exhibit 10 plays no

7   part in the decision of Anthem to terminate Mr. Garner; is

                           Page 44

1108CARR

8       that right?

9                   MR. DYER:  Objection.

10                  THE WITNESS:  What do you mean by what is

11          reported?

12          Q       (By Mr. Martins)  The items that are covered

13      in Exhibit 10, the memo from Ms. O'Rourke to you, if I'm

14      understanding your testimony, played no part in the decision

15      of Anthem to terminate Mr. Garner?

16          A       The fact that he would bring up concerns of

17      racism or inappropriate relationships absolutely had nothing

18      to do with his termination.  The fact that he chose to

19      discuss his concerns with a direct report of Ms. Hinkle's

20      and stated that, if I go down I'm taking her down with me,

21      among other comments, those were the things that led to his

22      termination.  It was appropriate for him to bring these

23      kinds of concerns, if he had them, to management or human

24      resources.  It was not appropriate for him to discuss these

25      kinds of things with subordinates of his own manager.

53

1           Q       Did you conduct an investigation, or are you

2       aware of whether Anthem conducted an investigation as to

3       whether or not Mr. Garner actually said to Ms. O'Rourke, if

4       I go down Kathy Hinkle will be going down with me?

5           A       I conducted that from the standpoint of the

6       first place that was reported to me was Kathy Hinkle because

7       Mary went directly to her and was quite upset about it, and

8       then I sat down with Mary and had her tell me what had

9       happened and then asked her to follow up with this.  I had

10      no reason to disbelieve that she was telling me the truth.

11          Q       Did you ever think to ask Mr. Garner if he had

Page 45

1108CARR
12    said that before you made your determination?

13         A    Well, it was discussed with him in this April

14    2nd meeting.

15         Q    No, no.  I'm asking from your standpoint.

16         A    Mr. Garner never -- no, I did not initiate

17    conversation with him about it, and he did not contact me as

18    he was asked to.

19         Q    Let's go as to the second paragraph in Exhibit

20    10, the racism issue.  Did that play any part in Mr.

21    Garner's termination?

22              MR. DYER:  Objection.

23         Q    (By Mr. Martins)  In the decision of Anthem to

24    terminate Mr. Garner?

25              MR. DYER:  Object to the form of the question,

54

1         and it's asked and answered.

2         Q    (By Mr. Martins)  You may answer.

3         A    As I said before, the fact that he brought a

4    concern of racism had absolutely nothing to do with his

5    termination.  The fact that he made inappropriate comments

6    to a subordinate did have to do with his termination.

7         Q    Just so that we're clear, the subordinate

8    you're referring to here is Ms. O'Rourke?

9         A    Correct.

10         Q    Again, with respect to this, as I understand

11    it, you did not talk with Mr. Garner to determine whether or

12    not he had such a conversation with Ms. O'Rourke; is that

13    correct?

14         A    I don't recall.

15         Q    Are you aware that Mr. Garner and Ms. O'Rourke

16    were friends?

1108CARR

17          A     No.

18          Q     Are you aware that Ms. O'Rourke does not

19    recall ever talking to you about these matters?

20          A     Jim, I believe, said earlier today that she

21    doesn't remember having a conversation with me.

22          Q     Okay.  Other than that, are you aware that Ms.

23    O'Rourke has no recollection of talking with you about this?

24          A     I mean, am I aware that she doesn't remember

25    anything?  I wouldn't have any reason to be aware that she

                                                              55

1     doesn't --

2           Q     Well, okay.  It's more specific than that.

3           A     Okay.

4           Q     Are you aware that Ms. O'Rourke has no

5     recollection of talking with you about this matter, the

6     matters in Exhibit 10?

7           A     I still don't know what you're asking.

8                 MR. DYER:  Why don't you ask it another way

9           around, did she have the conversation.

10                MR. MARTINS:  Well, okay.

11                MR. DYER:  She can't know what Mary knows or

12          doesn't know if she hasn't talked to Mary, so I

13          object to the form.

14          Q     (By Mr. Martins)  With respect to third item

15    in Exhibit 10, the intimate relationships allegations, do

16    you have -- as I understand your testimony, you did not

17    discuss this with Mr. Garner, correct?

18          A     Not that I'm aware of.

19          Q     This reference to an underlying investigation

20    with Sue Ulrey, do you see that?

                          Page 47

1108CARR
21          A     Yes.

22          Q     Are you aware that Anthem did this, conducted
23    this investigation and cleared Mr. Garner of any wrongdoing
24    in the underlying investigation?

25          A     In the -- pardon me?

56

1           Q     In the underlying investigation, the
2     investigation that Ms. Ulrey was conducting.

3           A     I knew an investigation was going on.  I'm not
4     sure I knew the outcome of it.  I may have by the time we
5     were meeting with him in April.  But it didn't matter
6     because his termination, again, didn't have anything to do
7     with the investigation.

