ROUGHDRAFTulrey

ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

```
              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION

THE UNITES STATES OF AMERICA, )
ex rel., ANDREW M. GARNER III,)
and ANDREW M. GARNER III,     )
individually,                 )
                              )
              Plaintiffs,     )
                              )
      -vs-                    ) CAUSE NO.
                              ) 1:00-CV-463
ANTHEM INSURANCE COMPANIES,   )
et al.,                       )
                              )
              Defendants.     )
```

DEPOSITION OF SUSAN ULREY

        The deposition upon oral examination of
SUSAN ULREY, a witness produced and sworn before
me, Tara Gandel Hudson, RPR, CRR, CSR #93-R-1039, a
Notary Public in and for the County of Marion,
State of Indiana, taken on behalf of the Defendant
at the offices of BAKER & DANIELS, 600 East 96th
Street, Suite 600, Indianapolis, Marion County,
Indiana, on the 9th day of November, 2005,
commencing at the hour of 11:16 a.m., pursuant to
the Federal Rules of Civil Procedure with written
notice as to the time and place thereof having been
given.

---

Connor+Associates, Inc.
1650 One American Square
Indianapolis, IN 46282
(317)236-6022

2

ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

A P P E A R A N C E S

FOR THE PLAINTIFFS:
The Unites States of America, ex rel., Andrew M.
Garner III, and Andrew M. Garner III, Individually,

Page 1



ROUGHDRAFTulrey
ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

    during the meeting?

A  Yes.

Q  How would you describe Mr. Garner's appearance and demeanor at the outset of the interview?

    MR. KELLER: Objection as to form, lack of foundation.

Q  You may answer.

A  I found Jim to be nervous, concerned that he was being asked to be interviewed. Just seemed nervous.

Q  Did you do anything as a result of that?

A  Tried to put him at ease, make him feel comfortable with the process.

Q  As the interview progressed, did his demeanor change any?

A  I felt he got more comfortable, more confident, more willing to share information, little bit defensive, annoyed that he was being asked to defend courses of action that management had taken, and very annoyed at the fact that actions on his part were being perceived and reported in this manner.

Q  Did you have any trouble getting Mr. Garner to talk?

A  No.

21

ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

Q  Would you describe him as hard to draw information out of or someone who volunteered information?

A  He was very -- he volunteered information quite

Page 17

ROUGHDRAFTulrey

    comfortably. Actually, I would say that once we got going, Jim did most of the talking.

Q    Where did this interview occur in the Anthem offices in Indianapolis?

    MR. KELLER: Objection. Asked and answered.

Q    Where in those offices did it occur?

A    In my office up there on the northwest side in the building that Anthem had up there at the time.

Q    Just briefly describe, as best you can recall, who was sitting where in the office.

A    I sat behind my desk. Jim sat in front of my desk. I got the glass window right there (indicating) and behind Jim's back, in-front-of-my-face kind of thing.

Q    What opportunity did you give Mr. Garner to answer the questions or the bullet points identified in Exhibit 5 aside from the "couch" and "fluff" we've already talked about?

    MR. KELLER: Objection as to the form.

    22

ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

A    Every opportunity. We went through all of them.

Q    At the conclusion of the interview, what did you say to Mr. Garner about whether he had other issues or concerns he might want to raise?

    MR. KELLER: Objection as to form. Obviously leading.

A    At the end of -- my protocol at the beginning of the session and at the end of the session and we've had in between is to ask the people I'm

Page 18

ROUGHDRAFTulrey

interviewing, are they aware of anything unethical or untoward and give them an opportunity to answer those questions.

Q   Ms. Ulrey, sometimes lawyers make objections, and sometimes courts end up ruling on objections, so let me reask the question and ask you to respond as appropriate to the following question:

A   Okay.

Q   What protocol did you have at the beginning and the end of interviews that you conducted, including the interview you conducted with Mr. Garner?

A   I always ask if they are aware of anything unethical or illegal going on in the organization.

23

ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

Q   What response do you recall Mr. Garner giving you when you asked those questions?

A   None. The response was that there were none, not that the response was that he didn't give me a response.

Q   What did you tell Mr. Garner about talking with other employees --

    MR. KELLER: I'm sorry. Could you reread that response?

    MR. DYER: Read the question and the last response.

    (The reporter read the requested question and answer.)

Q   So you were clarifying your answer?

Page 19

ROUGHDRAFTulrey

A   Correct.

    MR. KELLER: Thank you.

Q   What did you tell Mr. Garner about talking with other employees concerning your investigation after he left your office?

    MR. KELLER: Objection as to form, leading.

A   I told him not to discuss the investigation with anybody; that it was confidential.

Q   Let me stop you there and let me withdraw the question and ask it again.

    Would you describe any discussions you had
24
ROUGH DRAFT -- NOT PROOFREAD -- NOT CERTIFIED

with Mr. Garner about communications with other people after he left your office.

A   We informed Jim and everybody that we talked to not to talk about their interviews with anybody else and not to ask anybody any questions with regard to what was going on so that we could continue our investigation.

Q   Describe any communications you had with Mr. Garner during the course of the interview about any conclusions that you had reached with regard to your investigation.

A   I had not reached any conclusions, and I did not discuss any conclusions with anyone. Including Jim.

Q   What is your normal practice with regard to reaching conclusions before completing interviews.

A   I don't.

Q   Describe any communications you had with
Page 20