Garner, III, Andrew M. v. Anthem Insurance Companies, et al.                                    Thomas R. Rasp

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE SOUTHERN DISTRICT OF OHIO
 3                         WESTERN DIVISION
 4                            *  *  *
 5   UNITED STATES OF AMERICA,
 6   ex rel. ANDREW M. GARNER, III,
 7   and ANDREW M. GARNER, III,
 8   individually,
 9              Plaintiffs,
10        vs.                        CASE NO. 1:00CV463
11   ANTHEM INSURANCE COMPANIES,    VOLUME I
12   INC., et al.,
13              Defendants.
14                            *  *  *
15         Deposition of THOMAS R. RASP, Witness
16   herein, called by the Plaintiff for
17   cross-examination pursuant to the Rules of Civil
18   Procedure, taken before me, Kathy S. Wysong, a
19   Notary Public in and for the State of Ohio, at the
20   offices of Sebaly, Shillito + Dyer, 1900 Kettering
21   Tower, Dayton, Ohio, on Friday, November 4, 2005,
22   at 9:09 a.m.
23                            *  *  *
24
25
```

EXHIBIT

Mike Mobley Reporting
937-222-2259

Case 1:00-cv-00463-SAS   Document 65-17   Filed 11/14/2005   Page 2 of 5

Garner, III, Andrew M. v. Anthem Insurance Companies, et al.                                    Thomas R. Rasp

Page 174

1    A. It was -- under the original it was
2    OPM owing to Anthem.
3    Q. And that would have been seven
4    hundred and forty-four thousand and five hundred
5    and sixty-four dollars?
6    A. That is correct.
7    Q. And under the 04/05 submission the
8    amount OPM owed to Anthem decreased to seven
9    hundred and one thousand ninety-six dollars; is
10   that correct?
11   A. Yes.
12   Q. And do you believe the information
13   under the heading 04/05 submission to be accurate?
14   A. Yes.
15   Q. And if you could go back to the -- to
16   Plaintiff's Exhibit 12. Do you have that handy?
17       Under the original FEP 2003 true-up
18   summary OPM owed Anthem four hundred and
19   fifty-eight thousand six hundred and eighty-nine
20   dollars; is that correct?
21   A. Yes.
22   Q. And under the revisions OPM -- the
23   amount OPM owed increased to four hundred and
24   ninety-five thousand two hundred and eighty-eight
25   dollars; is that correct?

Page 175

1    A. Yes.
2    Q. And would it be a fair statement that
3    was -- that change was due in large part to the
4    decrease in admin fees charged to the FEP business
5    line under the 04/05 submission?
6    A. No.
7    Q. No?
8    A. Not in the way I understood you
9    stated it.
10   Q. Do you have an opinion as to why the
11   amount OPM -- the amount OPM owed to Anthem
12   increased under the 04/05 submission?
13   A. Because of the increase in the
14   allocation percentage between the original and the
15   04/05.
16   Q. But isn't there about a fifty
17   thousand dollar decrease in the admin fee charged
18   to FEP business between the original --
19   A. You are correct. I apologize on that
20   one. I -- you got me on that.
21       MR. DYER: Wait a minute. It will go
22   to his head, Tom.
23       THE WITNESS: It's a combination.
24   Yes, you are correct.
25   BY MR. KELLER:

Page 176

1    Q. I said in large part.
2    A. Yes, you are correct. My apologies.
3    Q. Mr. Rasp, the documents we've just
4    reviewed, Plaintiff's Exhibits 13, 12, 9, 8, and
5    11, involve situations where there have been --
6    the necessity has arose to make several updates to
7    the original FEP true-up summaries, correct?
8    A. That is correct.
9    Q. And the need for these revisions was
10   basically, except for the one time that Anthem
11   Midwest provided APM the wrong information, is --
12   would it be fair to say was the inaccuracy of the
13   original FEP true-up?
14   A. Yes.
15   Q. Okay. In your position in APM, does
16   this cause you some concern?
17   A. Yes.
18   Q. And have you taken any steps or
19   changed the way these FEP true-ups are put
20   together -- are drafted since these recent
21   problems have came to your attention?
22   A. We're taking different steps, yes.
23   The process, for the most part, is still -- will
24   still be the same. We're going to ask more
25   questions, try to go to different people, be a

Page 177

1    little more probing on some of the questions when
2    we go back.
3        Some of the changes that we're
4    talking about from the original, questions were
5    asked to different people for information but what
6    we're asking is questions of the same people like
7    us, accountants, accountants that don't have
8    any -- we don't deal with the benefit design.
9    We're not in that part of the area, okay.
10   Q. Yes.
11   A. So we're asking accountant to
12   accountant. Well, we need to go further into
13   that. We need to ask the business environment and
14   ask the businesspeople some of the questions that
15   arose from some of these things here.