8           Q     Did Ms. Hinkle indicate to you whether Mr.
9     Garner spoke to anyone else besides Ms. O'Rourke?

10          A     At any point in time?

11          Q     Well, concerning -- you have the memo from Ms.
12    O'Rourke, and you have concerning I guess this inappropriate
13    conduct by Mr. Garner in talking to subordinates, right?

14          A     Correct.

15          Q     That relates to Ms. O'Rourke; you've already
16    explained that?

17          A     Well, as you can see on this April 2nd memo,
18    there were a couple of instances that she, she being Kathy
19    Hinkle, met with him about and a comment to a Julie Townsend
20    and then these comments to Mary O'Rourke.

21          Q     Are you aware of whether Mr. Garner as alleged
22    to have spoken to anyone else besides Ms. O'Rourke?

23          A     I thought I just answered that.

24                MR. DYER:  Also earlier in her testimony as
25          well, so object, asked and answered.
                       Page 48

1108CARR

8    in no way --" you have "no way" underlined, "connected with

9    outcome of investigation."  What investigation are you

10   referring to?

11        A    That would have been the Sue Ulrey internal

12   investigation.

13        Q    And as I understand your testimony, you are

14   not aware that Mr. Garner was cleared in that investigation;

15   is that right?

16        A    I don't recall.

17        Q    Certainly at the time you wrote Exhibit 11,

18   did you know -- I'm sorry.  Did you inquire as to whether

19   the investigation being conducted by Sue Ulrey had been

20   concluded?

21        A    I don't recall.

22        Q    The next bullet point is, "Anthem has decided

23   to terminate your employment."  You wrote that, and then did

24   you pass that on to Ms. Gross?

25        A    She had this whole piece of paper where she

                                                           60

1    had the part where she was supposed to start the meeting at

2    the top.

3         Q    So this in effect is a script for Ms. Gross?

4         A    It's an outline.  It's not that she's expected

5    to say this exactly the way.  This was just normal thing I

6    would do to help a manager through a meeting.

7         Q    The third item is, "Recent actions on your

8    part have demonstrated poor judgment, decision making and

9    professionalism."  What did you mean by that?

10        A    We wanted it to be as clear as possible to Mr.

11   Garner exactly why he was being terminated.  It had to do

                         Page 51

1108CARR

12    with we wanted him to be clear that it didn't have anything

13    to do with the investigation, but it did have everything to

14    do with his behavior, his judgment in terms of talking with

15    people, decision making in terms of talking with people

16    after he was told not to, the insubordination, you know,

17    lack of following management direction and, you know, the

18    whole professionalism that you expect of a member of your

19    management team.  And he was not demonstrating the level of

20    professionalism that's expected of a manager.

21         Q    And am I correct in understanding that at the

22    time you wrote this, you had not talked with Mr. Garner to

23    get his side of it, right?

24         A    I don't believe he contacted me, no.

25         Q    And you did not contact him?

61

1          A    No.  He was told to contact me.

2          Q    At least that's what's on that prior form?

3          A    And I believe he was told that.

4          Q    But you weren't at that meeting?

5          A    No.

6          Q    You said the poor judgment is demonstrated by

7     the continued talking with people, and the people that

8     you're referring to would be Ms. O'Rourke and Ms. Townsend?

9          A    At least, yes.

10         Q    Did you at this point in time when you wrote

11    Exhibit 11, had you talked with Ms. Townsend?

12         A    I don't recall.

13         Q    Do you know whether or not anyone had

14    investigated or, I'm sorry, had talked with Ms. Townsend?

15         A    I don't recall.

16         Q    Insubordination, you used that term.  What was

Page 52

## 1108CARR

17    the insubordination?

18        A    Well, specifically, Kathy Hinkle had counseled
19    him with regard to the inappropriate comments he was making
20    and directed him to stop making inappropriate comments that
21    she felt were hurting morale, possibly interfering with the
22    audit, and she specifically told him don't do that kind of
23    -- you know, don't conduct yourself with that kind of
24    behavior.  And he went out and did exactly what she told him
25    not to do and bad-mouthed her.

0

62

1        Q    This is based on what Ms. Hinkle told you?

2        A    And supported by Mary O'Rourke.

3        Q    "Resulting in lack of confidence by
4    management." That's the last bullet point.  What was the
5    lack of confidence?

6        A    Well, it would have -- lack of confidence
7    would be the inability to trust that he'll carry out
8    directives, act in a professional manner, make good
9    decisions, use good judgment.  Those were the things that
10    caused his leaving the company.

11        Q    This was a man who for six years and nine
12    months had demonstrated good judgment, good performance for
13    the company, good leadership.  Was there any discussion
14    before meeting with Mr. Garner to cover the matters in
15    Plaintiff's Exhibit 11 to discuss some other alternate
16    position to take rather than termination?

17            MR. DYER:  Object to the form of the question.
18        You may answer.

19            THE WITNESS:  I'm confident that we held
20        those discussions because we had several days in

Page 53