16   Q. Is there -- have you developed or are
17   you attempting to develop revised written policies
18   on how to approach the drafting of the FEP
19   true-ups?
20   A. Yes.
21   Q. And are those complete at this point?
22   A. There were drafts that were completed
23   and forwarded on for review, again, at the
24   internal Anthem FEP office.
25   Q. Okay. Do you consider it a FEP issue

Case 1:00-cv-00463-SAS    Document 65-17    Filed 11/14/2005    Page 3 of 5

Garner, III, Andrew M. v. Anthem Insurance Companies, et al.                                    Thomas R. Rasp

Page 178

1  or an APM issue or is there really no difference?
2      A.  The questions are asked and, yes,
3  there are mistakes onto here; and, again, I think
4  it's where we're asking the questions, we're
5  doing -- we are doing a very good job of providing
6  these true-ups.  In the area where we did not have
7  the mail order part of it in here, questions were
8  asked, and, again, we're asking people that --
9  within the FEP that are accountants that are
10 responsible, again, for dealing with numbers that
11 don't have the benefit information.  So you could
12 say that we errored.  FEP errored because we asked
13 the questions, we inquired.  We inquired to the
14 wrong people within there.
15     There are errors -- there are
16 mathematical errors in here where we pulled an
17 incorrect number.  We own those and we're going to
18 own those, you know.  In our review process, as
19 you know, it's very difficult to go through every
20 calculation to make sure; but we go through an
21 effort to try to do our best to make sure that
22 what we have in front of us is the right -- the
23 right amount.  And at that point in time it is
24 what we believe to be the correct calculation and,
25 yes, we have on further review found that we've

Page 179

1  had some errors, you are correct.
2      MR. DYER:  Just for the record, as he
3  said it's difficult to go through every
4  calculation, the witness grabbed Exhibit 9 and
5  thumbed through the approximate seventy-five pages
6  of backup documentation supporting that exhibit.
7  BY MR. KELLER:
8      Q.  The Anthem Prescription Management as
9  an entity was certainly aware that the HMP program
10 involved prescription benefits beginning in 1999,
11 correct?
12     A.  I don't know that I can answer that
13 in 1999, that that -- that Anthem Prescription
14 Management knew that.  And by -- and to clarify a
15 little bit, when membership comes into us, it's --
16 it is a feed from Anthem Midwest.  I don't have
17 somebody that's sitting there saying, okay, who
18 came on today, who left today, through that
19 process to understand or know what membership has
20 been added and eliminated.
21     Q.  Well, in your opinion, where did the
22 ball get dropped as far as failing to include
23 mail-in rebates to the FEP program beginning in
24 1999?
25     MR. DYER:  Objection.

Page 180

1  BY MR. KELLER:
2      Q.  If you have an opinion in that
3  regard.
4      MR. DYER:  Objection.  I think
5  opinion testimony on that question is improper;
6  but in any event, he's already answered so it's
7  asked and answered.
8  BY MR. KELLER:
9      Q.  Subject to the objection, if you have
10 an opinion.
11     A.  I don't know what to answer from a
12 legal -- what I'm --
13     MR. DYER:  You may answer the
14 question if you understood the question; and if
15 you want it read back, you can.  My objections
16 will stand and I will repeat them if it's read
17 back.  So if you need to know what you're
18 answering, that's the main thing.
19     THE WITNESS:  Right.
20     MR. DYER:  You may answer but you
21 need to have the question in mind.  If you want it
22 read back, you can.
23     THE WITNESS:  Please read it back.
24     (Record read.)
25     MR. DYER:  Objections are repeated

Page 181

1  and you may answer.
2      THE WITNESS:  I believe I answered it
3  when I said that I think that Anthem Prescription,
4  myself, and the FEP have an equal blame within
5  there for not taking it and probing further than
6  what we did probe.
7  BY MR. KELLER:
8      Q.  But are you aware of any process in
9  place within APM where there's periodically a
10 review of the benefits that are provided to the
11 members of the respective plans that APM provides
12 services to?
13     A.  Yes, there are -- there are those and
14 there are probably people within APM, as there are
15 probably people -- there have to be people within
16 the FEP that know that there was a mail order
17 benefit, okay.  Those people don't know we're
18 doing a true-up, what we're doing, how we're
19 doing, why we're doing just as we didn't know to
20 go back to those people to ask that question.
21     Q.  What -- is there -- if you know, what
22 is the process by which the benefits provided to
23 the respective plans are reviewed periodically?
24     A.  I don't know the specific answer to
25 that.  I'm not responsible for that type of --

Case 1:00-cv-00463-SAS    Document 65-17    Filed 11/14/2005    Page 4 of 5

Garner, III, Andrew M. v. Anthem Insurance Companies, et al.                                          Thomas R. Rasp

Page 182

1  Q. Do you know who has that
2  responsibility?
3  A. There are probably several people
4  within the organization that have that from
5  different -- different areas. Obviously the
6  benefits have to be loaded into our -- into our
7  systems. Some of that is automated now so there
8  may not be an APM person that touches it. There
9  are also areas that are -- or there are
10 individuals that do have accountability for client
11 management. I would have to believe that a client
12 manager would have known or should have known.
13 Q. In 1988, did word ever come to you --
14 I'm sorry, in 1998, did word ever come to you that
15 mail-in rebates were not being properly credited?
16 A. No.
17 Q. Okay. Mr. Rasp, I'm handing you what
18 we've marked previously as Plaintiff's Exhibit 6,
19 and I'd like to ask you about the calculations in
20 regards to 1996.
21 A. Okay.
22 Q. And we discussed this document
23 previously and I think you indicated that you had
24 put this document together; is that correct?
25 A. That is correct.

Page 183

1  Q. And that was done -- well, it was
2  printed on May 2nd, 2005, correct?
3  A. Yes.
4  Q. And I think you said it was probably
5  put together in or about that time; is that
6  accurate?
7  A. Yes.
8  Q. Based on your review, information at
9  your disposal, you determined that in 1996
10 fifty-seven thousand nine hundred and forty-two
11 dollars in rebates had previously been returned to
12 FEP; is that correct?
13 A. Through the monthly process, yes.
14 Q. Okay. And you further determined
15 that the amount of rebates that would have been
16 attributed to FEP were two hundred and nine
17 thousand five hundred and seventy-three dollars
18 and twenty-eight cents; is that correct?
19 A. Yes.
20 Q. So there was a -- there was -- the
21 amount allocable to FEP/HMP was a hundred and
22 fifty-one thousand six hundred and thirty-one
23 dollars twenty-eight cents; is that correct?
24 A. Yes.
25 Q. Do you know if that amount has been

Page 184

1  returned to OPM?
2  MR. DYER: I believe that was asked
3  and answered earlier.
4  THE WITNESS: I do not remember.
5  BY MR. KELLER:
6  Q. Okay. In putting this information
7  together, did you run across anything that led you
8  to believe that this hundred and fifty-one
9  thousand six hundred and thirty-one dollars and
10 twenty-eight cents had been returned to OPM?
11 A. No.
12 Q. Okay. Do you have any information
13 about how rebates and true-ups were handled from
14 1992 through 1996?
15 A. Not specifics. Only what I would
16 believe would have happened.
17 Q. And let me -- I think I said '96. I
18 meant 1992 through 1995.
19 MR. DYER: I thought he testified
20 about '96 earlier.
21 MR. KELLER: Right.
22 THE WITNESS: Okay.
23 BY MR. KELLER:
24 Q. So, I'm sorry, I didn't mean to
25 interrupt you.

Page 185

1  A. I don't have -- I don't have -- how
2  can I say this? I have the belief that they were
3  done because of the processes that were in place
4  when I was in the corporate cost and budget area.
5  I do not have factual proof that the process was
6  done.
7  Q. Okay. Have you tried to do any
8  research or look to see if you could find any past
9  true-ups for '92 through '95 inclusive?
10 A. No, because in my current role, I'm
11 with APM and that's all the information I have
12 access to, which would have been when it became a
13 legal entity in 1995.
14 Q. Okay. Good point. Do you have an --
15 let's see. That's -- prior to '95 you informed us
16 that there were prescription benefits that were
17 administered and it was done so as a division of
18 CMIC; is that correct?
19 A. That is correct.
20 Q. Okay. You were working for CMIC at
21 that time, correct?
22 A. Yes.
23 Q. Do you have any -- do you know who
24 would have been responsible for putting together
25 true-up summaries from 1992 through 1995 inclusive

250

1  STATE OF OHIO            )
2  COUNTY OF MONTGOMERY )  SS: CERTIFICATE
3        I, Kathy S. Wysong, a Notary Public within
4  and for the State of Ohio, duly commissioned and
5  qualified,
6        DO HEREBY CERTIFY that the above-named
7  THOMAS R. RASP, was by me first duly sworn to
8  testify the truth, the whole truth and nothing but
9  the truth; that said testimony was reduced to
10 writing by me stenographically in the presence of
11 the witness and thereafter reduced to typewriting.
12       I FURTHER CERTIFY that I am not a relative
13 or Attorney of either party nor in any manner
14 interested in the event of this action.
15       IN WITNESS WHEREOF, I have hereunto set my
16 hand and seal of office at Dayton, Ohio, on this
17 __11th__ day of __November__, 2005.
18
19       _Kathy S. Wysong / mm_
         KATHY S. WYSONG, RPR
20       NOTARY PUBLIC, STATE OF OHIO
         My commission expires 12-2-2008
21
22
23
24
25